**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

**Common Cause**,

**Robert Hunter**,

**Service Employees International Union Local 32BJ**,

and

**Empire State 32BJ SEIU PAC**,

Plaintiffs

v.

**Department of Homeland Security**,

**Markwayne Mullin**, Secretary of the Department of Homeland Security, in his official capacity,

**Office of Management and Budget**,

**Russell Vought**, Director of the Office of Management and Budget, in his official capacity,

**Executive Office of the President**,

and

**Susie Wiles**, White House Chief of Staff, in her official capacity,

Defendants

**Case No. 26-cv-8882**

# COMPLAINT

## INTRODUCTION

1. Six weeks before contentious midterm elections, President Trump and members of his administration decided to use taxpayer funds to boost Trump's image, help Republican candidates, and hurt Democratic candidates and causes. At the White House's direction, the Office of Management and Budget shifted funds appropriated to the Department of Homeland Security for "border security, technology, and screening," allocating an additional $20 million for commemorative events related to border security—a category that Congress included to pay respects to officers who died in the line of duty, recognize department anniversaries, and honor victims of crime. But the plan was never to use the funds for those authorized uses. Instead, the day after OMB's budget maneuvering, DHS signed a $20 million contract for the national broadcast of advertisements that praise President Trump and echo attacks that he regularly makes against his Democratic political rivals.

2. The ads are overtly political. One ad is repurposed from Trump's 2024 campaign, and it includes a voiceover of Trump promising to "demolish the 'deep state,'" "drive out the globalists," and "liberate America" from "villains" like "the sick political class" and "fake news media." Another ad jumps between cuts of attacks on socialism and statements of what Trump views as his greatest policy accomplishments—including the largest tax cuts in history. And another ad features the president describing one of his military operations as one of the "most stunning, effective, and powerful displays of . . . competence in American history." These ads mirror those that voters are used to seeing during the height of campaign season, with a jarring difference: Each ends with a disclaimer—"Paid for by the U.S. Government"—that suggests that the federal government has taken sides in the upcoming midterm elections.

3. These ads come on the heels of President Trump stumping for Republican midterm candidates and urging voters to vote in the midterms as if Trump was on the ballot. What's more,

although the ads don't specifically name Democratic candidates, they disparage issues and positions that Trump and Republican candidates have tried time and again to tie to Democratic candidates. So despite the White House's insistence to the contrary, common sense demands what any viewer understands: These ads are not public-service announcements—they are personal publicity and political propaganda through and through.

4. But the founders made clear more than 200 years ago that the executive can spend money only according to Congress's direction. And Congress directed the funds at issue to commemorate fallen public servants, among other things, not to attack the President's political enemies. That is enough to rule in Plaintiffs' favor. But that's not all. Congress has made clear for the last 75 years that, absent explicit Congressional approval, the executive is forbidden to spend taxpayer funds on personal publicity and political propaganda. And it's hard to imagine government ads that flout those prohibitions more than Trump's taxpayer-funded ads.

5. By shifting taxpayer funds to place the government's thumb squarely on the scale before hard-fought elections, Defendants have already caused Plaintiffs (and the integrity of our elections) immense harm. And the President's social-media promise to direct his super PAC to pay for more ads down the road—itself a legally dubious proposition—does nothing to stop the ongoing harm, as the ads continue to run, now.

6. In short, lacking any legal basis, and in the face of explicit legal prohibitions, Defendants are attempting to skew midterm and state elections by using taxpayer dollars to run publicity and propaganda. And without this Court's intervention, Defendants will continue to run nakedly partisan ads that admit they are "Paid for by the U.S. Government" to Plaintiffs' detriment. This Court should enjoin this blatant abuse of authority.

## PARTIES

7. Plaintiff Common Cause is a nonpartisan, grassroots organization organized under the laws of the District of Columbia with a mission to uphold the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves the public interest; to promote equal rights, opportunity, and representation for all; and to empower all people to make their voices heard in the political process. Common Cause has nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. It has members in every congressional district.

8. Plaintiff Robert Hunter is the Democratic Party's nominee for Alabama House District 28. He identifies as a Democratic Socialist.

9. Plaintiff Service Employees International Union Local 32BJ (SEIU 32BJ) is a labor organization headquartered in New York City that represents more than 185,000 building workers, including men and women who work as window cleaners, doormen and women, porters, security guards, janitorial cleaners, and airport workers, across New York, New Jersey, Connecticut, Pennsylvania, Delaware, Maryland, Virginia, Massachusetts, Rhode Island, New Hampshire, Florida, Kentucky, and Washington D.C.

10. Plaintiff Empire State 32BJ SEIU PAC (Empire PAC) is an independent expenditure political action committee established and operated by SEIU 32BJ. Empire PAC is dedicated to achieving electoral outcomes that lead to raising standards at workplaces and improving conditions in communities, such that "working poor" becomes a contradiction in terms. Empire PAC spends money to support progressive, pro-worker candidates and causes without giving money directly to candidates and without coordinating with their campaigns.

11. Defendant Department of Homeland Security is an executive department of the United States and an agency within the meaning of the Administrative Procedure Act (APA), headquartered in Washington, D.C.

12. DHS contains component agencies, including U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.

13. Defendant Markwayne Mullin is the Secretary of the Department of Homeland Security. He is sued in his official capacity.

14. Defendant Office of Management and Budget is an executive department of the United States and an agency within the meaning of the APA, headquartered in Washington, D.C.

15. Defendant Russell Vought is the Director of the Office of Management and Budget. He is sued in his official capacity.

16. Defendant Executive Office of the President is a federal entity, headquartered in Washington, D.C.

17. Defendant Susie Wiles is the White House Chief of Staff and, in that role, leads the Executive Office of the President. She is sued in her official capacity.

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the United States Constitution and the APA, 5 U.S.C. § 551 *et seq.*, and under this Court's inherent equitable authority, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

19. This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

20. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency sued in their official capacity, and Plaintiffs SEIU 32BJ and Empire State 32BJ SEIU PAC reside in this judicial district.

## LEGAL BACKGROUND

### Congress determines the purposes for which taxpayer dollars may be used.

21. The power of the purse rests with Congress. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). Thus, Congress—not the President—is charged with appropriating federal funds and deciding how such funds may be used.

22. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The command is unmistakable—"no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

23. Without the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation[] and might apply all its monied resources at his pleasure." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). The Appropriations Clause thus serves as an essential "limitation" on the President. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 438 (2024). As James Madison wrote, "[t]he power over the purse may [be] the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist, No. 58.

24. This fundamental separation-of-powers principle "is enshrined in" the Purpose Statute, "which commands: 'Appropriations shall be applied only to the objects for which the

appropriations were made except as otherwise provided by law.'" *U.S. Dep't of Navy*, 665 F.3d at 1348 (Kavanaugh, J.) (quoting 31 U.S.C. § 1301(a)).

25. Originally enacted more than 200 years ago, the Purpose Statute "is one of the cornerstones of congressional control over the federal purse." U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law,* at 3–10 (4th ed. 2017), https://perma.cc/NLQ5-G4DA (GAO Red Book); *see* 10 Cong. Ch. 28, § 1, 2 Stat. 535 (Mar. 3, 1809). "Because the Constitution forbids payment of money from the Treasury except as provided by an appropriation, and because an appropriation must be derived from an act of Congress," the Purpose Statute codifies what the Appropriations Clause requires: "it is for Congress to determine the purposes for which an appropriation may be used." GAO Red Book, at 3-10. (citation omitted).

