**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

**Common Cause** et al.,

Plaintiffs,

v.

**Department of Homeland Security** et al.,

Defendants.

**Case No. 26-cv-8882**

# PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A SECTION 705 STAY

## TABLE OF CONTENTS


Table of Authorities ........ iii

Introduction ........ 1

Legal Background ........ 2

I. Congress determines the purposes for which taxpayer dollars may be used. ........ 2

II. Congress has long prohibited use of appropriated funds for political propaganda. ........ 3

Factual Background ........ 3

I. The taxpayer-funded ads praise President Trump and disparage political views that he attributes to his political adversaries. ........ 3

A. President Trump directs Defendants to find government funds to pay for ads. ........ 3

B. DHS paid for the advertisements with money appropriated for unrelated reasons. ........ 4

C. The ads are running on both national networks and in the New York and Alabama local markets. ........ 5

D. Taxpayers continue to fund the airing of these ads despite President Trump's vow to pay for the ads himself. ........ 8

II. Plaintiffs are harmed by the ads. ........ 10

Argument ........ 10

I. Plaintiffs have standing. ........ 10

A. Plaintiffs have suffered injuries in fact. ........ 11

1. The taxpayer-funded ads injure Robert Hunter. ........ 12

2. The taxpayer-funded ads injure SEIU 32BJ and Empire PAC. ........ 13

B. The injuries are traceable to the challenged actions and redressable. ........ 14

II. Plaintiffs are likely to succeed on the merits of their APA claims. ........ 16

A. Contrary to law and in excess of statutory authority ........ 16

1. Purpose Statute, 31 U.S.C. § 1301 ........ 16

2. Prohibition on "publicity or propaganda," § 718 ........ 18

B. Arbitrary and Capricious ........ 19

III. Plaintiffs are likely to succeed on their Equal Protection Clause claim. ........ 21

IV. Plaintiffs are likely to succeed on their ultra vires claims. ........ 24

V. Plaintiffs will continue to suffer irreparable harm absent a stay or injunction. ........ 25

VI. The balance of equities and public interest favor Plaintiffs. ........ 26

Conclusion ........ 27

# TABLE OF AUTHORITIES

## Cases

*Bolling v. Sharpe*,
347 U.S. 497 (1954) .......... 22

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026) .......... 13

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) .......... 24

*Citizens to Protect Pub. Funds v. Bd. of Educ.*,
13 N.J. 172 (1953) .......... 27

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .......... 22, 23

*Clark v. Jeter*,
486 U.S. 456 (1988) .......... 23

*Consumer Fin. Prot. Bureau v. L. Offs. of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) .......... 2

*Ctr. for Reprod. L. & Pol'y v. Bush*,
304 F.3d 183 (2d Cir. 2002) .......... 11, 13, 14

*D.C. Common Cause v. District of Columbia*,
858 F.2d 1 (D.C. Cir. 1988) .......... 19, 27

*Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) .......... 2, 24

*Espinoza v. Farah Mfg. Co., Inc.*,
414 U.S. 86 (1973) .......... 17

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) .......... 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 24

*Fulani v. League of Women Voters Educ. Fund*,
882 F.2d 621 (2nd Cir. 1989) .......... 11, 12, 14, 15

*Fullilove v. Klutznick*,
448 U.S. 448 (1980) .......... 23

*Gov't Emps. Ins. Co. v. Patel*,
166 F.4th 280 (2d Cir. 2026), *petition for cert. filed*, *Patel v. Gov't Emps. Ins. Co.*, No. 26-85 (U.S. July 20, 2026) .......... 25

*Guertin v. United States*,
743 F.3d 382 (2d Cir. 2014) .......... 15

*Harper v. Va. Bd. of Elections*,
383 U.S. 663 (1966) .......... 22

*In re U.S. Cath. Conf.*,
885 F.2d 1020 (2d Cir. 1989) .......... 11

*Jones v. United States*,
526 U.S. 227 (1999) .......... 18

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 25

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 25, 26

*Motor Vehicle Mfrs. Assoc. of the United States, Inc v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 19

*Mountain States Legal Found. v. Denver Sch. Dist. No. 1*,
459 F. Supp. 357 (D. Colo. 1978) .......... 27

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 11

*N.Y. Progress & Protection PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .......... 2, 25

*New York v. Trump*,
490 F. Supp. 3d 736 (S.D.N.Y. 2020) .......... 26

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 24

*OPM v. Richmond*,
496 U.S. 414 (1990) .......... 27

*Owen v. Mulligan*,
640 F.2d 1130 (9th Cir. 1981) .......... 12-13

*Perkins Coie LLP v. DOJ*,
783 F. Supp. 3d 105 (D.D.C. 2025) .......... 23

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) .......... 26

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) .......... 11, 13

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019), *stay granted*, 140 S. Ct. 1 (2019) (mem.) .................. 27

*Soule v. Connecticut Ass'n of Schs., Inc.*,
90 F.4th 34 (2d Cir. 2023) .................................................................................. 15

*Stanson v. Mott*,
17 Cal. 3d 206 (1976) ........................................................................................ 27

*Swanson v. City of Chetek*,
719 F.3d 780 (7th Cir. 2016) .............................................................................. 23

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)............................................................................................ 16

*United States v. MacCollom*,
426 U.S. 317 (1976)............................................................................................ 18

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)............................................................................................ 14

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000)............................................................................................ 21

*Walden v. Kosinski*,
153 F.4th 118 (2d Cir. 2025) .............................................................................. 10

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ................................................................................ 26

*Weinberger v. Weisenfeld*,
420 U.S. 636 (1975).........................................................................................21-22

*West Virginia v. EPA*,
597 U.S. 697 (2022)............................................................................................ 17

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ........................................................................................ 2

U.S. Const. art. I, § 9, cl. 7 ........................................................................................ 2

**Statutes**

5 U.S.C. § 705 ........................................................................................................ 27

5 U.S.C. § 706 ........................................................................................... 16, 19, 24

5 U.S.C. § 7324 ...................................................................................................... 20

31 U.S.C. § 1301 ......................................................................................... 2, 16, 24

31 U.S.C. § 1517 .......... 15, 16

52 U.S.C. § 30101 *et seq.* .......... 8

52 U.S.C. § 30125 .......... 8

10 Cong. Ch. 28, § 1, 2 Stat. 535 (Mar. 3, 1809) .......... 3

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173 .......... 3, 18, 24

Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, 140 Stat. 987 (2026) .......... 16

Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (2025) .......... 16

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 .......... 3, 18, 24

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 .......... 3, 18, 24

Reconciliation Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) (H.R. 1) .......... 4, 5, 17, 20

Secure America Act, Pub. L. No. 119-98, 140 Stat. 837 (2026) .......... 16

**Rules**

Fed. R. Civ. P. 65 .......... 15

**Regulations**

5 C.F.R. § 734.101 .......... 20

**Legislative Materials**

H. Rep. 119-106 (2025) .......... 17

*House Homeland Security Hearing*, Rev (May 15, 2025), https://perma.cc/8HY6-RVPV .......... 20

**Other Authorities**

*Acting Comptroller General Fisher to the Chairman, NLRB*, 31 Comp. Gen. 311 (1952) .......... 18, 19

AdImpact Politics (@AdImpact_Pol), X (Sep. 24, 2026, at 11:30 ET), https://x.com/AdImpact_Pol/status/2103145033092432017?s=20 .......... 5, 6

AdImpact Politics (@AdImpact_Pol), X (Sep. 25, 2026, at 08:21 ET), https://x.com/AdImpact_Pol/status/2103459952484323537?s=20 ........................ 6, 23

AdImpact Politics (@AdImpact_Pol), X (Sep. 28, 2026, at 12:50 ET), https://x.com/AdImpact_Pol/status/2104614634325979457?s=20 .............................. 7

Aileen Graef, *White House airs another government-funded ad, this time with Trump warning of 'final battle'*, CNN (Sep. 28, 2026), https://perma.cc/SC4B-GNQU ........................................................................................................... 5

