UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMON CAUSE *et al.*,

Plaintiffs,

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

Defendants.

26 Civ. 8882 (JLR)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A SECTION 705 STAY**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
Email: jeffrey.oestericher@usdoj.gov

JEFFREY S. OESTERICHER
Assistant United States Attorney
*—Of Counsel—*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

STATEMENT OF FACTS ....................2

I. CBP'S PURCHASE ORDER FOR SERVICES IN SUPPORT OF MEDIA BUYS ....................2

II. THIS LAWSUIT AND PLAINTIFFS' MOTION FOR A TRO ....................4

ARGUMENT ....................6

I. LEGAL STANDARDS ....................6

II. PLAINTIFFS FAIL TO DEMONSTRATE ARTICLE III STANDING ....................7

A. Plaintiffs Have Suffered No Injury-in-Fact ....................8

B. The Alleged Injury Is Not Redressable by an Order from this Court ....................10

III. IF ONLY PLAINTIFF HUNTER HAS STANDING, SDNY IS AN IMPROPER VENUE ....................11

IV. PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM ....................11

V. THE SCOPE OF PLAINTIFFS' REQUESTED TRO IS OVERBROAD ....................13

VI. PLAINTIFFS SHOULD BE REQUIRED TO POST A BOND ....................14

CONCLUSION ....................15

# TABLE OF AUTHORITIES

Page(s)

Cases

*Able v. United States*,
44 F.3d 128 (2d Cir. 1995)....................6
*AB PAC v. Fed. Election Comm.*,
No. 22-2139 (TJK), 2023 WL 4560803, at *4 (D.D.C. July 17, 2023)....................9
*American Freedom Defense Initiative v. Metropolitan Transportation Authority*,
109 F. Supp. 3d 626 (S.D.N.Y. 2015)....................13
*Borey v. Nat'l Union Fire Ins. Co.*,
934 F.2d 30 (2d Cir. 1991)....................11
*Caremark Therapeutic Services v. Levitt*,
405 F. Supp. 2d 454 (S.D.N.Y. 2005)....................2, 11
*Center for Reproductive Law and Policy v. Bush*,
304 F.3d 183 (2d Cir. 2002)....................10
*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)....................12
*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021)....................8
*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025)....................7
*E. Air Lines, Inc. v. Civil Aeronautics Bd.*,
261 F.2d 830 (2d Cir. 1958)....................7
*Gottlieb v. Federal Election Commission*,
143 F.3d 618 (D.C. Cir. 1998)....................10
*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)....................8
*Holland v. Goord*,
758 F.3d 215 (2d Cir. 2014)....................12
*In re U.S. Catholic Conference*,
885 F.2d 1020 (2d Cir. 1989)....................2, 8, 9
*Int'l Gemmological Institute v. Independent Gemological Labs, Inc.*,
No. 00 Civ. 4897 (LAK), 2000 WL 1278179 (S.D.N.Y. Sept. 7, 2000)....................13
*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002)....................11
*Lamar Advertising of Penn, LLC v. Town of Orchard Park*,
356 F.3d 365 (2d Cir. 2004)....................12
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................7
*LVM v. Lloyd*,
318 F. Supp. 3d 601 (S.D.N.Y. 2018)....................13
*Mazurek v. Armstrong*,
520 U.S. 968 (1997)....................6

*Munaf v. Geren*,
553 U.S. 674 (2008) ... 6, 7
*Murthy v. Missouri*,
603 U.S. 43 (2024) ... 7
*Nano Dimension Ltd. v. Murchinson Ltd.*,
681 F. Supp. 3d 168 (S.D.N.Y. 2023) ... 12
*New York v. Trump*,
765 F. Supp. 3d 287 (S.D.N.Y. 2025) ... 6
*New York v. U.S. Dep't of Educ.*,
No. 20 Civ. 4260 (JGK), 2020 WL 4581595 (S.D.N.Y. Aug. 9, 2020) ... 6
*Patsy's Italian Restaurant, Inc. v. Banas*,
658 F.3d 254 (2d Cir. 2011) ... 13
*Sierra Club v. Morton*,
405 U.S. 727 (1972) ... 8
*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007) ... 6
*United States v. Oregon State Medical Society*,
343 U.S. 326 (1952) ... 12
*Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*,
454 U.S. 464 (1982) ... 8
*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ... 6, 11

