**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

**Common Cause** et al.,

Plaintiffs,

v.

**Department of Homeland Security** et al.,

Defendants.

**Case No. 26-cv-8882**

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A SECTION 705 STAY**

## TABLE OF CONTENTS


Table of Authorities ..... iii

Introduction ..... 1

Argument ..... 3

- I. Plaintiffs have standing. ..... 3
  - A. Plaintiffs are suffering an irreparable injury. ..... 3
  - B. The injury is redressable. ..... 5
- II. Plaintiffs will continue to suffer irreparable harm absent a stay or injunction. ..... 6
- III. The public interest strongly favors relief and Defendants claim no harm. ..... 9
- IV. Defendants do not contest that the TRO should be nationwide and run against all Defendants, and their only objections to the scope of relief lack merit. ..... 9

Conclusion ..... 11

# TABLE OF AUTHORITIES

## Cases

*Blanding v. Martuscello*,
No. 26-cv-4999, 2026 WL 2123417 (S.D.N.Y. July 23, 2026) .................................. 6

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026) .................................................................................. 4, 9

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982) .................................................................................. 6, 7

*CREW v. Trump*,
971 F.3d 102 (2d Cir. 2020) .................................................................................. 3

*Ctr. for Reprod. L. & Pol'y v. Bush*,
304 F.3d 183 (2d Cir. 2002) .................................................................................. 3, 4, 5

*Ctr. for Taxpayer Rts. v. IRS*,
No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026) .................................. 9

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .................................................................................. 3

*Doctor's Assocs., Inc. v. Distajo*,
107 F.3d 126 (2d Cir. 1997) .................................................................................. 10

*FBI v. Fikre*,
601 U.S. 234 (2024) .................................................................................. 6

*First Choice Women's Res. Centers, Inc. v. Davenport*,
608 U.S. 174 (2026) .................................................................................. 3

*Fulani v. League of Women Voters Educ. Fund*,
882 F.2d 621 (2d Cir. 1989) .................................................................................. 4

*Gov't Emps. Ins. Co. v. Patel*,
166 F.4th 280 (2d Cir. 2026) .................................................................................. 8, 9

*Holland v. Goord*,
758 F.3d 215 (2d Cir. 2014) .................................................................................. 8

*In re U.S. Catholic Conference*,
885 F.2d 1020 (2d Cir. 1989) .................................................................................. 5

*Khalil v. Joyce*,
No. 25-cv-1935, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025) .................................. 6

*League of United Latin Am. Citizens v. EOP*,
818 F. Supp. 3d 34 (D.D.C. 2026) .................................................................................. 9

*Moreno-Bravo v. Gonzales*,
463 F.3d 253 (2d Cir. 2006)........................................................................ 6

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018)........................................................................... 8

*Nat'l Coal. on Black Civic Participation v. Wohl*,
498 F. Supp. 3d 457 (S.D.N.Y. 2020)........................................................... 6

*Nat'l Republican Senatorial Comm. v. FEC*,
146 S. Ct. 2404 (2026)............................................................................. 3, 4

*Nat'l Urban League v. Ross*,
491 F. Supp. 3d 572 (N.D. Cal. 2020) ........................................................ 10

*New York v. Admin. for Children & Families*,
833 F. Supp. 3d 361 (S.D.N.Y. 2026)........................................................... 9

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981).................................................................................... 11

*Valenzuela Arias v. Decker*,
612 F. Supp. 3d 307 (S.D.N.Y. 2020)......................................................... 10

*Widakuswara v. Lake*,
No. 25-cv-2390, 2025 WL 1020231 (S.D.N.Y. Apr. 4, 2025) .................................... 6

**Rules**

Fed. R. Civ. P. 65 ........................................................................................ 2, 10

**Other Authorities**

BakerHostetler, *Revisiting Makegoods in Media Buys*, Adventures in Law (Aug. 13, 2024), https://perma.cc/2KCL-B9D9..................................................... 11

Mack N. Butler for Ala. House District 28, https://perma.cc/3VQX-RQDN..................... 4

NFL, *Schedule 2026*, https://perma.cc/3EHN-84QU ........................................................ 7

