UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMON CAUSE, ROBERT HUNTER, SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ, and EMPIRE STATE 32BJ SEIU PAC,

Plaintiffs,

-against-

DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary of the Department of Homeland Security, in his official capacity; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, Director of the Office of Management and Budget, in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT; and SUSIE WILES, White House Chief of Staff, in her official capacity,

Defendants.

Case No. 1:26-cv-08882 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs Common Cause, Robert Hunter ("Hunter"), Service Employees International Union Local 32BJ ("SEIU 32BJ"), and Empire State 32BJ SEIU PAC ("Empire PAC") (collectively, "Plaintiffs") bring this action against Defendants Department of Homeland Security ("DHS"), Markwayne Mullin ("Mullin"), Office of Management and Budget ("OMB"), Russell Vought ("Vought"), the Executive Office of the President ("EOP"), and Susie Wiles ("Wiles"). *See* Dkt. 1 ("Compl." or the "Complaint"). Plaintiffs challenge the use of taxpayer funds appropriated to the Department of Homeland Security to finance a television advertisement campaign featuring President Donald Trump in the weeks before the November 2026 midterm elections, contending, among other things, that the expenditures exceed the purposes authorized by Congress and violate restrictions on appropriated funds being used for publicity and

propaganda. Now before the Court is a motion filed by Plaintiffs Hunter, SEIU 32BJ, and Empire PAC (the "Moving Plaintiffs") on the evening of October 8, 2026, for a temporary restraining order and stay under Section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705. Dkt. 25 ("Mot.").

The Court held a conference to discuss the motion on Friday, October 9, 2026, the morning after the motion was filed, because the Moving Plaintiffs sought expedited relief before the weekend, when the challenged advertisements would continue to be shown. *See* October 9, 2026 Transcript ("Tr."). Defendants expressed that they needed more time to address the substantive merits of the motion and gather the relevant factual information. Tr. at 4:1-4, 8:3-5, 19:2-4. The Court therefore permitted them additional time to respond to the motion, ordering expedited briefing through the weekend and a follow-up conference on October 13, 2026. *See* Dkt. 33. Such briefing concluded by midday on Sunday, October 11, 2026. Dkts. 37-40. In their opposition, Defendants did not contest that the placements for the challenged advertisements were paid for by taxpayer appropriated funds for border security, technology, and screening and did not dispute Plaintiffs' contention that use of those funds violated the Purpose Act and the Appropriations Act. Instead, Defendants argued that mootness and lack of standing deprived the Court of jurisdiction to grant relief. After reviewing the parties' papers and arguments, the Court informed the parties that it did not require the additional October 13, 2026 conference and issued an Order GRANTING the Moving Plaintiffs' motion for temporary injunctive relief in the early evening of Sunday, October 11, 2026, stating that an opinion would follow shortly (the "October 11, 2026 Order"). *See* Dkt. 41. This is the opinion in support of the October 11, 2026 Order.

## BACKGROUND

"When considering a motion for [injunctive relief], . . . the Court need not accept as true the well-pleaded allegations in Plaintiff[s'] [C]omplaint." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (quoting *Victorio v. Sammy's Fishbox Realty Co.*, No. 14-cv-08678 (CM), 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014)); *see also AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical."). Instead, the "[C]ourt may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. OptumRx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, No. 01-cv-09587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003)). "Rule 52(a)'s requirement of findings of fact and conclusions of law upon the issuance of interlocutory injunctions does not apply to a [temporary restraining order]." *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2d Cir. 1994).

### I. Factual Background

The present dispute concerns an advertising campaign praising the United States and President Donald Trump and describing certain political ideologies and perceived adversaries in sharply negative terms. In short, Plaintiffs allege that, at the direction of the EOP, federal officials and agencies redirected taxpayer funds appropriated for border-security purposes to finance an advertising campaign in advance of the November 3, 2026 midterm elections. *See* Compl. ¶¶ 1-6, 41-47. The evidence before the Court consists of public reporting and declarations from the Moving Plaintiffs concerning the advertisements and their asserted effect on candidates and political organizations, as well as declarations from Defendants concerning the allocation and use of federal funds for the advertisements.

### A. Funding the Advertisements with Taxpayer Appropriated Funds

In its May 20, 2025 report accompanying H.R. 1, the House Committee on the Budget proposed approximately $6.266 billion in separately specified appropriations for border security technology and related activities. *See* H.R. Rep. No. 119-106, at 790-92 (2025). One such appropriation was for "commemorative events honoring meritorious contributions and achievements related to border security, including events recognizing victims of crimes." *Id.* at 792. Identified "[e]xamples of such events include[d] Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies," with funding to be "used for venue and setup, program materials, commemoratives (e.g., plaques, flags, awards)[,] and personnel services (e.g., honor guard, officiants, security)." *Id.*

As enacted in July 2025, Congress reduced the total appropriation to $6.168 billion and consolidated the separate allocations into a single lump-sum appropriation to U.S. Customs and Border Protection ("CBP"), a component of DHS, for specified expenses related to "border security, technology, and screening," to remain available for obligation through September 30, 2029. *See* Reconciliation Act, Pub. L. No. 119-21, § 90004, 139 Stat. 72, 359 (2025) (H.R. 1) ("[T]here is appropriated to the Commissioner of U.S. Customs and Border Protection for fiscal year 2025 . . . to remain available until September 30, 2029, $6,168,000,000 for the following[.]"). The listed expenses track the allocations identified in the House report but at a higher level of generality: "[p]rocurement and integration of new nonintrusive inspection equipment and associated civil works," "upgrading and procurement of new platforms for rapid air and marine response capabilities," "[u]pgrades and procurement of border surveillance technologies," "[s]creening persons entering or exiting the United States," "combating drug trafficking," and "[c]ommemorating efforts and events related to border security." *Id.* The final category is the subject of the parties' dispute.

OMB initially apportioned $500,000 towards the commemorative category in November 2025.[1] On September 19, 2026, at 6:15 p.m., CBP submitted a request to OMB to reapportion funds that were appropriated by section 90004 of the Working Families Tax Cut Act (Pub. L. No. 119-21) within CBP's "Operations and Support" account. Dkt. 39 ("Woolf Decl.") ¶ 3. The CBP request sought to make an additional $20 million available for obligations under line 6043 for "commemorative events" by reallocating funds from the following fiscal year. *Id.* ¶ 4. The request was approved by OMB that evening, less two hours later, at 7:50 p.m. *Id.* ¶ 5. OMB increased the commemorative events line item by $20 million.[2] *Id.* ¶¶ 3-5. The following day, on September 20, 2026, CBP issued a $20 million purchase order to Lepugh, Inc. d/b/a LMD Agency, Inc. ("LMD") for a "National Media Campaign" (the "PO"),[3] pursuant to a "previously awarded" blanket purchase agreement. Dkt. 38 ("Mehringer Decl.") ¶ 3. Holly Mehringer ("Mehringer"), the Senior Official Performing the Duties of the Chief Financial Officer for DHS, attests that the PO, funded by the appropriation for commemorative events, covers only the placement — not the creation or production — of the advertisements at issue. Mehringer Decl.

---

[1] *See* OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/3LH8-6BXF (last visited Oct. 11, 2026); *see also* Compl. ¶ 77 n.24; OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/7SKN-8B7L (last visited Oct. 11, 2026).

The Court here relies on Protect Democracy Project's OpenOMB searchable database of federal spending authorization, the underlying data for which comes directly from OMB. *See* OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/3LH8-6BXF (providing "[d]ownload primary source" link); *see also Approved Apportionments*, OMB, https://apportionment-public.max.gov (last visited Oct. 11, 2026) ("The public release of apportionment documents on this website fulfills the requirement in Public Law 117-103 for [OMB] to post each document apportioning an appropriation.").

[2] OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/7SKN-8B7L (last visited Oct. 11, 2026).

[3] *Contract Summary*, USASpending.Gov, https://perma.cc/MB53-7CCC (last visited Oct. 11, 2026).

