UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMON CAUSE *et al.*,

Plaintiffs,

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

Defendants.

26 Civ. 8882 (JLR)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXPAND THE TEMPORARY RESTRAINING ORDER**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
Email: jeffrey.oestericher@usdoj.gov

JEFFREY S. OESTERICHER
Assistant United States Attorney
—*Of Counsel*—

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 2

I. CBP's Purchase Order for Services in Support of Media Buys .......... 2

II. This Lawsuit and Plaintiffs' Motions for a TRO .......... 3

ARGUMENT .......... 4

THE COURT SHOULD DENY PLAINTIFFS' MOTION TO EXPAND THE TRO .......... 4

I. Legal Standards .......... 4

II. Plaintiffs Cannot Seek to Enjoin Conduct Not Alleged in Their Complaint .......... 5

III. Plaintiffs Cannot Show Likelihood of Success on the Merits of Their Claims .......... 6

IV. The Alleged Injury from the Challenged Advertisements Aired by MAGA Is Not Redressable by an Order from This Court .......... 14

V. Plaintiffs Should Be Required to Post a Bond .......... 15

CONCLUSION .......... 16

## TABLE OF AUTHORITIES

Page(s)

Cases

*Arrington v. Taylor*,
380 F. Supp. 1348 (M.D. N.C. 1974) .......... 9

*Colvin v. Caruso*,
605 F.3d 282 (6th Cir. 2010) .......... 5, 6

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024) .......... 4

*Devose v. Herrington*,
42 F.3d 470 (8th Cir. 1994) .......... 5, 6

*Donaggio v. Arlington County, Virginia*,
880 F. Supp. 446 (E.D. Va. 1995) .......... 9

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 15

*Fulani v. League of Women Voters Educ. Fund*,
882 F.2d 621 (2d Cir. 1989) .......... 15

*Joyner v. Whiting*,
477 F.2d 456 (4th Cir. 1973) .......... 9

*Make the Road New York v. Pompeo*,
475 F. Supp. 3d 232 (S.D.N.Y. 2020) .......... 15

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 4

*Moody v. Mount Sinai Hospital*,
No. 25 Civ. 8859 (JHR), 2026 WL 205637 (S.D.N.Y. Jan. 27, 2026) .......... 5

*Munaf v. Geren*,
553 U.S. 674 (2008) .......... 4

*Neguse v. ICE*,
822 F. Supp. 3d 86 (D.D.C. 2026) .......... 8

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .......... 5

*New York v. Nat'l Science Foundation*,
793 F. Supp. 3d 562 (S.D.N.Y. 2025)........................................................................ 7, 14

*New York v. Trump*,
765 F. Supp. 3d 287 (S.D.N.Y. 2025)........................................................................... 4

*NRC v. Texas*,
605 U.S 665 (2025)........................................................................................................ 7

*Pope v. County of Albany*,
687 F.3d 565 (2d Cir. 2012)........................................................................................... 5

*United States Postal Service v. California*,
No. 26A305, 609 U.S. __, 2026 WL 2687160 (Sept. 14, 2026)......................................... 7, 13

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)...................................................................................................... 14

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)........................................................................................................... 4

*Yale New Haven Hospital v. Becerra*,
56 F.4th 9 (2d Cir. 2022) ........................................................................................ 7, 10, 13

*Zeptolab UK Ltd. v. Commonwealth Toy & Novelty Co.*,
No. 12 Civ. 2044 (TPG) (KNF), 2012 WL 4761501 (S.D.N.Y. Aug. 23, 2012) .................. 5, 6

Statutes and Regulations

31 U.S.C. § 712(1), (3)-(4) (2012)................................................................................... 9

31 U.S.C. § 1301............................................................................................................. 6

31 U.S.C. § 1301(a) ...................................................................................................... 14

3 C.F.R. § 102.103 .......................................................................................................... 9

Defendants (the "Government") respectfully submit this memorandum of law in opposition to Plaintiffs' motion to expand the temporary restraining order ("TRO") (ECF No. 81).

## PRELIMINARY STATEMENT

Plaintiffs' motion to expand the TRO to enjoin advertisements recently posted on the White House YouTube page and aired on television by MAGA, Inc. ("MAGA"), a political action committee, rests on several faulty legal premises and therefore should be denied. First, Plaintiffs cannot obtain injunctive relief for claims and allegations made for the first time in their motion for a TRO. Accordingly, Plaintiffs cannot expand the TRO to encompass these actions because their Complaint is devoid of a single allegation regarding the White House YouTube page or ads paid for by MAGA.

