**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

**Common Cause** et al.,

Plaintiffs,

v.

**Department of Homeland Security** et al.,

Defendants.

**Case No. 26-cv-8882**

# PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO EXPAND THE TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS


Table of Authorities ..... iii

Introduction ..... 1

Argument ..... 1

I. The Court can expand the TRO on the allegations in the amended complaint. ..... 1

II. Plaintiffs are likely to succeed on the merits of their claims against the Executive Office of the President. ..... 3

A. Plaintiffs are likely to succeed on their *ultra vires* claim. ..... 3

B. Plaintiffs are likely to succeed on their Equal Protection claim. ..... 7

III. Under Rule 65, the Court can enjoin the ads being aired by MAGA Inc., which is acting in concert with Defendants. ..... 8

Conclusion ..... 9

## TABLE OF AUTHORITIES

### Cases

*Black v. Cakor Rest., Inc.*,
No. 22-cv-1447, 2022 WL 17689840 (S.D.N.Y. Dec. 15, 2022) ............ 2

*Bruce v. Martin*,
680 F. Supp. 616 (S.D.N.Y. 1988) ............ 2

*City of Saint Paul v. Wright*,
816 F. Supp. 3d 65 (D.D.C. 2026) ............ 7

*Env't Def. Ctr. v. Babbitt*,
73 F.3d 867 (9th Cir. 1995) ............ 3, 4

*Forschner Grp., Inc. v. Arrow Trading Co.*,
124 F.3d 402 (2d Cir. 1997) ............ 8, 9

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) ............ 9

*Kimberlin v. DOJ*,
318 F.3d 228 (D.C. Cir. 2003) ............ 4

*Neguse v. ICE*,
822 F. Supp. 3d 86 (D.D.C. 2026) ............ 3, 4, 5

*New York v. Nat'l Sci. Found.*,
793 F. Supp. 3d 562 (S.D.N.Y. 2025) ............ 8

*Patane v. Nestle Waters N. Am., Inc.*,
786 F. Supp. 3d 474 (D. Conn. 2025) ............ 7

*Pettaway v. National Recovery Solutions*,
955 F.3d 299 (2d Cir. 2020) ............ 2

*Philip Morris USA, Inc. v. Otamedia Ltd.*,
331 F. Supp. 2d 228 (S.D.N.Y. 2004) ............ 9

*Studebaker Corp. v. Gittlin*,
360 F.2d 692 (2d Cir. 1966) ............ 2

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ............ 3

*United States v. Jackson*,
388 F. Supp. 3d 505 (E.D. Pa. 2019) ............ 4

*United States v. United Liquors Corp.*,
77 S. Ct. 208 (1956) ............ 9

**Other Authorities**

*Acting Comptroller General Fisher to the Chairman*, NLRB, 31 Comp. Gen. 311 (1952) ........ 5

Black's Law Dictionary (12th ed. 2024) ........ 3

*Circumstances of a Mass Mailing of a Letter in Praise of President Nixon*, B-178528 (Comp. Gen. July 27, 1973), https://perma.cc/R82J-M5U2 ........ 7

U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law*, (4th ed. 2017), https://perma.cc/NLQ5-G4DA (GAO Red Book) ........ 5, 6

Jonathan Cooper, *Trump, hoping to salvage midterms, makes a dubious pledge to give every US adult $5,000 if GOP wins*, AP News (Sep. 10, 2026), https://perma.cc/8UUY-PXPQ ........ 6

*Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Use of Appropriated Funds for Flyer and Print and Television Advertisements*, B-302504 (Comp. Gen. Mar. 10, 2004), https://perma.cc/79U5-8CKR ........ 6, 7

.

## INTRODUCTION

In their opposition, Defendants do not contest that Plaintiffs have standing. They do not contest Plaintiffs' irreparable harm. And they do not contest that the balance of the equities and public interest favor an expanded injunction. Instead, Defendants argue that the Court cannot expand its TRO based on the allegations in the original complaint, that Plaintiffs' *ultra vires* claim fails on the merits, and that the Court cannot enjoin MAGA Inc. Defendants are wrong at each turn.