26. Under the Purpose Statute, "[t]he expenditure must bear a logical relationship" to the appropriation relied on by the agency and cannot be otherwise "prohibited by law." *Id*. at 3-16–17.

27. Under the Antideficiency Act, Congress has even prescribed criminal penalties for United States Government employees or officers who "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A).

**Congress has long prohibited the use of public funds for political propaganda.**

***Section 718***

28. For more than 75 years, Congress has repeatedly and firmly established one category of activity it does not fund: publicity and propaganda for political candidates and causes.

29. In annual appropriations acts since 1952, Congress has included a provision that prohibits the use of appropriated funds for unauthorized "publicity or propaganda":

> No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

GAO Red Book, at 3-280–82 (citation omitted). "[L]anguage almost identical" has appeared in every federal appropriations act since 1952. U.S. Gov't Accountability Off., B-302504, *Medicare Prescription Drug, Improvement, and Modernization Act of 2003 - Use of Appropriated Funds for Flyer and Print and Television Advertisements*, at 6 (Mar. 10, 2004), https://perma.cc/PK26-6B8S.[1] Congress enacted the same language in appropriations for Fiscal Years 2025 and 2026.[2]

30. For more than 65 years, the GAO has interpreted this prohibition to cover at least two types of publications: those that are "self-aggrandizing" or "purely partisan in nature." GAO Red Book, at 3-285, 3-293. Agencies may, of course, fund communications "reasonably necessary" to carry out their duties. *Id.* at 3-284. But they may not use taxpayer funds for the "individual glorification" of executive officials, *Appropriations—Limitations—Publicity And Propaganda Prohibition—Labor—Federal Security Appropriation Act, 1952*, 31 Comp. Gen. 311, 313 (1952), or "to emphasize the importance of the agency or activity in question," *id.* at 311. And appropriations may not be used "to aid a political party or candidates." GAO Red Book, at 3-293–94 (quoting *Information Concerning White House Regional Conferences*, B-147578 (Comp. Gen. Nov. 8, 1962)). In short, "[i]t is axiomatic that funds appropriated to carry out a particular program would not be available for political purposes." *Id.* at 3-294.

[1] *See*, *e.g.*, Financial Services and General Government Appropriations Act, 2016, Pub. L. No. 114-113, div. E, title VII, § 718, 129 Stat. 2242, 2477; Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, div. F, title VI, § 624, 118 Stat. 3; Labor-Federal Security Appropriation Act, 1952, Pub. L. No. 134, ch. 373, § 702, 65 Stat. 209, 223.

[2] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E, § 718, 140 Stat. 173, 495; Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. B, title VII, § 718, 138 Stat. 460, 576, as incorporated by Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. 9, 10–12.

***The Hatch Act***

31. In addition, for almost 90 years, the Hatch Act has prohibited federal employees from using their positions to engage in political activities.[3] A federal employee may not engage in "political activity" while "on duty"; "in any room or building occupied in the discharge of official duties"; and "while wearing a uniform or official insignia identifying the office or position of the employee." 5 U.S.C. § 7324(a).[4]

32. The statute covers any activity "directed toward[s] the success or failure of a political party, candidate for partisan political office, or partisan political group," 5 C.F.R. § 734.101, even if it is not express electoral advocacy for or against a political party or candidate. *See* U.S. Off. of Special Couns., *Hatch Act Assessment and Advisory: Partisan Agency Communications During the 2025 Lapse in Appropriations*, at 1 (Sep. 25, 2026); U.S. Off. of Special Couns. *Hatch Act Advisory Opinion Regarding the Use of Presidential Campaign Slogans*, at 1 (June 7, 2023). If a government employee uses his official authority or influence to interfere with or affect the results of an upcoming election, he engages in "political activity" in violation of the Hatch Act. *See* U.S. Off. of Special Couns., *Hatch Act Advisory Opinion Regarding Official Agency Communications*, at 1 (Sep. 5, 2024).

**Congress appropriated funds to DHS, OMB, and EOP for specific purposes—none of which include partisan political advertising.**

***Department of Homeland Security***

33. For Fiscal Year 2026, Congress enacted two DHS appropriations acts. The first funded U.S. Citizenship and Immigration Services, the Federal Emergency Management Agency, the

[3] *See Hatch Act Overview*, U.S. Off. of Special Couns., https://perma.cc/84VV-7NW5.

[4] The Office of Special Counsel has the sole, nondiscretionary power to investigate "any allegation concerning . . . political activity" that is prohibited under the Hatch Act. 5 U.S.C. § 1216(a).

Transportation Security Administration, the Cybersecurity and Infrastructure Security Agency, the Coast Guard, and the Secret Service. Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, 140 Stat. 773, 773–809. The second funded U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement. Secure America Act, Pub. L. No. 119-98, 140 Stat. 837 (2026).

34. Congress appropriated funds to CBP "to hire, pay, train, and equip Border Patrol agents and Border Patrol support personnel" for border security and immigration enforcement operations, and for various specific border security, technology, and screening costs. *Id.*, §§ 101, 103, 201, 140 Stat. at 837–39.

35. Congress did not appropriate any other FY2026 funds to DHS or CBP for political propaganda.[5] The same is true as to FY2027 funds. *See* Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, div. A, § 101, 140 Stat. 987, 987–99 (providing continuing appropriations for FY2027 through December 11, 2026).

36. In Fiscal Year 2025, Congress, in a budget reconciliation act, made multi-year appropriations to DHS, including CBP. Reconciliation Act, Pub. L. No. 119-21, title IX, subtitle A, 139 Stat. 72, 357–61 (July 4, 2025) (H.R. 1). Congress appropriated funds to CBP for expenses related to border infrastructure, personnel, vehicles, and facilities. *Id.*, §§ 90001–02, 139 Stat. at 357–58. Congress also appropriated $6.1 billion to CBP for the following "border security, technology, and screening" expenses: "[p]rocurement and integration of new nonintrusive inspection equipment"; "new platforms for rapid air and marine response capabilities"; "[u]pgrades and procurement of border surveillance technologies along the southwest, northern,

[5] *See also* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 (FY2026 Continuing Resolution), Pub. L. No. 119-37, div. A, 139 Stat. 495, 495–508 (providing FY2026 appropriations from November 12, 2025, through January 30, 2026).

and maritime borders"; expenses related to "biometric entry and exit system"; "Screening persons entering or exiting the United States"; "[i]nitial screenings of unaccompanied alien children"; "[e]nhancing border security by combating drug trafficking"; and "[c]ommemorating efforts and events related to border security." *Id.* § 90004, 139 Stat. at 359.