America Will Never Be A Socialist/Communist Country, The White House (Sep. 11, 2026), https://www.whitehouse.gov/videos/america-will-never-be-a-socialist-communist-country/.......................................................................... 6

Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Alabama Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U ...................... 11, 21

Associated Press, *Trump Decries Democrats as 'Communists,' Even as He Looks to Impress China's Communist Leader*, U.S. News (Sep 20, 2026), https://perma.cc/J9SM-C5XQ......................................................................... 7

Bayliss Wagner, *A Trump 2024 Campaign Ad Returns, Now Brought to You by the Government*, N.Y. Times (Sep. 27, 2026), https://perma.cc/R7VD-KWSJ ..... 5, 19

Betsy Klein, *'God made Trump' ad and at least 12 others are part of controversial taxpayer-funded ad campaign*, CNN (Oct. 2, 2026), https://perma.cc/6BPJ-A223 ......................................................................... 8

*Contract Summary*, USASpending.Gov, https://perma.cc/MB53-7CCC .......................... 5

*DHS and Secretary Mullin Mark One Year Anniversary of Historic Big Beautiful Bill*, Homeland Security (July 4, 2026), https://perma.cc/CZP2-7NKR..................... 20

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W....................................................................... 8, 9

*Elect Conservative Mack N. Butler for Ala. House District 28*, https://perma.cc/3VQX-RQDN ............................................................... 10, 12

*Empire State 32BJ PAC, Independent Spender Profile*, N.Y.C. Campaign Fin. Bd. (2025), https://perma.cc/Q4V5-Y5QP ............................................................ 13, 14

*Empire State 32BJ SEIU PAC, Independent Spender: Expenditures*, N.Y.C. Campaign Fin. Bd. (2025), https://perma.cc/6KFN-KUMV ..................................... 14

GAO, B-302504, *Medicare Prescription Drug, Improvement, and Modernization Act of 2003 - Use of Appropriated Funds for Flyer and Print and Television Advertisements* (Mar. 10, 2004), https://perma.cc/PK26-6B8S.................................... 3

GAO, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (Sept. 2005), https://perma.cc/2HC2-YZWD ........................................................... 16

Garrett Downs, *Taxpayer-funded Trump ads draw bipartisan scrutiny ahead of midterms*, CNBC (Sep. 27, 2026), https://perma.cc/E2TG-QSFX ............................... 5

Jenna Monnin, *Trump Does Not Plan to Reimburse the Government for Taxpayer-Funded Ads*, The Washington Sun (Oct. 6, 2026), https://perma.cc/A6YK-5K96 ........................................................................................................................ 9

John T. Woolley, *The 2022 Midterm Elections: What the Historical Data Suggest*, The American Presidency Project (Aug. 30, 2022), https://perma.cc/W8QJ-6MAK ...................................................................................................................... 12

Josephine Walker, *Trump to pay for controversial TV ads after DNC sues*, https://www.axios.com/2026/10/07/dnc-trump-lawsuit-taxpayer-funded-ads ............. 9

Laurie Kellman, *Trump brands his opponents as 'communists,' stirring up an American history of fear*, L.A. Times (May 4, 2025), https://perma.cc/VRL4-HAEU ......................................................................................................................... 7

*Maduro*, AdImpact, https://platform.adimpact.com/viewer/2df9dd4c-1220-485d-babe-f2594f18686c (last visited Oct. 6, 2026)............................................................. 8

Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.................................................................................................................... 3, 4

Nandita Bose, *Trump invokes communism 81 times in two weeks as aides test midterms message*, Reuters (July 8, 2026), https://perma.cc/R8YS-SPKP .................. 7

Nicholas Kerr, *Trump says his super PAC will now pay for controversial taxpayer-funded promotional ads*, ABC News (Oct. 6, 2026), https://perma.cc/NY88-BUXY ......................................................................... 9

OMB, Circular A-11 § 120.1 .......................................................................... 16

OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/7SKN-8B7L .......................................................................... 5

Pollock And Pollock News Channel, *Donald Trump 2024 Presidential Pounding Powerful Ad "The Final Battle"* (YouTube, April 14, 2024), https://www.youtube.com/watch?v=pxZwMG3hse4 ............................................ 7, 19

*President Trump Defends Taxpayer-Funded Ads, Says He's Promoting the Country*, C-Span (Sep. 30, 2026), https://www.c-span.org/clip/white-house-event/president-trump-defends-taxpayer-funded-ads-says-hes-promoting-the-country/5207706 ........................................................................................... 21

*Secretary of State Wes Allen Announces Start of Absentee Voting in Alabama*, Ala. Sec'y of State (Sept. 9, 2026), https://perma.cc/5ZPH-RYTA ........................... 25

Shane Goldmacher & Maggie Haberman, *Trump Does Not Plan to Reimburse Taxpayers for Promotional Ads*, N.Y. Times (Oct. 6, 2026), https://perma.cc/HVU2-TZDN ........ 9

Steven Portnoy et al, *Pro-Trump ad campaign was financed by DHS: Sources*, Eyewitness News ABC 7 (Sep. 30, 2026), https://perma.cc/M8UU-65L3 ........ 21

Tara Suter, *White House airs taxpayer-funded ad talking about 'the final battle'*, The Hill (Sep. 27, 2026), https://perma.cc/P583-A4TN ........ 5

Tarini Parti, Marianne LeVine & Michelle Hackman, *Homeland Security Money Financed Pro-Trump Television Ads*, *The Wall Street Journal* (Sep. 29, 2026), https://perma.cc/W6YT-KJ5L ........ 4

*To the Great Proud People of Iran*, AdImpact, https://platform.adimpact.com/viewer/d4135db4-4cb0-493b-806f-50a4774269ba (last visited Oct. 7, 2026) ........ 7

*Topic: Endorsement*, 32BJ SEIU, https://perma.cc/4RQS-PCVL ........ 13

U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law* (4th ed. 2017), https://perma.cc/NLQ5-G4DA ........ 2, 3, 18, 19

U.S. Off. of Special Couns., *Hatch Act Advisory Opinion Regarding the Use of Presidential Campaign Slogans* (June 7, 2023) ........ 20

U.S. Off. of Special Couns., *Hatch Act Assessment and Advisory: Partisan Agency Communications During the 2025 Lapse in Appropriations* (Sep. 25, 2026) ........ 20

*What's at Stake in the 2026 Midterm Elections*, 32BJ SEIU, https://perma.cc/WX53-9HR6 ........ 14

William A. Galston, *Commentary: What History Tells Us About the 2026 Midterm Elections*, Brookings (Aug. 28, 2025), https://perma.cc/5NML-G3AJ ........ 11, 12

## INTRODUCTION

Despite public statements implying otherwise, Defendants continue to run partisan political ads, funded by U.S. taxpayers, in this midst of the ongoing state and federal election period. At the White House's direction, the Office of Management and Budget (OMB) shifted $20 million in funds that Congress directed U.S. Customs and Border Protection (CBP) to use to commemorate its work—including honoring fallen federal agents—to instead praise President Trump and attack his perceived political enemies. Each ad states that it was "Paid for by the U.S. Government," giving the ads' pro-Trump, political message the official imprimatur of the government. And because the President has repeatedly reminded midterm voters to vote as if he were on the ballot, the message is clear.

These ads are causing Plaintiffs immense and irreparable harm. Robert Hunter is a Democratic Socialist candidate for state office in Alabama with an opponent who has explicitly tied himself to Trump's policies. Likewise, Service Employees International Union Local 32BJ (SEIU 32BJ) and its affiliated Empire State 32BJ SEIU PAC (Empire PAC) work to advance progressive and pro-worker policies. SEIU 32BJ has endorsed candidates that Trump has called "Communist," "Socialist," and "Seditious." And Empire PAC has spent money to independently support candidates that Republicans have likewise called socialists and radicals. Every time a potential voter sees the taxpayer-funded ads, they are told that the U.S. Government's stance is that Plaintiffs' positions are wrong and anti-American. The government cannot ever put its thumb on the scale in that way. But to do so weeks before an election is breathtakingly unlawful.