Statutes

28 U.S.C. § 1391(e)(1) ... 2, 10
28 U.S.C. § 1406 ... 10
5 U.S.C. § 705 ... 1, 6
Pub. L. 119-21 ... 2, 3

Rules

Fed. R. Civ. P. 65(c) ... 14
Fed. R. Civ. P. 65(d)(1) ... 13

Defendants (the "Government") respectfully submit this memorandum of law in opposition to Plaintiffs' motion for temporary restraining order ("TRO") and a stay under Section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705.

## PRELIMINARY STATEMENT

Plaintiffs' motion should be denied because the alleged improper final agency action of which they are complaining—"run[ning] partisan political ads, funded by U.S. taxpayers," Plaintiffs' Brief in Support of Motion for a Temporary Restraining Order and Section 705 Stay ("Pls. Br.") (ECF No. 26) at 1—will not continue past tomorrow, the date on which briefing on their motion for a TRO will close. As such, Plaintiffs cannot demonstrate that a TRO is necessary to prevent imminent irreparable harm to them from Defendants' future conduct.

As explained in the accompanying Declaration of Holly C. Mehringer, the Senior Official Performing the Duties of the Chief Financial Officer for the United States Department of Homeland Security ("DHS") ("Mehringer Decl."), DHS issued a purchase order to obtain media services from a vendor in support of U.S. Customs and Border Protection ("CBP") for placing national media buys. Mehringer Decl. ¶¶ 3-7. The vendor has currently purchased media buys under the terms of the purchase order through tomorrow, October 11, 2026. *Id.* ¶ 8. DHS has directed the vendor not to make any additional media buys past October 11, *id.*, and DHS has no plans to make any additional media buys under the purchase order or otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit, *id.* ¶ 10. Accordingly, the alleged offending conduct will end tomorrow, and Plaintiffs therefore will suffer no harm, let alone irreparable harm, absent an injunction.

Plaintiffs' motion also should be denied for the additional, independent reason that they

lack standing.[1] Plaintiffs assert standing under the "competitor advocate" theory, but they cannot make the requisite showing that they compete "in the same arena with the party to whom the government has bestowed the assertedly illegal benefit" so as to be "personally disadvantaged." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). Stated bluntly, the media depictions of the President of which Plaintiffs complain do not "personally disadvantage" them because they are not "personally compet[ing] in the same arena" with the party the media buys purportedly benefit—President Trump. In addition, Plaintiffs acknowledge that their purported injury is not redressable by this Court, demonstrating another reason why they lack standing.

Moreover, even if Plaintiffs could establish that Robert Hunter has standing, that would not assist them because he resides in Alabama, the events relating to his alleged injury did not occur in the Southern District of New York ("SDNY"), and Defendants do not reside in SDNY. Accordingly, venue does not properly lie in SDNY for his claims. *See* 28 U.S.C. § 1391(e)(1); *Caremark Therapeutic Services v. Levitt*, 405 F. Supp. 2d 454, 463-64 (S.D.N.Y. 2005).

For the foregoing reasons and as explained further below, Plaintiffs' motion for a TRO should be denied.

## STATEMENT OF FACTS

### I. CBP's Purchase Order for Services in Support of Media Buys

On September 19, 2026, CBP, a component of DHS, submitted a request to the Office of Management and Budget ("OMB") to reapportion funds appropriated by section 90004 of the Working Families Tax Cut Act (Pub. L. 119-21) ("WFTCA") within CBP's "Operations and Support" account. *See* Declaration of William C. Woolf, dated October 10, 2026 ("Woolf Decl."),

[1] Plaintiffs are not bringing the TRO on behalf of plaintiff Common Cause, which they acknowledge is not experiencing irreparable harm from the challenged actions. *See* Pls. Br. at 11 n.36; *see also* Transcript of October 9, 2026 Conference at 10.