Nicholas Kerr, *Trump says his super PAC will now pay for controversial taxpayer-funded promotional ads*, ABC News (Oct. 6, 2026), https://perma.cc/NY88-BUXY ....................................................................... 8

SAM.gov, *Contract Summary*, https://perma.cc/ZBR6-YVED......................................... 8

The Athletic, *Projecting the 2026 NFL schedule's most-watched national TV games*, https://perma.cc/Z3F4-KSYT ............................................................... 7

USA Spending, *Contract Summary*, https://perma.cc/57GK-G7DB.................................. 8

USA Spending, *Glossary*, https://perma.cc/JW76-3FKF .............................................. 7, 8

## INTRODUCTION

Defendants admit that appropriated funds were used to pay for political ads and do not dispute that this use of taxpayer money is unlawful. Instead, much of Defendants' opposition boils down to a single premise: it is too late for the Court to act. That is not because Defendants have stopped airing the ads. Indeed, Defendants assert—boldly, given their failure to defend the ads on the merits—that ads will continue to air today, including during evening programming that will attract millions of viewers. Rather, Defendants say there is nothing for this Court to do because the Defendants will stop airing the ads *soon*—presumably by the time Defendants believe the Court can rule on the motion. That attempt to run out the clock does not cut against issuing a TRO and a Section 705 stay; it shows why the Court should grant relief today.

Even if relief could not be issued today, Defendants' opposition shows why it is necessary going forward. Beyond their soon-to-be-cessation argument, Defendants offer no guarantee that the ads will not continue beyond today. They acknowledge that the contract with the ad agency runs until September 2027. They acknowledge that there is still $1,000,000 remaining for this ad-buy. And they admit that the $20 million "purchase order" was made possible by a "blanket purchase agreement" for media services that remains in effect.

Despite all that, Defendants insist that there is nothing to see here because the vendor has been directed not to make additional media buys under this purchase order past October 11 and DHS currently "has no plans to make any additional media buys under the [$20 million purchasing order] or to renew the Order or otherwise use DHS appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit." Mehringer Decl. ¶¶ 8, 10, Dkt. 38. Considering that Defendants state they will continue to run the ads *today*, the vague statement that DHS currently has no current "plans" to use the remaining $1,000,000—which has

not been de-obligated and remains available—rings hollow. So too does the limited vow not to use "any similar contracts" to air these ads going forward.

That is to say nothing of OMB's ability to shift around other funds and once again fund the President's political propaganda campaign with money Congress appropriated for another purpose. The Court informed Defendants that it wanted to know if "Mr. Trump instructed the OMB director, Russell Vought, after the meeting to find government funds to pay for advertisements." Hr'g Tr. 19. Defendants do not answer that question. And, despite submitting a declaration from OMB, they provide no assurance that OMB will not apportion any more funds for these purposes, to DHS or any other agency.

Worse yet, Defendants do not even mention the White House and the role the Executive Office of the President played in orchestrating this entire scheme. The Court asked Defendants about the meeting in which Plaintiffs allege that President Trump spoke with Susie Wiles and Natalie Harp, among others, and directed the creation and distribution of these ads. Hr'g Tr. 18. Defendants ignore that allegation entirely. And they provide no assurance that EOP will not continue to work with OMB to again find money for these ads. Similarly, Defendants offer no commitment not to use further EOP appropriations to create or disseminate these or similar ads—a noteworthy omission given that Defendants say only that DHS's vendor was not involved in the creation of these ads, without saying whether other taxpayer funds were used.

Finally, Defendants do not contest three key aspects of the relief that Plaintiffs have requested: that, given the nationwide ad buys at issue, the TRO should not be geographically limited; that all defendants, including EOP, should be enjoined; and, pursuant to Rule 65, that LMD and LMO Agencies should be required to cancel any existing ad buys.

For these reasons, the requested TRO and Section 705 stay should issue today.