¶¶ 1, 4-6. The advertisements began airing three days later, on September 23, 2026. *See* Dkt. 26-4 ("Ward-Packard Decl.") ¶ 4. The PO's "period of performance" is "September 20, 2026 through September 19, 2027, or until all deliverables and media placements have occurred." Mehringer Decl. ¶ 7.

Plaintiffs assert that the decision to use federal funds to finance these advertisements came from the White House. Relying on reporting from the New York Times,[4] Plaintiffs claim that one month before this reapportionment of funds and the purchase order with LMD, on August 7, 2026, President Trump, along with Wiles and others, met with Republican political strategists to discuss the upcoming elections and the use of funds from MAGA Inc., a political action committee, to support Republican candidates in the midterm elections.[5] Compl. ¶ 41. During that meeting, President Trump reportedly expressed a desire to promote his administration and showed the strategists videos of himself, including footage later incorporated into one of the challenged advertisements.[6] *Id.* ¶¶ 42-43. Plaintiffs allege that the President subsequently instructed Vought, OMB's Director, to find government funds to pay for the advertisements.[7] *Id.* ¶ 45. Defendants do not deny that this meeting took place or dispute the reported substance of the various discussions, even though the Court expressly asked Defendants

---

[4] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2 (last visited October 11, 2026). Per the Times, the "article [wa]s based on interviews with 12 people familiar with the president's interest in the ads and how they came to be," who "spoke on the condition of anonymity." *Id.* at 2.

[5] *See id.* at 4-5.

[6] *See id.*

[7] *See id.* at 1.

during the TRO conference on October 9, 2026 to address whether they disputed the reports of this meeting. *See* Tr. at 18:20-19:4, 24:23-25:3.

### B. The Advertisements and Their Dissemination

Plaintiffs challenge the five government-funded advertisements that have aired to date. *See* Compl. ¶¶ 46, 48, 58, 62, 67, 71. Samuel Ward-Packard ("Ward-Packard"), counsel for Plaintiffs, states that he used AdImpact's AdMo+ database on the morning of October 8, 2026 to examine the government's advertising campaign. Ward-Packard Decl. ¶¶ 2, 4.[8] He identifies the five advertisements that aired between September 23 and October 8, 2026 as: "The Country He Loves," "Celebrating the Enduring Spirit," "Final Battle," "To the Great Proud People of Iran," and "Maduro." *Id.* ¶ 6.[9] Two are thirty seconds long and three are sixty seconds long. *Id.* ¶ 7.[10] Each contains a concluding statement that reads, "Paid for by the U.S. Government."[11]

**"The Country He Loves."** This 30-second advertisement first aired on September 23, 2026. Ward-Packard Decl. ¶¶ 7-8. It features images and footage of President Trump interspersed with statements touting his administration's accomplishments, including the "largest

---

[8] Ward-Packard represents that "AdImpact is a paid subscription service that provides detailed, current, highly reliable data about political advertising." Ward-Packard Decl. ¶ 3. The "[s]pending and impression figures" available on AdImpact's AdMo+ dashboard are ultimately "AdImpact estimates." *Id.* ¶ 5.

[9] *See* AdImpact Politics (@AdImpact_Pol), X (Sept. 24, 2026, at 11:30 ET), https://perma.cc/C56Z-SQXW (last visited Oct. 11, 2026) [hereinafter The Country He Loves]; AdImpact Politics (@AdImpact_Pol), X (Sept. 25, 2026, at 08:21 ET), https://perma.cc/6DBD-65QA (last visited Oct. 11, 2026) [hereinafter Celebrating the Enduring Spirit]; AdImpact Politics (@AdImpact_Pol), X (Sept. 28, 2026, at 12:50 ET), https://perma.cc/8E36-2D9N (last visited Oct. 11, 2026) [hereinafter Final Battle]; *To the Great Proud People of Iran*, AdImpact, https://perma.cc/S5G3-P736 (last visited Oct. 11, 2026) [hereinafter To the Great Proud People of Iran]; *Maduro*, AdImpact, https://perma.cc/P4LX-C23R (last visited Oct. 11, 2026) [hereinafter Maduro].

[10] *See supra* note 9.

[11] *See supra* note 9.

tax cuts in history," "reigniting American manufacturing," and "defend[ing] law and order and police." *See* The Country He Loves, at 00:11, 00:13, 00:16 (capitalization omitted). The advertisement also includes the President declaring that "[t]ogether we will defeat Communism, Socialism, and Marxism in America," *id.* at 00:00-00:04 (capitalization omitted), and that "America will never be a Communist country," *id.* at 00:04-00:07 (capitalization omitted). It concludes with remarks by Dana White, the president of the Ultimate Fighting Championship (UFC), describing President Trump as "the toughest, most resilient person [he has] ever met." *See id.* at 00:19-00:23 (capitalization omitted). During the final portion of the advertisement, a disclaimer states that it was "Paid for by the U.S. Government." *Id.* at 00:20-00:30.

Ward-Packard reports that, as of 11:00 a.m. Eastern time on October 8, 2026, "The Country He Loves" had aired approximately 1,315 times, generating an estimated 95 million impressions, at an estimated cost of more than $1.37 million. Ward-Packard Decl. ¶ 8.

**"Celebrating the Enduring Spirit."** This 60-second advertisement first aired on September 24, 2026. *Id.* ¶¶ 7, 9. It combines footage of Mount Rushmore, service members, and President Trump with excerpts from a speech in which the President celebrates America's 250th anniversary. *See* Celebrating the Enduring Spirit. In the advertisement, President Trump describes the United States as "the freest people on Earth" and "the most successful, most accomplished, most exceptional nation ever to exist in human history." *Id.* at 00:10-00:12, 00:16-00:24. The advertisement also bears the government-funding disclaimer. *Id.* at 00:50-01:00. Ward-Packard reports that, by October 8, 2026, the advertisement had aired approximately 3,190 times, generating an estimated 360 million impressions at an estimated cost exceeding $2.84 million. Ward-Packard Decl. ¶ 9.

**"Final Battle."** This approximately 30-second advertisement began airing on September 26, 2026. *Id.* ¶¶ 7, 10. This advertisement is essentially identical to one used during President

Trump's 2024 campaign, except that the current advertisement omits the call to support Trump in the 2024 election and now identifies the United States government as the advertisement's funder. Compl. ¶ 62.[12] The advertisement features black-and-white footage of the President walking down a hallway, accompanied by recordings of his statements about his political adversaries. *See* The Final Battle. Among other things, he promises to "demolish the deep state," *id.* at 00:03-00:04, "drive out the globalists," *id.* at 00:07-00:09, "cast out the communists, Marxists, and fascists," *id.* at 00:09-00:12, "throw off the sick political class that hates our country," *id.* at 00:13-00:16, and "rout the fake news media," *id.* at 00:17-00:19. The advertisement concludes with the government-funding disclaimer. *See id.* at 00:19-00:28.

Of the five advertisements identified by Ward-Packard, "Final Battle" accounts for the largest estimated distribution. By October 8, 2026, it had aired approximately 9,679 times, generating an estimated 972 million impressions at an estimated cost exceeding $9.09 million. Ward-Packard Decl. ¶ 10.

**"To the Great Proud People of Iran."** This 60-second advertisement, which first aired on October 1, 2026, *id.* ¶¶ 7, 11, concerns United States military operations in Iran. *See* To the Great Proud People of Iran. It combines footage of the administration's military operations with statements by administration officials, including Pete Hegseth's declaration that "[i]f you kill Americans, if you threaten Americans anywhere on earth, we will hunt you down without apology and without hesitation, and we will kill you." *Id.* at 00:24-00:34. The advertisement closes with a message from President Trump "to the great proud people of Iran," urging them to "take over [their] government" once the United States "[is] finished." *Id.* at 00:51-01:00. As the

[12] *Compare* Final Battle *with* Pollock and Pollock News Channel, *Donald Trump 2024 Presidential Pounding Powerful Ad "The Final Battle"*, YouTube (Apr. 14, 2024), https://www.youtube.com/watch?v=pxZwMG3hse4 (last visited October 11, 2026) (2024 campaign ad).