Second, Plaintiffs' assertion that the Executive Office of the President acted *ultra vires* when it devoted White House staff time to compiling the advertisements is mistaken. The White House staff perform duties to support the President. And the President has the right to inform the public about his policies and to rebut attacks on those policies and his Administration. Accordingly, there was nothing improper about having White House staff assist with advertisements that tout Administration policies and accomplishments and Plaintiffs cannot point to an express statutory prohibition that was violated by this conduct.

Third, Plaintiffs' motion fails with respect to the television advertisements being paid for by MAGA for the additional, independent reason that their purported injury is not redressable. MAGA has not been named as a party to this case. And Plaintiffs' contention that MAGA is controlled by the President is of no moment because the law is clear that the Court may not order injunctive relief against the President. The Court therefore lacks subject matter jurisdiction over that claim for relief.

Accordingly, for the foregoing reasons and as explained further below, Plaintiffs' motion to expand the TRO should be denied.

## STATEMENT OF FACTS

### I. CBP's Purchase Order for Services in Support of Media Buys

On September 19, 2026, U.S. Customs and Border Protection ("CBP"), a component of DHS, submitted a request to the Office of Management and Budget ("OMB") to reapportion funds appropriated by section 90004 of the Working Families Tax Cut Act (Pub. L. 119-21) within CBP's "Operations and Support" account. *See* ECF No. 39 (Declaration of William C. Woolf, dated October 10, 2026 ("Woolf Decl.")) ¶ 3. CBP's reapportionment request sought to make an additional $20 million available for "OBBBA - Commemorative Events." *Id.* ¶ 4. That additional funding came from amounts apportioned for obligation in fiscal year 2027. *Id.* OMB approved CBP's reapportionment request on September 19, 2026. *Id.* ¶ 5.

On or about September 20, 2026, CBP issued a $20,000,000 purchase order for services ("the Purchase Order") to Lepugh, Inc. (doing business as LMD Agency, Inc.) ("the Vendor") under a previously awarded blanket purchase agreement. ECF No. 38 (Declaration of Holly C. Mehringer, dated October 10, 2026 ("Mehringer Decl.")) ¶ 3. To fund the Purchase Order, DHS used funds appropriated to CBP in section 90004 of Public Law No. 119-21. *Id.* ¶ 4; Woolf Decl. ¶ 3.

The Purchase Order was issued for media services in support of CBP for placing national media buys. Mehringer Decl. ¶ 5. The Purchase Order did not fund the creation or production of any videos or media; it only funded the airing of preexisting media. *Id.* ¶ 6. DHS has directed the Vendor not to make any additional media buys past October 11. *Id.*

## II. This Lawsuit and Plaintiffs' Motions for a TRO

On October 7, 2026, Plaintiffs Common Cause, Service Employees International Union Local 32BJ ("SEIU 32BJ"), Empire State 32BJ SEIU PAC ("SEIU 32BJ PAC"), and Robert Hunter ("Hunter") filed this action challenging DHS's broadcast of certain media depicting the President of the United States as violative of the APA and the Equal Protection Clause of the Fifth Amendment, and as *ultra vires*. ECF No. 1 (Complaint). Specifically, the Complaint alleges that "[t]he taxpayer-funded ads harm Plaintiffs because they give a 'competitive advantage' to candidates, causes, and organizations aligned with the President in the 2026 midterm elections, putting Plaintiffs at a disadvantage." *Id.* ¶ 97. The Complaint asserts nine claims for relief, including seven counts under the APA, one *ultra vires* count, and one count alleging a violation of the Equal Protection Clause of the Fifth Amendment. *Id.* ¶¶ 129-193.