## ARGUMENT

### I. The Court can expand the TRO on the allegations in the amended complaint.

Plaintiffs' complaint challenged Defendants' use of public funds to pay for President Trump's taxpayer-funded political ads. Compl., Dkt. 1. And Plaintiffs' pending motion to expand the Temporary Restraining Order explicitly requests the Court to enjoin Defendants' further dissemination of taxpayer-funded political ads—no matter the platform on which these ads are airing. Mot., Dkt. 82. Plaintiffs' amended complaint clarified that the challenged advertisements include those that aired on national and local tv and those posted to official government channels, such as YouTube and Instagram. These ads also include those "compiled" by EOP staff and later aired by MAGA Inc.[1] Am. Compl., Dkt. 90. Thus, Defendants' threshold argument that Plaintiffs should amend their Complaint is moot. Opp'n Br. 6, Dkt. 86.

The amendment and mooting of Defendants' threshold argument does not prejudice Defendants. Defendants have had ample notice that Plaintiffs challenge the political advertisements posted on official government channels. Defendants have been on notice of some

---

[1] Defs.' Am. Resp. & Objs. to Pls.' Interrogs., 5 (Oct. 21, 2026); Defs.' Resp. & Objs. to Pls.' Reqs. for Admis., 7 (Oct. 20, 2026); Pls.' Reqs. for Admis., 3 (Oct. 14, 2026).

of these allegations since at least October 14, when Plaintiffs raised them at the conference as a potential basis for further relief. *See* Oct. 14 Tr. 6:25–7:4, 16:21–17:21, 23:16–19. Other of these allegations relate to Defendants' responses to Plaintiffs' discovery requests on October 20 and 21. And the supplemental allegations included in the amended complaint were described in the pending motion and have been addressed on the merits by Defendants in their opposition.

Moreover, Plaintiffs' amended complaint does not change the grounds on which Plaintiffs seek the expanded TRO, and it does not prevent the Court from granting emergency relief. As the Second Circuit has confirmed, when a plaintiff amends their complaint after a defendant has filed a pending motion to dismiss, courts may evaluate the pending motion in light of the facts alleged in the amended complaint. *Pettaway v. National Recovery Solutions*, 955 F.3d 299, 303-304 (2d Cir. 2020). The same rule applies when a complaint is amended while a motion for preliminary injunction is pending. *See Black v. Cakor Rest., Inc.*, No. 22-cv-1447, 2022 WL 17689840, at *4 (S.D.N.Y. Dec. 15, 2022) (granting leave to amend, "assess[ing] [plaintiff's] motion for a preliminary injunction in light of the newly-added allegations" included in amended complaint, and granting the preliminary injunction); *Bruce v. Martin*, 680 F. Supp. 616, 617 (S.D.N.Y. 1988) (similar). Indeed, the Second Circuit has affirmed the grant of an emergency motion for a preliminary injunction filed before the plaintiff even filed a formal complaint. *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 694 (2d Cir. 1966) (Friendly, J.).

This approach is especially appropriate here, given the ongoing irreparable harms to Plaintiffs and the public as the November 3 elections approach—harms that Plaintiffs have already detailed in their motion and which Defendants do not contest in their response.

## II. Plaintiffs are likely to succeed on the merits of their claims against the Executive Office of the President.

### A. Plaintiffs are likely to succeed on their *ultra vires* claim.

Plaintiffs' motion to expand the TRO showed (at 6-10) why EOP's use of funds appropriated for everyday White House operations to create partisan propaganda was *ultra vires*. Specifically, EOP, like every other part of the federal government, can use appropriated funds only for purposes determined by Congress. *See U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347-48 (D.C. Cir. 2012) (Kavanaugh, J.). And Congress did not appropriate funds to EOP to run a PR shop to help the President's allies and attack his perceived ideological opponents. What's more, Congress has specifically prohibited the use of appropriated funds for publicity or propaganda—a definition these ads plainly satisfy. In response, Defendants argue that EOP does not "use" appropriated funds when it creates propaganda and that, in all events, the challenged ads are not publicity or propaganda. Both arguments fail.