37. The last item was appropriated for commemorative events like "Line-of-Duty death memorials, Department or agency anniversaries," "commendation ceremonies," and "events recognizing victims of crime." H. Rep. No. 119-106, at 792 (2025). It was meant to be used for "venue and setup, program materials, commemoratives (e.g., plaques, flags, awards); and personnel and services (e.g., honor guard, officiants, security)." *Id.*

***Office of Management and Budget***

38. Congress did not appropriate any funding to OMB for political propaganda. For Fiscal Year 2026, the only relevant appropriation, OMB was appropriated funds for staff salaries and various expenses "to prepare and submit the budget of the United States." FY2026 Appropriations Act, Pub. L. No. 119-75, div. E, title II, 140 Stat. at 452–53.

***Executive Office of the President***

39. Congress did not appropriate any funding to EOP for political propaganda. For Fiscal Year 2026, the only relevant appropriation, EOP was appropriated funds for staff salaries and various operating expenses related to the Executive Residence, including "security," "information resources," "motor vehicles," "heating and lighting," and the like. FY2026 Appropriations Act, div. E, title II, 140 Stat. at 450–56.

40. Political expenses incurred by EOP must be reimbursed by the sponsoring political entity and not be borne by the taxpayers. *Id.*, 140 Stat. at 450. Accordingly, Congress required "each person sponsoring a reimbursable political event" at the White House "to pay in advance an amount equal to the estimated cost of the event" and "the national committee of the political party

of the President to maintain on deposit $25,000, to be separately accounted for and available for expenses relating to reimbursable political events sponsored by such committee during such fiscal year." *Id.*

## FACTUAL ALLEGATIONS

### The administration uses taxpayer funds to pay for advertisements praising President Trump and disparaging political views that he attributes to his political adversaries.

41. According to reporting, on August 7, 2026, President Trump met with Republican strategists who asked the President to use some of the $400 million in MAGA Inc., the super PAC that the President asserts that he controls, to financially support Republicans in tight midterm elections.[6] White House Chief of Staff Susie Wiles participated in the discussion.

42. President Trump asked his assistant, White House staffer Natalie Harp, to show the strategists videos of himself that he liked. "One video showed Dana White, the U.F.C. president, at the 2024 Republican convention, calling [President] Trump 'the toughest, most resilient person that I've ever met.'"[7] According to reporting, President Trump "has talked with delight about that quote repeatedly" since his party's 2024 convention.[8]

43. President Trump told the Republican political strategists that he would travel to support Republican candidates in the midterms, and "also that his presidency needed to be promoted."[9]

44. Weeks later, in late September 2026, "several ads glorifying [President] Trump began appearing across the country."[10] The ads were not, however, funded by the super PAC President

---

[6] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

Trump purports to control—which was the funding source discussed in the August 7 meeting with his Republican strategists.

45. Instead, the ads were paid for by taxpayers, after President Trump told OMB Director Vought "to come up with the money" for the President's advertisements "from within the government."[11]

46. Five taxpayer-funded ads have aired so far, with the administration promising more to come.

47. The ads have aired on both nationwide broadcasts and in local media markets throughout the country, including in Alabama and New York.

***"The Country He Loves"***

48. "The Country He Loves," a 30-second ad, first aired on September 23. It features rapid cuts of photos and videos of President Trump mixed in with text touting what the President views as his accomplishments in office.[12]

49. The text of those supposed accomplishments reads:

a. "LARGEST TAX CUTS IN HISTORY";

b. "REIGNITING AMERICAN MANUFACTURING"; and

c. "DEFEND LAW AND ORDER AND POLICE"

50. Between those messages, the screen repeatedly flashes the words "AMERICA WILL NEVER BE A COMMUNIST COUNTRY."

---

[11] *Id*.

[12] AdImpact Politics (@AdImpact_Pol), X (Sep. 24, 2026, at 11:30 ET), https://x.com/AdImpact_Pol/status/2103145033092432017?s=20.

51. The advertisement also includes audio of President Trump—which is also transcribed on screen—stating: "Together we will defeat Communism, Socialism, and Marxism in America," and "America will never be a Communist country."

52. The ad ends with a voice over—also transcribed on screen—from Dana White, President and CEO of the Ultimate Fighting Championship, describing President Trump: "He is the toughest, most resilient person I've ever met, and nothing was going to stop him from fighting so hard for the country he loves."

53. During the last 10 seconds of the ad, the words "Paid for by the U.S. Government" appear on the bottom of the screen.

54. Throughout the entirety of the ad, a portion of the song "Love Me" by the artist JMSN plays in the background—the sampled portion repeats the lyrics "Love Me."

55. At no point does the ad mention any specific agency or any agency priority.

56. The ad first ran on September 23 on Fox News, including during *Jesse Watters Primetime*, and Newsmax.[13] By September 24, the ad was airing on additional national cable and broadcast networks. For example, the ad ran on CBS over the weekend of September 26-27 during *CBS Face the Nation* and NCAA football games.[14] The ad continues to run on similar programs.

---

[13] Ed O'Keefe & Aaron Navarro, *New Trump-focused "Love Me" ad campaign paid for by taxpayers hits airwaves*, CBS News (Sep. 25, 2026), https://perma.cc/6Z3F-3XP5; Jim DeFede (@DeFede), X (Sep. 23, 2026, at 21:11 ET), https://x.com/DeFede/status/2102928979254792260; Elleiana Green, *Trump administration launches pro-Trump TV ad ahead of midterms*, POLITICO (Sep. 24, 2026); Meridith McGraw, Maggie Severns & Suzanne Vranica, *U.S. Government Airs Pro-Trump, Anti-Communism Ad*, The Wall Street Journal (Sep. 24, 2026), https://perma.cc/H36X-J6H8; Robert Mackey, *White House claims pro-Trump ad it paid Fox to air was 'public service announcement'*, The Guardian (Sep. 25, 2026), https://perma.cc/AL5U-GCV2.

[14] Garrett Downs, *Taxpayer-funded Trump ads draw bipartisan scrutiny ahead of midterms*, CNBC (Sep. 27, 2026), https://perma.cc/E2TG-QSFX.

57. As of 11:00 A.M. eastern on October 7, "The Country He Loves" had aired in 1,315 spots and recorded an estimated 95 million impressions, at an estimated cost to taxpayers of over $1.37 million.[15]

***"Celebrating the Enduring Spirit"***

58. "Celebrating the Enduring Spirit," a 60-second ad, first aired on September 24. It features portions of the speech President Trump delivered at Mount Rushmore over Fourth of July weekend. The video includes clips of Mount Rushmore, as well as clips of President Trump.

59. In the ad, President Trump's voiceover says:

> In all the chronicles of the ages, never before has any nation celebrated so magnificent a triumph as this one. We are the freest people on Earth. And by the grace of God, the United States of America is the most successful, most accomplished, most exceptional nation ever to exist in human history. Liberty has prevailed here because of the culture and character of the people who declared it, defended it, and preserved it. We reach a milestone like no other and celebrate with joyful hearts and soaring spirits because after two and a half centuries, we know that this is not an ending. This is only the beginning of the Golden Age of America.[16]

60. As with the other ads, a disclaimer toward the end of the ad states that it is "Paid for by the U.S. Government."

61. As of 11:00 A.M. eastern on October 7, "Celebrating the Enduring Spirit" had aired in 2,989 spots and recorded an estimated 357 million impressions, at an estimated cost to taxpayers of over $2.71 million.