Emergency relief is needed now. After the once-secret source of the ads' funding became public, President Trump said that he would pay for them himself (or direct his super PAC to pay for them, which he cannot legally do). But he later said that he meant he would pay for *future* ads. So the ads keep running. Other than anonymous reports about when the ads might stop, the

government has not committed to ending the ads on any particular date. Indeed, the ads continue to run today. Without a Section 705 stay and a temporary restraining order, and as they are making final decisions about their votes, voters across the country will see the taxpayer-funded propaganda during some of the most-popular tv programing, including NFL and NCAA football and weekend national news shows like *CBS Face the Nation*. No final judgment—or even late preliminary relief—could mend the resulting harms. After all, "timing is of the essence in politics" and relief delayed by "even a day or two may be intolerable." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).

## LEGAL BACKGROUND

### I. Congress determines the purposes for which taxpayer dollars may be used.

The power of the purse rests with Congress. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). "Congress's control over federal expenditures is absolute." *Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (cleaned up). Under the Appropriations Clause, Art. I, § 9, cl. 7, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Consumer Fin. Prot. Bureau v. L. Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 181 (2d Cir. 2023) (citation omitted).

This fundamental separation-of-powers principle "is enshrined in" the Purpose Statute, "which commands: 'Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *Dep't of the Navy*, 665 F.3d at 1348 (quoting 31 U.S.C. § 1301(a)). "Because the Constitution forbids payment of money from the Treasury except as provided by an appropriation, and because an appropriation must be derived from an act of Congress," the Purpose Statute—which was originally enacted over 200 years ago—codifies what the Appropriations Clause requires: "it is for Congress to determine the purposes for

which an appropriation may be used." U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law,* at 3-10 (4th ed. 2017), https://perma.cc/NLQ5-G4DA (GAO Redbook); *see* 10 Cong. Ch. 28, § 1, 2 Stat. 535 (Mar. 3, 1809).

**II. Congress has long prohibited use of appropriated funds for political propaganda.**

In annual appropriations acts since 1952, Congress has included a provision that prohibits the use of appropriated funds for unauthorized "publicity or propaganda":

> No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

GAO Red Book, at 3-280 (citation omitted). "[L]anguage almost identical" has appeared in every federal appropriations act since 1952. GAO, B-302504, *Medicare Prescription Drug, Improvement, and Modernization Act of 2003 - Use of Appropriated Funds for Flyer and Print and Television Advertisements*, at 6 (Mar. 10, 2004), https://perma.cc/PK26-6B8S. Congress enacted the same language in appropriations for Fiscal Years 2025 and 2026.[1]

## FACTUAL BACKGROUND

**I. The taxpayer-funded ads praise President Trump and disparage political views that he attributes to his political adversaries.**

**A. President Trump directs Defendants to find government funds to pay for ads.**

On August 7, 2026, President Trump met with Republican strategists who asked the President to use some of the $400 million in MAGA Inc., the super PAC that the President asserts that he controls, to financially support Republicans in tight midterm elections.[2] During the meeting, the

[1] Consolidated Appropriations Act, 2026 , Pub. L. No. 119-75, div. E, § 718, 140 Stat. 173, 495 (FY2026 Appropriations Act); Further Consolidated Appropriations Act, 2024 , Pub. L. No. 118-47, div. B, title VII, § 718, 138 Stat. 460, 576 (FY2024 Appropriations Act), as incorporated by Full-Year Continuing Appropriations and Extensions Act, 2025 , Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. 9, 10–12 (FY2025 Continuing Resolution).

[2] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

President asked his assistant to show the strategists videos of himself that he liked, including one of the Ultimate Fighting Championship President, Dana White, "at the 2024 Republican convention, calling [President] Trump 'the toughest, most resilient person that I've ever met.'"[3] President Trump told the Republican political strategists that he would travel to support Republican candidates in the midterms, and "also that his presidency needed to be promoted."[4]

Weeks after this meeting, "several ads glorifying [President] Trump began appearing across the country."[5] Despite the President's statements at the August 7 meeting, these ads were not funded by the super PAC over which the President purports to exert control. Instead, the taxpayers footed the bill, after President Trump told OMB Director Vought "to come up with the money" for the President's advertisements "from within the government."[6]

### B. DHS paid for the advertisements with money appropriated for unrelated reasons.

On September 29, almost a week after the ads first started airing, the *Wall Street Journal* published a breaking story that the ads were paid for by funds from DHS.[7] According to reporting, President Trump and White House Chief of Staff Susie Wiles spoke with DHS Secretary Markwayne Mullin about the ads.[8] The funds specifically came from the approximately $6.1 billion Congress appropriated to CBP for "Border Security, Technology, and Screening" in H.R. 1. § 90004, 139 Stat. at 359. Congress appropriated those funds for new equipment and technology

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id*.

[7] Tarini Parti, Marianne LeVine & Michelle Hackman, *Homeland Security Money Financed Pro-Trump Television Ads*, The Wall Street Journal (Sept. 29, 2026), https://perma.cc/W6YT-KJ5L.

[8] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

to combat drug trafficking at ports of entry, upgrades to border surveillance technology, screening of persons entering or exiting the country, enhanced border security, and, as relevant here, "[c]ommemorating efforts and events related to border security." § 90004, 139 Stat. at 359. OMB had previously apportioned $500,000 of these funds for commemorative events.[9] But on September 19, OMB increased this apportionment by $20 million.[10] The next day, DHS signed a $20 million contract with advertising agency LMD.[11] Days later, the ads began to run nationwide.

### C. The ads are running on both national networks and in the New York and Alabama local markets.

Five taxpayer-funded ads have aired so far, with the administration promising more to come. The ads began to air on September 23, 2026, and are continuing to this day.[12] They have aired on nationwide broadcasts, including *Fox News Sunday*, *Saturday Night Live*,[13] NCAA football games, and *CBS Face the Nation*,[14] and in local media markets throughout the country, including in Alabama and New York.[15] Each of the five ads includes the same statement at the end: "Paid for by the U.S. Government."

---

[9] OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/7SKN-8B7L.

[10] *Id.*

[11] *Contract Summary*, USASpending.Gov, https://perma.cc/MB53-7CCC.

[12] Ward-Packard Decl. ¶¶ 6, 18-22; AdImpact Politics (@AdImpact_Pol), X (Sep. 24, 2026, at 11:30 ET), https://x.com/AdImpact_Pol/status/2103145033092432017?s=20.

[13] Aileen Graef, White House airs another government-funded ad, this time with Trump warning of 'final battle', CNN (Sep. 28, 2026), https://perma.cc/SC4B-GNQU; Bayliss Wagner, A Trump 2024 Campaign Ad Returns, Now Brought to You by the Government, N.Y. Times (Sep. 27, 2026), https://perma.cc/R7VD-KWSJ; Tara Suter, White House airs taxpayer-funded ad talking about 'the final battle', The Hill (Sep. 27, 2026), https://perma.cc/P583-A4TN.

[14] Garrett Downs, Taxpayer-funded Trump ads draw bipartisan scrutiny ahead of midterms, CNBC (Sep. 27, 2026), https://perma.cc/E2TG-QSFX.

[15] Ward-Packard Decl. ¶¶ 14-17, 21-22.

The first ad, "The Country He Loves," aired on September 23. It features a voiceover from President Trump saying, "we will defeat Communism, socialism, and Marxism in America." It also includes rapid cuts of photos and videos of President Trump mixed in with text touting what the President views as his accomplishments in office, including the "largest tax cuts in history," "reigniting American manufacturing," and "defend law and order and police."[16] Between those messages, the screen repeatedly flashes the words "America will never be a communist country." The ad ends with a voice over—also transcribed on screen—from Dana White, President and CEO of the Ultimate Fighting Championship, describing President Trump: "He is the toughest, most resilient person I've ever met, and nothing was going to stop him from fighting so hard for the country he loves." The ad does not mention any specific agency or agency priority. Throughout the ad, a portion of the song "Love Me" plays in the background, repeating the lyrics "Love Me" throughout. The same advertisement is currently posted on the White House website, without the "Paid for by the U.S. Government" disclaimer.[17]

The second ad, "Celebrating the Enduring Spirit," first aired on September 24. It features portions of the speech President Trump delivered at Mount Rushmore over Fourth of July weekend, including the line "[l]iberty has prevailed here because of the culture and character of the people who declared it, defended it, and preserved it."[18] The video includes clips of Mount Rushmore, as well as clips of President Trump.