¶ 3. CBP's reapportionment request sought to make an additional $20 million available for "OBBBA - Commemorative Events." *Id.* ¶ 4. That additional funding came from amounts appropriated to the same account and then-apportioned for obligations in fiscal year 2027. *Id.* OMB approved CBP's reapportionment request on September 19, 2026. *Id.* ¶ 5.

On or about September 20, 2026, CBP issued a $20,000,000 purchase order for services ("the Purchase Order") to Lepugh, Inc. (doing business as LMD Agency, Inc.) ("the Vendor") under a previously awarded blanket purchase agreement. Mehringer Decl. ¶ 3. To fund the Purchase Order, DHS used funds appropriated to CBP in section 90004 of Public Law No. 119-21. *Id.* ¶ 4; Woolf Decl. ¶ 3. Those funds are available for, among other things, "[c]ommemorating efforts and events related to border security." Mehringer Decl. ¶ 4.

The Purchase Order was issued for media services in support of CBP for placing national media buys. *Id.* ¶ 5. The terms of the Purchase Order required the Vendor to provide media buy support with media outlets and programs on a national level using a combination of morning and evening cable news, 6–10am dayparts, 4–11pm dayparts, media programming through FOX, CNN, MSNOW, and NEWSMAX, Sunday shows including broadcasts with CBS, ABC, and NBC, and football commercial buys with CBS, ABC, ESPN, and other channels. *Id.* The Purchase Order did not fund the creation or production of any videos or media; it only funded the airing of preexisting media. *Id.* ¶ 6. None of DHS's appropriated funds were used to create or produce any of the media that aired under the terms of the Purchase Order. *Id.*

The Purchase Order's period of performance is September 20, 2026, through September 19, 2027, or until all deliverables and media placements have occurred. *Id.* ¶ 7. The Vendor has currently purchased media buys under the terms of the Purchase Order through Sunday, October 11, 2026, at an approximate cost of $19,000,000. *Id.* ¶ 8. DHS has directed the Vendor not to

make any additional media buys past October 11 and expects that the Vendor will submit its final invoice for services performed under the Purchase Order after that date. *Id*. Once received by DHS, that invoice will be paid for services already performed under the Purchase Order. *Id*. Any residual funding left under the Purchase Order after October 11, 2026, after all invoices have been paid, will be de-obligated. *Id*. ¶ 9.

As of October 10, 2026, DHS has no plans to make any additional media buys under the Purchase Order or to renew the Purchase Order or otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit. *Id*. ¶ 10.

## II. This Lawsuit and Plaintiffs' Motion for a TRO

On October 7, 2026, Plaintiffs Common Cause, Service Employees International Union Local 32BJ ("SEIU 32BJ"), Empire State 32BJ SEIU PAC ("SEIU 32BJ PAC"), and Robert Hunter ("Hunter") filed this action challenging DHS's broadcast of certain media depicting the President of the United States as violative of the APA and the Equal Protection component of the Fifth Amendment, and as *ultra vires*. ECF No. 1 ("Compl."). In their Complaint, Plaintiffs state that Common Cause is a grassroots organization "with a mission to uphold the core values of American democracy," *id.* at ¶ 7; SEIU 32BJ "is a labor organization headquartered in New York City that represents more than 185,000 building workers," *id*. ¶ 9; SEIU 32BJ PAC "is an independent expenditure political action committee established and operated by SEIU 32BJ . . . dedicated to achieving electoral outcomes that lead to raising standards at workplaces and improving conditions in communities, such that 'working poor' becomes a contradiction in terms," *id*. ¶ 10; and Hunter is the Democratic Party's nominee for Alabama House District 28, *id*. ¶ 8. Plaintiffs allege in the Complaint that they have been injured by Defendants' decision to use taxpayer funds to air what they characterize as partisan political ads during an ongoing state and federal election period. *Id*. ¶¶ 1-6, 44-88, 97-128.