## ARGUMENT

### I. Plaintiffs have standing.

Plaintiffs meet all three elements of standing to seek prospective relief: a "substantial risk" of injury traceable to the challenged actions and redressable by the Court. *Dep't of Com. v. New York*, 588 U.S. 752, 766-67 (2019); *accord CREW v. Trump*, 971 F.3d 102, 128 (2d Cir. 2020) (Leval, J., concurring) ("substantial risk of competitive injury" is sufficient).

#### A. Plaintiffs are suffering an irreparable injury.

Defendants acknowledge that parties engaged in the political process have standing to sue when the government provides a benefit to their competitors. But they argue Plaintiffs lack standing because they do not "personally compete[] in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." *Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002) (cleaned up). As Defendants tell it, the only person who "purportedly benefit[s]" from the taxpayer-funded ads is President Trump. Opp'n 2, 8-9. But "courts may make 'commonsense inferences' when assessing Article III standing." *First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. 174, 190 (2026). The ads are plainly designed to benefit more than just the President. Commonsense suggests that when the leader of a political party runs $19 million in political commercials to extol his policies and attack the opposing party during an ongoing election period, he means to sway voters in those elections.

The undisputed facts establish a substantial risk that the ads will influence the elections in which Plaintiffs participate. Even Defendants acknowledge the "well-known fact about midterm elections" that "the more favorably the public views the President, the better his party does, up and down the ballot." Opp'n 9. Because so many voters see the midterms as a "referendum on the…[P]resident" as the leader of his party, ads that boost Trump are substantially likely to boost his party. Pls.' Br. 21, Dkt. No. 26; *see Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct.

2404, 2425 (2026) ("[P]arty affiliation is the primary way by which voters identify candidates." (citation omitted)). And Trump openly refers to Democrats as "socialists" and communists" every day. Pls. Br. 7 & n.20. When he uses those terms in the ads, voters know what he means.

The ads are substantially likely to influence Robert Hunter's election. They specifically attack socialists, and Hunter is running as a democratic socialist. Hunter Decl. ¶ 2. The ads build up Trump, and Hunter's opponent is running on his association with Trump. *Id.* ¶ 9. The Court need not speculate to conclude that the ads are a headwind to Hunter and a boon to his "Trump Tested" opponent. *Mack N. Butler for Ala. House District 28*, https://perma.cc/3VQX-RQDN. Because Hunter and his opponent indisputably compete in the "same arena," Hunter has a competitive injury. *Ctr. for Reprod. L.*, 304 F.3d at 197. That Hunter's opponent does not directly receive the government funds does not erase the advantage he receives from them. *See*, *e.g*., *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 625-26 (2d Cir. 1989) (holding that candidate suffered competitive injury even though the government benefit—a tax exemption—went to the host of the debate and indirectly benefited his opponents in the race).

Indeed, Hunter does not just have standing as "common competitor," *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 78 (2026); as a candidate, he also has a special interest in the "integrity of the election" in which he is running. *Id.* at 82. By diverting taxpayer funds to influence that election, the challenged actions impair the "democratic process" by which Hunter will "earn or lose the support of the people [he] seek[s] to represent." *Id.* Defendants do not even attempt to address Hunter's independent ground for standing under *Bost.*

SEIU 32BJ and Empire PAC both have standing, even under Defendants' blinkered view of the "same arena." They and Trump are both supporting candidates in the midterms. Contrary to Defendants' suggestion, neither SEIU 32BJ nor Empire PAC is "merely advocating for a position

in a public political debate," Opp'n 8: They have both committed significant resources to the election of their endorsed candidates, which (for SEIU 32BJ and Empire PAC) include Democrats who have been labeled socialists or communists by the President and members of his party. Banks Decl. ¶ 14; Tall Decl. ¶¶ 16-17. But only Trump has access to the government's coffers to aid his political efforts. The administration's misuse of government funds has effectively turned DHS into a PAC for the President's party. The unequal playing field it produces inflicts a competitive injury on SEIU 32BJ and Empire PAC.