President's closing message plays, the government-funding disclaimer appears on screen. *Id.* By October 8, 2026, Ward-Packard estimates that the advertisement had aired 782 times, generating approximately 37 million impressions at an estimated cost exceeding $595,000. Ward-Packard Decl. ¶ 11.

**"Maduro."** This 60-second advertisement began airing on October 6, 2026. *Id.* ¶¶ 7, 12. It concerns the operation to capture Venezuelan President Nicolás Maduro and includes footage and statements by administration officials relating to that operation. *See* Maduro. The end of the advertisement features a speech from Marco Rubio describing President Trump as "not a president that just talks and does letters and press conferences," *id.* at 00:47-00:50, and warning "[d]on't play games when this president's in office because it's not gonna turn out well," *id.* at 00:54-00:57. That latter warning is followed by a clip of Maduro in handcuffs. *Id.* at 00:58. Like the others, this advertisement bears a disclaimer identifying the United States government as its sponsor. *Id.* at 00:50-01:00. As of October 8, 2026, Ward-Packard reports approximately 1,288 airings, 103 million estimated impressions, and advertising costs exceeding $1.47 million. Ward-Packard Decl. ¶ 12.

In all, Ward-Packard estimates at least 16,254 airings, 1.56 billion impressions, and $15.4 million in advertising expenditures for the advertisements at issue through 11:00 a.m. on October 8, 2026. *Id.* ¶ 13. The campaign has appeared on nationwide broadcasts and local television in New York and Alabama, among other markets. *Id.* ¶¶ 14-17. It is reported that this advertising campaign also includes at least eight additional ads, all with similar content, that have yet to air.[13] *See* Compl. ¶ 83. Even though the Court asked Defendants to expressly address the

---

[13] *See* Betsy Klein, *'God made Trump' ad and at least 12 others are part of controversial taxpayerfunded ad campaign*, CNN (Oct. 2, 2026), https://perma.cc/6BPJ-A223.

accuracy of this report and the additional ads, *see* Tr. at 20:25-21:8, Defendants do not dispute this report in their opposition submissions.

### C. Statements Concerning Continued Funding

On October 5, 2026, President Trump announced on Truth Social that he would begin paying for the advertisements himself and "with money [he] raised for MAGA, Inc." after the "Radical Left" expressed disapproval of his decision to "pay[] for [advertisements] with U.S.A. money."[14] Notwithstanding this posting, the advertisements continued to air after October 5, 2026, with the statement "Paid for by the U.S. Government." Ward-Packard reports that "Final Battle" aired 773 times on October 6 and 921 times on October 7. Ward-Packard Decl. ¶ 19. By 11:00 a.m. on October 8, it had aired more than 500 additional times, including 195 times during Good Morning America. *Id.* Likewise, "Maduro" began airing on October 6, the day after the President's announcement, and had aired 1,288 times by October 8. *Id.* ¶ 20.

The advertisements also continued to appear in the markets where the Moving Plaintiffs conduct political activities. Between early October 6 and 11:00 a.m. on October 8, 2026, "Final Battle" aired in 1,439 national network spots, fourteen local New York spots, and at least six local Alabama spots. *Id.* ¶¶ 21-22.

Defendants do not address funding of the advertising campaign by MAGA, Inc. or President Trump. Instead, they state that LMD has "currently purchased media buys under the terms of the [September 20, 2026 PO] through Sunday, October 11, 2026, at an approximate cost of $19,000,000." Mehringer Decl. ¶ 8. According to DHS, it has "directed [LMD] not to make any media buys past October 11" and it "expects that [LMD] will submit its final invoice for services already performed under the [September 20, 2026 PO] after that date." *Id.* DHS states

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W (last visited Oct. 11, 2026).

that any residual funding left under the PO after the final invoice is paid will be de-obligated. *Id.* ¶ 9. Finally, Mehringer attests that as of October 10, 2026, "to the best of [her] knowledge and belief, [DHS] has no plans to make any additional media buys under the [September 20, 2026 PO,] . . . to renew the [September 20, 2026 PO,] or otherwise to use DHS appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit[.]" *Id.* ¶ 10.

### D. The Moving Plaintiffs

Hunter is a resident of Gadsden, Alabama, and the Democratic nominee for Alabama House District 28. *See* Dkt. 26-1 ("Hunter Decl.") ¶¶ 1-2. He identifies as a democratic socialist, having co-founded the North Alabama chapter of the Democratic Socialists of America ("DSA"). *Id.* ¶¶ 3-4. The DSA has endorsed and financially contributed to his campaign. *Id.* ¶ 5. Hunter's campaign has spent $1,812 on advertising, including $168 for a newspaper advertisement, $549 for postcards, and $895 for a billboard. *Id.* ¶ 7. His postcards and canvassing materials identify him as a socialist. *Id.*

SEIU 32BJ is a labor union representing more than 185,000 building and service workers across several states, including New York. Dkt. 26-3 ("Tall Decl.") ¶¶ 1-4. Candis Tall, the union's Executive Vice President and Political Director, oversees its efforts to advance legislation concerning workers and to elect candidates who support SEIU 32BJ's priorities. *See id.* ¶¶ 1, 6. To support those candidates, SEIU 32BJ contributes financial resources, organizes volunteers, communicates with members, and operates political action committees in multiple states, including "New York, New Jersey, Connecticut, Pennsylvania, Delaware, Maryland, Virginia, Massachusetts, Rhode Island, New Hampshire, Florida, Kentucky, and Washington D.C." *Id.* ¶¶ 8-14.

Tall identifies two candidates whom the union supports in New York: Cait Conley, the Democratic nominee for the House of Representatives in New York's Seventeenth Congressional District, and Tom Suozzi, the Democratic nominee in the Third Congressional District. *Id.* ¶ 16. According to Tall, the National Republican Congressional Committee has described Conley as a "radical Democrat" who is "cozying up to socialists" and has referred to Suozzi as "Socialist Suozzi." *Id.* Tall also describes statements in which President Trump has characterized other candidates endorsed by SEIU 32BJ as socialists, communists, or unamerican. *Id.* ¶ 17.

Empire PAC is an independent expenditure political action committee associated with SEIU 32BJ. Dkt. 26-2 ("Banks Decl.") ¶ 3. Kyron Banks, the union's Deputy Political Director for New York, states that Empire PAC seeks to elect candidates who support improved working conditions and economic opportunities for workers. *See id.* ¶¶ 1, 5-6. It makes expenditures independently of candidates and political party committees. *Id.* ¶ 6. For the 2026 general election, Empire PAC has spent approximately $20,000 thus far supporting candidates including Kathy Hochul ("Hochul"), Letitia James ("James"), Cait Conley ("Conley"), Tom Suozzi ("Suozzi"), and Laura Gillen ("Gillen"). *Id.* ¶ 7. Among them, Banks identifies Conley and Suozzi as candidates whom political opponents have associated with socialism. *Id.* ¶ 14.

## II. Procedural History

Plaintiffs commenced this action on October 7, 2026. *See* Compl. The Complaint asserts nine counts arising from the funding and dissemination of the challenged advertisements, including claims under the APA, an equal protection theory, and non-statutory ultra vires review. *See generally id.*

On the evening of October 8, 2026, Hunter, SEIU 32BJ, and Empire PAC requested emergency relief in the form of a temporary restraining order and a stay under 5 U.S.C. § 705.

*See* Mot.; Dkt. 26 ("Br."); Hunter Decl.; Banks Decl.; Tall Decl.; Ward-Packard Decl. The Moving Plaintiffs seek, among other things, to suspend the alleged $20 million advertising contract and OMB apportionment, prevent further use of DHS funds for the advertisements, and require cancellation of scheduled placements and compliance reporting. *See* Dkt. 27 ("Proposed Order") at 1-2. The parties appeared before the Court on the morning of October 9, 2026 for a conference on the motion and the Court set an expedited briefing schedule. Dkt. 33. In accordance with that schedule, Defendants submitted their opposition brief and supporting declarations on October 10, 2026, Dkt. 37 ("Opp."); Mehringer Decl.; Woolf Decl., and the Moving Plaintiffs replied on October 11, 2026, Dkt. 40 ("Reply"). The motion is fully briefed.