On October 8, 2026, Plaintiffs filed a motion for a TRO. ECF No. 25. In their motion, Plaintiffs sought broad emergency relief, including, among other things, an order (a) staying the Purchase Order contract between DHS and the Vendor, (b) staying OMB's apportionment of $20 million to fund the broadcast of certain media depicting the President of the United States; (c) enjoining DHS from using OMB's apportionment of $20 million to fund the broadcast certain media depicting the President, (d) canceling any reservation for the airing of the media depicting the President that Plaintiffs are challenging; and (e) enjoining DHS from renewing or entering into any new agreement authorizing the creation or airing of the media depicting the President that Plaintiffs are challenging. *See* ECF Nos. 26 (Plaintiffs' Brief in Support of Motion for a TRO and a Section 705 Stay), 27 (Proposed Order). On October 11, 2026, the Court granted Plaintiffs' first motion for a TRO and, among other things, stayed DHS's contract with the Vendor, stayed OMB's appropriation of $20 million to fund the Vendor contract, and enjoined Defendants from entering into a new vendor contract to, among other things, create, disseminate or air the challenged

advertisements. ECF No. 41 (Order) at 2-3. The Court's temporary restraining order has been extended to November 20, 2026 (*see* ECF No. 58), after the midterm elections.

On October 23, 2026, Plaintiffs filed a motion to expand the TRO. ECF No. 81. Specifically, Plaintiffs complain that allegedly partisan advertisements have recently been posted on the White House YouTube page and have aired on television, paid for by MAGA. ECF No. 82 (Plaintiffs' Brief in Support of Motion to Expand the Temporary Restraining Order ("Pls. Br.") at 1-2, 3-5). Plaintiffs assert in their brief that the alleged creation and distribution of these advertisements by EOP is *ultra vires* and violates the Equal Protection Clause. *Id*. at 5-12.

## ARGUMENT

## THE COURT SHOULD DENY PLAINTIFFS' MOTION TO EXPAND THE TRO

### I. Legal Standards

A TRO, like a preliminary injunction, is an "an extraordinary and drastic remedy," which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation marks omitted); *see also New York v. Trump*, 765 F. Supp. 3d 287, 291 (S.D.N.Y. 2025) (noting that the standards for granting TROs and preliminary injunctions are the same). An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks omitted). A plaintiff seeking a TRO "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the moving party seeks a mandatory injunction – *i.e.*, an injunction that "requires the non-movant to take some action," *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024), – the movant must "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm," *id*. at 356

(quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)); *see* Opinion and Order at 15.

## II. Plaintiffs Cannot Seek to Enjoin Conduct Not Alleged in Their Complaint

Plaintiffs motion to expand the TRO fails as a matter of law because it concerns facts and claims not alleged in the Complaint. The law is clear that "the focus in analyzing the likelihood of success on the merits element of the preliminary injunction standard is on the claims and factual allegations in the complaint, not subsequent claims and allegations, made, for the first time, in the motion for a preliminary injunction." *Zeptolab UK Ltd. v. Commonwealth Toy & Novelty Co.*, No. 12 Civ. 2044 (TPG) (KNF), 2012 WL 4761501, at *7 (S.D.N.Y. Aug. 23, 2012) (citing *Pope v. County of Albany*, 687 F.3d 565 (2d Cir. 2012)); *see also Moody v. Mount Sinai Hospital*, No. 25 Civ. 8859 (JHR), 2026 WL 205637, at *2 (S.D.N.Y. Jan. 27, 2026) (same). A preliminary injunction, or TRO, thus "cannot be obtained based on claims and factual allegations not contained in the complaint." *Zeptolab*, 2012 WL 4761501, at *7; *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) ("a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint"); *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (the plaintiff "had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his original complaint").

Here, Plaintiffs' motion for a TRO concerns "ads posted on the White House official YouTube page" and advertisements paid for by MAGA. Pls. Br. at 1, 3-5. However, the White House YouTube page is not mentioned at all in the Complaint and there are no allegations concerning allegedly partisan political advertisements posted by the White House on social media. The Complaint is also devoid of any allegations concerning allegedly partisan political advertisements paid for by MAGA. *See* Complaint. Rather, the *ultra vires* and Equal Protection

claims alleged in the Complaint relate only to the airing of advertisements pursuant to DHS's contract with the Vendor. *Id.* ¶¶ 175-88. Indeed, Plaintiffs expressly allege that the challenged advertisements "were not, however, funded by the Super PAC President Trump purports to control." *Id.* ¶ 44.