**1.** The government "used" appropriated funds when EOP staff "compiled" the challenged ads. As the district court in *Neguse v. ICE* explained, "'used,' is the past participle form of the verb 'use,' which in this context means '[t]o employ for the accomplishment of a purpose; to avail oneself of.'" 822 F. Supp. 3d 86, 105 (D.D.C. 2026) (quoting Black's Law Dictionary (12th ed. 2024)). "The fact that officials and employees spent time" compiling these advertisements "constitutes a use of funds, one which is prohibited" by Section 718. *Id.* at 106; *accord Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 871-72 (9th Cir. 1995) ("The use of any government resources—whether salaries, employees, paper, or buildings—to accomplish [an agency action] would entail government expenditure."). In short, the government may not pay for services that Congress did not authorize it to fund, whether the payment is part of an employee's salary or a contractor's fee.

To hold otherwise would be to deprive appropriations riders of their intended effect: "restraining [unauthorized] government action." *Neguse*, 822 F. Supp. 3d at 103.

Indeed, in *Neguse*, DHS recognized that staff time constitutes the use of appropriations. In an attempt to avoid a similar appropriations rider that stated that "funds appropriated" to DHS could not "be used" for certain purposes, then-Secretary Noem "instructed that 'any time or resources spent conducting activities otherwise subject to [the appropriation rider's] limitations must be appropriately logged and funded from'" sources not subject to the rider. *Neguse*, 822 F. Supp. 3d at 96. No such effort to avoid using appropriated funds to pay EOP staff for their time creating political advertisements was undertaken here—nor could it have been, since all funding appropriated to EOP is subject to Section 718.

Staff time constitutes "use" of appropriations even if the amount of time dedicated to creating the challenged advertisements was relatively minimal. Any misuse of government staff, "however minor the expense," constitutes use of appropriated funds. *United States v. Jackson*, 388 F. Supp. 3d 505, 514 (E.D. Pa. 2019). Thus, even if, as Defendants maintain, the diversion of staff resources here did not result in "any additional salary or other monies" being paid, EOP staff used appropriated funds in creating these advertisements. Opp'n Br. 8; *see Neguse*, 822 F. Supp. 3d at 115 ("When [appropriations rider] says that '[n]one' of DHS's annually appropriated funds may be used for a prohibited purpose, it means none." (second alteration in original)).

Other incidental reliance on government resources also constitutes "use" of appropriated funds. *Babbitt*, 73 F.3d at 871-72 ("salaries, employees, paper, or buildings"); *Kimberlin v. DOJ*, 318 F.3d 228, 232 (D.C. Cir. 2003) ("storage" and "electricity"). The use of "information technology systems and contracts, office supplies, utilities, and building infrastructure"—including any software, hardware, or other technology relied on to compile these advertisements—

thus involves the "use" of appropriated funds subject to Section 718. *Neguse*, 822 F. Supp. 3d at 106.

Finally, it is Defendants' argument that "ignores EOP's function within the Executive Branch." Opp'n Br. 9. Congress does not appropriate funding to EOP to serve as an arm of a political campaign or PAC; instead, Congress provides funding to enable staff to support the President in carrying out the constitutional and statutory duties of the office. EOP, like other entities within the Executive Branch, is subject to both the Purpose Statute and Section 718, and Defendants cite no authority to the contrary.

**2.** The ads are publicity and propaganda. As the Court explained, the "GAO has identified three activities that are prohibited by the publicity or propaganda prohibition—self-aggrandizement, covert propaganda, and purely partisan materials." Op. and Order 35-36, Dkt. 42 (quoting GAO Red Book, at 3-282). That means Defendants may not use taxpayer funds for the "individual glorification" of executive officials, *Acting Comptroller General Fisher to the Chairman*, NLRB, 31 Comp. Gen. 311, 313 (1952), or "to emphasize the importance of the agency or activity in question," *id.* Nor may Defendants use appropriated funds "to aid a political party or candidate." GAO Red Book, at 3-293-94 (citation omitted). Plaintiffs' motion for a TRO (at 18-19) and the motion to expand the TRO (at 9-10) explained what is obvious to any viewer of the taxpayer-funded ads—they are self-aggrandizing and purely partisan, so they violate Section 718.