---

[15] The impression and cost data in this and the following paragraphs come from AdImpact datasets reviewed on the evening of October 6 and morning of October 7, 2026. Spending and impression figures are AdImpact estimates. AdImpact counts a "spot" as a single airing of an advertisement on a single station.

[16] AdImpact Politics (@AdImpact_Pol), X (Sep. 25, 2026, at 08:21 ET), https://x.com/AdImpact_Pol/status/2103459952484323537?s=20.

***"Final Battle"***

62. "Final Battle," a 30-second ad, first aired on September 26. It is identical to an ad that President Trump ran as a campaign ad in 2024. The only difference is that instead of a disclaimer that the ad was funded by the campaign, the ad's disclaimer now reads: "Paid for by the U.S. Government."[17]

63. The ad is a 30-second clip of President Trump walking down a hallway. In a voiceover narration, President Trump says:

> This is the final battle. With you at my side, we will demolish the "deep state." We will expel the warmongers from our government. We will drive out the globalists. We will cast out the communists, Marxists and fascists. We will throw off the sick political class that hates our country. We will rout the fake news media, and we will liberate America from these villains, once and for all.[18]

64. As with the other ads, a disclaimer toward the end of the ad states that it is "Paid for by the U.S. Government."

65. According to reporting, the ad ran on September 26 and 27 across various national platforms, including *Fox News Sunday*, *Saturday Night Live*, and multiple NFL and college football games.[19] The ad continues to run on similar programs.

66. As of 11:00 A.M. eastern on October 7, "Final Battle" had aired in 8,643 spots and recorded an estimated 909 million impressions, at an estimated cost to taxpayers of over $7.90 million.

---

[17] Cynthia Silva, *Trump's 2024 Campaign Ad Returns, With Taxpayers Paying for It*, N.Y. Times (Sep. 27, 2026), https://www.nytimes.com/video/us/politics/100000011178196/trumps-2024-campaign-ad-taxpayers.html.

[18] AdImpact Politics (@AdImpact_Pol), X (Sep. 28, 2026, at 12:50 ET), https://x.com/AdImpact_Pol/status/2104614634325979457?s=20.

[19] Aileen Graef, *White House airs another government-funded ad, this time with Trump warning of 'final battle'*, CNN (Sep. 28, 2026), https://perma.cc/SC4B-GNQU; Bayliss Wagner, *A Trump 2024 Campaign Ad Returns, Now Brought to You by the Government*, N.Y. Times (Sep. 27, 2026), https://perma.cc/R7VD-KWSJ; Tara Suter, *White House airs taxpayer-funded ad talking about 'the final battle'*, The Hill (Sep. 27, 2026), https://perma.cc/P583-A4TN.

***"To the Great Proud People of Iran"***

67. "To the Great Proud People of Iran," a 60-second ad, first aired on September 30 or October 1. It features footage of Trump interspersed with various military clips.

68. The ad reads:

> [Voiceover:] On the orders of the President of the United States, US Central Command, commence Operation Epic Fury. [President Trump:] This regime will soon learn that no one should challenge the strength and might of the United States armed forces. [Secretary Hegseth:] He reminded the world, as he has time and time again, being an American means something unbreakable. If you kill Americans, if you threaten Americans anywhere on earth, we will hunt you down without apology and without hesitation, and we will kill you. We didn't start this war. But under President Trump we are finishing it. Their war on Americans has become our retribution against their Ayatollah. [President Trump:] To the great proud people of Iran, the hour of your freedom is at hand. When we are finished, take over your government. It will be yours to take.[20]

69. As with the other ads, a disclaimer toward the end of the ad states that it is "Paid for by the U.S. Government."

70. As of 11:00 A.M. eastern on October 7, "To the Great Proud People of Iran" had aired in 747 spots and recorded an estimated 26 million impressions, at an estimated cost to taxpayers of over $553,000.

***"Maduro"***

71. "Maduro," a 60-second ad, first aired on October 6. It features clips of Nicolas Maduro interspersed with United States fighter jets and explosions in Caracas, Venezuela. It then cuts to a press conference featuring, among others, Department of Defense Secretary Pete Hegseth, President Trump, and Secretary of State Marco Rubio.

72. The ad reads:

[20] *To the Great Proud People of Iran*, AdImpact, https://platform.adimpact.com/viewer/d4135db4-4cb0-493b-806f-50a4774269ba (last visited Oct. 7, 2026).

> [Joint Chiefs Chairman Caine:] Last night on the order of the President of the United States and in support of a request from the Department of Justice, the United States military conducted an apprehension mission in Caracas, Venezuela to bring to justice two indicted persons, Nicolas and Cecilia Maduro. [Secretary Hegseth:] Nicolas Maduro had his chance until he didn't. He f'ed around and he found out. [President Trump:] This was one of the most stunning, effective, and powerful displays of American military might and competence in American history. [Secretary Rubio:] Look, I don't understand yet how they haven't figured this out. And now if you don't know, now you know, cause this is the way it's gonna play out, and I think people need to understand that this is not a president that just talks and does letters and press conferences and, you know, if he says he's serious about something, he means it, but don't play games. Don't play games with this president's in office because it's not gonna turn out well.[21]

73. As with the other ads, a disclaimer toward the end of the ad states that it is "Paid for by the U.S. Government."

74. As of 11:00 A.M. eastern on October 7, "Maduro" had aired in 277 spots and recorded an estimated 903,000 impressions, at an estimated cost to taxpayers of over $104,000.

**DHS paid for the advertisements with money appropriated for unrelated reasons.**

75. Although the source of the taxpayer funds the administration used to pay for the ads was not initially clear, the *Wall Street Journal* published a breaking story on September 29—almost a week after the ads first started to run—that the ads were paid for by funds from DHS.[22] According to reporting, President Trump and White House Chief of Staff Susie Wiles spoke with DHS Secretary Markwayne Mullin about the ads.[23]

76. In H.R. 1, the budget reconciliation act noted above, Congress appropriated approximately $6.1 billion to CBP for "Border Security, Technology, and Screening." § 90004, 139 Stat. at 359.

---

[21] *Maduro,* AdImpact, https://platform.adimpact.com/viewer/2df9dd4c-1220-485d-babe-f2594f18686c (last visited Oct. 6, 2026).

[22] Tarini Parti, Marianne LeVine & Michelle Hackman, *Homeland Security Money Financed Pro-Trump Television Ads*, The Wall Street Journal (Sep. 29, 2026), https://perma.cc/W6YT-KJ5L.

[23] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

That agency work includes new equipment and technology to combat drug trafficking at ports of entry, upgrades to border surveillance technology, screening of persons entering or exiting the country, enhanced border security, and, as relevant here—"[c]ommemorating efforts and events related to border security." § 90004, 139 Stat. at 359.

77. According to public records, for FY2026, the administration had previously apportioned (that is, set aside for potential future obligation) $500,000 of CBP's budget for commemorative events.[24]

78. On September 19, OMB adjusted CBP's apportionment for commemorative events—increasing it by $20 million.[25]

79. The next day, DHS signed a $20 million contract with LMD, the marketing and advertising agency that is producing and distributing the administration's advertisements.[26]

80. Days later, the ads began to run across the country.

81. Notwithstanding the ads' content, the White House described them as "public service announcements" that are "educational and unapologetically patriotic."[27]

82. But no Defendant has even attempted to explain how a 2024 campaign ad featuring then-candidate Trump walking down a hallway, or an ad featuring the CEO of the Ultimate Fighting Championship praising Trump (which was also from 2024) are in any way aligned with Congress's funding to commemorate "efforts and events related to border security."