The third ad, "Final Battle," which first aired on September 26, is almost identical to an ad that President Trump ran as a campaign ad in 2024. The only difference is the current ad includes

---

[16] AdImpact Politics (@AdImpact_Pol), X (Sep. 24, 2026, at 11:30 ET), https://x.com/AdImpact_Pol/status/2103145033092432017?s=20.

[17] America Will Never Be A Socialist/Communist Country, The White House (Sep. 11, 2026), https://www.whitehouse.gov/videos/america-will-never-be-a-socialist-communist-country/.

[18] AdImpact Politics (@AdImpact_Pol), X (Sep. 25, 2026, at 08:21 ET), https://x.com/AdImpact_Pol/status/2103459952484323537?s=20.

the "Paid for by the U.S. Government" state at the end. In the ad, President Trump walks down a hallway, while he makes a series of remarks in a voiceover, including "we will demolish the 'deep state,'" "cast out the communists, Marxists and fascists," and "rout the fake news media."[19] President Trump has regularly used those labels refer to Democrats.[20] He has made his strategy clear: "[a]ll we have to do," he has told reporters, "is define our opponent as being a communist or a socialist or somebody who is going to destroy our country."[21]

The fourth ad, "To the Great People of Iran," first aired on September 30 or October 1. The ad features footage of Trump interspersed with various military clips and features messages from the President and Department of Defense Secretary Pete Hegseth extolling the U.S. war in Iran.[22]

The last ad to date, "Maduro," first aired on October 6. As the name indicates, the ad focuses on the U.S. operation to capture Venezuelan President Nicolás Maduro in January 2026. It features clips of Maduro interspersed with United States fighter jets and explosions in Caracas, Venezuela. It then cuts to a press conference featuring, among others, Defense Secretary Pete Hegseth,

---

[19] *Compare* AdImpact Politics (@AdImpact_Pol), X (Sep. 28, 2026, at 12:50 ET), https://x.com/AdImpact_Pol/status/2104614634325979457?s=20 *with* Pollock And Pollock News Channel*, Donald Trump 2024 Presidential Pounding Powerful Ad "The Final Battle"* YouTube (April 14, 2024), https://www.youtube.com/watch?v=pxZwMG3hse4 (2024 campaign ad).

[20] *See*, *e.g.*, Associated Press, *Trump Decries Democrats as 'Communists,' Even as He Looks to Impress China's Communist Leader*, U.S. News (Sep 20, 2026), https://perma.cc/J9SM-C5XQ; Nandita Bose, *Trump invokes communism 81 times in two weeks as aides test midterms message*, Reuters (July 8, 2026), https://perma.cc/R8YS-SPKP.

[21] Laurie Kellman, Trump brands his opponents as 'communists,' stirring up an American history of fear, L.A. Times (May 4, 2025), https://perma.cc/VRL4-HAEU

[22] To the Great Proud People of Iran, AdImpact, https://platform.adimpact.com/viewer/d4135db4-4cb0-493b-806f-50a4774269ba (last visited Oct. 7, 2026).

Secretary of State Marco Rubio, and President Trump, who lauded the "stunning, effective, and powerful displays of American military might."[23]

According to AdImpact tracking data, "as of 11 a.m. eastern on October 8, the government's taxpayer-funded political advertising spree has included at least 16,254 spots and ha[s] generated an estimated 1.56 billion impressions."[24] It "ha[s] cost taxpayers an estimated $15.4 million and counting."[25] And Defendants have prepared at least seven additional ads, all with similar content, that have yet to air.[26]

### D. Taxpayers continue to fund the airing of these ads despite President Trump's vow to pay for the ads himself.

On October 5, the President posted on social media that he would pay for these ads himself "and with the money [he] raised for MAGA, Inc." [27]—the super PAC that the President openly describes as under his control, despite federal election law prohibiting such control.[28] But he has not said that he will take the taxpayer-funded ads off the air. And, indeed, the ads—still stamped "Paid for by the U.S. Government"—continue to run.[29] "Final Battle," for instance, ran in more

---

[23] *Maduro,* AdImpact, https://platform.adimpact.com/viewer/2df9dd4c-1220-485d-babe-f2594f18686c (last visited Oct. 6, 2026).

[24] Ward-Packard Decl. ¶ 13; *see id.* ¶¶ 3-12.

[25] *Id.* ¶ 13.

[26] Betsy Klein, *'God made Trump' ad and at least 12 others are part of controversial taxpayer-funded ad campaign*, CNN (Oct. 2, 2026), https://perma.cc/6BPJ-A223.

[27] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W.

[28] Federal law prohibits "an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of" a federal officer from "solicit[ing], direct[ing], transferr[ring], or spend[ing] funds in connection with an election for Federal office unless the funds are subject to the limitations [and] prohibitions" of the Federal Election Campaign Act, 52 U.S.C. § 30101 et seq. 52 U.S.C. § 30125(e)(1).

[29] Ward-Packard Decl. ¶¶ 18-22.

spots on both October 6 and 7 than it had on the day of the President's announcement, and it continues to run frequently as of the day of this filing.[30]

Similarly, President Trump has not acknowledged that funding the ads with taxpayer dollars was illegal—instead calling it "a rather standard thing to do."[31] And he did not disavow future obligations from the public fisc, including from the $6.1 billion appropriation from which the original $20 million was obligated, to pay for additional partisan propaganda.[32] Nor has DHS or OMB made any public statement regarding a halt to running the ads.

Indeed, on October 6, the day after President Trump's statement, a White House spokesperson made clear that the administration would not recoup the taxpayer funds for the ads, nor would President Trump ask MAGA, Inc. to reimburse the government.[33] And an administration official "confirmed that Trump will only pay for the ads 'moving forward'"—without explaining whether the $20 million obligated for these ads would be fully spent before President Trump or the MAGA Inc. super PAC begins to cover the costs.[34] And while yesterday an anonymous source told reporters that unnamed "outside groups" would start to pay for the ads by the weekend, that statement is littered with unknowns: the identity of the source, the identity of these "outside groups," when the ads might stop this weekend, whether the source speaks for the government, and whether the statement is, in fact, true. In any event, today, the ads keep running. [35]

---

[30] *Id.* ¶ 19.

[31] Nicholas Kerr, *Trump says his super PAC will now pay for controversial taxpayer-funded promotional ads*, ABC News (Oct. 6, 2026), https://perma.cc/NY88-BUXY.

[32] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W.

[33] Shane Goldmacher & Maggie Haberman, *Trump Does Not Plan to Reimburse Taxpayers for Promotional Ads*, N.Y. Times (Oct. 6, 2026), https://perma.cc/HVU2-TZDN.

[34] Jenna Monnin, *Trump Does Not Plan to Reimburse the Government for Taxpayer-Funded Ads*, The Washington Sun (Oct. 6, 2026), https://perma.cc/A6YK-5K96.

[35] Josephine Walker, *Trump to pay for controversial TV ads after DNC sues*, Axios (Oct. 7, 2026), https://www.axios.com/2026/10/07/dnc-trump-lawsuit-taxpayer-funded-ads.

### II. Plaintiffs are harmed by the ads.

The government-endorsed, taxpayer-funded ads harm Robert Hunter by denigrating his campaign, while promoting that of his opposition. Mr. Hunter is a self-identified "socialist," who is the Democratic Party's nominee for Alabama House District 28. Hunter Decl. ¶¶ 2, 3. He has used the term "socialist" on his website and advertising, while his opponent refers to himself as a "Tax Fighter" who is "Trump Tested." *See id.* ¶¶ 7-9; *Elect Conservative Mack N. Butler for Ala. House District 28*, https://perma.cc/3VQX-RQDN. Because the ads use the imprimatur of the U.S. government to specifically attack socialists, promote President Trump's allies, and promote tax cuts, every day that the ads run, voters hear messages that attack Mr. Hunter's campaign and echo his opposition—overwhelming Mr. Hunter's campaign communications.