Specifically, the Complaint alleges that "[t]he taxpayer-funded ads harm Plaintiffs because they give a 'competitive advantage' to candidates, causes, and organizations aligned with the President in the 2026 midterm elections, putting Plaintiffs at a disadvantage." *Id.* ¶ 97. With respect to Hunter, a Democratic Socialist running for office in the Alabama House of Representatives, *id.* ¶¶ 98, 102, Plaintiffs assert that the media depicting the President are placing him "at a competitive disadvantage." *Id.* ¶ 99. As to SEIU 32BJ and SEIU 32BJ PAC, Plaintiffs likewise allege that the media depicting the President puts the union's (and the union's PAC's) favored candidates at a competitive disadvantage to the extent those candidates are not aligned with the policies of the federal government or the Trump Administration. *Id.* ¶¶ 111, 122. Finally, Plaintiffs assert that the decision to use government funds to air such media depicting the President "interferes with Common Cause's core business activities." *Id.* ¶ 127.

The Complaint asserts nine claims for relief, including six counts under the APA, one *ultra vires* count, and two counts alleging a violation of the Equal Protection component of the Fifth Amendment. *Id.* ¶¶ 129-193.

On October 8, 2026, Plaintiffs filed a motion for a TRO. ECF No. 25. In their motion, Plaintiffs essentially rely on the same facts, as well as supporting declarations from Hunter, ECF No. 26-1 ("Hunter Decl."), declarations from representatives of SEIU 32BJ and SEIU 32BJ PAC, ECF Nos. 26-2 ("Banks Decl."), 26-3 ("Tall Decl."), and a declaration providing political advertising data, ECF No. 26-4 ("Ward-Packard Decl."), and seek broad emergency relief, including, among other things, an order (a) staying the Purchase Order contract between DHS and the Vendor, (b) staying OMB's apportionment of $20 million to fund the broadcast of certain media depicting the President of the United States; (c) enjoining DHS from using OMB's apportionment of $20 million to fund the broadcast certain media depicting the President, (d) canceling any

reservation for the airing of the media depicting the President that Plaintiffs are challenging; and (e) enjoining DHS from renewing or entering into any new agreement authorizing the creation or airing of the media depicting the President that Plaintiffs are challenging. *See* Pls. Br.; ECF No. 27 (Proposed Order).

**ARGUMENT**

**THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A TRO**

## I. Legal Standards

A preliminary injunction is an "an extraordinary and drastic remedy," which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation marks omitted). An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also New York v. Trump*, 765 F. Supp. 3d 287, 291 (S.D.N.Y. 2025) (noting that the standards for granting TROs and preliminary injunctions are the same). Where "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the plaintiffs "must establish a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation marks omitted); *see Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995) ("sufficiently serious questions" standard is inapplicable to a request for injunction against governmental action).

The "standard for a stay under 5 U.S.C. § 705" "is the same as the standard for a preliminary injunction." *New York v. U.S. Dep't of Educ.*, No. 20 Civ. 4260 (JGK), 2020 WL

4581595, at *5 (S.D.N.Y. Aug. 9, 2020); *see E. Air Lines, Inc. v. Civil Aeronautics Bd.*, 261 F.2d 830, 830 (2d Cir. 1958).

## II. Plaintiffs Fail to Demonstrate Article III Standing

The Court should deny the request for a TRO because Plaintiffs have not demonstrated the requisite standing to pursue their claims.[2] At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs must demonstrate standing at each stage of the litigation with an increasing burden of proof. *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (citing *Lujan*, 504 U.S. at 561). "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Id.* (internal quotation and citation omitted). "Consequently, to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation and citation omitted).

Here, Plaintiffs attempt to establish standing as "political competitors" under the "competitive advocate" theory of standing. *See* Pls. Br. at 11 & n.36. Plaintiff Hunter is the

---

[2] Standing is also relevant to the "likelihood of success on the merits" preliminary injunction factor, as that factor includes both the merits of the underlying claims and jurisdictional issues. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see also Munaf*, 553 U.S. at 690 (noting that when considering "likelihood of success on the merits" for a preliminary injunction, jurisdictional "impediments" "mak[e] such success more unlikely").