Defendants' chief Second Circuit case reinforces Plaintiffs' standing. There, the plaintiff-organizations lacked standing because they had access to the benefit at issue (a tax exemption) and did not "match the [defendants'] alleged electioneering with their own." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). Unlike those organizations, SEIU 32BJ/Empire PAC and Trump are directly engaged and spending resources on opposite sides of the election. In that way, they are more like the organizations in *Center for Reproductive Law*, which advocated different sides of the abortion debate. 304 F.3d at 197. Though Defendants complain that this would give PACs supporting candidates around the country standing to challenge the ads, Opp'n 9, it could do so only because the administration broadcast them nationwide to influence elections across the country. *See* Ward-Packard Decl. ¶¶ 14-17.

**B. The injury is redressable.**

Defendants do not challenge causation. Instead, they suggest that Plaintiffs' injuries are not redressable because "any competitive disadvantage resulting from the airing of the media has already taken effect." Opp'n 10. Not so. The government's unlawful advertisements reach more viewers and harm Plaintiffs anew each time they run (and, again, Defendants state that they

continue to run today). The relief Plaintiffs seek—which would prevent the government's ads from reaching viewers and tilting the elections—therefore redresses Plaintiffs' ongoing injury.[1]

**II. Plaintiffs will continue to suffer irreparable harm absent a stay or injunction.**

Defendants suggest that the request for injunctive relief is "moot," Opp'n 12, because DHS has told the ad agency to stop running the political ads and, "to the best of [her] knowledge," DHS has "no plans" to buy more such ads, Mehringer Decl. ¶ 10. But Defendants cannot moot a case by claiming, as DHS does here, that the conduct has stopped and they have no plan to repeat it. *See FBI v. Fikre*, 601 U.S. 234, 241 (2024) (declaration that the plaintiff "will not be placed on the No Fly List in the future based on the currently available information" did not moot case). If "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case," *City of Mesquite v. Aladdin's Castle, Inc*., 455 U.S. 283, 289 n.10 (1982) (cleaned up), then certainly soon-to-be-voluntary-cessation doesn't.

The same holds for preliminary relief. "A defendant's expressed intention to cease the offending conduct is not sufficient to eliminate the possibility of irreparable harm absent the existence of a consent injunction or other enforceable assurance that the offending conduct will not recur." *Blanding v. Martuscello*, No. 26-cv-4999, 2026 WL 2123417, at *16 (S.D.N.Y. July 23, 2026) (cleaned up); *see Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 475 (S.D.N.Y. 2020) (issuing preliminary injunction even though defendants claimed that they

[1] Defendants' argument that Plaintiffs may lack venue provides no basis to deny the TRO or stay. Venue "is a concept of convenience, not a jurisdictional mandate," *Moreno-Bravo v. Gonzales*, 463 F.3d 253, 258 (2d Cir. 2006), and courts may grant relief that survives a subsequent change of venue. *See, e.g., Widakuswara v. Lake*, No. 25-cv-2390, 2025 WL 1020231, at *4 (S.D.N.Y. Apr. 4, 2025), Dkt. No. 61 (transferring venue but ordering that an already-granted TRO would "remain[] in full force and effect" unless the new court otherwise ordered); *Khalil v. Joyce*, No. 25-cv-1935, 2025 WL 849803, at *14 (S.D.N.Y. Mar. 19, 2025) (similar). If this Court has jurisdiction—and it does—it may grant the TRO without further considering venue. Defendants notably do not argue otherwise.

had stopped the offending conduct and had "no plans for further [such conduct] in the future"). If it were, "the courts would be compelled to leave '[t]he defendant ... free to return to his old ways,'" *City of Mesquite*, 455 U.S. at 289 n.10, until the case reaches final judgment.

Here, Defendants have offered no "enforceable assurance" that they will not continue to run the government-funded political ads. To the contrary, Defendants admit that contract remains in effect, state that the ads continue to run, and conceded that at least $1 million remains obligated to pay for more. And although Defendants say they will de-obligate the additional million dollars, *see* Mehringer Decl. ¶ 9, they have not said how or when. That is far from an enforceable assurance.