## LEGAL STANDARD

### I. Temporary Restraining Order ("TRO")

"A temporary restraining order . . . is an extraordinary remedy that will not be granted lightly." *Ilin v. JPMorgan Chase Bank, N.A.*, No. 26-cv-04816 (DEH), 2026 WL 2410796, at *1 (S.D.N.Y. Aug. 18, 2026) (quoting *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997)). In considering the appropriateness of a temporary restraining order, courts "must examine whether the movant[ ] ha[s] demonstrated a threat of irreparable harm that will occur *immediately* to justify a temporary restraining order, while the temporal context of a preliminary injunction takes a longer view." *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367-68 (E.D.N.Y. 2020). Thus, a "plaintiff's demonstration of irreparable harm must be considered in conjunction with the time frame involved." *Id.* at 367.

Aside from the issue of immediate relief, the standard for granting a temporary restraining order and preliminary injunction is the same. *See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."). "To obtain a preliminary injunction . . . the

[movant] must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-74 (2d Cir. 2021); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A heightened showing applies where, as here, a movant seeks a mandatory injunction — an injunction that "requires the non-movant to take some action." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024); *see Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act."); *see also* Proposed Order at 1-2 (compelling cessation of payments and broadcasts, cancellation of placements, and reporting requirements). In such a case, the movant must "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Daileader*, 96 F.4th at 356 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

## II. Stay Under APA § 705

Section 705 of the APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The provision authorizes interim protection pending judicial review, not a final decision on the validity of agency action. *See id.* Its terms require the Court to identify the agency action whose operation would be postponed and to tailor any process to what is necessary to preserve the relevant rights. *See id.*

Courts considering relief under Section 705 commonly apply the traditional preliminary injunction factors: likelihood of success, irreparable injury, the balance of equities, and the public interest. *See, e.g.*, *Rural & Migrant Ministry v. U.S. Env't Prot. Agency*, 565 F. Supp. 3d 578, 595 (S.D.N.Y. 2020) ("The standard for a stay under 5 U.S.C. § 705 is the same as or similar to the standard for a preliminary injunction."); *E. Air Lines, Inc v. C a B*, 261 F.2d 830, 830 (2d Cir. 1958) (per curiam) ("[S]tay of an order of an administrative agency may be granted when the following conditions are met: (a) [w]here the petitioner is likely to prevail on the merits of its appeal; (b) [w]here the petitioner has shown that without a stay it will suffer irreparable injury; (c) [w]here there is no substantial harm to other interested persons; and (d) [w]here the public interest will not be harmed."); *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (setting out the factors governing stays pending review). Although a stay and an injunction are distinct forms of relief, *see Nken*, 556 U.S. at 428-29, the parties' requests overlap here because each seeks to prevent further operation of the challenged advertising arrangements while the case proceeds.

**DISCUSSION**

The Moving Plaintiffs seek immediate relief in the form of a TRO and a Section 705 stay. They first requested relief on October 8, 2026, *see* Mot., and renewed their request following expedited briefing, urging the Court to act by October 11, 2026, before the advertisements reached millions of additional viewers during evening programming. Reply at 1-2. Defendants do not contest the merits of Plaintiffs' claims. Instead, Defendants argue that injunctive relief is unwarranted because the "alleged offending conduct will end [on October 11, 2026]." Opp. at 1. Alternatively, Defendants contend that the Moving Plaintiffs lack standing and that even if Hunter has standing, venue is improper. *Id*. at 1-2. For the reasons that follow, the Court

rejected these arguments and granted the TRO and Section 705 stay on October 11, 2026. *See* Dkt. 41.

## I. Mootness

The Moving Plaintiffs' request for a temporary restraining order and Section 705 stay is not moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quotation marks and citation omitted); *accord Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021) ("A case becomes moot 'when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" (quoting *Janakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020))). Generally, mere "voluntary cessation of allegedly illegal conduct does not . . . make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"); *accord City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). Under this standard, "'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur.'" *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth,* 528 U.S. at 189). This is a "formidable burden." *Id.* In other words, "[a] case might become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (emphasis added). "[S]o long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the[y] remain under a constant

threat that government officials will use their power to reinstate the challenged [action]." *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (quotation marks and citation omitted).

Here, Defendants contend that the TRO request is moot because "there is no basis for th[e] Court to grant injunctive relief for challenged conduct that will cease after [October 11, 2026]." Opp. at 13. The Court disagrees for several reasons.

First, Defendants acknowledged that, as of October 11, 2026, when the Court issued the TRO, advertisements purchased using misappropriated government funds were set to run through the end of October 11, 2026, and media buys were already purchased for evening broadcasts from 4 p.m. through 11 p.m. Mehringer Decl. ¶ 8 ("The Vendor has currently purchased media buys under the terms of the [PO] through Sunday, October 11, 2026."); *id.* at ¶ 5 (detailing media buys for evening programming). Because the challenged conduct was ongoing when the Court issued the TRO, the Moving Plaintiffs' claims presented a live controversy warranting judicial intervention. *See, e.g.*, *Allee v. Medrano*, 416 U.S. 802, 811 (1974) ("The essential controversy is therefore not moot, but very much alive.").

In addition, Defendants represented that DHS had "directed [LMD] not to *make* any *additional* media buys past October 11," Mehringer Decl. ¶ 8 (emphasis added). But this representation is somewhat unclear and leaves open whether LMD has already purchased ad placements scheduled to air after October 11, thereby continuing the alleged harm to Plaintiffs. Given this lack of clarity, Defendants have not provided the Court with a reasonable assurance that future transmissions of the advertisements purchased with funds concededly appropriated to DHS will cease as of October 11.

Even if LMD has not purchased any further media buys for placement after October 11, Defendants have not shown that the "allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. The blanket purchase agreement with

LMD is still in effect, Mehringer Decl. ¶ 3, the "period of performance" of the PO itself lasts until September 19, 2027, *id.* ¶ 7, and LMD has only spent $19 million of the $20 million under the terms of the PO, *id.* ¶ 8. Mehringer's statement that "to the best of [her] knowledge and belief," DHS has "no plans" to make additional media buys under the PO, renew the PO, or "otherwise use DHS appropriated funds on any similar contracts for the creation or distribution of the media," is equivocal. *Id.* ¶ 10; *see also* Opp. at 12. This statement does not make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203; *see also Fikre*, 601 U.S. at 241-42 (concluding that a declaration that the plaintiff "will not be placed on the No Fly List in the future based on the currently available information" did not moot case); *Wohl*, 498 F. Supp. 3d at 475 (granting temporary restraining order despite defendants' "self-serving assurances that they have no plans" to continue the at-issue conduct in the future because "[a] defendant's expressed intention to cease the offending conduct is not sufficient to eliminate the possibility of irreparable harm absent the existence of a consent injunction or other enforceable assurance that the offending conduct will not recur" (quotation marks and citation omitted)).

Defendants also have not provided reasonable assurances that OMB will not reapportion funds from another source to continue running similar advertisements. The present apportionment was done quickly, *see* Woolf Decl. ¶¶ 3, 5 (attesting that CBP's request to reapportion funds appropriated by Section 90004 occurred on September 19, 2026 at 6:15 PM EDT and that OMB's approval of the request occurred on September 19, 2026 at 7:50 PM EDT), and President Trump has publicly conveyed his belief that using appropriated taxpayer money is not only legal but a "standard thing to do."[15]

[15] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2026, at 18:25 ET), https://perma.cc/Y3PJ-JC2W (last visited Oct. 11, 2026).