As such, Plaintiffs cannot obtain injunctive relief based on these new facts and claims that were not alleged in their Complaint. *Zeptolab*, 2012 WL 4761501, at *7; *Devose*, 42 F.3d at 471; *Colvin*, 605 F.3d at 300. At a minimum, Plaintiffs should be required to amend their Complaint to specify the conduct that has caused the claimed injury before any injunctive relief can be sought. *See, e.g.*, *Zeptolab*, 2012 WL 4761501, at *7 ("While ZeptoLab is free to make an application for leave to amend the complaint by making additional claims and factual allegations, a preliminary injunction cannot be obtained based on claims and factual allegations not contained in the complaint").[1]

## III. Plaintiffs Cannot Show Likelihood of Success on the Merits of Their Claims

Plaintiffs' TRO motion should be denied for the additional reason that they are not likely to succeed on the merits of their claims. Plaintiffs claim in their motion (although not in their Complaint) that EOP acted *ultra vires* in compiling the advertisements that are posted on the White House YouTube page and airing on television paid for by MAGA. Pls. Br. at 8-10. Specifically, Plaintiffs allege that EOP's actions violate the Purpose Statute, 31 U.S.C. § 1301, and Section 718 of the 2026 Consolidated Appropriations Act. Pls. Br. at 8-10. However, neither of these claims is correct.

---

[1] The mere fact that Plaintiffs asserted *ultra vires* and Equal Protection claims in the Complaint against all Defendants (including EOP) based on the advertisements that were aired under the DHS contract, *see* Complaint ¶¶ 175-188, is not a sufficient basis to obtain injunctive relief based on different conduct (ads posted to a YouTube page and ads paid for by MAGA) not alleged in the Complaint.

Because *ultra vires* claims rely on a judicially implied cause of action and may be used to "end run" statutes created by Congress that restrict judicial review, "'cases have strictly limited nonstatutory *ultra vires* review' to a narrow set of circumstances." *United States Postal Service v. California*, No. 26A305, 609 U.S. __, 2026 WL 2687160, at *3 (Sept. 14, 2026) (Justices Alito and Thomas dissenting from the denial of application for stay) (quoting *NRC v. Texas*, 605 U.S 665, 681 (2025)); *see also New York v. Nat'l Science Foundation*, 793 F. Supp. 3d 562, 610 (S.D.N.Y. 2025) (same). Accordingly, an action is not *ultra vires* "simply because an agency has arguably reached a conclusion which does not comport with the law." *NRC*, 605 U.S. at 681 (internal quotation marks and citation omitted); *see also Nat'l Science Foundation*, 793 F. Supp. 3d at 610 (same). Rather, the agency action must be "entirely in excess of [the agency's] delegated powers and contrary to a specific prohibition in a statute." *NRC*, 605 U.S. at 681 (internal quotation marks and emphasis omitted); *see also Nat'l Science Foundation*, 793 F. Supp. 3d at 610 (same). For this reason, claims under this doctrine have been characterized as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 605 U.S. at 681-82; *see also Nat'l Science Foundation*, 793 F. Supp. 3d at 610 (same).

The rigorous test for an *ultra vires* claim has been set forth by the Second Circuit. An *ultra vires* claim is only available in the "extremely limited" circumstance "when three requirements are met: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hospital v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (internal quotation marks and citation omitted). Plaintiffs clearly cannot meet that standard here.

As an initial matter, Plaintiffs' assertion that the use of staff time to compile the advertisements constitutes the "use" of appropriations within the meaning of the Purpose Act and Section 718 is not persuasive. Importantly, this is not a situation where funds were appropriated to an agency for a specific purpose and then redirected by the agency for another project. Rather, as Plaintiffs acknowledge (Pls. Br. at 8), EOP was appropriated funds in Fiscal Years 2026 and 2027 for, among other things, "staff and consultant salaries" and there is no dispute that the funds at issue were used to pay the salaries of EOP staff. Likewise, Plaintiffs do not allege that any additional salary or other monies were paid out in connection with the compilation of certain ads by EOP staff.

Thus, there was no diversion of appropriated funds or expenditure of additional funds as a result of the use of staff time. And, in this context, the term "use of funds" more naturally means the incurring of new legal obligations that require the payment of money. Indeed, when Congress wishes to prevent the allocation of appropriated salary for a specific prohibited purpose, it speaks with much more clarity. Thus, for example, since 1998, appropriations acts each year have contained a government-wide prohibition on the use of appropriated funds to pay the salary of any federal official who prohibits or prevents another federal employee from communicating with Congress. *See* Pub. L. No. 105-61, § 640, 111 Stat. 1272, 1318 (Oct. 10, 1997).