In response, Defendants ignore GAO's standard. Instead, they rely on stray language to argue (at 10-11) that differentiating between propaganda and the Executive's right to explain its policies is an almost-standardless balancing act. On that basis, Defendants argue that it is too hard to tell whether the challenged ads are partisan propaganda to warrant equitable relief. But this is not a close question. The government's chosen example, "$5,000 to Americans," proves the point. As

the government tells it, the ad "informs the general public of a new monetary proposal as well as the Administration's views on tax policy." Opp'n Br. 13. But the "new monetary proposal" is a $5,000 bribe that voters will receive "[i]f the Republicans win," but not if the Democrats win. And the "view[] on tax policy" is that "Democrat policies won't allow [the bribe] to happen. In fact, the opposite. They're going to raise your taxes." The ad later repeats, "All you have to do is vote Republican." The ad's language echoes the first time Trump made this promise: the RNC's midterm convention in September.[2] Another ad is called ""Every Democrat Voted Against No Tax on Tips." The commercials do not mention any discernable government policy other than the President's belief that Republicans should win and Democrats should lose. There is no question that they are designed "to aid a political party or candidate." GAO Red Book, at 3-293-94.

Defendants' "instructive" examples from other GAO decisions demonstrate the stark differences between advertisements that GAO has determined are not publicity or propaganda and the challenged advertisements at issue in this litigation. The first example that Defendants cite (at 11) is a television advertisement campaign that the Department of Health and Human Services ran promoting changes to Medicare as "Same Medicare. More Benefits." *Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Use of Appropriated Funds for Flyer and Print and Television Advertisements*, B-302504, at 5 (Comp. Gen. Mar. 10, 2004), https://perma.cc/79U5-8CKR. That advertisement "focuse[d] only on the new provisions allowing for savings on prescription drugs, specifically the drug discount card and the prescription drug benefit." *Id.* It ended with an announcer directing the public to call 1-800-MEDICARE with

[2] Jonathan Cooper, *Trump, hoping to salvage midterms, makes a dubious pledge to give every US adult $5,000 if GOP wins*, AP News (Sep. 10, 2026), https://perma.cc/8UUY-PXPQ.

questions. *Id.* The GAO found that the ads were not "so partisan in nature" as to be "a purely partisan message." *Id.* at 13.

Defendants' second example (at 11-12) concerns a mass mailing on State Department letterhead transmitting British newspaper editorials praising President Nixon. GAO investigated whether appropriated funds had been used for the mailing and concluded the mailing was carried out and funded by the Republican National Committee, not with State Department appropriations. *Circumstances of a Mass Mailing of a Letter in Praise of President Nixon*, B-178528 (Comp. Gen. July 27, 1973), https://perma.cc/R82J-M5U2. The Redbook's reliance on B-178528 demonstrates that the publicity-and-propaganda inquiry has long distinguished between informing the public about governmental programs and using official resources to disseminate materials praising political leaders. The latter raises the precise concerns that gave rise to the prohibition. And the GAO recognized that there is "a point beyond which it could be concluded that the bounds of propriety have been overstepped[.]" *Id.* In denigrating particular candidates and political parties, and promising voters money in exchange for their votes, the challenged advertisements plainly cross the bounds of propriety in a manner that Defendants' examples did not.

**B. Plaintiffs are likely to succeed on their Equal Protection claim.**

Plaintiffs' motion to expand the TRO explained that EOP's production of advertisements attacking the President's perceived political enemies violates the Equal Protection component of the Fifth Amendment because there is no rational governmental interest in attacking groups based on their "political identity." Mot. 11 (quoting *City of Saint Paul v. Wright*, 816 F. Supp. 3d 65, 72 (D.D.C. 2026)). Defendants do not respond to that argument, so they have forfeited it. *See Patane v. Nestle Waters N. Am., Inc.*, 786 F. Supp. 3d 474, 480 (D. Conn. 2025). And that alone is enough to expand the TRO.