---

[24] OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/7SKN-8B7L (last visited Oct. 7, 2026).

[25] *Id.*

[26] *Contract Summary*, USASpending.Gov, https://perma.cc/MB53-7CCC.

[27] Steven Portnoy, Nicholas Kerr & Benjamin Siegel, *White House airs more taxpayer-funded ads promoting Trump*, ABC News (Sep. 28, 2026), https://perma.cc/C2DE-LGFC.

83. As of October 2, the administration had prepared at least thirteen ads celebrating President Trump and attacking Democratic opponents.[28]

**The ads are running on both national networks and in the New York and Alabama local markets.**

84. Trump's taxpayer-funded ads are airing nationwide, including in both the New York and Alabama markets.

85. "Final Battle," for instance, has aired on various national network broadcasts. That national programming has included, among other placements, 1,000 spots during Good Morning America and 541 spots during NFL football. Both those programs are carried in New York and Alabama, as are many of the other national programs during which the government's spots have aired.

86. "Final Battle" has also aired in 59 spots during local New York programming, 5 spots during local Birmingham programming, and several spots during local programming in other Alabama markets.

87. The other ads have similarly aired during local programming in both the New York and Alabama markets.

88. In total, as of 11:00 A.M. eastern on October 7, the government's taxpayer-funded political advertising spree has included at least 13,971 spots and has generated an estimated 1.39 billion impressions. It has cost taxpayers an estimated $12.6 million and counting.

**Taxpayers continue to fund the airing of these ads despite President Trump's vow to pay for the ads himself.**

89. On October 5, President Trump posted on Truth Social that he would "do the Patriotic Ads, among others," and pay for them himself "and with money [he] raised for MAGA, Inc."—

[28] Betsy Klein, *'God made Trump' ad and at least 12 others are part of controversial taxpayer-funded ad campaign*, CNN (Oct. 2, 2026), https://perma.cc/6BPJ-A223.

the super PAC that the President openly describes as under his control, despite federal election law prohibiting such control.[29]

90. President Trump did not, however, acknowledge that funding the ads with taxpayer dollars was illegal; indeed, he said it was "a rather standard thing to do," and a White House official later said that the ads are "nothing new."[30] The President did not state that he would order DHS to stop running the ads and paying for them with the $20 million obligated for the ads. And he did not disavow future obligations from the public fisc, including from the $6.1 billion appropriation from which the original $20 million was obligated, to pay for additional partisan propaganda.[31] Nor has DHS or OMB made any public statement regarding a halt to running the ads.

91. Indeed, the day after President Trump's statement, a White House spokesperson made clear that the administration would not recoup the taxpayer funds for the ads, nor would President Trump ask MAGA Inc. to reimburse the government: "the president's Truth was not referring to reimbursement."[32] And an administration official "confirmed that Trump will only pay for the ads 'moving forward'"—without explaining whether the $20 million obligated for these ads would be fully spent before President Trump or the super PAC that he purports to control begins to cover the costs.[33] President Trump has similarly failed to explain how, as a federal officeholder, he can

[29] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W.

[30] Nicholas Kerr, *Trump says his super PAC will now pay for controversial taxpayer-funded promotional ads*, ABC News (Oct. 6, 2026), https://perma.cc/NY88-BUXY.

[31] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W.

[32] Shane Goldmacher & Maggie Haberman, *Trump Does Not Plan to Reimburse Taxpayers for Promotional Ads*, N.Y. Times (Oct. 6, 2026), https://perma.cc/HVU2-TZDN

[33] Jenna Monnin, *Trump Does Not Plan to Reimburse the Government for Taxpayer-Funded Ads*, The Washington Sun (Oct. 6, 2026), https://perma.cc/A6YK-5K96.

direct a super PAC to spend funds for a particular purpose without violating the Federal Election Campaign Act. *Cf.* 52 U.S.C. § 30125(e)(1)(A).

92. Despite President Trump's claim on the evening of October 5 that he would begin paying for the ads himself, the taxpayer-funded ads—which still state that they are "Paid for by the U.S. Government"—continued on October 6 and 7.

93. "Final Battle," for instance, aired in 773 spots on October 6—over 150 more spots than on October 5. And as of 11 A.M. eastern on October 7, "Final Battle" had already aired that morning in nearly 400 more spots, including 172 spots during "Good Morning America" alone.

94. Each of the other ads that had begun airing before Trump's claim—"Celebrating the Enduring Spirit," "To the Great Proud People of Iran," and "The Country He Loves"—likewise aired on October 6, and the first two had also aired on October 7 as of 11:00 A.M. eastern.

95. And "Maduro" first *began* airing on October 6, one day after Trump's assertion that he would cease the taxpayer-funded advertising. As of 11:00 A.M. eastern on October 7, it had aired in 277 spots and counting, most during "CBS News Mornings."

96. The taxpayer-funded advertisements also have continued to air in the markets most pertinent to Plaintiffs on October 6 and 7. For instance, as of 11:00 A.M. eastern on October 7, "Final Battle" had aired in 723 national network spots, 10 New York local spots, and at least 6 Alabama local spots.

**The advertisements harm Plaintiffs.**

97. The taxpayer-funded ads harm Plaintiffs because they give a "competitive advantage" to candidates, causes, and organizations aligned with the President in the 2026 midterm elections, putting Plaintiffs at a disadvantage. *Fulani v. League of Women Voters Edu. Fund*, 882 F.2d 621, 626 (2d Cir. 1989); *see Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002). By praising President Trump attacking his political adversaries, while Trump urges Americans to

"pretend I'm on the ballot," the ads help the President's party and work against those who oppose him, and do so with the imprimatur of the U.S. government.[34] This unlawful government action forces Plaintiffs to compete on an "illegally structured" political playing field and unfairly advantages their political competitors. *See Shays v. FEC*, 414 F.3d 76, 90–91 (D.C. Cir. 2005).

***Robert Hunter***

98. Plaintiff Robert Hunter is a Democratic Socialist running for office in the Alabama House of Representatives. Hunter's opponent, incumbent Republican state representative Mack N. Butler, campaigns on his alignment with President Trump and opposition to taxes. Butler's website markets him as a "Trump-tested" "Conservative Republican," greeting visitors with a photo of Butler posing with President Trump. Elect Conservative Mack N. Butler for Ala. House District 20, https://perma.cc/3VQX-RQDN.

99. With less than a month left in the campaign, the taxpayer funded and U.S. government endorsed ads are airing in Alabama, broadcasting government-approved praise for Trump and disdain for "socialism," influencing the race in Butler's favor. In doing so, they deprive Hunter of a fair electoral process and place him at a competitive disadvantage. *See Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 77 (2026); *Shays*, 414 F.3d at 85-87.

100. The President's advertisements provide a competitive advantage to Hunter's Republican opponent because Butler is clearly aligned with the President, his party, and his message.