So too the ads harm SEIU 32BJ and Empire PAC by using the federal government's deep pockets to publicly sponsor political ads that are in opposition to the candidates and messaging that SEIU 32BJ and Empire PAC support. SEIU 32BJ and Empire PAC support pro-worker, progressive candidates, whom Trump and his allies have attacked as "socialists," "communists," and "unamerican." Tall Decl. ¶¶ 16-17; Banks Decl. ¶ 15. The ads reinforce these attacks with the public use of taxpayer dollars, making it less likely that the progressive, pro-worker candidates that SEIU 32BJ and Empire PAC support will succeed, thereby harming SEIU 32BJ and Empire PAC. Tall Decl. ¶¶ 19-23; Banks Decl. ¶¶ 19-21.

## ARGUMENT

### I. Plaintiffs have standing.

For standing, a party must show an injury that is "fairly traceable" to the challenged conduct and "a non-speculative likelihood that the injury can be remedied by the requested relief." *Walden v. Kosinski*, 153 F.4th 118, 131 (2d Cir. 2025). To obtain preliminary relief, Plaintiffs need show

only that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Plaintiffs meet those elements here.[36]

**A. Plaintiffs have suffered injuries in fact.**

A party suffers a cognizable injury when the government provides a benefit to their economic or "political competitors" that disadvantages the plaintiffs. *In re U.S. Cath. Conf.*, 885 F.2d 1020, 1029-30 (2d Cir. 1989). When government's action tilts the "playing field" against them, the plaintiff need not prove they will likely lose money or votes as a result. *Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002). They need only show it "impaired [their] ability to compete on an equal footing" with their rivals. *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2nd Cir. 1989); *see also Shays v. FEC*, 414 F.3d 76, 90-91 (D.C. Cir. 2005) (finding Article III injury where unlawful regulation forced plaintiffs to compete on an "illegally structured" political playing field and unfairly advantaged their political competitors). Plaintiffs satisfy that standard when the government gives "some competitive advantage," like money or airtime, *Fulani*, 882 F.2d at 626, to an adversary who "competes in the same arena," *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197 (quoting *U.S. Cath. Conf.*, 885 F.2d at 1029).

The $20 million ad-buy works such a competitive injury on the plaintiffs. As Trump urges Americans to "pretend I'm on the ballot," the ad-buy commits federal funds to broadcast government-approved messages that boost President Trump and attack his political opponents.[37] The strategy leverages a well-known fact about midterm elections: The more favorably the public views the President, the better his party does, up and down the ballot. William A. Galston,

[36] This brief addresses only the standing of those Plaintiffs currently experiencing irreparable harm from the challenged actions: SEIU 32BJ, Empire PAC, and Robert Hunter.

[37] Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Alabama Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U.

*Commentary: What History Tells Us About the 2026 Midterm Elections*, Brookings (Aug. 28, 2025), https://perma.cc/5NML-G3AJ ("The president's job approval has a strong impact on the outcome of midterm House elections. . . . The higher his job approval, the lower the losses that his party will experience."). Indeed, "the midterm is taken as a referendum on the incumbent president." John T. Woolley, *The 2022 Midterm Elections: What the Historical Data Suggest*, The American Presidency Project (Aug. 30, 2022), https://perma.cc/W8QJ-6MAK.

By glorifying the President and disparaging his political adversaries—and doing so with the imprimatur of the U.S. government—the taxpayer-funded ads help the President's party and work against candidates and groups who oppose him.

**1. The taxpayer-funded ads injure Robert Hunter.**

The ads disadvantage plaintiff Robert Hunter, a "socialist" Democrat running for office in the Alabama House of Representatives. Hunter Decl. ¶¶ 2-3. Hunter co-founded the local chapter of the Democratic Socialists of America and campaigns as a socialist: he "decided to run for office in part due to [his] socialist values," including the need for a "social safety net." *Id.* ¶ 6. His opponent, incumbent Mack N. Butler, campaigns on his alignment with President Trump. Butler's website markets him as a "Trump Tested" "Conservative Republican" who is a "Tax Fighter," and greets visitors with a photo of Butler posing with President Trump. *Elect Conservative Mack N. Butler for Ala. House District 28*, https://perma.cc/3VQX-RQDN.

Meanwhile, just weeks before voters choose between a self-described socialist and a Trump-tested Republican, the government-endorsed and taxpayer-funded ads broadcast praise for Trump and calls to "defeat" "socialism" into voters' living rooms. Ward-Packard Decl. ¶¶ 15, 17, 21-22. In doing so, they bestow at least "some competitive advantage" on Butler at Hunter's expense, a cognizable injury. *Fulani*, 882 F.2d at 626-27 (televised debate featuring plaintiff candidate's competitors but excluding the plaintiff inflicted competitive injury); *accord Owen v. Mulligan*,

640 F.2d 1130, 1133 n.8 (9th Cir. 1981) ("[A]nybody who personally intends to oppose the candidacy of an incumbent congressman or supports a person mounting such a challenge has a vital interest in enjoining activities financed at least in part by the public fisc that arguably promote his electoral prospects." (citation omitted)); *Shays*, 414 F.3d at 85-87.

Indeed, even if the ads had "no effect" on Hunter's "electoral prospects," they would still cause him a cognizable injury. By unlawfully using federal funds to place the imprimatur of the U.S. government behind his opponent's party, they "deprive the candidate of a fair [electoral] process"—"a process of the most fundamental significance under our constitutional structure." *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 77 (2026). Hunter has standing to protect that process from illegal influence. *Id.*

**2. The taxpayer-funded ads injure SEIU 32BJ and Empire PAC.**

The taxpayer-funded ads injure SEIU 32BJ and Empire PAC as well. Much like political candidates, an organization suffers a competitive injury when "the government's allocation of a particular benefit 'creates an uneven playing field' for organizations advocating their views in the public arena." *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197 (citation omitted). In *Center for Reproductive Law and Policy*, for example, reproductive rights organizations challenged a government policy that allowed anti-abortion groups, but not pro-choice groups, to receive support from federal funded foreign organizations. *Id.* at 197. Because the government "bestowed a benefit on [the] plaintiffs' competitive adversaries" that it did not provide to the plaintiffs, who advocated on the "same issues" on different sides, the plaintiffs had standing to challenge the policy. *Id.*

So too here. SEIU 32BJ has long endorsed "progressive," "pro-worker" candidates and policies that would benefit SEIU 32BJ's members. *Topic: Endorsement*, 32BJ SEIU, https://perma.cc/4RQS-PCVL. And Empire PAC has long made independent expenditures to support those candidates. *See, e.g.*, *Empire State 32BJ PAC, Independent Spender Profile*, N.Y.C

Campaign Fin. Bd. (2025), https://perma.cc/Q4V5-Y5QP; *Empire State 32BJ SEIU PAC, Independent Spender: Expenditures*, N.Y.C. Campaign Fin. Bd. (2025), https://perma.cc/6KFN-KUMV. President Trump and his allies have attacked many of these very candidates as "socialists" and "communists"—the same groups the taxpayer-funded advertisements demonize. Tall Decl. ¶¶ 16-18; Banks Decl. ¶¶ 14-15. The government-sponsored ads double down on those attacks, fighting against the pro-worker campaigns that SEIU 32BJ and Empire PAC support. Tall Decl. ¶ 18; Banks Decl. ¶ 15.

Conversely, the President, his party, and his allies support policies that would harm SEIU 32BJ members. As part of its election advocacy, SEIU 32BJ has campaigned against policies associated with President Trump, including cuts to healthcare programs like Medicare and increased immigration enforcement. *What's at Stake in the 2026 Midterm Elections*, 32BJ SEIU, https://perma.cc/WX53-9HR6.

By channeling millions of taxpayer funds to publicly sponsor President Trump and his party's policies, the challenged decisions have "bestowed a benefit on plaintiffs' competitive adversaries" that is not available to Plaintiffs. *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197. "This is precisely the type of situation that the doctrine of competitive advocate standing contemplates." *Id.* SEIU 32BJ and Empire PAC thus suffer competitive harm.