Democratic Party's candidate for Alabama House District 28 in the upcoming midterm election, Hunter Decl. ¶ 2; Plaintiffs SEIU 32BJ and SEIU 32BJ PAC are a labor union and its affiliated PAC, both of whom support progressive causes and candidates and are supporting several Democratic candidates for state and federal offices in the upcoming election, Tall Decl. ¶¶ 7-8, 12, 16-17; Banks Decl. ¶¶ 5, 7, 10, 19; *see also* Compl. ¶¶ 8-10. These plaintiffs do not have Article III standing because they establish neither an injury-in-fact nor that their alleged injuries could be redressed by a favorable decision from this Court.

**A. Plaintiffs Have Suffered No Injury-in-Fact**

Under the "competitor advocate" theory, a plaintiff may establish an injury as a competitor if she can show that she "personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit" so as to be "personally disadvantaged." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). This path to standing is narrow, however, as merely advocating for a position in a public political debate does not make one a "competitor" for standing purposes. *Id.* at 1030; *see also id.* ("strongly held beliefs are not a substitute for injury in fact" (citing *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 471 (1982))); *cf. Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (injury cannot be based on an entity's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem"); *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021) (to satisfy injury requirement, challenged action must do more than "merely harm [organization's] 'abstract social interests'" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))).

Plaintiffs have failed to make this showing. The media depicting the President of which Plaintiffs complain does not "personally disadvantage" them because they are not "personally compet[ing] in the same arena" with the party the media buys purportedly benefit—President

Trump. Pls. Br. at 11 (describing media as "government-approved messages that boost President Trump and attack his political opponents"). While this media attacks a generic list of "villains," it does not address any specific race, electoral candidate, or party. *See* Compl. ¶ 62 (describing ad that lists as "villains" "the deep state," "warmongers," "globalists," "the communists, Marxists, and fascists," "the sick political class," and "the fake news media"). Plaintiffs attempt to expand the scope of the "arena," by pointing to the President's recent public statements that voters should "pretend I'm on the ballot" as well as the "well-known fact about midterm elections" that "the more favorably the public views the President, the better his party does, up and down the ballot." Pls. Br. at 11. But Plaintiffs' theory goes too far; under it, essentially every non-Republican candidate running in any election (state or federal), and any organization or PAC supporting any non-Republican candidate should be considered to be "personally compet[ing] in the same arena" with President Trump (who is himself not running for office). Such an approach is untenable as it lacks any limiting principle and would "effectively give standing to any spectator who supported a given side in public political debate." *In re U.S. Catholic Conference*, 885 F.2d at 1030.

The fact that Plaintiff Hunter is a member of and endorsed by the Democratic Socialists of America and campaigns as a socialist, *see* Pls. Br. at 12, or that some of the candidates the SEIU 32BJ plaintiffs support "have been labeled socialists by their opposition," Banks Decl. ¶ 14, does not put any of these plaintiffs in direct personal competition with President Trump. And SEIU 32BJ and SEIU 32BJ PAC, which are not themselves candidates for office but merely organization that endorse and support progressive, pro-worker candidates, are not even direct competitors of any candidate or public official. *See AB PAC v. Fed. Election Comm.*, No. 22-2139 (TJK), 2023 WL 4560803, at *4 (D.D.C. July 17, 2023) ("No court has ever extended competitor standing to cover PACs . . . that seek to enforce political candidates' (or even other PACs') compliance with

campaign-finance laws."); *see also Gottlieb v. Federal Election Commission*, 143 F.3d 618, 621 (D.C. Cir. 1998) (rejecting competitor standing claims by a PAC and voters).

Plaintiffs argue that this case is analogous to *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002), in which the Second Circuit held that pro-choice organizations had standing to challenge a government policy under which anti-abortion groups (but not pro-choice groups) could receive support from federally funded foreign organizations. Pls. Br. at 13. But in that case, it was clear that the plaintiffs were players in a defined arena: the government had "bestowed a benefit on plaintiffs' competitive adversaries" by permitting "anti-abortion groups engaged in advocacy around the very same issues" to receive grants that they were denied. *Ctr. For Reprod. L. & Pol'y*, 304 F.3d at 197. No such direct competition exists here.