Indeed, absent judicial relief, the administration's government-funded political ads will, according to its own declarant, continue to run tonight—and during some of the most popular national programming in America. *See* Mehringer Decl. ¶ 8 (the ad agency "has currently purchased media buys under the terms of the Order through Sunday, October 11, 2026"); *id.* ¶ 5 (the contract required the ad agency to place ads on "evening cable news," Sunday shows including broadcasts, and football commercial buys"); NFL, *Schedule 2026*, https://perma.cc/3EHN-84QU, (showing National Football League games airing at 8:20 p.m., 4:25 p.m., and 4:05 p.m. on CBS and FOX); The Athletic, *Projecting the 2026 NFL schedule's most-watched national TV games*, https://perma.cc/Z3F4-KSYT, ("NBC's 'Sunday Night Football' has been America's most-watched prime-time TV program for 15 straight years.").

Second, DHS has already set up a mechanism to buy more ads in the future. Customs and Border Protection made the $20 million obligation under a Blanket Purchase Agreement (BPA) with LMD that is still in effect. Mehringer Decl. ¶ 3. A BPA is a method that agencies use to "speed up the process of repeated purchases" of supplies or services. *Id.*; USA Spending, Glossary, https://perma.cc/JW76-3FKF. "Once a BPA is set up, repeat purchases are easy for both sides."

*Id.* On September 21, 2026—the day after CPB made the $20 million ad purchase order—the government modified the BPA with the ad agency to give CPB "full authority" to place more orders from the agency. *See* SAM.gov, *Contract Summary*, https://perma.cc/ZBR6-YVED; USA Spending, Contract Summary, https://perma.cc/57GK-G7DB. DHS could easily use that authority to order new ads tomorrow.

And third, even as President Trump tweeted that his PAC would fund future ads, he continued to claim that funding them with "U.S.A. money" was not only legal, but a "standard thing to do." Nicholas Kerr, *Trump says his super PAC will now pay for controversial taxpayer-funded promotional ads*, ABC News (Oct. 6, 2026), https://perma.cc/NY88-BUXY.

All this distinguishes this case from the only Second Circuit case government cites, which involved a binding reversal of the challenged conduct. *See*, *e.g*., *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (prison amended its regulations "specifically to prohibit the conduct of which [the plaintiff] complain[ed]," plaintiff won his administrative appeal, and defendants abandoned their argument that the challenged conduct had been constitutional).

Here, in contrast, there is "a substantial chance" that the "final resolution of the action" will not restore the status quo. *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291 (2d Cir. 2026).[2] Every minute that the government-sponsored political ads continue to run is another minute that the federal government illegally influences elections in which the plaintiffs participate—and another minute that voters cannot unsee and unhear, skewing the election. No amount of "money damages" would repair that harm. *Id.*

---

[2] The requested TRO and stay would only restore the status quo ante—the "the last actual, peaceable uncontested status which preceded the pending controversy," i.e., before the defendants' "wrongdoing" occurred. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 & n.5 (2d Cir. 2018).

**III. The public interest strongly favors relief and Defendants claim no harm.**

Defendants do not contend that preliminary relief will inflict any harm on them or harm the public interest. Nor could they.[3] Given that Defendants do not even defend the legality of the ads, Plaintiffs have an "extremely high likelihood of success on the merits," meaning the requested relief will "serve the public interest" because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *New York v. Admin. for Children & Families*, 833 F. Supp. 3d 361, 403 (S.D.N.Y. 2026). That is especially true here. Unlawful election interference by the government shakes public confidence in elections—a process "of the most fundamental significance under our constitutional structure." *Bost*, 607 U.S. at 77.

**IV. Defendants do not contest that the TRO should be nationwide and run against all Defendants, and their only objections to the scope of relief lack merit.**

Defendants do not contest that if the Plaintiffs prevail on the TRO and stay factors, relief should run nationwide against all Defendants, including EOP. APA stays suspend legal effect of the agency action as to everyone, not just particular plaintiffs. *See*, *e.g.*, *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, 2026 WL 2635380, at *14 (D.C. Cir. Sept. 8, 2026). And the government does not suggest the Court could provide complete relief to Plaintiffs without enjoining the continued ad placements, which are aired at the "national level." Mehringer Decl. ¶ 5; see *League of United Latin Am. Citizens v. EOP*, 818 F. Supp. 3d 34, 92 (D.D.C. 2026) (court can award nationwide relief when "necessary to provide complete relief to the prevailing Plaintiffs before the Court").