Defendants' cited authorities reinforce the Court's conclusion that their declarations do not establish that the anticipated cessation of the challenged conduct moots the requested injunctive relief. *See* Opp. at 12. For example, in *Holland v. Goord*, the court found that the defendants had met their "formidable burden" because a defendant had formally amended its policy directive "specifically to prohibit the conduct" of which plaintiff complained. 758 F.3d 215, 223-24 (2d Cir. 2014). In addition, in *American Freedom Defense Initiative v. Metropolitan Transportation Authority*, the defendant "revised its regulations through proper procedures" to prohibit the complained-of conduct. 109 F. Supp. 3d 626, 630 (S.D.N.Y. 2015) (citation omitted), *aff'd*, 815 F.3d 105 (2d Cir. 2016). No such final and formal action has been taken here; the Court is left only with equivocal statements that declarants are not aware of future plans to resume the challenged conduct. Mehringer Decl. ¶ 10 ("[T]o the best of my knowledge and belief, [DHS] has no plans to make any additional media buys.").

Nor is the matter moot merely because LMD has stopped purchasing airtime. Defendants acknowledge that LMD has yet to submit its final invoice, *id.* ¶ 8, meaning that further payments of appropriated funds remain outstanding. Indeed, Defendants have not yet de-obligated the appropriated funds and will only do so "after all invoices" to LMD Agency have been paid, *id.* ¶ 9, whenever that may be.

Thus, the Moving Plaintiffs' request for a temporary restraining order and Section 705 stay was not moot when the Court issued its Order on October 11, 2026, *see* Dkt. 41, and remains live.

## II. Standing

The Court will next consider Defendants' argument that the Moving Plaintiffs lack standing.[16] *See Dep't of Educ. v. Brown*, 600 U.S. 551, 560 (2023) ("We have 'an obligation to assure ourselves of litigants' standing under Article III' before proceeding to the merits of a case." (citation omitted)); *see also Cohen v. N.Y.C. Dep't of Educ.*, No. 18-cv-11100 (JMF), 2018 WL 6528241, at *1 (S.D.N.Y. Dec. 12, 2018) ("Before proceeding to the merits of the TRO, the [c]ourt must address [defendant]'s argument that [p]laintiffs lack standing to sue because they have neither suffered, nor are about to suffer, an injury-in-fact.").

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'" *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, plaintiffs must show "(1) that they 'suffered an injury in fact,' (2) that the injury 'is fairly traceable' to [d]efendants' challenged conduct, and (3) that the injury 'is likely to be redressed by a favorable judicial decision.'" *Soule v. Conn. Ass'n of Schs.*, 90 F.4th 34, 45 (2d Cir. 2023) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). As the party asserting federal jurisdiction, the plaintiff bears the burden of establishing standing. *Id.* (citing *Spokeo*, 578 U.S at 338). "At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that []he is 'likely' to establish each element of standing." *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, 152 F.4th 47, 56 (2d Cir. 2025) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).

---

[16] Although Common Cause is a named Plaintiff, it does not join in the emergency motion because it is purportedly not experiencing irreparable harm. *See* Br. at 11 n.36.

The Moving Plaintiffs advance related theories of standing. Hunter contends that the advertisements' anti-socialist message and promotion of President Trump disadvantage him as a democratic socialist running against a candidate who has closely aligned himself with the President. *See* Hunter Decl. ¶¶ 7-10. SEIU 32BJ and Empire PAC argue that their fundraising and organizing efforts on behalf of candidates who President Trump and those affiliated with him have pejoratively called "socialists" and "communists" are similarly disadvantaged by the advertisements. Tall Decl. ¶¶ 6-18; Banks Decl. ¶¶ 5-11, 14-15. The Court assessed whether these asserted injuries satisfy each element of Article III standing in turn.

**A. Injury In Fact**

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) (quoting *Spokeo*, 578 U.S at 339). Such an injury exists under the "well-established concept of competitors' standing." *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994). To succeed under this theory, "a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit," *In re U.S. Cath. Conf. (USCC)*, 885 F.2d 1020, 1029 (2d Cir. 1989), and that the benefit "impaired [his] ability to compete on an equal footing with other significant" competitors in that arena, *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989).

This doctrine has long been used to establish "cognizable injuries to economic competitors." *U.S. Cath. Conf.*, 885 F.2d at 1029 (collecting cases); *see also Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) ("[A] plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors."). The Second Circuit has repeatedly recognized the doctrine's

applicability to political competitors where government action "creates an uneven playing field." *U.S. Cath. Conf.*, 885 F.2d at 1029. In *Fulani*, the Second Circuit determined that the exclusion of a candidate from a televised debate "palpably impaired [his] ability to compete on an equal footing with other significant presidential candidates." 882 F.2d at 626. Thus, the court concluded that "depriving a serious candidate for public office of the opportunity to compete equally for votes in an election" constituted a cognizable injury. *Id.* Likewise, in *Center for Reproductive Law and Policy*, the Second Circuit considered whether "an advocacy organization that communicates its viewpoint regarding issues of abortion and reproductive rights" and "competes with anti-abortion groups engaged in advocacy around the very same issues" was harmed by a government policy requiring foreign organizations receiving federal funds "to agree neither to perform abortions nor to promote abortion." 304 F.3d at 186. This injury was cognizable, the court concluded, because the policy "bestowed a benefit on plaintiffs' competitive adversaries . . . while withholding" it from those who collaborated with plaintiffs. *Id.* at 197.

Courts in other circuits have applied similar reasoning to political actors competitively disadvantaged by government policies. *See, e.g.*, *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 85 (D.C. Cir. 2005) (determining that political candidates suffered injury when disadvantaged by agency actions that benefited rival candidates); *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) ("If an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing."); *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 61-62 (D.D.C. 2025) (finding government action "would alter the 'competitive environment' in

which [political candidates] compete for elective office" thereby injuring them (quoting *Shays*, 414 F.3d at 87)), *aff'd sub nom.* No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

Hunter asserts that the challenged advertisements disadvantage him as a candidate whose political identity the advertisements expressly criticize, while SEIU 32BJ and Empire PAC assert that they undermine the organizations' efforts to support candidates whose opponents have associated them with the political ideologies criticized in the advertisements. *See* Hunter Decl. ¶ 9; Banks Decl. ¶¶ 13-15; Tall Decl. ¶¶ 15-18. Each Moving Plaintiff also contends that the advertisements' government sponsorship disclaimer exacerbates the harm caused by the advertisements. *See* Hunter Decl. ¶ 10; Banks Decl. ¶¶ 18-21; Tall Decl. ¶¶ 19-23. For the following reasons, the Court agrees that the Moving Plaintiffs have demonstrated injury in fact from the advertising campaign.

*1. Hunter*

As the Democratic Party's nominee for Alabama House District 28, Hunter Decl. ¶ 2, Hunter is a political candidate seeking elected office. He has spent $1,812 disseminating campaign materials describing himself as a "democratic socialist," *see id.* ¶¶ 7, 9, and is running against Mack N. Butler ("Butler"), a member of the Republican Party whose campaign website closely associates him with President Trump.[17] Defendants have used millions of dollars in appropriated funds to run the challenged advertisements opposing "socialism" and promoting President Trump in media markets nationwide, including in Alabama, where Hunter is campaigning. Ward-Packard Decl. ¶¶ 13-17.

[17] *Elect Conservative Mack N. Butler for Ala. House District 28*, https://perma.cc/3VQX-RQDN (last visited Oct. 12, 2026) (featuring photograph of Butler with President Trump, describing him as "Trump Tested," and noting his service as a "Trump Delegate in 2016 and 2020").

Hunter contends that the advertisements harm his electoral prospects because they criticize socialism, a political identity that he openly embraces, Hunter Decl. ¶¶ 9-10, and have aired more widely within his district than the advertising his campaign could afford, *id.* ¶ 8. He also emphasizes that the advertisements identify the United States government as their sponsor. *Id.* ¶ 10. In his view, that disclaimer gives the advertisements an authority that private political advertising lacks and creates a disadvantage that he cannot overcome through additional campaign spending. *Id.* In particular, Hunter contends that Butler's alignment with President Trump and self-identification as a "Tax Fighter" align with the advertisements' messages. *Id.* ¶ 9.