Given the ambiguity regarding whether devotion of staff time constitutes the use of appropriated funds and the fact that Congress has not forbidden the allocation of staff time for this purpose, Plaintiffs cannot establish an *ultra vires* claim based on the fact that EOP staff spent time compiling the challenged advertisements. *But see Neguse v. ICE*, 822 F. Supp. 3d 86, 105-06 (D.D.C. 2026) (holding that the use of any government resources, including time spent by government employees, would entail government expenditures).

Moreover, even assuming *arguendo* that the devotion of staff time constitutes a clear use of appropriated funds, Plaintiffs' *ultra vires* claim still fails because they cannot establish that the use of EOP staff to compile the advertisements violated the Purpose Statute or Section 718. That is because Plaintiffs' argument ignores EOP's function within the Executive Branch. EOP contains a number of entities, including the White House Office (the staff working closest to the President, including West Wing staff) and the Office of the Vice President. *See* 3 C.F.R. § 102.103. These offices support the work of the President. And it well-established that the President has a legitimate interest in communicating with the public to advocate for his positions and communicate about his functions, policies, and activities, even on controversial issues. *See Joyner v. Whiting*, 477 F.2d 456, 461 (4th Cir. 1973) (it is not illegal for government agencies to spend money to advocate their positions, even on controversial issues); *Donaggio v. Arlington County, Virginia*, 880 F. Supp. 446, 454–56 (E.D. Va 1995); *Arrington v. Taylor*, 380 F. Supp. 1348, 1364 (M.D. N.C. 1974).

As this Court has recognized (Opinion and Order at 35), the limitations in appropriations laws are interpreted and administered by the Government Accountability Office ("GAO"). *See* 31 U.S.C. § 712(1), (3)-(4) (2012).[2] Because federal agencies, including the Executive Branch, must communicate information to the public regularly and may have statutory missions or other objectives requiring them to educate the public, GAO interprets the limitations on agencies' use of funding narrowly. Indeed, with respect to the President specifically, GAO has observed that "[t]o restrict all materials that have some political content or express support of an

[2] The statute authorizes the Comptroller General to "investigate all matters related to the receipt, disbursement, and use of public money; ... [and] make an investigation and report ordered by either House of Congress or a committee of Congress having jurisdiction over revenue, appropriations, or expenditures." *Id.* § 712(1), (4). The GAO's interpretations are published in a federal publication known as the Red Book.

Administration's policies would significantly curtail the recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies. It is important for the public to understand the philosophical underpinnings of the policies advanced by elected officials and their staff in order for the public to evaluate and form opinions on those policies." *See* GAO Redbook, 4th Edition, 2017 Revision at 3-296 (available at https://www.gao.gov/assets/2019-11/687162.pdf (p. 296) (last visited Oct. 27, 2026)).[3]

As applied here, it cannot be said that the devotion of EOP staff time to compile advertisements was plainly in "excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Becerra*, 56 F.4th at 26-27. Plaintiffs insist that Section 718 "imposes a specific, clear bar on the Executive from using appropriations 'directly or indirectly' . . . for publicity and propaganda purposes," Pls. Br. at 9, and that the challenged advertisements plainly are "publicity or propaganda," *id*. at 10; however, that is not correct.

As an initial matter, the Appropriations Act does not define "publicity or propaganda." *See* GAO Redbook at 3-281 ("[T]here is no definition of either term."); *see also id*. at 3-282 ("[T]he prohibitions themselves provide little definitional guidance as to what specific activities are publicity or propaganda."). Rather, GAO has explained that "[i]n construing and applying a publicity or propaganda provision," *id.* at 3-281, it is necessary to "achieve a delicate balance between competing interests." *Id.* On the one hand, the Executive "has a legitimate right to explain

[3] Congress has recognized the same with respect to federal agencies as shown by this statement in the Interim Report of the Select Committee on Lobbying Activities: "Apart from his responsibility as spokesman, the department head has another obligation in a democracy: to keep the public informed about the activities of his agency. How far to go and what media to use in this effort present touchy issues of personal and administrative integrity. But of the basic obligation there can be little doubt." H.R. Rep. No. 81-3138, at 53 (1950) (internal quotation marks and citation omitted).