Instead of responding to Plaintiffs' argument, Defendants state without explanation that Plaintiffs' equal-protection claim is based on the "same operative facts and legal theory" as Plaintiffs' *ultra vires* claim—"that EOP acted outside its statutory authority in devoting staff time to compile certain advertisements." Opp'n Br. 14. And because, in Defendants' view, the *ultra vires* claim fails, so must the equal-protection claim. Defendants are wrong on both the facts and the law. The equal-protection claim says nothing about statutory authority to create or compile political advertisements. *See* Mot. 10-12; Compl. ¶¶ 180-88; First Am. Compl. ¶¶ 205-13. And the single case Defendants cite in support, *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 607 (S.D.N.Y. 2025), is irrelevant. There, the plaintiffs' *ultra vires* claim largely mirrored their two constitutional claims (one under the Take Care Clause and one alleging a violation of separation of powers) because "in each of these three claims, Defendants are said to have violated the terms of various statutes." *Id*. (quotation marks omitted). Neither that court nor any other court has held that *any* constitutional claim rises and falls with an *ultra vires* claim. And again, Plaintiffs' equal-protection claim does not allege that Defendants acted without statutory authority, but rather that they drew a classification without any legitimate reason to do so.

### III. Under Rule 65, the Court can enjoin the ads being aired by MAGA Inc., which is acting in concert with Defendants.

Defendants argue that "the Court has no ability to enjoin the airing" of the advertisements created by EOP because MAGA, Inc. paid to air them. Opp'n Br. 15. In other words, as Defendants tell it, EOP may produce campaign ads to influence an ongoing election, pass them off to a super PAC to carry out their purpose, and get away with the unlawful scheme just because EOP staff hit "send" before any court could stop them.

The judiciary is not so powerless. A court may enter an injunction not only to stop unlawful conduct, but also to "cure the effects of the harm caused by the violation." *Forschner Grp., Inc. v.*

*Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997). The ads that MAGA Inc. is running were unlawfully compiled by EOP so that others—LMD Agency, then MAGA Inc.—could air them to influence the election. The court may enjoin their distribution to "correct the evil effects of unlawful conduct." *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 246 (S.D.N.Y. 2004) (quoting *United States v. United Liquors Corp*., 77 S. Ct. 208, 210 (1956)).

That "MAGA is not a party to this case" and is "under [the President's] control," Opp'n Br. 15, does not bring it outside the reach of relief. An injunction binds not only "the parties" and their "agents," but also "those 'who are in active concert or participation' with the enjoined parties . . . ." *Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023). That includes parties who take actions "for the benefit of, or to assist" a party. *Id.* at 112. Just like LMD Agency, MAGA Inc. is "in active concert and participation with Defendants." Order 3, Dkt. 41. It is airing the ads at the direction of the same person—President Trump—to serve the same goal for which EOP plainly created them: to skew the election in favor of the Republican candidates MAGA Inc. supports.

In short, Defendants cannot thwart effective relief by using the President's super PAC.

**CONCLUSION**

For these reasons, Plaintiffs respectfully request that this Court expand its TRO.

October 29, 2026

Respectfully submitted,

*/s/ Bradley Girard*
Bradley Girard
Sean Ouellette
Michael J. Gaffney
Anashua Dutta
Paul R.Q. Wolfson
Robin F. Thurston
Democracy Forward
P.O. Box 34553
Washington, DC 20043

Bruce V. Spiva
Tara Malloy
Brent Ferguson
Sejal Jhaveri
Renata O'Donnell
Katherine Hamilton
Campaign Legal Center Action
1333 New Hampshire Ave. NW
Washington, DC 20036

(202) 736-2200

(202) 448-9090
bgirard@democracyforward.org

Brendan Ballou*
Samuel T. Ward-Packard
Public Integrity Project Action, Inc.
1763 Columbia Rd. NW, Suite 175
Washington, DC 20009
(917) 684-3900

*Counsel for Plaintiffs*

* Motion to appear pro hac vice forthcoming

**CERTIFICATE OF COMPLIANCE**

Under Local Rule 7.1(c), I hereby certify that this memorandum of law was prepared using Microsoft Word, and that using the Word Count feature, it is 2752 words, including footnotes and not including those portions of the memorandum excluded from the word count by Local Rule 7.1(c).

/s/ *Bradley Girard*
Bradley Girard