101. That advantage is magnified by the disclaimer that the advertisements are paid for by the federal government because voters often trust the federal government more than individual candidates.

---

[34] Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Alabama Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U.

102. To begin to counteract these advertisements, Hunter would have to expend money to educate voters that this is not normal use of government resources and should not influence their views of the candidates in his race. But Hunter has spent less than $2,000 on advertising for his campaign and cannot match the millions of dollars that the federal government has spent to his disadvantage.

103. If the advertisements are not stopped immediately, the competitive disadvantage Hunter has experienced will continue to compound. Because voting has already started for the general election, the advantages these ads provide Hunter's opponents cannot be remedied after voters cast their ballots.

***SEIU 32BJ***

104. SEIU 32BJ has spent time and resources to campaign for progressive and pro-worker policies that would benefit its members. As part of that effort, SEIU 32BJ has endorsed multiple candidates across 12 states and Washington, D.C., including Democrats who have been labeled socialists or communists by the President and members of his party.

105. For example, President Trump called Janeese Lewis George, the Democratic nominee for Mayor of D.C., a "Communist" in a Truth Social post in which he also vowed to block her policy goals. SEIU 32BJ has endorsed Ms. Lewis George. President Trump has also labeled Senator Cory Booker, another SEIU 32BJ-endorsed candidate, a "socialist." President Trump has also called some SEIU 32BJ-endorsed candidates un-American, claiming that congressional candidates Chris Deluzio and Chrissy Houlahan had engaged in "SEDITIOUS BEHAVIOR, punishable by DEATH" and reposting that they someone should "HANG THEM, GEORGE WASHINGTON WOULD!"

106. To advance its political goals, SEIU 32BJ has established and operates PACs in eight states to participate in their elections as well as one with the Federal Election Commission to participate in federal elections.

107. The PACs support candidates in New York, New Jersey, Connecticut, Pennsylvania, Delaware, Maryland, Virginia, Massachusetts, Rhode Island, New Hampshire, Florida, Kentucky, and Washington D.C., including by making contributions to, or independent expenditures in support of, their campaigns.

108. SEIU 32BJ also uses emails, phone calls, texts, and membership meetings for internal communications to mobilize its membership, asking SEIU 32BJ's 185,000 members to volunteer for its own independent campaigns and those that the union has identified as pro-worker.

109. SEIU 32BJ also sends out its own mailers to remind people to get out and vote. These materials contain links to its website to show the slate of candidates that SEIU 32BJ has endorsed.

110. By touting the President's policies and disparaging those he opposes, the taxpayer-funded ads have "bestowed a benefit" on SEIU 32BJ's "competitive adversaries by rewarding" Trump-aligned candidates and groups with millions of dollars in advertising without extending any funds to plaintiffs or other groups with the same views. *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197.

111. SEIU 32BJ supports candidates that opponents have tried to cast as "socialists," including through its Empire PAC. The taxpayer-funded advertisements are attacks on those pro-worker campaigns that SEIU 32BJ supports, delivered in the name of the U.S. government. This puts those candidates at a serious competitive disadvantage, depicting them as people who the federal government does not trust to join its ranks. Because SEIU 32BJ supports some of these candidates, such as Cait Conley and Tom Suozzi, it also puts SEIU 32BJ and the resources that it

extends to those candidates at a serious disadvantage. No amount of money can be spent to match the powerful message that the "U.S. government" backs the opposition.

112. SEIU 32BJ is thus competitively harmed by the taxpayer funded ads and will continue to be harmed, because the election is already underway, with mail-in voting having begun, and early voting beginning across the country. Every day that these ads continue to run is a day that the federal government attacks some of the pro-worker, progressive candidates and policies SEIU 32BJ has dedicated resources to support, and that those candidates and policies lose voters.

113. In response to these advertisements, SEIU 32BJ will have to (1) double down on its civic engagement for members, explaining that this is not normal use of government resources and that it should not influence their views of the candidates in this election, and (2) raise additional voluntary contributions from members and commit additional treasury funds and use that money strategically to invest in races for candidates who will promote workers' rights.

***Empire PAC***

114. Empire PAC's mission is to achieve electoral outcomes that lead to raised standards at New York workplaces and "improve[d] conditions in our communities so that one day [the phrase] 'working poor' will be a contradiction in terms." Empire State 32BJ PAC, *Independent Spender Profile*, New York City Campaign Finance Board (2025), https://perma.cc/Q4V5-Y5QP.

115. Empire PAC makes independent expenditures to help candidates that support SEIU 32BJ's mission of creating work with dignity for all its members. Empire PAC does all of its spending independent of candidate and political party committees and makes no expenditures coordinated with them.

116. For the 2026 General Election, Empire PAC has made independent expenditures totaling about $20,000 so far to support Democrat Kathy Hochul for Governor, Democrat Letitia James for Attorney General, Democrat Cait Conley for United States House of Representatives in District

17, Democrat Thomas Suozzi for United States House of Representatives in District 3, and Democrat Laura Gillen for United States House of Representatives in District 4. Empire plans to continue making independent expenditures through Election Day, November 3.

117. As part of its independent expenditures in the 2026 election cycle, Empire PAC has paid for advertising in the form of palm cards in support of those candidates.

118. Empire PAC also spends money to support member engagement in support of these candidates, including by phone banking and door knocking.

119. Some of these candidates have been labeled socialists by their opposition. For instance, the National Republican Congressional Committee ("NRCC") has referred to Cait Conley as a "radical Democrat" who is "cozying up to socialists." Similarly, the NRCC has labeled Tom Suozzi, "Socialist Suozzi."

120. Because opponents of candidates Empire PAC supports have tried to cast these candidates as "socialists," and the taxpayer funded advertisements are being aired less than a month before the election, the advertisements are attacks on those pro-worker campaigns that Empire PAC supports.

121. The advertisements also appear to pit the whole of the federal government against these candidates on issues—like criminal justice reform and income inequality—that are at the heart of the platforms of the candidates Empire PAC supports. The advertisements reach the same audience as the palm cards that Empire PAC has created and distributed and convey the opposite message as Empire PAC.

122. Empire PAC already competes in the political marketplace against candidates and other PACs that oppose its message. The President's advertisements provide a competitive advantage to those candidates and PACs because of their clear alignment with the President, his party, and

his message. *See Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197. Moreover, Empire PAC's funds cannot match the millions of dollars that the federal government can command.

123. That advantage will be magnified because of the disclaimer that the advertisements are paid for by the federal government. Voters trust the federal government, particularly when it says that particular people are dangerous.

124. In response to the advertisements, Empire PAC will have to expend money to educate SEIU 32BJ members that this is not a normal use of government resources and that it should not influence their views of the candidates in this election.

125. In addition, if the advertisements are not stopped immediately, Empire PAC will continue to face a competitive disadvantage. Voting has already started and the general election is only a few weeks away. The advantage bestowed by these ads cannot be remedied after voters cast their ballots.

***Common Cause***

126. The decision to use government funds for political propaganda without requesting or obtaining authorization through the normal budgetary process also interferes with Common Cause's core business activities: monitoring budget requests and government spending and, when it identifies unlawful or unethical requests or spending, intervening via legislative tools or seeking redress from appropriate oversight bodies.