**B. The injuries are traceable to the challenged actions and redressable.**

Those competitive injuries are traceable to the ad-buy contract and to OMB's apportionment, and they are redressable by an order vacating those actions or enjoining the defendants from continuing to fund and run the ads. Traceability requires no more than "but for" causation. *Fulani*, 882 F.2d at 628. And redressability does not require "full redress"; the Court need only be able to "effectuate a partial remedy." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). For competitive injuries, "the courts need not be able to level the 'playing field' between the actors

involved; instead, there need only be a substantial likelihood that the relief requested will have a substantial ameliorative effect on the specific injury alleged." *Fulani*, 882 F.2d at 628 n.6.

Each of the challenged actions was a "but for" cause of the government-endorsed, taxpayer-funded ad broadcasts that injured the plaintiffs. *Fulani*, 882 F.2d at 628. DHS's ad-buy contract commissioned the ads, and it could not have done so without OMB's apportionment. *See* 31 U.S.C. § 1517(a)(1) (agency may not authorize spending without an apportionment). Each action was, therefore, a "prerequisite" to the harm. *Fulani*, 882 F.2d at 628 (holding competitive injury—television exposure for a candidate's competitors—was traceable to the government benefit (a tax exemption) because without it, defendant could not have sponsored the exposure).

And judicial relief would redress the plaintiffs' competitive injuries. Of the $20 million that OMB apportioned and DHS's contract obligated to pay for the ads, millions remain unspent. *See* Ward-Packard Decl. ¶ 13 (estimating total spending at $15.4 million as of the morning of October 8). If the Court vacates the apportionment, DHS could no longer use that money to pay for more political ads. If the Court vacates the ad-buy contract because it exceeds Congress's authorization or violates the propaganda rider, the agency could not use the funds for that purpose.[38] And of course, if the Court enjoins the defendants from funding or placing the ads, it would keep them off the air. *See* Fed. R. Civ. P. 65; *Guertin v. United States*, 743 F.3d 382, 388-89 (2d Cir. 2014) (issuing injunction in APA case). Any of these remedies would prevent more taxpayer-funded ads, and therefore would "at least partially redress" the competitive injuries. *Soule v. Connecticut Ass'n of Schs., Inc.*, 90 F.4th 34, 48 (2d Cir. 2023) (en banc).

---

[38] Even if DHS could enter a new contract for similar ads (and it could not), that would not defeat standing: Vacatur of harm-causing agency action redresses the injury "even though the [agency] might reach the same result exercising its discretionary powers lawfully." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). For the same reason, the possibility that President Trump might find another source to pay for the ads does not preclude redressability.

## II. Plaintiffs are likely to succeed on the merits of their APA claims.

Plaintiffs are likely to succeed on the merits. DHS's decision to obligate funds to pay for political ads, and OMB's decision to apportion the funds for that purpose, exceed their authority, are contrary to law, and are "arbitrary" and "capricious" under the APA. 5 U.S.C. § 706(2).[39]

### A. Contrary to law and in excess of statutory authority

#### 1. Purpose Statute, 31 U.S.C. § 1301

First, the ads violate the Purpose Statute because political advertising is not among the purposes for which Congress appropriated funds to DHS. *See* 31 U.S.C. § 1301.

For Fiscal Year 2026, Congress appropriated funds to Customs and Border Protection for, unsurprisingly, customs and border protection: "to hire, pay, train, and equip Border Patrol agents and Border Patrol support personnel" for border security and immigration enforcement operations, and for various specific border security, technology, and screening costs. Secure America Act, Pub. L. No. 119-98, §§ 101, 103, 201, 140 Stat. 837, 837–39 (2026). None of these FY2026 funds are for political propaganda.[40] The same is true as to FY2027 funds. *See* Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, div. A, § 101, 140 Stat. 987, 987-99 (2026) (providing continuing appropriations for FY2027 through December 11, 2026).

---

[39] Both DHS obligation of the funds via the ad-buy contract with LMD and OMB's apportionment of the funds to DHS are final agency actions reviewable under the APA because each "mark[ed] the consummation of the agency's decisionmaking process" and "determined" "rights or obligations" or had "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 597 (2016) (cleaned up). An OMB apportionment is "legally binding" because it "limits the obligations [the agency] may incur" with the funds. OMB, Circular A-11 § 120.1; 31 U.S.C. 1517(a)(1), (b). And an agency incurs an "obligation" when it enters a contract. GAO, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* at 70 (Sep. 2005), https://perma.cc/2HC2-YZWD.

[40] *See also* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 ("FY2026 Continuing Resolution"), Pub. L. No. 119-37, div. A, 139 Stat. 495, 495-508 (Nov. 12, 2025) (providing FY2026 appropriations from November 12, 2025 through January 30, 2026).

In a 2025 budget reconciliation act, Congress made multi-year appropriations to DHS, including CBP. Pub. L. No. 119-21, tit. IX, subtitle A, 139 Stat. 72, 357-61 (2025) (H.R. 1). But H.R. 1 did not authorize political ad spending, either. Rather, it required CBP to invest in border security technology and other infrastructure improvements. *See id.*, §§ 90001-02, 139 Stat. at 357-58 (appropriating funds to CBP for expenses related to border infrastructure, personnel, vehicles, and facilities). Congress also appropriated funds to CBP for "border security, technology, and screening" expenses such as "new nonintrusive inspection equipment" and "new platforms for rapid air and marine response capabilities." *Id.* § 90004, 139 Stat. at 359

Within this overall category of expenses, H.R. 1 provided for outlays related to "[c]ommemorating efforts and events related to border security." *Id*. But this does not authorize President Trump's political advertisements. That appropriation was included to fund "line-of-Duty death memorials, Department or agency anniversaries," "commendation ceremonies," and "events recognizing victims of crime." H. Rep. 119-106, at 792 (2025). It was meant to be used for "venue and setup, program materials, commemoratives (e.g., plaques, flags, awards); and personnel and services (e.g., honor guard, officiants, security)," *id.*, not campaign ads.

If there were any doubt about whether these appropriations authorized spending for political ad campaigns, the longstanding prohibition on the use of taxpayer funds for "publicity or propaganda," absent express congressional authorization, would remove it. Given Congress maintains a "longstanding practice" of prohibiting the use of funds for political purposes, a court should not "lightly" conclude that Congress has "flouted its own declaration of policy." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 90-91 (1973); *accord West Virginia v. EPA*, 597 U.S. 697, 725 (2022) ("[E]stablished practice may shed light on the extent of power conveyed by general

statutory language . . . ."); *Jones v. United States*, 526 U.S. 227, 234 (1999) ("Congress is unlikely to intend any radical departures from past practice without making a point of saying so.").

Because Congress has not affirmatively authorized spending on political propaganda, this spending violates Section 1301. *See United States v. MacCollom*, 426 U.S. 317, 321 (1976).

**2. Prohibition on "publicity or propaganda," § 718**

Second, the ads violate the prohibition on using appropriated funds "directly or indirectly, including by private contractor, for publicity or propaganda purposes." FY2026 Appropriations Act, Pub. L. No. 119-75, § 718, 140 Stat. at 495; FY2024 Appropriations Act, Pub. L. No. 118-47, § 718, 138 Stat. at 576, as incorporated by FY2025 Continuing Resolution, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. at 10-12.