**B. The Alleged Injury Is Not Redressable by an Order from this Court**

Plaintiffs also cannot show that an order from this Court could redress the harm they allege they have suffered. Plaintiffs themselves acknowledge that any competitive disadvantage resulting from the airing of the media has already taken effect. Candis Tall, Executive Vice President and Political Director of SEIU Local 32BJ, states that "[t]he bell cannot be unrung on voters hearing these messages." Tall Decl. ¶ 20; *see also* Banks Decl. ¶ 21. And Robert Hunter states that as a result of the media buys, "[v]oters have heard this message and there is nothing I can do to erase its influence on them and on my electoral prospects." Hunter Decl. ¶ 10. As discussed above, DHS has directed its vendor not to make any additional media buys past October 11 and has no plans to make any additional media buys or otherwise use appropriated funds on any similar contracts. Mehringer Decl. ¶ 10. As such, for the same reason that Plaintiffs cannot show irreparable harm (as discussed below), the relief that they seek will not redress their alleged harm.

## III. If Only Plaintiff Hunter Has Standing, SDNY Is an Improper Venue

Venue in this district is predicated solely on the fact that SEIU 32BJ and its PAC reside here. Compl. ¶ 20 (citing 28 U.S.C. § 1391(e)(1)); *see* Hunter Decl. ¶ 1 (Hunter resides in Gadsden, Alabama). If the Court finds that they both lack standing, there is no basis for venue in SDNY. *See* 28 U.S.C. § 1391(e)(1); *Caremark*, 405 F. Supp. 2d at 463-64. Therefore, should the Court find that only Plaintiff Hunter has standing, venue does not properly lie in SDNY and this case should be dismissed or transferred to a district in which it could have been brought. *See* 28 U.S.C. § 1406.

## IV. Plaintiffs Fail to Show Irreparable Harm

Plaintiffs' motion for a TRO should also be denied because the allegedly improper final agency action will not continue after October 11. A movant can establish irreparable harm upon a showing that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks and citations omitted). The irreparable harm alleged must be "actual and imminent, not remote or speculative." *Id*. The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction" or a temporary restraining order. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991); *see also Winter*, 555 U.S. at 22.

Plaintiffs' irreparable harm argument rests on their assertion that continuing the media broadcasts from now until the November 3 midterm elections will continue to place them at a competitive disadvantage. As to Plaintiff Hunter, Plaintiffs assert that the media buys cause voters to "hear messages that attack [his] campaign and echo his opposition—overwhelming [his] campaign communications." Pls.' Br. at 10; *see also id.* at 25-26. As to SEIU 32BJ and SEIU 32BJ PAC, the media buys purportedly "reinforce . . . attacks with the public use of taxpayer

dollars, making it less likely that the progressive, pro-worker candidates that SEIU 32BJ and Empire PAC support will succeed," thereby harming them both. *Id*. at 10; *see also id.* at 26. However, the record plainly belies any likelihood of harm to Plaintiffs in the absence of injunctive relief.

As DHS's declarant has explained, the Vendor has already purchased media buys at an approximate $19 million cost under the terms of the Purchase Order through October 11, 2026. Mehringer Decl. ¶ 8. DHS has directed the Vendor not to make any additional media buys past October 11, and any residual funding left in the purchase order will be de-obligated after the Vendor has submitted a final invoice and has been paid for services rendered. *Id*. ¶¶ 8-9. DHS has no plans to obtain any additional media buys under the purchase order, to renew the purchase order, or otherwise use appropriated funds on any similar contracts for creating or distributing the ads that are the subject of this lawsuit. *Id.* ¶ 10.