Defendants argue that Plaintiffs' proposed order is too broad in other ways. Opp'n 13-14. But the Court has "wide discretion" in determining whether and how to fashion its grant of equitable

[3] Indeed, if Defendants truly mean to stop the advertisements going forward, as they claim, an order stopping them from doing so certainly would do no harm.

relief, *Valenzuela Arias v. Decker*, 612 F. Supp. 3d 307, 311 (S.D.N.Y. 2020), and the objections Defendants raise lack merit.

Defendants quibble with the wording of Plaintiffs' proposed order because it refers to the complaint, Opp'n 13, but the Court can easily revise the order to refer to the specific advertisements identified in the Complaint. Defendants also take issue with the request for a declaration concerning the funds obligated and expended on the challenged advertisements and any currently scheduled future advertising placements. *Id*. But that information goes directly to the court's ability to determine compliance once its order is in place. *See, e.g.*, *Nat'l Urban League v. Ross*, 491 F. Supp. 3d 572, 583-84 (N.D. Cal. 2020) (ordering agency to file declaration that "confirms Defendants' ongoing compliance with the Injunction Order and details the steps Defendants have taken to prevent future violations of the Injunction Order").[4]

Defendants also suggest that the Court cannot stay OMB's apportionment of the funds because of the new fiscal year. Opp'n 14. But it is not clear why that would prevent a stay. And in any event, the Court can still stay DHS's obligation to the ad agency and enter the requested TRO.

Finally, the TRO should, as requested, prevent any further disbursement of funds by DHS in connection with these advertisements. In objecting to other aspects of the requested relief, Defendants do not contest this point. And Defendants state that DHS "expects" a final invoice sometime after October 11 and that, "[o]nce received, that invoice will be paid" with funds that Defendants do not contest were not appropriated for this purpose. The Court retains broad equitable authority to fashion relief that addresses the challenged expenditures and any remaining

[4] Plaintiffs should not be required to post a bond. The Court has wide discretion to dispense with Rule 65(c)'s bond requirement "where there has been no proof of likelihood of harm" to the restrained party. *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 136 (2d Cir. 1997). Defendants do not claim they will suffer any harm if the Court issues the requested relief. *See* Opp'n 14. The Court should therefore dispense with the bond requirement.

disbursements in a manner that maintains the status quo by preventing one more cent of taxpayer funds from going towards these unlawful advertisements. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Further, under market-standard ad-buying contract provisions, networks often run additional ads when collecting payment, to reconcile any shortfall in guaranteed impression numbers. Stopping payment to LMD and LMO here will prevent such "makegood" ads—which are otherwise market-standard—from running in coming days. DHS's instruction not to purchase new airtime, by contrast, will not. *See* BakerHostetler, *Revisiting Makegoods in Media Buys*, https://perma.cc/2KCL-B9D9.

## CONCLUSION

The Court should grant the motion for a TRO and Section 705 stay.

October 11, 2026

Respectfully submitted,

*<u>/s/_Bradley Girard__</u>*
Bradley Girard+
Sean Ouellette+
Michael J. Gaffney*
Anashua Dutta*
Paul R.Q. Wolfson*
Robin F. Thurston*
**Democracy Forward**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
egoldstein@democracyforward.org

Bruce V. Spiva*
Tara Malloy*
Brent Ferguson*
Sejal Jhaveri
Renata O'Donnell
Katherine Hamilton*
**Campaign Legal Center Action**
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 736-2200

Brendan Ballou*
Samuel T. Ward-Packard*
**Public Integrity Project Action, Inc.**
1763 Columbia Rd. NW, Suite 175
Washington, DC 20009
(917) 684-3900

*Counsel for Plaintiffs*

+ Motion to appear pro hac vice pending
* Motion to appear pro hac vice forthcoming

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.1(c), I hereby certify that this memorandum of law was prepared using Microsoft Word, and that using the Word Count feature, it is 3,491 words, including footnotes and not including those portions of the memorandum excluded from the word count by Local Rule 7.1(c).

/s/ *Bradley Girard*
Bradley Girard