The Court agrees that, for all of these reasons, the challenged advertisements "fundamentally alter the environment" in which Hunter is running by "intensif[ying]" his opposition and requiring him to respond to this "additional campaign activity." *Shays*, 414 F.3d at 86. Indeed, this appears to be the advertising campaign's intended goal. Defendants do not dispute reports that, at an August 7, 2026 meeting with President Trump, Wiles, and others, Republican strategists requested that efforts be taken to support Republican candidates in the midterm elections. Nor do Defendants dispute reports that videos shown at that meeting were later incorporated into the challenged advertisements, which were disseminated shortly thereafter.[18] *See* Compl. ¶¶ 41-44. Thus, Plaintiffs are likely to succeed in showing that the challenged advertisements were disseminated to support Republican candidates and impact the midterm elections. The advertisements explicitly denounce "socialism" — the political label with which Hunter identifies himself — in the United States. Hunter Decl. ¶¶ 3, 8-9; Banks Decl. ¶ 13; *see* Final Battle; The Country He Loves. They also prominently feature President

---

[18] *See* Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

Trump, who is not only closely associated with Butler's candidacy but has also expressly instructed voters in Alabama to "pretend [President Trump] on the ballot."[19] *See* To the Great Proud People of Iran; Celebrating the Enduring Spirit; Maduro. Moreover, these advertisements bear disclaimers stating "Paid for by the U.S. Government," suggesting the messages expressed therein carry the weight of the federal government's endorsement. *See* The Country He Loves, at 00:20-00:30; Final Battle, at 00:19-00:28; To the Great Proud People of Iran, at 00:51-01:00; Celebrating the Enduring Spirit, at 00:50-01:00; Maduro, at 00:50-01:00; *see also* Hunter Decl. ¶ 10.

Because Hunter has spent just over $1,812 on political advertising while Defendants have invested millions in the dissemination of the challenged advertisements, the advertisements impair Hunter's "ability to compete on an equal footing with" his opponent and have caused him a concrete and particularized injury. *Fulani*, 882 F.2d at 626; *see also Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197 (concluding plaintiff established competitor standing where government action favored political competitors).

In addition, the advertising campaign undermines Hunter's interest, as a candidate, in the "integrity" of the election in which he is running. *See Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78-79, 83 (2026) (holding that plaintiff-candidate had standing to challenge the rules that govern the counting of ballots in his election, in part, because the rules concerned the "integrity of the electoral process").

*2. SEIU 32BJ and Empire PAC*

While Hunter's status as a candidate in the upcoming midterm elections plainly supports his claim of competitive injury, whether SEIU 32BJ and Empire PAC have suffered comparable

---

[19] *See* Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Ala. Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U.

injuries is a closer question.[20] SEIU 32BJ works to "elect progressive, pro-worker candidates at the local, state and federal levels" by promoting those candidates, encouraging its members to volunteer on their behalf, and "rais[ing] funds to advance [its] political goals." Tall Decl. ¶¶ 6, 8-9, 13. Likewise, SEIU 32BJ operates Empire PAC, a political action committee which "mak[es] contributions to, or independent expenditures for" political candidates SEIU 32BJ supports. *Id.* ¶ 12; Banks Decl. ¶ 6. Empire PAC also promotes "pro-worker" candidates to its members and arranges volunteer initiatives on behalf of those candidates. Banks Decl. ¶¶ 10-11. As of October 8, 2026, SEIU 32BJ has organized door-knocking trips and phone banks on behalf of the candidates it has endorsed, *id.*, and Empire PAC has contributed $20,000 to various candidates, *id.* ¶ 19. In this campaign cycle, some of those candidates have been labelled "socialists" by their political opponents, *id.* ¶ 14; Tall Decl. ¶ 16, and President Trump himself has called some of those candidates "socialists" and "communists." Tall Decl. ¶ 17.

As with Hunter, the challenged advertisements "fundamentally alter the environment in which" SEIU 32BJ and Empire PAC are competing, *Shays*, 414 F.3d at 86, especially given that Plaintiffs are likely to succeed in showing that the advertisements were disseminated for the purpose of impacting the midterm elections. *See supra* Part II.A.1. The Second Circuit's decision in *Center for Reproductive Law & Policy* is instructive. 304 F.3d at 197. Although SEIU 32BJ and Empire PAC are not candidates themselves, both are competitors like the "advocacy organization[s]" in that case because each is competing with opponents "engaged in advocacy around the very same issues," namely the election of specific candidates for public

---

[20] Even if SEIU 32BJ and Empire PAC lack standing, Hunter's standing is sufficient because "only one plaintiff needs standing for a suit to proceed." *Bost*, 607 U.S. at 76 n.3. Any venue concerns can be addressed at a later date since venue is a matter of convenience, not a jurisdictional bar. *See Moreno-Bravo v. Gonzales*, 463 F.3d 253, 258 (2d Cir. 2006) ("[V]enue in the federal courts is a concept of convenience, not a jurisdictional mandate." (quotation marks and citation omitted)).

office. *Id.* The advertisements reach the same audiences as Empire PAC's campaign materials but convey opposing political messages. Banks Decl. ¶ 17. The challenged advertisements denounce "socialism" and "communism" — labels that political opponents have applied to candidates supported by SEIU 32BJ and Empire PAC — and promote President Trump, the leader of the political party that those candidates are running against. *See generally* Final Battle; The Country He Loves; To the Great Proud People of Iran; Celebrating the Enduring Spirit; Maduro. The challenged advertisements therefore reinforce these criticisms of candidates whom SEIU 32BJ and Empire PAC support, thereby diminishing the effectiveness of both their advocacy efforts. *See Int'l Ass'n of Machinists & Aerospace Workers v. Fed. Election Comm'n*, 678 F.2d 1092, 1098 (D.C. Cir. 1982) (conferring standing to labor union members who "suffer[ed] a relative diminution in their political voices — their influence in federal elections –– as a direct result of the discriminatory imbalance" imposed by the at-issue government action), *aff'd*, 459 U.S. 983 (1982). Moreover, the government's sponsorship of the advertisements compounds Empire PAC's financial disadvantage because voters may attach greater weight to messages presented as official government communications. Banks Decl. ¶¶ 19-20.

Thus, like Hunter, SEIU 32BJ and Empire PAC must now reckon with "additional campaign activity" brought on by the challenged advertisements, *Shays*, 414 F.3d at 86, and financially compete with Defendants, who have vastly outspent them, *see* Banks Decl. ¶ 19. These competitive disadvantages are sufficient to establish injury in fact as to SEIU 32BJ and Empire PAC.[21]

---

[21] The Court is not persuaded by Defendants' proffered caselaw to the contrary. *See* Opp. at 8-10. First, the harm experienced by SEIU 32BJ and Empire PAC is not akin to the harm alleged in *In re U.S. Catholic Conference* because those plaintiffs challenged the Catholic Church's tax-exempt status while it allegedly advocated against abortion and the plaintiffs themselves decided "not to match the Church's alleged electioneering with their own." 885 F.2d 1020, 1029 (2d Cir. 1989). Those plaintiffs were therefore "not competitors" with the church purportedly receiving

### B. Traceability

To establish traceability, "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006) (quoting *Lujan*, 504 U.S. at 560-61); *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 84 (2d Cir. 2013), *as amended* (Mar. 21, 2013).

Here, Defendants concede that they disseminated the advertisements that are harming the Moving Plaintiffs.[22] Mehringer Decl. ¶¶ 3-5. This is sufficient to establish the requisite causal connection, and Defendants do not argue otherwise. *See Fulani*, 882 F.2d at 628 (concluding that government action was a "prerequisite" to harm and therefore traceable to it).

---

the government benefit. *Id.* In contrast, SEIU 32BJ and Empire PAC are directly engaged in advocacy against candidates who benefit from the challenged advertisements. Moreover, the Second Circuit has recognized competitor standing for "advocacy organization[s]" like SEIU 32BJ and Empire PAC in a more recent decision. *See Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197.

Second, Defendants' reliance on *Gottlieb v. Federal Election Commission*, 143 F.3d 618 (D.C. Cir. 1998) is likewise unpersuasive. In *Gottlieb*, the court rejected a labor union PAC's claim of "political competitor" standing because the PAC was not eligible for the challenged fund-matching program; the court reasoned that only a candidate eligible to receive matching funds could assert such an injury. *Id.* at 621. Here, SEIU 32BJ and Empire PAC are not alleging the government bestowed a benefit on their opponents that they would be ineligible to receive. Rather, they allege that they compete with opponents who benefit from the challenged advertisements in advocating for their views in the national discourse. *See* Banks Decl. ¶ 17.