and defend its policies and respond to attacks on th[ose] polic[ies]." *Id.* at 3-294. So "[t]o restrict all materials that have some political content or express support of an Administration's policies would significantly curtail th[at] recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies." *Id.* at 3-296 (citation omitted). On the other hand, the statute must mean something, so if the activity in question is "completely devoid of any connection with official functions," then the use of appropriated funds will be improper. *Id.* at 3-294 (citation omitted).[4]

GAO's application of this standard is instructive. For example, in finding that a Department of Health and Human Services' television advertisement describing changes to Medicare did not constitute impermissible publicity or propaganda despite containing opinion and notable factual omissions and some overstatement of the benefits, GAO emphasized the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies. *See* GAO Redbook at 3-296; Principles of Federal Appropriations Law, Chapter 3 Availability of Appropriations: Purpose, Step 2 Expenditure Must Not Be Prohibited at 24, 2026 WL 1460438 (citing B-302504, at 10 (Mar. 10, 2004)).

The GAO came to the same conclusion in a decision relating to use of White House staff time. That matter involved a challenge to the Republican National Committee having financed in 1973 a mass mailing of copies of editorials from British newspapers in praise of the President. The editorials were transmitted with a letter prepared by a member of the White House staff, on

---

[4] As stated by GAO: "[The question is] whether in any particular case a speech or a release by a cabinet officer can be said to be so completely devoid of any connection with official functions or so political in nature that it is not in furtherance of the purpose for which Government funds were appropriated, thereby making the use of such funds … unauthorized. This is extremely difficult to determine in most cases as the lines separating the nonpolitical from the political cannot be precisely drawn." GAO Redbook at 3-294 (citing B-144323 (Nov. 4, 1960)).

State Department letterhead stationery, and signed by the Ambassador to Great Britain. *See* GAO Redbook at 3-285 (citing B-178528 (July 27, 1973)). GAO again noted the extreme difficulty in distinguishing between disseminating information to explain or defend administration policies, which is permissible, and similar activities designed for purely political or partisan purposes. *See id*. (citing B-194776 (June 4, 1979)). Thus, GAO was unable to conclude that there was any violation of the publicity or propaganda law. *Id*.

Applying the same standard here, it is clear that Plaintiffs cannot meet their burden of proof on their *ultra vires* claim. In serving the President, White House staff play an important role in helping educate the public regarding the President's positions, policies, and accomplishments. Moreover, as applied to EOP, it is difficult to draw clear lines between what is strictly partisan and what is information explaining and defending the Administration's policies. *See* GAO Redbook at 3-294 ("An agency has a right to explain and defend its policies and respond to attacks on that policy") (citing B-302504, at 10 (Mar. 10, 2004)); *id*. (The question "is whether in any particular case a speech or a release by a cabinet officer can be said to be so completely devoid of any connection with official functions or so political in nature that it is not in furtherance of the purpose for which Government funds were appropriated, thereby making the use of such funds … unauthorized. This is extremely difficult to determine in most cases as the lines separating the nonpolitical from the political cannot be precisely drawn.") (quoting B-144323 (Nov. 4, 1960)). Accordingly, the devotion of EOP staff to compile advertisements that informed the public of the Administration's policies and countered attacks on those policies was part of the agency's function and cannot be said to be "completely devoid of any connection with official functions." GAO Redbook at 3-294.

To take one example, Plaintiffs argue vigorously that a new ad posted on the White House YouTube page in which the President promises $5,000 to all adult citizens depending on the outcome of the midterm elections is purely partisan and constitutes propaganda. *See* Pls. Br. at 1, 4-5. But the ad also informs the general public of a new monetary proposal as well as the Administration's views on tax policy. *See id.* at 4 (stating that the ad discusses tax policy, economic prosperity, etc.). Accordingly, Plaintiffs cannot satisfy the rigorous *ultra vires* standard.[5] *See Becerra*, 56 F.4th at 26-27 (agency must have acted "plainly . . . in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory"); *California*, 609 U.S. __, 2026 WL 2687160, at *3 ("If the question of the Postal Service's power were before us in something other than the context of an ultra vires claim, the Government's argument would present a difficult question. But here the question is different.").[6]

Plaintiffs' *ultra vires* claim based on a purported violation of the Purpose Act fails for the same reason. The Purpose Act provides that appropriations should be used for their intended purpose. *See* 31 U.S.C. § 1301(a) ("[A]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). Just like the prohibition on using funds for "publicity or propaganda," the Purpose Act's directive to use funds for which they are intended is likewise not sufficiently clear or specific to support *ultra vires* review or a finding

---

[5] The same holds true for the other challenged advertisements referenced in Plaintiffs' brief. *See* Pls. Br. at 3-5.