127. Common Cause has a long track record of monitoring and seeking redress for the use of taxpayer money for unauthorized publicity and propaganda. In 2004, Common Cause obtained a well-known GAO finding that the covert use of federal funds to produce advertisements without disclosing the government as their source violated the publicity and propaganda prohibition. In October 2025 alone, Common Cause filed 54 complaints with the GAO, agency inspectors general, and Congress alleging that federal agencies used official websites, employee email

systems, and other taxpayer-funded resources for publicity, propaganda, and partisan messaging in violation of the longstanding anti-propaganda prohibition and the Antideficiency Act.

128. To perform this critical work, Common Cause and its members rely on legally required disclosures to take timely appropriate action to stop the misuse of government funds. If Defendants had engaged in the required process to seek Congressional approval for the taxpayer funded ads, DHS would have included the request in a public budget justification, and the President would have submitted it to Congress. *See* 31 U.S.C. § 1105(a), (i).[35] And to authorize the use of federal funds for that purpose, Congress would have had to include an express statement in the federal budget, as Section 718 requires. Had Defendants followed this process, Common Cause would have mobilized in a range of ways, including engaging its nearly one million members and leveraging staff resources. For example, it could have urged Congress not to authorize the use of taxpayer funds in this way, and it could have sought redress through the appropriate channels to prevent misuse of the funds before they were spent. But Defendants' decision to bypass that process has deprived Common Cause of its ability to do so.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Department of Homeland Security and Markwayne Mullin
### Contrary to law and exceeds statutory authority—31 U.S.C. § 1301

129. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

130. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

[35] Even if DHS used other vehicles to seek Congressional authorization, Common Cause would have typically been informed about any proposed legislation granting such authorization and used its resources to prevent it from happening.

131. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up).

132. The Department of Homeland Security is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

133. The contract purchasing President Trump's advertisements is a final agency action subject to judicial review under the APA. *See* 5 U.S.C. § 704. The ad-buy contract "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

134. The Purpose Statute requires that "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301.

135. DHS's ad-buy contract is contrary to the Purpose Statute.

136. Trump's taxpayer-funded ads violate Section 1301 because Congress appropriated the expended funds for "border security, technology, and screening" expenses—not political propaganda that would otherwise be paid for by the President's political organizations. H.R. 1, § 90004, 139 Stat. at 359.

137. These political ads—which praise the President and invite viewers to join him in defeating ideological opponents, using terms he has tied to Democrats, Democratic Socialists, and left-leaning policy positions—are not authorized by Congress's funding to "commemorat[e] efforts and events related to border security." *Id.* Congress intended this specific appropriation for commemorative events like "Line-of-Duty death memorials, Department or agency anniversaries," "commendation ceremonies," and "events recognizing victims of crime." H. Rep. No. 119-106, at 792 (2025).

138. Because Congress has not affirmatively authorized spending on political propaganda, this spending violates Section 1301 separate and apart from Section 718's prohibition on such spending. *United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").

**COUNT II**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Department of Homeland Security and Markwayne Mullin**
**Contrary to law and exceeds statutory authority—Section 718**

139. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

140. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

141. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC*, 596 U.S. at 301 (internal quotation marks and citation omitted).

142. The Department of Homeland Security is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

143. The contract purchasing President Trump's advertisements is a final agency action subject to judicial review under the APA. *See* 5 U.S.C. § 704. The ad-buy contract "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (cleaned up).

144. DHS's ad-buy contract is contrary to Section 718, which applies to all funds appropriated in FY2025 and FY2026. *See* FY2026 Appropriations Act, Pub. L. No. 119-75, div. E, § 718, 140 Stat. at 495 ; FY2024 Appropriations Act, Pub. L. No. 118-47, div. B, title VII, § 718, 138 Stat. at

576, as incorporated by FY2025 Continuing Resolution, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. at 10–12.

145. Section 718 of both acts provides, "No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." FY2026 Appropriations Act, Pub. L. No. 119-75, div. E, § 718, 140 Stat. at 495; FY2024 Appropriations Act, Pub. L. No. 118-47, div. B, title VII, § 718, 138 Stat. at 576.

146. DHS's ads are publicity and propaganda in violation of Section 718. The ads are both "self-aggrandizement" and "purely partisan" communications. GAO Redbook at 3-236–37. Indeed, one substantively reproduces a campaign ad released by President Trump's 2024 presidential campaign.[36] They engage in the "personal glorification" of the President, tout his administration's claimed legislative achievements, and call viewers to "battle" against his opponents, including socialists, "globalists," and the "sick political class." They do not provide any "'information reasonably necessary to the proper administration of the laws' for which [DHS] is responsible." *See* GAO Redbook at 3-284 (quoting 31 Comp. Gen. at 314).

147. Nor are the DHS ads "heretofore authorized by Congress." As alleged above, the ads are not authorized by any DHS appropriation, including H.R. 1, and are contrary to the Purpose Statute. Indeed, the ads do not even mention DHS or any specific program—a telling indication that they advance no purpose for which Congress has appropriated funds to DHS.

148. DHS's decision to obligate funds for the ads thus violates Section 718.

---

[36] Bayliss Wagner, *A Trump 2024 Campaign Ad Returns, Now Brought to You by the Government*, N.Y. Times (Sep. 27, 2026), https://perma.cc/R7VD-KWSJ.

**COUNT III**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Office of Management and Budget and Russell Vought**
**Contrary to law and exceeds statutory authority—31 U.S.C. § 1301**

149. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

150. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

151. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC*, 596 U.S. at 301 (cleaned up).

152. The Office of Management and Budget is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

153. The apportionment of funds to DHS for the purpose of purchasing President Trump's advertisements is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (cleaned up); OMB, Circular A-11 § 120.1 (2025), https://perma.cc/Q6JV-4DTC (apportionments are "legally binding").

154. OMB's apportionment is contrary to 31 U.S.C. § 1301.

155. Section 1301 requires that "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." *Id.*

156. Trump's taxpayer-funded ads violate Section 1301 because Congress appropriated the expended funds for "border security, technology, and screening" expenses—not political propaganda that would otherwise be paid for by the President's political organizations. H.R. 1, § 90004, 139 Stat. at 359.

157. These political ads—which praise the President and invite viewers to join him in defeating ideological opponents, using terms he has tied to Democrats, Democratic Socialists, and left-leaning policy positions—are not authorized by Congress's funding to "commemorat[e] efforts and events related to border security." *Id.* Congress intended this specific appropriation for commemorative events like "Line-of-Duty death memorials, Department or agency anniversaries," "commendation ceremonies," and "events recognizing victims of crime." H. Rep. No. 119-106, at 792 (2025).

158. Because Congress has not affirmatively authorized spending on political propaganda, this spending violates Section 1301 separate and apart from Section 718's prohibition on such spending. *MacCollom*, 426 U.S. at 321 ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.")

**COUNT IV**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Office of Management and Budget and Russell Vought**
**Contrary to law and exceeds statutory authority—Section 718**

159. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

160. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

161. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC*, 596 U.S. at 301 (internal quotation marks and citation omitted).

162. The Office of Management and Budget is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

163. The apportionment of funds to DHS for the purpose of purchasing President Trump's advertisements is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (cleaned up).