This longstanding prohibition—included in appropriation acts since 1952—covers at least two types of publications: those that are "self-aggrandizing" or "purely partisan in nature." GAO Red Book, at 3-285, 3-293. Agencies may, of course, fund communications "reasonably necessary" to carry out their duties. *Id.* at 3-284. But they may not use taxpayer funds for the "individual glorification" of executive officials, *Acting Comptroller General Fisher to the Chairman, NLRB*, 31 Comp. Gen. 311, 313 (1952), or "to emphasize the importance of the agency or activity in question," *id.* And appropriations may not be used "to aid a political party or candidates." GAO Red Book, at 3-293–94 (citation omitted). In short, "[i]t is axiomatic that funds appropriated to carry out a particular program would not be available for political purposes." *Id*. at 3-294

DHS's ads are publicity or propaganda in violation of Section 718. The ads are both "self-aggrandizement" and "purely partisan" communications. GAO Redbook at 3-236-37. Indeed, one

substantively reproduces a campaign ad from President Trump's 2024 presidential campaign.[41] They engage in the personal glorification of the President, tout his administration's claimed legislative achievements, and call viewers to "battle" against his opponents, including "socialis[ts], and "communists," his epithets for Democrats. They do so within the last month of the midterm elections. They do not provide any "'information reasonably necessary to the proper administration of the laws' for which [DHS] is responsible." GAO Redbook at 3-284 (quoting 31 Comp. Gen. at 314). And as discussed above, they are not otherwise authorized by Congress.

The advertisements thus violate Section 718. *See D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988) (advertising "in connection with an initiative campaign constitutes publicity or propaganda within the meaning of the appropriations statute").

**B. Arbitrary and Capricious**

OMB's decision to apportion and DHS's decision to obligate $20 million appropriated for border security for a taxpayer-funded political propaganda campaign is "arbitrary" and "capricious" for at least three reasons. 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious where an agency "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. of the United States, Inc v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

First, Defendants failed to consider the Hatch Act implications of creating and disseminating taxpayer-funded political propaganda. The Hatch Act prohibits a federal employee from engaging

[41] Bayliss Wagner, *A Trump 2024 Campaign Ad Returns, Now Brought to You by the Government*, N.Y. Times (Sep. 27, 2026), https://perma.cc/R7VD-KWSJ; Pollock And Pollock News Channel, *Donald Trump 2024 Presidential Pounding Powerful Ad "The Final Battle"* YouTube (April 14, 2024), https://www.youtube.com/watch?v=pxZwMG3hse4.

in "political activity" while "on duty"; "in any room or building occupied in the discharge of official duties"; and "while wearing a uniform or official insignia identifying the office or position of the employee." 5 U.S.C. § 7324(a). The Act covers any activity "directed toward[s] the success or failure of a political party, candidate for partisan political office, or partisan political group," 5 C.F.R. § 734.101, even if it is not express electoral advocacy for or against a political party or candidate. *See* U.S. Off. of Special Couns., *Hatch Act Assessment and Advisory: Partisan Agency Communications During the 2025 Lapse in Appropriations*, at 1 (Sep. 25, 2026); U.S. Off. of Special Couns., *Hatch Act Advisory Opinion Regarding the Use of Presidential Campaign Slogans*, at 1 (June 7, 2023). The use of taxpayer funds to pay for the ads likely violates the Hatch Act. Defendants failed to consider the consequences of engaging in such apparently unlawful activity as well as the substantial harm caused to the public perception of the government as a neutral actor in partisan contests.

Second, Defendants failed to consider or explain the consequences of diverting funds away from the purposes for which they were appropriated. Secretary Mullin recently touted H.R. 1's "historic funding for" CBP "to make America safe again."[42] And prior to passage, then-Secretary Noem described H.R. 1 as "imperative to our future and security of our nation," asserting that "our borders need surveillance and technology" and "our ports of entry need new scanners."[43] After these pleas of necessity, Congress went on to appropriate billions for "border security, technology, and screening" investments. H.R. 1, § 90004, 139 Stat. at 359. Defendants do not explain why the full appropriation is no longer necessary and why no harm will result from diverting funds from those purportedly essential purposes.

---

[42] *DHS and Secretary Mullin Mark One Year Anniversary of Historic Big Beautiful Bill*, Homeland Security (July 4, 2026), https://perma.cc/CZP2-7NKR.

[43] *House Homeland Security Hearing*, Rev (May 15, 2025), https://perma.cc/8HY6-RVPV.

Third, Defendants' explanations as to the permissibility of using taxpayer dollars to fund these ads lack a basis in law and fact. DHS has directed inquiries about the ads to the White House, and provided no other explanation of its own, implicitly adopting the President's explanation.[44] As for the President, he defended the ad spending on the grounds that he is "not promoting [himself]" in these ads "because [he is] not running for office" and that the ads do not advocate for or against any particular candidate by name.[45] But any viewer of the ads can see that they do, indeed, promote President Trump while deriding policy positions that he opposes—and regularly attributes to his political adversaries. And while President Trump is not presently running for office, he has asked voters to "pretend I'm on the ballot" in the upcoming midterm elections.[46] Moreover, the President has contemplated using money from a super PAC—which exists to make campaign expenditures—to run identical ads in the future. Against this backdrop, Defendants' explanations—in addition to misunderstanding the law—are implausible.

## III. Plaintiffs are likely to succeed on their Equal Protection Clause claim.

Defendants' actions are also unconstitutional. The Constitution's guarantee of equal protection under the law is violated when the federal government (1) treats someone "differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Weinberger v. Wiesenfeld*, 420

[44] Steven Portnoy et al, *Pro-Trump ad campaign was financed by DHS: Sources,* Eyewitness News ABC 7 (Sep. 30, 2026), https://perma.cc/M8UU-65L3.

[45] *President Trump Defends Taxpayer-Funded Ads, Says He's Promoting the Country*, C-Span (Sep. 30, 2026), https://www.c-span.org/clip/white-house-event/president-trump-defends-taxpayer-funded-ads-says-hes-promoting-the-country/5207706.

[46] Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Alabama Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U.

U.S. 636, 638 n.2 (1975).[47] Here, Defendants did just that. Their government-endorsed, taxpayer-funded political ads throw the might of the federal government behind candidates and causes aligned with the President—while disparaging views the President attributes to his political adversaries—ahead of the upcoming midterm elections. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985). There is no rational nor legitimate basis for the federal government to platform candidates and causes associated with one party while attacking ideologies associated with its opposition, let alone for it to use taxpayer dollars to do so weeks away from the midterms.

Both prongs of the test are met here. First, the ads use the imprimatur of the federal government to disparage and attack ideologies associated with President Trump's adversaries. These ads feature photos and videos of President Trump while text and voiceovers—in the President's voice—denounce the "fake news media," "communism," "socialism," and "the deep state." They include promises from the President to "liberate America from these villains" and to "throw off the sick political class that hates our country." *See supra* Factual Background, Section I.C. These issues and positions that the ads repeatedly disparage are those that Trump and Republican candidates have tried time and again to tie to Democratic candidates, like Plaintiff Hunter and others whose campaigns have received independent expenditures from Plaintiff Empire PAC. For example, the National Republican Congressional Committee has referred to Democratic House candidate Cait Conley as a "radical Democrat" who is "cozying up to socialists." Tall Decl.

---

[47] The taxpayer-funded advertisements may be subject to strict scrutiny because massive, rank, political speech by the government has the effect of rendering less effective the First Amendment protected speech of candidates and messages not supported by the federal government. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966). Because Defendants' justifications do not pass rational basis review, they fail any heightened scrutiny.

¶ 16. Similarly, the NRCC has labeled Democratic House candidate Tom Suozzi, "Socialist Suozzi." *Id.*

This demonstrates that "similarly situated individuals . . . received more favorable treatment." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). These ads do not in turn criticize or attack ideologies or positions associated with President Trump and his party. Rather, the theme of all the ads is to laud his Presidency as the "[G]olden [A]ge of America."[48] Where, as it is in these taxpayer-funded ads, "animus is readily obvious," it is unnecessary to strictly apply the comparator requirement to establish an equal protection violation. *Swanson*, 719 F.3d at 784; *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 167 (D.D.C. 2025) (no need to "infer animus" since the text of the Executive Order and "other contextual evidence, including President Trump's statements over nearly the past decade," "makes obvious the Trump Administration's animus toward plaintiff").