Courts have recognized that the cessation of a challenged action is "'an important factor bearing on the question whether a court should exercise its power' to entertain a request for injunctive relief or declare it moot." *Holland v. Goord*, 758 F.3d 215, 223 (2d Cir. 2014) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 190 n.6 (S.D.N.Y. 2023) ("traditional principles of equity . . . limit injunctive relief to *future* violations") (emphasis in original). Moreover, "[s]ome deference must be afforded to the representations of a public authority that certain conduct has been discontinued." *American Freedom Defense Initiative v. Metropolitan Transportation Authority*, 109 F. Supp. 3d 626, 630 (S.D.N.Y. 2015) (citing *Lamar Advertising of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 376 (2d Cir. 2004)). Because "[t]he sole function of an action for injunction is to forestall future violations," *United States v. Oregon State Medical*

*Society*, 343 U.S. 326, 333 (1952), there is no basis for this Court to grant injunctive relief for challenged conduct that will cease after tomorrow. *See, e.g.*, *Int'l Gemmological Institute v. Independent Gemological Labs, Inc.*, No. 00 Civ. 4897 (LAK), 2000 WL 1278179, at *1 (S.D.N.Y. Sept. 7, 2000) (denying preliminary injunction motion where defendant ceased challenged conduct, because the "cessation surely is relevant to a claim for a preliminary injunction"); *American Freedom Defense Initiative*, 109 F. Supp. 3d at 633 (holding that "plaintiffs' request for injunctive relief is moot" because, *inter alia*, defendant "is no longer enforcing the regulations at issue in the Court's prior order").

## V. The Scope of Plaintiffs' Requested TRO Is Overbroad

If this Court nonetheless is inclined to grant Plaintiffs' motion for a TRO and a stay—which it should not—any order should be appropriately tailored to the perceived exigency. *See, e.g.*, *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) ("[i]njunctive relief should be narrowly tailored to fit specific legal violations") (internal quotation marks and citation omitted); *LVM v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (same). Contrary to settled law, the proposed order submitted by Plaintiffs (ECF No. 27) is far broader than necessary.

For example, Plaintiffs request that the Court order that "within 24 hours, Defendants shall file with the Court and serve upon Plaintiffs a declaration identifying: (a) all appropriated funds obligated or expended for the above-referenced advertisements; (b) all amounts not yet expended by contractors or subcontractors; (c) all currently scheduled future advertising placements; and (d) all contracts, task orders, and funding instruments relating to the advertisements." ECF No. 27 at 2. However, as the Court remarked at the parties' initial appearance, this provision is more akin to "expedited discovery," Transcript of October 9, 2026 Conference at 11-12, than proper relief to address imminent irreparable harm. In addition, Plaintiffs' proposed order would stay "OMB's apportionment of $20 million to fund the development, creation, and airing of the taxpayer-funded

ads." ECF No. 27 at 1. However, the funds have already been obligated on the contract, the Vendor has already performed services under the purchase order, and DHS anticipates that the final invoice will be submitted shortly requiring disbursement. *See* Mehringer Decl. ¶ 8. In fact, that apportionment for Fiscal Year 2026 is no longer in effect, as the fiscal year has passed, and OMB cannot reapportion a past period according to OMB Circular A-11, section 120. And, a new initial apportionment has already been executed for Fiscal Year 2027. In sum, stay of OMB's apportionment of the $20 million in the prior fiscal year does nothing to provide redress. Accordingly, this relief is overbroad. Finally, two of the paragraphs in Plaintiffs' proposed order reference the Complaint in describing the nature of the media that should be subject to the TRO. ECF No. 27 at 1-2. But Fed. R. Civ. P. 65(d)(1) expressly forbids a court from referring to the complaint in describing what is required under the TRO. *Id*. ("Every order granting an injunction and every restraining order must: . . . (C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required.").

## VI. Plaintiffs Should Be Required to Post a Bond

If the Court grants a TRO and a stay (which the Court should not do), it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post bond pursuant to Rule 65(c).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order and a stay.

Dated: October 10, 2026
New York, New York

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: *\/s/ Jeffrey Oestericher*
JEFFREY S. OESTERICHER
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
Email: jeffrey.oestericher@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, that this brief complies the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 4,634 words in this brief.

Dated: New York, New York
October 10, 2026

*/s/ Jeffrey Oestericher*
JEFFREY S. OESTERICHER
Assistant United States Attorney