Finally, the out-of-Circuit district court decision in *AB PAC v. Federal Election Commission*, No. 22-cv-02139, 2023 WL 4560803, at *4-5 (D.D.C. July 17, 2023), concerned distinguishable factual circumstances — a PAC's attempted enforcement of campaign finance laws against President Trump — and is difficult to square with *Ctr. for Reprod. L. & Pol'y*'s conferral of standing to an "advocacy organization," 304 F.3d at 197, like those here.

[22] *See Contract Summary*, USASpending.Gov, https://perma.cc/MB53-7CCC (last visited Oct. 11, 2026).

### C. Redressability

Finally, "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). "For the redressability prong to be met, the courts need not be able to level the 'playing field' between the actors involved; instead, there need only be a substantial likelihood that the relief requested will have a substantial ameliorative effect on the specific injury alleged." *Fulani*, 882 F.2d at 628 n.6. "[E]ven when a plaintiff's requested relief 'cannot provide full redress' with respect to an injury, a federal court's 'ability to effectuate a partial remedy satisfies the redressability requirement.'" *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. 2026) (quoting *Uzuegbunam*, 592 U.S. at 291).

Here, the Moving Plaintiffs request that the Court enjoin Defendants from, among other things, continuing to show the challenged advertisements. *See generally* Proposed Order. Because removal of the advertisements from the national media market and cessation of misappropriated funding would aid in leveling "the uneven playing field" brought on by Defendants' conduct, *U.S. Cath. Conf.*, 885 F.2d at 1029, the Moving Plaintiffs' injuries are redressable. *See Fulani*, 882 F.2d at 628 (concluding that plaintiff's injury was redressable where "revocation of [defendant]'s tax-exempt status at least would have prevented [its] sponsorship of the debates, from which [plaintiff] claims she was wrongfully excluded").

In sum, each of the Moving Plaintiffs has standing.

## III. Likelihood of Success on the Merits

Having concluded that the motion is not moot and that the Moving Plaintiffs have standing, the Court turns to the motion's likelihood of success on the merits. The Court begins with Plaintiffs' four APA claims alleging that Defendants have acted contrary to law and exceeded their statutory authority under the Purpose Statute, 31 U.S.C. § 1301, and Section 718

of the Appropriations Act. *See* Compl. ¶¶ 129-66. Notably, Defendants do not contest that Plaintiffs are likely to succeed on the merits of their claims.

Section 706 of the APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[:] . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

As a threshold matter, Defendants do not contest that DHS and OMB are agencies under the APA and that both OMB's apportionment of funds to DHS for the challenged advertisements and DHS's contract to purchase advertising placements constitute final agency actions subject to judicial review under the APA.

**A. Violations of 31 U.S.C. § 1301 (the "Purpose Statute") (Counts I and III)**

Plaintiffs have demonstrated that they are likely to succeed on their claims that Defendants acted contrary to law and exceeded their statutory authority because their spending violated the Purpose Statute. The Appropriations Clause of the United States Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The clause "was intended as a restriction upon the disbursing authority of the Executive department," and "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *accord Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). Its "fundamental and comprehensive purpose . . . is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Richmond*, 496 U.S. at 427-28.

"Federal statutes reinforce Congress's control over appropriated funds." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (citing 31 U.S.C. § 1301); *accord Strom v. McMahon*, No. 22-cv-04678 (JHR), 2025 WL 1746905, at *10 (S.D.N.Y. June 24, 2025). The Purpose Statute provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "Under the federal appropriations Purpose Statute, '[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *Strom*, 2025 WL 1746905, at *10 (citing 31 U.S.C. § 1301). "[A]ll uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient." *U.S. Dep't of Navy*, 665 F.3d at 1348; *accord Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 110 (D.D.C. 2026). The Anti-Deficiency Act relatedly "prevents federal officers from 'making or authorizing an expenditure or obligation exceeding an amount available in an appropriation.'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012) (alterations adopted) (quoting 31 U.S.C. § 1341(a)(1)(A)).

"For most federal agencies, Congress provides funding on an annual basis," *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024), and annual "appropriations bills provide funding for agencies like DHS 'and most of the programs, projects, and activities they carry out,'" *Neguse*, 822 F. Supp. 3d at 93 (alterations adopted) (quoting Cong. Rsch. Serv., R48731, Full-Year Continuing Resolutions: Frequently Asked Questions 1 (2025)). "Congress will also frequently fund agencies through continuing resolutions, which function as stopgap measures that provide 'funding for ongoing programs pending enactment of a formal' appropriations act, often by incorporating the prior appropriations act's provisions by reference." *Id.* (quoting *Com. of Pa. v. Weinberger*, 367 F. Supp. 1378, 1380 (D.D.C. 1973)).

Plaintiffs argue that the advertisements at issue violate the Purpose Statute because "political advertising is not among the purposes for which Congress appropriated funds to DHS." Br. at 16. Plaintiffs direct the Court to the relevant language of the appropriations acts for FY2026 and FY2027, as well as the legislative history of the appropriation provision at issue. *Id.* at 16-17. Defendants admit that the monies for the challenged advertisements were paid for from funds appropriated to CBP in Section 90004 for commemorating efforts and events related to border security. Opp. at 2-3; Mehringer Decl. ¶¶ 2-4.

The plain language of the relevant appropriations acts does not expressly provide DHS or CBP with the authority to use appropriated funds for these advertisements. In 2025, Congress made multi-year appropriations to DHS, including CBP. *See* Pub. L. No. 119-21, tit. IX, subtitle A, 139 Stat. 72, 357-61. Congress appropriated funds for various activities including, but not limited to, border infrastructure, *id.* § 90001, 139 Stat. at 357; personnel, vehicles, and facilities, *id.* § 90002, 139 Stat. at 358; and "border security, technology, and screening," *id.* § 90004, 139 Stat. at 359. Section 90004 provides that $6.168 billion is appropriated for eight topics, including "[c]ommemorating efforts and events related to border security." *Id.* § 90004(a)(8), 139 Stat. at 359. The next year, the Secure Act specifically appropriated funds for Fiscal Year 2026 to CBP for personnel; border security, technology, and screening; and U.S. customs and border protection. *See* Secure America Act, Pub. L. No. 119-98, §§ 101, 103, 201, 140 Stat. 837, 837-39 (2026). Congress subsequently provided for continuing appropriations to, among others, CBP for Fiscal Year 2027. *See* Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, div. A, § 101(6), 140 Stat. 987, 988 (2026). Defendants do not contest that Section 90004 does not provide for expenditures for the challenged advertisements. *See* 31 U.S.C. § 1301 ("Appropriations shall be applied *only* to the objects for which the appropriations were made except as otherwise provided by law." (emphasis added)).

The Court also finds that the legislative history of the 2025 Reconciliation Act supports the plain language of the scope of the appropriations under Section 90004(a)(8), such that it does not encompass the challenged advertisements at issue here. In its May 20, 2025 report accompanying H.R. 1, the House Committee on the Budget proposed approximately $6.266 billion in separately specified appropriations for border security technology and related activities. *See* H.R. Rep. No. 119-106, at 790-92. One such appropriation was for "commemorative events honoring meritorious contributions and achievements related to border security, including events recognizing victims of crimes." *Id.* at 792. The provided "[e]xamples of such events include[d] Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies," with funding to be "used for venue and setup, program materials, commemoratives (e.g., plaques, flags, awards)[,] and personnel services (e.g., honor guard, officiants, security)." *Id.* When enacted in July 2025, Congress reduced the total appropriation to $6.168 billion and consolidated the separately specified allocations into one appropriation to CBP for specified expenses related to "border security, technology, and screening," which includes Section 90004(a)(8), "[c]ommemorating efforts and events related to border security." Pub. L. No. 119-21, § 90004, 139 Stat. 72, 359. Therefore, the legislative history supports a finding that Congress intended that funds appropriated for "[c]ommemorating efforts and events related to border security," *id.* § 90004(a)(8), 139 Stat. at 359, be used for venue and setup, program materials, commemoratives, and personnel services for death memorials, agency anniversaries, and ceremonies — rather than the challenged advertising campaign designed to impact the midterm elections.