[6] It is important to recognize that under Plaintiffs' theory, the Court could be called on to review speeches prepared for the President by White House staff to determine if they were purely partisan and therefore (according to Plaintiffs' arguments) violative of the Appropriations Act. This type of review would raise serious separation of powers concerns and is one of the reasons why the publicity and propaganda review standard is so deferential. *See* Principles of Federal Appropriations Law, Chapter 3 Availability of Appropriations: Purpose, Step 2 Expenditure Must Not Be Prohibited at 24, 2026 WL 1460438 (discussing the difficulties of applying the standard to speeches or releases by cabinet officers).

of a violation. That is especially true here given that EOP staff serve to support the President and the ads in question explain and defend the Administration's policies and rebut attacks on those policies.

Finally, Plaintiffs' Equal Protection claim fares no better. Pls. Br. at 10-12. The constitutional claim also flows from the same operative facts and legal theory – *i.e.*, that EOP acted outside its statutory authority in devoting staff time to compile certain advertisements. *See id*. Because Plaintiffs cannot establish that EOP acted outside its statutory authority, the Equal Protection claim fails as well. *See, e.g.*, *National Science Foundation*, 793 F. Supp. 3d at 607 (holding that failure to show likelihood of success on the merits of *ultra vires* claims also doomed plaintiffs' constitutional claims arising for the same set of facts).

## IV. The Alleged Injury from the Challenged Advertisements Aired by MAGA Is Not Redressable by an Order from This Court

Plaintiffs' motion regarding the challenged advertisements paid for by MAGA should also be denied for the additional, independent reason that their alleged injury cannot be redressed by the Court. As this Court has observed, "'no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury.'" ECF No. 42 (Opinion and Order) at 30 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)). Accordingly, to satisfy the redressability requirement, there must be a "'substantial likelihood that the relief requested will have a substantial ameliorative effect on the specific injury alleged.'" Opinion and Order at 30 (quoting *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 628 n.6 (2d Cir. 1989)).

Here, Plaintiffs seek to enjoin challenged advertisements being paid for by MAGA, but they have not named MAGA as a defendant.[7] Accordingly, the Court has no ability to enjoin the airing of those advertisements. Indeed, the Proposed Order that Plaintiffs submitted (ECF No. 83) is overbroad and improper because it orders Defendants to "cancel or cause to be cancelled any slot, placement, reservation, or arrangement for the airing or dissemination of the challenged advertisements that were compiled by the Executive Office of the President" (ECF No. 83 at 2), even though Plaintiffs concede that Defendants are not the ones making those arrangements or paying for the ads.

Plaintiffs' assertion that MAGA is "under [the President's] control," Pls. Br. at 1, cannot save this claim. Again, MAGA is not a party to this case. And the law is clear that courts "have no 'jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 253 (S.D.N.Y. 2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)). Accordingly, the Court cannot order the President to take action with respect to MAGA.[8]

## V. Plaintiffs Should Be Required to Post a Bond

If the Court grants an expanded TRO, it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post bond pursuant to Rule 65(c).

---

[7] As the Government argued in its memorandum of law in opposition to Plaintiffs' first TRO motion (ECF No. 37), Plaintiffs lack standing with respect to all of the claims in the Complaint. Because the Court has decided against the Government on that issue (Opinion and Order at 30), the Government has not repeated those arguments herein.

[8] Plaintiffs' attempt in their proposed order to enjoin MAGA in the proposed order (ECF No. 83) as a purported derivative agent of the President fails for the same reason.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for an expanded temporary restraining order.

Dated: October 27, 2026
New York, New York

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: *\/s/ Jeffrey Oestericher*

JEFFREY S. OESTERICHER
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
Email: jeffrey.oestericher@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, that this brief complies the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 5,684 words in this brief.

Dated: New York, New York
October 27, 2026

*/s/ Jeffrey Oesterricher*
JEFFREY S. OESTERICHER
Assistant United States Attorney