164. Section 718 of both acts provides, "No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress."

165. Trump's taxpayer-funded ads are publicity and propaganda in violation of Section 718. The ads are both "self-aggrandizement" and "purely partisan" communications. GAO Redbook at 3-236–37. Indeed, one substantively reproduces a campaign ad released by President Trump's 2024 presidential campaign. They engage in the "personal glorification" of the President, tout his administration's claimed legislative achievements, and call viewers to "battle" against his opponents, including socialists, "globalists," and the "sick political class." They do not provide any "'information reasonably necessary to the proper administration of the laws' for which [DHS] is responsible." *See* GAO Redbook at 3-284 (quoting 31 Comp. Gen. at 314). Indeed, they do not even mention DHS or any specific program.

166. OMB's decision to obligate funds for the ads thus violates Section 718.

**COUNT V**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Department of Homeland Security and Markwayne Mullin**
**Arbitrary and Capricious**

167. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

168. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

169. A decision is arbitrary and capricious where an agency "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. of the United States, Inc v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). DHS's decision is arbitrary and capricious because, among other things, DHS failed to consider the Hatch Act implications of using taxpayer funds for these ads; failed to consider the consequences of diverting funds away from the purposes for which they were appropriated; failed to consider the context in which these ads are being aired, including the proximity to the 2026 midterm elections; failed to consider longstanding GAO interpretations about the prohibition on the use of appropriated funds for "publicity or propaganda"; and offered explanations as to the permissibility of using taxpayer dollars to fund these ads that lack a basis in law and fact.

170. DHS's decision to obligate funds for the ads is thus arbitrary and capricious.

**COUNT VI**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Office of Management and Budget and Russell Vought**
**Arbitrary and Capricious**

171. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

172. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

173. A decision is arbitrary and capricious where an agency "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm.*, 463 U.S. at 43. OMB's decision is arbitrary and capricious because, among other things, OMB failed to consider the Hatch Act implications of using taxpayer funds for these ads; failed to consider the consequences of diverting funds away

from the purposes for which they were appropriated; failed to consider the context in which these ads are being aired, including the proximity to the 2026 midterm elections; failed to consider longstanding GAO interpretations about the prohibition on the use of appropriated funds for "publicity or propaganda"; and offered explanations as to the permissibility of using taxpayer dollars to fund these ads that lack a basis in law and fact.

174. OMB's decision to apportion funds for the ads is thus arbitrary and capricious.

**COUNT VII**
**Ultra Vires**
**All Defendants**

175. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

176. *Ultra vires* review is appropriate "when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up).

177. The purpose statute, 31 U.S.C. § 1301, requires that "Appropriations shall be applied only to the objects for which the appropriations were made." And Section 718 prohibits the use of appropriated funds for "publicity or propaganda" unless expressly authorized by Congress.

178. Congress appropriated to CBP funds related to "border security, technology, and screening." It did not appropriate funds for commercials touting the President's agenda or attacking the President's enemies. So, the ads violate the terms of the appropriation. Defendants in fact ran and funded the ads without any grant of statutory authority whatsoever.

179. And because the ads are little more than puffery, self-aggrandizement, and politics, they are publicity and propaganda, prohibited by Congress for the last 75 years.

**COUNT VIII**
**Violation of the Fifth Amendment**
**Equal Protection Clause**
**All Defendants**

180. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

181. The Fifth Amendment prohibits the federal government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

182. "The Equal Protection Clause addresses all manner of distinctions between persons," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) and "demand[s] that any governmental distinction among groups must be justifiable," *Fullilove v. Klutznick*, 448 U.S. 448, 496 (1980) (Powell, J., concurring). If the government is drawing a classification, then, "[a]t a minimum, [the] classification must be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

183. "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (citation omitted); *see also Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the . . . guarantee of equal protection under the law, . . . settling personal vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government . . . ."), *appeal filed*, No. 25-5241 (D.C. Cir. July 2, 2025).

184. A plaintiff may bring an equal protection claim where "[it] has been intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also*, *e.g.*, *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1021–23 (9th Cir. 2011).

185. These political ads are intended to help Republicans and hurt Democrats in tight elections.

186. By funding these political ads—which promote the President and invite viewers to join him in defeating ideological opponents, using terms he has tied to Democrats and Democratic

Socialists—Defendants have thrown the might of the federal government behind one political party and attacked its opposition.

187. Defendants' reasons for that differential treatment between political parties are arbitrary and irrational. Defendants lack any rational, legitimate, or compelling governmental interest in airing these political ads that put the federal government's thumb on the scale to garner support for the President and Republican candidates weeks away from the 2026 midterm elections.

188. Defendants' differential treatment is motivated by political animus towards Democrats and other left-leaning political organizations, including Plaintiffs.

**COUNT IX**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Department of Homeland Security, Markwayne Mullin, Office of Management and Budget, and Russell Vought**
**Contrary to Constitutional Right**

189. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

190. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

191. As set forth above, DHS and OMB are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

192. As set forth above, OMB's apportionment of funds to DHS, and DHS's obligation of such funds, for the purpose of purchasing President Trump's advertisements are each final agency actions subject to judicial review under the APA, *see* 5 U.S.C. § 704, because they "mark the consummation of the [agencies'] decisionmaking process" and are actions "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (cleaned up).

193. As set forth above, these actions are contrary to the Fifth Amendment because they violate the guarantee of equal protection.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Declare illegal and unconstitutional Defendants' use of public funds to pay for Trump's taxpayer-funded ads, which are unrelated to any purpose for which Congress appropriated money;

b. Vacate and set aside the agency actions using public funds to pay for Trump's taxpayer-funded ads, including:

   i. OMB's September 19 apportionment of funds to pay for the advertisements; and

   ii. DHS's contract with LMD Agency paying for the advertisements;

c. Temporarily restrain, stay pursuant to 5 U.S.C. § 705, and preliminarily and permanently enjoin Defendants from using appropriated funds to pay for the development, creation, or airing of Trump's taxpayer-funded ads;

d. Order Defendants to take all available steps to recover any funds that have been outlaid but not yet expended by any entity that contracted with DHS to develop, create, or air Trump's taxpayer-funded ads;

e. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements deemed appropriate; and

f. Grant such other relief as the Court deems necessary, just, and proper.

October 7, 2026

Respectfully submitted,

/s/_Elena Goldstein__
Elena Goldstein (Bar No. EG8586)
Bradley Girard*
Sean Ouellette*
Michael J. Gaffney*
Anashua Dutta*
Paul R.Q. Wolfson*
Robin F. Thurston*
Democracy Forward

Bruce V. Spiva*
Tara Malloy*
Brent Ferguson*
Sejal Jhaveri*
Renata O'Donnell*
Katherine Hamilton*
Campaign Legal Center Action
1333 New Hampshire Ave. NW

Washington, DC 20036
(202) 736-2200

P.O. Box 34553
Washington, DC 20043
(202) 448-9090
egoldstein@democracyforward.org

Brendan Ballou*
Samuel T. Ward-Packard*
Public Integrity Project Action, Inc.
1763 Columbia Rd. NW, Suite 175
Washington, DC 20009
(917) 684-3900

*Counsel for Plaintiffs*

* Motion to appear pro hac vice forthcoming