Second, Defendants cannot justify their conduct, even under rational basis review. The Equal Protection Clause "demand[s] that any governmental distinction among groups must be justifiable." *Fullilove v. Klutznick*, 448 U.S. 448, 496 (1980) (Powell, J., concurring). If the government is drawing a classification, then, "[a]t a minimum, [the] classification must be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (citation omitted). The federal government has no legitimate or rational basis for airing taxpayer-funded ads intended to help Republicans and harm Democrats in the upcoming midterm elections. *See Perkins Coie LLP*, 783 F. Supp. 3d at 168 ("Under the . . . guarantee of equal protection under the law, . . . settling personal vendettas by targeting a disliked business or

---

[48] AdImpact Politics (@AdImpact_Pol), X (Sep. 25, 2026, at 08:21 ET), https://x.com/AdImpact_Pol/status/2103459952484323537?s=20.

individual for punitive government action is not a legitimate use of the powers of the U.S. government . . . .").

Because Defendants' actions violate the Equal Protection Clause, they are "contrary to constitutional right" under the APA. 5 U.S.C. § 706(2)(B). But even apart from the APA, courts may "issue injunctions to protect rights safeguarded by the Constitution." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (citation omitted). So Defendants' constitutional violation provides an independent ground for relief.

**IV. Plaintiffs are likely to succeed on their ultra vires claims.**

Even if relief under the APA were unavailable, the Court could enjoin Defendants' actions here as ultra vires. "Congress intends the executive to obey its statutory commands and, accordingly," it ordinarily "expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986). The Court may enjoin executive action that is "in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation marks omitted). That standard is met here.

As explained, the Purpose Act required the defendants to use federal funds "only" for the "objects for which the appropriations were made" absent congressional authorization. *Dep't of Navy*, 665 F.3d at 1348 (quoting 31 U.S.C. § 1301(a)). And Section 718 of the applicable appropriations acts specifically prohibited the Executive from using appropriations "directly or indirectly, including by private contractor, for publicity or propaganda purposes." *See* FY2026 Appropriations Act, Pub. L. No. 119-75, § 718, 140 Stat. at 495; FY2024 Appropriations Act, Pub. L. No. 118-47, § 718, 138 Stat. at 576, as incorporated by FY2025 Continuing Resolution, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. at 10-12. By diverting taxpayer funds to pay for

political advertisements, Defendants acted outside their delegated authority and violated that express statutory command.

**V. Plaintiffs will continue to suffer irreparable harm absent a stay or injunction.**

Plaintiffs also show an imminent threat of irreparable harm—harm that "cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291 (2d Cir. 2026) (cleaned up), *petition for cert. filed, Patel v. Gov't Emps. Ins. Co.*, No. 26-85 (U.S. July 20, 2026).

"[T]iming is of the essence in politics" and relief delayed by "even a day or two may be intolerable." *N.Y. Progress*, 733 F.3d at 486 (cleaned up). Plaintiffs show such an irreparable harm here. As the midterm elections approach, every day the government-sponsored political ads continue to run—reaching millions of voters watching college and NFL football this weekend—is another day the federal government illegally influences the elections in which the plaintiffs participate. Voters cannot unsee the ads, and in less than a month, all will have cast their ballots; many millions will do so even before Election Day. "Because this Court can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns, this is not a case in which 'adequate compensatory or other corrective relief will be available at a later date.'" *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 201-02 (D.D.C. 2025) (citation omitted); *see League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that harm was irreparable "because after the registration deadlines for the November election pass, 'there can be no do over and no redress'" (citation omitted)). Post-election relief cannot restore the pre-election status quo.

Plaintiff Robert Hunter is irreparably harmed every day that the advertisements continue to air. Voting is already underway in Alabama, with absentee voting having begun on September 9. *See Secretary of State Wes Allen Announces Start of Absentee Voting in Alabama*, Ala. Sec'y of

State (Sept. 9, 2026), https://perma.cc/5ZPH-RYTA. And Hunter's campaign cannot run its own ads to counteract the U.S. government's. Hunter has spent a total of $1,812 on advertisements, purchased one newspaper ad for $168, postcards to voters for $549, and a billboard advertisement for $895. Hunter Decl. ¶ 7. He does not have the same deep pockets as the federal government to run television advertisements regularly in the weeks before the election.

Plaintiffs SEIU 32BJ and Empire PAC also suffer every day that these ads continue to air. SEIU 32BJ supports candidates in multiple states where it has members, including New York, where Empire PAC focuses its spending and outreach efforts. Tall Decl. ¶ 12; Banks Decl. ¶ 3. Voting either by mail or absentee is already underway in all of those regions. Tall Decl. ¶ 20; Banks Decl. ¶ 21. And early voting starts on October 24 in New York. Banks Decl. ¶ 21. Like Hunter, SEIU 32BJ and Empire PAC do not have millions of dollars to drop on campaign advertisements at this point in the cycle to combat the far-reaching taxpayer-sponsored ads. Across the entire general election cycle, Empire PAC has strategically and thoughtfully spent $20,000 so far for independent expenditures to support pro-worker candidates and campaigns, and intends to spend more through the November 3rd election. Banks Decl. ¶ 7. It cannot match the millions the federal government has thrown behind their adversaries.

## VI. The balance of equities and public interest favor Plaintiffs.

The public interest and balance of equities merge here, *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (per curiam), and both factors favor halting the government's misappropriation of taxpayer dollars to fund partisan propaganda. In general, "the perpetuation of unlawful agency action is not in the public interest." *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019). To the contrary, the public interest favors "having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. Trump*, 490 F. Supp. 3d 736, 747 (S.D.N.Y. 2020) (three-judge panel) (quoting *Newby*, 838 F.3d at 12).

That interest in abating unlawful government action is compounded here, where the Executive is spending money Congress never appropriated to fund actions Congress never authorized. The Appropriations Clause ensures "that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good." *OPM v. Richmond*, 496 U.S. 414, 428 (1990). Where Congress has not funded an expenditure, it "presumably decided" the expenditure "was not in the public interest," and it is "not for [courts] to reach a different conclusion." *Sierra Club v. Trump*, 929 F.3d 670, 707 (9th Cir. 2019), *stay granted*, 140 S. Ct. 1 (2019) (mem.).

With the midterm and state elections impending, the public interest favors halting the government's propaganda campaign immediately, before more harm is done. "A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions." *Mountain States Legal Found. v. Denver Sch. Dist. No. 1*, 459 F. Supp. 357, 360 (D. Colo. 1978) (quoting *Stanson v. Mott*, 17 Cal. 3d 206, 217 (1976)). When the government violates that precept, "fairness and justice" require "that the use by public bodies of public funds for advocacy be restrained." *Citizens to Protect Pub. Funds v. Bd. of Educ.*, 13 N.J. 172, 182 (1953) (Brennan, J.).

Courts accordingly have enjoined other "uses of the power of publicly owned resources to propagandize," finding relief "necessary for the protection of the public interest." *Mountain States Legal Found.*, 459 F. Supp. at 360-61 (granting preliminary injunction); *see*, *e.g.*, *D.C. Common Cause*, 858 F.2d at 11 (affirming final injunction). The equities favor the same relief here.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court enter a temporary restraining order and a stay under 5 U.S.C. § 705 as described in the accompanying proposed order.

October 8, 2026

Respectfully submitted,

*/s/ Elena Goldstein*
Elena Goldstein (Bar No. EG8586)
Bradley Girard*
Sean Ouellette*
Michael J. Gaffney*
Anashua Dutta*
Paul R.Q. Wolfson*
Robin F. Thurston*
**Democracy Forward**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
egoldstein@democracyforward.org

Bruce V. Spiva*
Tara Malloy*
Brent Ferguson*
Sejal Jhaveri*
Renata O'Donnell*
Katherine Hamilton*
**Campaign Legal Center Action**
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 736-2200

Brendan Ballou*
Samuel T. Ward-Packard*
**Public Integrity Project Action, Inc.**
1763 Columbia Rd. NW, Suite 175
Washington, DC 20009
(917) 684-3900

*Counsel for Plaintiffs*

* Motion to appear pro hac vice forthcoming

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.1(c), I hereby certify that this memorandum of law was prepared using Microsoft Word, and that using the Word Count feature, it is 8,700 words, including footnotes and not including those portions of the memorandum excluded from the word count by Local Rule 7.1(c).

/s/ *Elena Goldstein*
Elena Goldstein