Plaintiffs have therefore demonstrated that there is a clear and substantial likelihood that they will succeed on their APA claims asserting violations of Section 1301 because Congress did not appropriate funds for DHS to spend on disseminating the challenged advertisements. OMB's

apportionment of these funds and DHS's media-buy contract with LMD are contrary to law and beyond the statutory authority of the Purpose Statute.

**B. Violations of Section 718 of the Appropriations Act ("Section 718") (Counts II and IV)**

Plaintiffs have also shown a likelihood of success on their APA claims for violations of Section 718 of the Appropriations Act. Section 718 of the 2026 Consolidated Appropriations Act provides that "[n]o part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 718, 140 Stat. 173, 495. Section 718 has been included in other appropriations acts over time. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. B, title VII, § 718, 138 Stat. 460, 576; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. 9, 10-12 (incorporating the FY2024 Appropriations Act for FY 2025).

Because the appropriations acts do not provide guidance on what constitutes "publicity or propaganda," and there is little case law interpreting such provisions, courts look to guidance from the United States Government Accountability Office ("GAO"). *See* GAO, Principles of Federal Appropriations Law, GAO-17-797SP, at 3-282 (4th ed. 2017) [hereinafter Red Book] ("As noted, although the publicity or propaganda prohibition has appeared in some form in the annual appropriations acts since 1951, the prohibitions themselves provide little definitional guidance as to what specific activities are publicity or propaganda."); *see also id.* at 3-278–3-298; *Neguse*, 822 F. Supp. 3d at 110 n.8 (analyzing Red Book provisions and noting that it is "an influential guide to appropriations law and rulings cited numerous times by the federal courts, including . . . by the Supreme Court" (citation omitted)). The "GAO has identified three

activities that are prohibited by the publicity or propaganda prohibition — self-aggrandizement, covert propaganda, and purely partisan materials." Red Book at 3-282. As relevant here, "[t]o be characterized as purely partisan in nature, the offending materials must be found to have been designed to aid a political party or candidate." Red Book at 3-293–3-294 (quotation marks and citation omitted).

Defendants do not contest that the at-issue advertisements are purely partisan and unconnected to DHS's official functions. Thus, the Court finds that Moving Plaintiffs are likely to succeed in showing that the advertisements are impermissible "publicity or propaganda" under Section 718. *See District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 11 (D.D.C. 1988) (finding that promotional materials paid for with appropriated funds were prohibited "publicity or propaganda"). Indeed, the "Final Battle" advertisement is almost identical to one used during President Trump's 2024 campaign, other than the fact that its funding disclaimer now identifies the United States government rather than his presidential campaign. *See* Final Battle.[23] It depicts President Trump walking down a hallway while delivering a series of statements about his political adversaries. *Id.* Among other things, he promises to "demolish the deep state," "drive out the globalists," "cast out the communists, Marxists and fascists," "throw off the sick political class that hates our country," and "rout the fake news media." *Id.* This advertisement provides no information about DHS's official functions. Thus, the Court finds that Moving Plaintiffs have shown a clear and substantial likelihood of success on their APA claims for violations of Section 718. Given this, it is unnecessary to address the remaining claims, including the Equal Protection and ultra vires

[23] Cynthia Silva, *Trump's 2024 Campaign Ad Returns, With Taxpayers Paying for It*, N.Y. Times (Sep. 27, 2026), https://www.nytimes.com/video/us/politics/100000011178196/trumps-2024-campaign-ad-taxpayers.html [https://perma.cc/JQ3A-5QQE] (last visited on Oct. 11, 2026).

claims, Compl. ¶¶ 167-93, at this juncture. *See Neguse*, 822 F. Supp. 3d at 115 n.13 (declining to address APA arbitrary and capricious claim after finding likelihood of success under 31 U.S.C. § 1301).

## IV. Likelihood of Imminent, Irreparable Harm

Moving Plaintiffs have additionally demonstrated a strong showing of imminent irreparable harm. To demonstrate irreparable harm, "the movant must show an 'injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages.'" *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291 (2d Cir. 2026) (quoting *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025)). "[I]rreparable harm exists 'where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)). Harm can be "particularly irreparable" in the electoral context because "timing is of the essence in politics and a delay of even a day or two may be intolerable." *New York Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted).

Here, the Moving Plaintiffs seek a temporary restraining order and Section 705 stay in the context of the approaching midterm and state elections. Early and absentee voting is already underway in some states, including in Alabama, where Hunter is running for election, as well as New York, where SEIU 32BJ and Empire PAC support candidates. Br. at 25-26. The advertisements were still airing when the Court issued the October 11, 2026 Order, and Defendants have provided no reasonable assurance that the challenged conduct will not recur if voluntarily ceased. *See supra* Part I. The Court agrees with the Moving Plaintiffs that each

additional day of broadcasting matters because "[v]oters cannot unsee the ads, and in less than a month, all will have cast their ballots." Br. at 25. Given that "this Court can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns, this is not a case in which adequate compensatory or other corrective relief will be available at a later date. The only way to provide complete relief to . . . Plaintiff[s] is to award" a temporary restraining order and Section 705 stay. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 201-02 (D.D.C. 2025) (quotation marks and citation omitted). This "harm is irreparable because after the registration deadlines for the November election pass, there can be no do over and no redress." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quotation marks and citation omitted).

**V. Balance of Equities and Public Interest**

Finally, the Moving Plaintiffs have shown that the balance of equities and public interest support a temporary restraining order and Section 705 stay. "When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (citation omitted). In considering the balance of equities and public interest, the Court's duty is to "balance the equities by weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *League of United Latin Am. Citizens*, 808 F. Supp. 3d at 83 (quoting *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024)). "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citations omitted); *accord New York v. Trump*, 490 F. Supp. 3d 736, 747 (S.D.N.Y. 2020).

Because the Moving Plaintiffs have shown a clear and substantial likelihood of success on the merits of their APA claims, the public interest is also benefited by a temporary restraining order and Section 705 stay. *See Newby*, 838 F.3d at 12 ("[A]ppellants' extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest."); *accord League of United Latin Am. Citizens*, 808 F. Supp. 3d at 83. As the purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good," *Richmond*, 496 U.S. at 427-28, any alleged violation is in contravention of that common good and against the public interest.

The public interest further favors a temporary restraining order and Section 705 stay because, absent this relief, "there is a substantial risk that [candidates and the organizations that support them] will be disenfranchised in the present federal election cycle." *Newby*, 838 F.3d at 12. Given the ongoing and impending midterm and state elections, and the "undoubted[]" "public interest in preserving the integrity of the election process," *League of United Latin Am. Citizens*, 808 F. Supp. 3d at 83 (citation modified), the Court finds that the balance of equities and public interest support a temporary restraining order and Section 705 stay.

**CONCLUSION**

In sum, the Court rejects Defendants' arguments that the motion for injunctive relief is moot and that the Moving Plaintiffs lack standing. The Moving Plaintiffs have demonstrated a clear and substantial likelihood of success on the merits of their APA claims concerning Section 1301 and Section 718 (which Defendants do not contest), a strong showing of imminent and irreparable harm, and that the balance of equities and public interest support a temporary

restraining order. Therefore, the Court grants the Moving Plaintiffs' motion for a temporary restraining order and stay, as stated in its October 11, 2026 Order. Dkt. 41.[24]

Dated: October 12, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge

[24] Contrary to Defendants' arguments, *see* Opp. at 13, such an order is not overly broad and is tailored to the perceived exigency. Moreover, the Court did not require the Moving Plaintiffs to post a bond, *see id.* at 14, because Defendants presented no evidence that the injunction would cause them harm, *see Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997), particularly in light of Defendants' representation that they do not intend to purchase additional advertising placements.