**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

**Common Cause** et al.,

Plaintiffs,

v.

**Department of Homeland Security** et al.,

Defendants.

**Case No. 26-cv-8882**

# PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND A SECTION 705 STAY

## TABLE OF CONTENTS


Table of Authorities ..... iii

Introduction ..... 1

Legal Background ..... 2

Factual Background ..... 3

I. President Trump directs Defendants to find government funds to pay for ads created by White House staff. ..... 3

II. From late September until the Court's first TRO in mid-October, DHS paid to air EOP-created ads. ..... 4

III. After the October 11 TRO, Defendants continued to create and distribute political ads on official government websites. ..... 5

IV. The new EOP-created ads remained on official government websites until this Court's second TRO order, and at least two have run on national television. ..... 6

Argument ..... 7

I. Plaintiffs have standing. ..... 7

A. Plaintiffs have suffered injuries in fact. ..... 8

B. The injuries are traceable to the challenged actions and redressable. ..... 10

II. Plaintiffs' claims are not moot. ..... 12

A. Social media and MAGA Inc. advertisements ..... 12

B. LMD Contract ..... 14

C. The mootness exception for cases capable of repetition but evading review ..... 15

III. Plaintiffs are likely to succeed on the merits of their APA claims. ..... 15

A. Contrary to law and in excess of statutory authority ..... 16

1. Purpose Statute, 31 U.S.C. § 1301 ..... 16

2. Prohibition on "publicity or propaganda," § 718 ..... 17

B. Arbitrary and Capricious ..... 19

IV. Plaintiffs are likely to succeed on their *ultra vires* claims. ..... 21

V. Plaintiffs are likely to succeed on their Equal Protection claim. ..... 24

VI. Plaintiffs will continue to suffer irreparable harm absent a stay or injunction. ..... 25

VII. The balance of equities and public interest favor Plaintiffs. ..... 26

Conclusion ..... 27

# TABLE OF AUTHORITIES

## Cases

*A.I. Indus. Ass'n, Inc. v. Geisel Software, Inc.*,
No. 25-cv-7387 (PKC), 2026 WL 2859845 (S.D.N.Y. Sep. 23, 2026) .................... 7, 8

*Am. Council of Learned Societies v. Nat'l Endowment for the Humans*,
No. 25-cv-3657, 2026 WL 1256545 (S.D.N.Y. May 7, 2026) .................................. 21

*Center for Reproductive Law and Policy v. Bush*,
304 F.3d 183 (2d Cir. 2002) ................................................................................ 8, 9, 10

*Citizens to Protect Pub. Funds v. Bd. of Educ.*,
13 N.J. 172 (1953) ................................................................................................ 27

*City of Saint Paul v. Wright*,
816 F. Supp. 3d 65 (D.D.C. 2026) ...................................................................... 24, 25

*Common Cause v. Dep't of Homeland Sec.*,
No. 1:26-cv-08882 (JLR), 2026 WL 3043900 (S.D.N.Y. Oct. 12, 2026) ................. 27

*Conn. Citizens Def. League, Inc. v. Lamont*,
6 F.4th 439 (2d Cir. 2021) .................................................................................... 12

*Consumer Fin. Prot. Bureau v. L. Offs. of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) ..................................................................................... 2

*D.C. Common Cause v. District of Columbia*,
858 F.2d 1 (D.C. Cir. 1988) ........................................................................... 19, 23, 27

*Davis v. FEC*,
554 U.S. 724 (2008) ................................................................................................ 7

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) ........................................................................... 21, 22

*Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ........................................................................... 2, 22

*Env't Def. Ctr. v. Babbitt*,
73 F.3d 867 (9th Cir. 1995) ............................................................................... 22, 23

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*,
551 U.S. 449 (2007) ........................................................................................... 12, 15

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ............................................................................... 21

*Fulani v. League of Women Voters Educ. Fund*,
882 F.2d 621 (2d Cir. 1989) .................................................................................... 8

*Gov't Emps. Ins. Co. v. Patel*,
166 F.4th 280 (2d Cir. 2026),
*petition for cert. filed*, No. 26-85 (U.S. July 20, 2026) .......... 25

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) .......... 11

*In re U.S. Cath. Conf.*,
885 F.2d 1020 (2d Cir. 1989) .......... 8

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 26

*Lindahl v. OPM*,
470 U.S. 768 (1985) .......... 21

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016) .......... 12, 14

*Motor Vehicle Mfrs. Assoc. of the United States, Inc v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 19

*Mountain States Legal Found. v. Denver Sch. Dist. No. 1*,
459 F. Supp. 357 (D. Colo. 1978) .......... 27

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 8

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
821 F. Supp. 3d 62 (D.D.C. 2026) .......... 21, 22

*Neguse v. ICE*,
822 F. Supp. 3d 86 (D.D.C. 2026) .......... 22, 23

*New York v. Trump*,
490 F. Supp. 3d 736 (S.D.N.Y. 2020) (three-judge panel) .......... 26

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) .......... 26

*New York v. United States Dep't of Agric.*,
454 F. Supp. 3d 297 (S.D.N.Y. 2020) .......... 7

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 21

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025),
*appeal filed*, No. 25-5241 (D.C. Cir. Jul. 2, 2025) .......... 24

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) .......... 26

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) .......... 8

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019), *stay granted*, 140 S. Ct. 1 (2019) (mem.) .......... 27

*Soule v. Conn. Ass'n of Schs.*,
90 F.4th 34 (2d Cir. 2023) .......... 10

*Stanson v. Mott*,
17 Cal. 3d 206 (1976) .......... 27

*Summerour v. IRS*,
No. CV 23-2442 (LLA), 2024 WL 3443604 (D.D.C. July 16, 2024) .......... 21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 16

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) .......... 25

*United States v. Greebel*,
184 F.4th 93 (2d Cir. 2026) .......... 7

*United States v. MacCollom*,
426 U.S. 317 (1976) .......... 17

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000) .......... 24, 25

*Wagschal v. Skoufis*,
442 F. Supp. 3d 612 (S.D.N.Y. 2020) .......... 14

*Walden v. Kosinski*,
153 F.4th 118 (2d Cir. 2025) .......... 8

*Yale New Haven Hosp. v. Becerra*,
56 F.4th 9 (2d Cir. 2022) .......... 21, 22

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 .......... 2

U.S. Const. art. I, § 9, cl. 7 .......... 2

**Statutes**

5 U.S.C. § 705 .......... 27

5 U.S.C. § 706 .......... 16, 19

5 U.S.C. § 7324 .......... 19

31 U.S.C. § 1301 .......... 2, 16, 22

31 U.S.C. § 1517 .......... 16

10 Cong. Ch. 28, § 1, 2 Stat. 535 (Mar. 3, 1809) .......... 2

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118-47, 138 Stat. 460 .......... 3, 17

Full-Year Continuing Appropriations and Extensions Act, 2025,
Pub. L. No. 119-4, 139 Stat. 9 .......... 3, 17

2025 Budget Reconciliation Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) .......... 4, 16, 17, 20

Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026,
Pub. L. No. 119-37, 139 Stat. 495 (2025) .......... 16

Consolidated Appropriations Act, 2026,
Pub. L. No. 119-75, 140 Stat. 173 .......... 3, 17, 22, 23

Secure America Act,
Pub. L. No. 119-98, 140 Stat. 837 (2026) .......... 16

Continuing Appropriations and Extensions Act, 2027,
Pub. L. No. 119-103, 140 Stat. 987 (2026) .......... 16, 23

**Regulations**

5 C.F.R. § 734.101 .......... 19

**Legislative Materials**

H. R. Rep. No. 119-106 (2025) .......... 17

**Other Authorities**

32BJ SEIU (@32bjseiu), Instagram, https://www.instagram.com/32bjseiu/ .......... 10

*Acting Comptroller General Fisher to the Chairman*,
NLRB, 31 Comp. Gen. 311 (1952) .......... 18, 19

AdImpact Politics (@AdImpact_Pol), X (Sep. 28, 2026, at 12:50 ET), https://x.com/AdImpact_Pol/status/2104614634325979457?s=20 ...................... 18, 19

Alejandra Jaramillo, *Trump says he will pay for campaign-style ads himself after backlash over taxpayer-funded effort*, CNN (Oct. 6, 2026), https://perma.cc/TTN2-PJTB .......................................................................... 6

*America Will Never Be A Socialist/Communist Country*, The White House (Sep. 11, 2026), https://www.whitehouse.gov/videos/america-will-never-be-a-socialist-communist-country/ ........................................................................ 18

Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Alabama Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U ........................... 20

Betsy Klein & Brian Stetler, *Taxpayer-funded ads aired hundreds of times after judge ordered Trump to halt the push*, CNN (Oct. 12, 2026), https://perma.cc/U3GS-6P5W ........................................................................ 4

Contract Summary, USASpending.Gov, https://perma.cc/MB53-7CCC .......................... 4

Dan Gooding, *Trump Debuts New Ads on Truth Social, YouTube After Judge's Taxpayer Order*, Newsweek (Oct. 13, 2026), https://perma.cc/BWH8-5R45............. 5

Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2 ...................................................... 3, 4, 11, 18

OMB, Circular A-11 (2025), https://perma.cc/Q6JV-4DTC .......................................... 16

OpenOMB, Operations and Support, Protect Democracy Project, https://perma.cc/7SKN-8B7L ......................................................................... 4

*President Trump Defends Taxpayer-Funded Ads, Says He's Promoting the Country*, (C-SPAN, Sep. 30, 2026), https://www.c-span.org/clip/white-house-event/president-trump-defends-taxpayer-funded-ads-says-hes-promoting-the-country/5207706 ......................................................................................... 20

Steven Portnoy et al., *Pro-Trump ad campaign was financed by DHS: Sources*, Eyewitness News ABC 7 (Sep. 30, 2026), https://perma.cc/M8UU-65L3 ................ 20

Tarini Parti, Marianne LeVine & Michelle Hackman, *Homeland Security Money Financed Pro-Trump Television Ads*, The Wall Street Journal (Sep. 29, 2026), https://perma.cc/W6YT-KJ5L ........................................................................ 4

The White House, *$5000 to Americans* (YouTube, Oct. 12, 2026), https://www.youtube.com/watch?v=OaTi_y8_GLk........................................... 18, 19

The White House, *Retribution Through Success* (YouTube, Oct. 29, 2026), https://www.youtube.com/watch?v=AkGLdI8BDTc .................................................. 6

The White House, *Videos Tab* (YouTube), https://www.youtube.com/@WhiteHouse/videos (last visited Oct. 29, 2026) ............. 5

U.S. Gov't Accountability Off., B-302504, *Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Use of Appropriated Funds for Flyer and Print and Television Advertisements* (Mar. 10, 2004), https://perma.cc/PK26-6B8S ............ 3

U.S. Gov't Accountability Off., GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (Sep. 2005), https://perma.cc/2HC2-YZWD....................... 16

U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law* (4th ed. 2017), https://perma.cc/NLQ5-G4DA...... 2, 3, 17, 18, 19

U.S. Off. of Special Couns., *Hatch Act Advisory Opinion Regarding the Use of Presidential Campaign Slogans* (June 7, 2023)........... 20

U.S. Off. of Special Couns., *Hatch Act Assessment and Advisory: Partisan Agency Communications During the 2025 Lapse in Appropriations* (Sep. 25, 2026) ............ 19, 20

## INTRODUCTION

At the President's direction, federal employees and agencies used taxpayer dollars to create and run advertisements that are pure partisan propaganda—either because they exalt the President, attack his perceived opponents, or both. When this Court temporarily restrained Defendants from drawing from the public fisc to pay for national television slots for these ads, Defendants pushed the ads on official government websites (after the ads continued running on national tv into the next day). Not giving up on television, the super PAC that President Trump says he controls began to pay to run the ads—the creation of which was, again, bankrolled by U.S. taxpayers. The Court temporarily restrained three of those ads too. Despite the second TRO order, the ads continued running on government websites for almost 24 additional hours and on national television for more than 24 hours after that (indeed, at the time of filing this motion, MAGA Inc. is still running at least one taxpayer-funded ad). There can be little doubt that the ads were never public-service announcements or policy statements—they were attempts to influence the electoral landscape.

To allow the administration to use its official megaphone to create and air such propaganda decreases the chance that voters will support the candidates whom SEIU 32BJ and Empire PAC endorse and will hurt Robert Hunter's electoral prospects. That harm is most acute in the run-up to the midterms. But because Plaintiffs' electoral work does not stop on November 3, the harm will continue as long as Defendants are allowed to continue creating and disseminating these ads. And Defendants have not stated any intention to stop—a fact highlighted by their foot-dragging in complying with each of the Court's TRO orders.

Without a preliminary injunction, Defendants will be free to, once again, have taxpayers subsidize Defendants' partisan battles. And that means that as Plaintiffs move toward run-off elections, 2027 elections, and continuing to organize for their electoral goals, they will be forced to work against the budget and imprimatur of the federal government. Those are harms that cannot

be remedied after a final judgment. The Court was correct to temporarily restrain the plainly unlawful ads. And for the same reasons, it should preliminarily enjoin Defendants from creating or disseminating any advertisement that singles out a particular candidate, party, or ideology in a manner similar to that blatant propaganda.

## LEGAL BACKGROUND

The power of the purse rests with Congress. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). "[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Consumer Fin. Prot. Bureau v. L. Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 181 (2d Cir. 2023) (citation omitted).

This fundamental separation-of-powers principle "is enshrined in" the Purpose Statute, "which commands: 'Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 31 U.S.C. § 1301(a)). "Because the Constitution forbids payment of money from the Treasury except as provided by an appropriation, and because an appropriation must be derived from an act of Congress," the Purpose Statute—which was originally enacted over 200 years ago—codifies what the Appropriations Clause requires: "it is for Congress to determine the purposes for which an appropriation may be used." U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law,* at 3-10 (4th ed. 2017), https://perma.cc/NLQ5-G4DA (GAO Red Book); *see* 10 Cong. Ch. 28, § 1, 2 Stat. 535 (Mar. 3, 1809).

Congress has long used its appropriations power to bar funding for political propaganda. In annual appropriations acts since 1952, Congress has prohibited the use of appropriated funds for unauthorized "publicity or propaganda":

> No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

GAO Red Book, at 3-280 (citation omitted). "[L]anguage almost identical" has appeared in every federal appropriations act since 1952. U.S. Gov't Accountability Off., B-302504, *Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Use of Appropriated Funds for Flyer and Print and Television Advertisements* 6 (Mar. 10, 2004), https://perma.cc/PK26-6B8S. Congress enacted the same language in appropriations for Fiscal Years 2025 and 2026.[1]

## FACTUAL BACKGROUND

### I. President Trump directs Defendants to find government funds to pay for ads created by White House staff.

On August 7, President Trump met with Republican strategists who asked the President to use some of the $400 million held by MAGA Inc., the super PAC that the President asserts he controls (albeit unlawfully), to support Republicans in tight midterm elections.[2] During the meeting, the President asked his assistant to show the strategists videos of himself that he liked.[3]

Weeks after this meeting, political advertisements paid for by the government began appearing on television.[4] After President Trump told OMB Director Vought "to come up with the money" for the President's advertisements "from within the government," taxpayers footed the

---

[1] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E, § 718, 140 Stat. 173, 495 (FY2026 Appropriations Act); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. B, title VII, § 718, 138 Stat. 460, 576 (FY2024 Appropriations Act), as incorporated by Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. 9, 10-12 (FY2025 Continuing Resolution).

[2] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

[3] *Id.*

[4] *Id.*

bill.[5] EOP appropriations were used to create these ads—Defendants have admitted that EOP staff "compiled certain" of the advertisements, including some or all of those that were "created or disseminated in advance of the 2026 midterm elections that have been posted online by Defendants."[6] Defendants' admission is consistent with public reporting that the ads "were created in-house by the White House video team."[7]

### II. From late September until the Court's first TRO in mid-October, DHS paid to air EOP-created ads.

On September 29, almost a week after the ads first started airing, the *Wall Street Journal* reported that the ads were paid for by funds from DHS.[8] The funds came from $6.1 billion Congress appropriated to CBP to "[c]ommemorat[e] efforts and events related to border security." § 90004, 139 Stat. at 359. OMB previously apportioned $500,000 for commemorative events.[9] But on September 19, OMB increased this apportionment by $20 million.[10] The next day, DHS signed a $20 million contract with advertising agency LMD.[11] Days later, the ads began to run nationwide.

Five taxpayer-funded ads aired between September 23 and October 11 on nationwide broadcasts, and in local media markets throughout the country, including in Alabama and New York. First Ward-Packard Decl. ¶¶ 6, 14-17, 21-22, Dkt. 26-4. Each of the ads included the same

---

[5] *Id.*

[6] Defs.' Am. Resp. & Objs. to Pls.' Interrogs. 5 (Oct. 21, 2026), Dkt. 75-5; Defs.' Resp. & Objs. to Pls.' Reqs. for Admis. 7 (Oct. 20, 2026), Dkt. 75-3; Pls.' Reqs. for Admis. 3 (Oct. 14, 2026), Dkt. 75-2.

[7] Betsy Klein & Brian Stetler, *Taxpayer-funded ads aired hundreds of times after judge ordered Trump to halt the push*, CNN (Oct. 12, 2026), https://perma.cc/U3GS-6P5W.

[8] Tarini Parti, Marianne LeVine & Michelle Hackman, *Homeland Security Money Financed Pro-Trump Television Ads*, The Wall Street Journal (Sep. 29, 2026), https://perma.cc/W6YT-KJ5L.

[9] OpenOMB, *Operations and Support*, Protect Democracy Project, https://perma.cc/7SKN-8B7L.

[10] *Id.*

[11] *Contract Summary*, USASpending.Gov, https://perma.cc/MB53-7CCC.

statement at the end: "Paid for by the U.S. Government." Some, such as "The Country He Loves," and "Final Battle," attacked ideologies that Trump opposes, claiming that "we will defeat Communism, socialism, and Marxism in America" and "we will demolish the 'deep state,'" "cast out the communists, Marxists and fascists," and "rout the fake news media."

According to AdImpact tracking data, as of November 2, the government's taxpayer-funded political advertising spree included at least 21,475 spots and generated an estimated 2.15 billion impressions. It cost taxpayers an estimated $22.4 million. Fourth Ward-Packard Decl. ¶ 9.

### III. After the October 11 TRO, Defendants continued to create and distribute political ads on official government websites.

The Court granted Plaintiffs' motion for a TRO and Section 705 stay on October 11. Order, Dkt. 41. The order stayed the purchase order between DHS and LMD. The order also stayed OMB's $20 million apportionment to fund the development, creation, or airing of advertisements covered by the purchase order. The Court enjoined Defendants and anyone acting in concert with Defendants from further funding, disseminating, or airing the challenged advertisements. Order 3, Dkt. 41.

The day after this Court entered its order, EOP posted new political ads, similar to the ads enjoined by the order, to the official White House YouTube page, including: "Every Democrat Voted Against No Tax on Tips," and "$5,000 to Americans."[12] "Every Democrat Voted Against No Tax on Tips," was also posted to the official White House Instagram. *See* Second Tall Decl. ¶ 25, Dkt. 82-1; Second Banks Decl. ¶ 15, Dkt. 82-3.

[12] Dan Gooding, *Trump Debuts New Ads on Truth Social, YouTube After Judge's Taxpayer Order*, Newsweek (Oct. 13, 2026), https://perma.cc/BWH8-5R45; The White House, Videos Tab (YouTube), https://www.youtube.com/@WhiteHouse/videos (last visited Oct. 29, 2026).

Additional ads have been uploaded to the official White House YouTube page, including "The Cost of Socialism" and "Retribution Through Success," indicating that EOP will continue creating and disseminating new political advertisements.[13]

**IV. The new EOP-created ads remained on official government websites until this Court's second TRO order, and at least two have run on national television.**

On October 16, shortly after the White House posted "Every Democrat Voted Against No Tax on Tips" on YouTube, MAGA Inc. began running the ad on television. Fourth Ward-Packard Decl. ¶ 11.[14] AdImpact data show that the ad has been airing in both the New York and Alabama local markets, as well as nationally. *Id.* ¶ 13. On October 30, following an October 23 motion by Plaintiffs, briefing, and a hearing, this Court issued a second TRO enjoining Defendants from disseminating three of the ads, requiring them to remove the ads from government websites and to direct authorized third parties, including MAGA Inc., to stop airing the ads. Order Granting Mot. for TRO 2, Oct. 30, 2026, Dkt. 101.

Though "Every Democrat Voted Against No Tax on Tips," was subject to that order, *see id.*, MAGA Inc. has continued to run it. As of November 2, AdImpact estimates that MAGA Inc. had spent over $7.93 million airing this ad, that the ad has aired in 7,343 spots, and that it had recorded at least 1.29 billion impressions. Fourth Ward-Packard Decl. ¶ 12. On November 1, Plaintiffs' counsel emailed Defense counsel to address this violation of the TRO. *See* Ex. B, Nov. 1, 2026 Email Exchange with Defense Counsel. Counsel responded that "Defendants served the TRO on

---

[13] Ex. A, Oct. 30, 2026 TRO Hr'g Tr., 33-34 (describing "The Costs of Socialism" advertisement); The White House, *Retribution Through Success* (YouTube, Oct. 29, 2026), https://www.youtube.com/watch?v=AkGLdI8BDTc.

[14] Although MAGA Inc. is not a Defendant in this litigation, Trump has expressly stated that he controls MAGA Inc. and directed them to run the advertisements. *See* Alejandra Jaramillo, *Trump says he will pay for campaign-style ads himself after backlash over taxpayer-funded effort*, CNN (Oct. 6, 2026), https://perma.cc/TTN2-PJTB.

MAGA but Defendants did not provide specific instructions to MAGA." *See id.* On November 2, 2026, defense counsel forwarded a letter, dated November 1, from MAGA Inc. Treasurer Charles Gantt in which he stated that "MAGA Inc. nevertheless instructed the organization's media buyer to cancel any placements of the specified advertisements." See Ex. C, Nov. 1, 2026 MAGA Inc. Ltr. Nonetheless, the ads continued to air through the date of this filing. Fourth Ward-Packard Decl. ¶ 14.

## ARGUMENT

Plaintiffs challenge Defendants' most egregiously partisan ads, which denigrate other political parties and candidates, including "America Will Never Be A Socialist/Communist Country," "The Country He Loves," "Final Battle," "$5,000 to Americans," "Every Democrat Voted Against No Tax on Tips," and "Cost of Socialism," and future ads that attack or promote a particular candidate, party, or political ideology. Plaintiffs have standing to challenge these advertisements, their claims are not moot, they are likely to succeed on the merits of their claims, and the balance of equities weighs in their favor.

### I. Plaintiffs have standing.

This Court has already determined that Plaintiffs who moved for the temporary restraining orders had standing when they filed suit, *see* Op. and Order 21-30, Dkt. 42; the same conclusion applies here, given that the same Plaintiffs move for this preliminary injunction. That is because "the standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008); *see also United States v. Greebel,* 184 F.4th 93, 99 (2d Cir. 2026). When there are multiple plaintiffs, "only one plaintiff need possess the requisite standing for a suit to go forward." *New York v. United States Dep't of Agric.*, 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citation omitted)). And "standing is assessed at the time of the original complaint, even if the complaint is later amended." *A.I. Indus.*

*Ass'n, Inc. v. Geisel Software, Inc.*, No. 25-cv-7387 (PKC), 2026 WL 2859845, at *2 (S.D.N.Y. Sep. 23, 2026) (quotation marks omitted).

To obtain preliminary relief, Plaintiffs need show only that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). And as this Court correctly concluded, Plaintiffs have an injury that is "fairly traceable" to the challenged conduct and "a non-speculative likelihood that the injury can be remedied by the requested relief." *Walden v. Kosinski*, 153 F.4th 118, 131 (2d Cir. 2025).

**A. Plaintiffs have suffered injuries in fact.**

Hunter, SEIU 32BJ, and Empire PAC each demonstrated injury-in-fact due to the competitive disadvantage each suffered by reason of the DHS-funded and government-endorsed political advertising campaign. *See* Op. and Order 22-29. Hunter, SEIU 32BJ and Empire PAC suffered a similar competitive injury due to the EOP-created ads recently disseminated by the White House on its social media platforms and adopted by MAGA Inc. in its ongoing television ad campaigns.

The Second Circuit has long recognized that political actors suffer a cognizable injury when government action provides a benefit to their competitors and "creates an uneven playing field." *In re U.S. Cath. Conf.*, 885 F.2d 1020, 1029-30 (2d Cir. 1989). A plaintiff need not prove they will likely lose money or votes as a result of the government's actions, but only that these actions have "impaired [their] ability to compete on an equal footing" with their rivals. *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989); *see also Shays v. FEC*, 414 F.3d 76, 90-91 (D.C. Cir. 2005). For instance, in *Center for Reproductive Law and Policy v. Bush*, the Second Circuit found that "an advocacy organization that communicates its viewpoint regarding issues of abortion and reproductive rights" was harmed by a government policy restricting foreign recipients of federal funds from performing or promoting abortion because the policy "bestowed

a benefit on plaintiffs' competitive adversaries . . . while withholding" it from groups aligned with the plaintiffs. 304 F.3d 183, 197 (2d Cir. 2002).

Accordingly, this Court found that the DHS-funded ads' anti-socialist message and promotion of President Trump worked a competitive injury on Hunter, a self-declared Democratic Socialist running against a Trump-aligned candidate. Op. and Order 24-26. This Court likewise found that SEIU 32BJ and Empire PAC had established a cognizable competitive injury because the DHS-funded advertisements "reinforced" "criticism[] of candidates whom SEIU 32BJ and Empire PAC support, thereby diminishing the effectiveness of both their advocacy efforts." *Id.* at 28.

The EOP-created advertisements recently disseminated by the White House and MAGA Inc. cause Plaintiffs the same harm. Op. and Order, Dkt 42.

As to Hunter, "Every Democrat Voted Against No Tax on Tips" explicitly and broadly attacks elected officials of Hunter's political party, *see* Am. Compl. ¶¶ 123-28, Dkt. 90, and "$5000 to Americans" predicts "an economic depression" if Democratic candidates win and promises "$5,000 in your pocket and economic success for our country" if Republicans win. These two ads each have hundreds of thousands of views across the White House's social media platforms, *see* Am Compl. ¶¶ 107, 111, and bear the imprimatur, showing the White House logo. Hunter's campaign cannot hope to reach even a tiny fraction of the audience that a single post on the White House YouTube channel can command. MAGA Inc. has further amplified the EOP-created ad "No Tax on Tips" by spending almost $8 million to air it on television, including in both Alabama and New York. *See supra* at 6. This means that the White House is subsidizing a super PAC that is running negative ads against Hunter's party in his state using taxpayer funds that Hunter cannot receive or hope to counter.

The EOP-created advertisements similarly harm the competitive interests of SEIU 32BJ and Empire PAC because they undermine the candidates who these Plaintiffs support. As was the case in *Center for Reproductive Law & Policy*, SEIU 32BJ and Empire PAC are competing with a White House which is "engaged in advocacy around the very same issues," 304 F.3d at 197, and which is attempting to "reach the same audiences as [their] campaign materials but convey[ing] opposing political messages," Op. and Order 27. For example, "Every Democrat Voted Against No Tax on Tips" attempts to condemn every sitting Democratic member of Congress—several of whom SEIU 32BJ has endorsed. Third Tall Decl. ¶ 19. In contrast to the millions reached by White House social media accounts or MAGA Inc. television advertising, SEIU 32BJ has 2,600 YouTube subscribers and 20,400 Instagram followers.[15] SEIU 32BJ and Empire PAC cannot match the enormous audience that the White House can so easily reach simply by posting these ads on its government-sponsored social media channels.

**B. The injuries are traceable to the challenged actions and redressable.**

Plaintiffs have also demonstrated that their competitive injury "is fairly traceable' to [d]efendants' challenged conduct, and . . . 'is likely to be redressed by a favorable judicial decision.'" Op. and Order 21 (quoting *Soule v. Conn. Ass'n of Schs.*, 90 F.4th 34, 45 (2d Cir. 2023)). As this Court has already affirmed, the DHS-funded ad campaign is traceable to Defendants' actions, and "removal of the advertisements from the national media market and cessation of misappropriated funding" would redress Plaintiffs' injuries. *Id.* at 30. So too are the EOP-created ads traceable to Defendants, and Plaintiffs' injuries redressable by "removal of the advertisements from the national media market," as Plaintiffs have requested, *Id.*; *see* Am. Compl. 44.

[15] *Id.*; 32BJ SEIU (@32bjseiu), Instagram, https://www.instagram.com/32bjseiu/.

In opposing the first TRO motion, Defendants did not contest Plaintiffs' standing on redressability grounds. For the second TRO, they raised only one narrow objection to the relief requested in connection to the EOP-created ads, arguing that this Court cannot redress the alleged injury caused by MAGA Inc., because MAGA is not a named defendant. Defs.' Opp'n. to Expand TRO 14-15, Dkt. 86. But as this Court concluded when it issued the second TRO, its powers are not so constrained.

This outcome reflects the settled principle that an injunction can bind not only "the parties" and their "agents," but also "those 'who are in active concert or participation' with the enjoined parties." *Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023). That includes parties who take actions "for the benefit of, or to assist" a party. *Id*. at 112. Just like LMD Agency, MAGA Inc. is "in active concert and participation with Defendants." Order 3, Dkt. 41. It is airing the ads to serve the same goal for which EOP plainly created them: to skew the election in favor of the Republican candidates MAGA Inc. supports. MAGA Inc. also functions at the President's direction, with assistance from EOP staff—as made clear by the August 7 meeting in which President Trump, Susie Wiles, and Republican strategists discussed how President Trump could use both MAGA Inc. and EOP to help Republicans.[16] And MAGA Inc. has indicated that it will comply with the second TRO and will stop broadcasting certain EOP-created ads. *See* Ex. C.

Even with respect to the ads aired by MAGA Inc., Plaintiffs seek not only to enjoin their broadcast, but also to bar Defendants from using employees' staff time to "disseminate" any further "taxpayer-funded ads supporting President Trump or attacking particular political parties, ideologies, or politicians" to MAGA Inc. Am. Compl. 44. Defendants' objection thus in no way

[16] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

defeats Plaintiffs' standing to challenge the dissemination of political ads unlawfully compiled by EOP.

**II. Plaintiffs' claims are not moot.**

Defendants will be unable to establish this case is moot even after voting occurs on November 3rd. Defendants' ads will injure Plaintiffs even if they are not tied to any particular election. But regardless, Plaintiffs are already planning for 2027 campaign activity, and potentially 2026 runoff elections; the threat that Defendants will continue to create or disseminate illegal advertisements demonstrates that a live controversy still exists.

A case is moot when changed circumstances make it "impossible for a court to grant any effectual relief whatever to the prevailing party." *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021) (cleaned up). Unlike standing, which a plaintiff must prove, defendants bear the burden of establishing mootness. *See*, *e.g.*, *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). Further, the Supreme Court has "established [an] exception to mootness for disputes capable of repetition, yet evading review." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007).

Here, Defendants cannot show that the Court will be unable to grant relief after Election Day: harm will continue to accrue even if the challenged advertisements are not tied to a particular election. In any event, Plaintiffs are already planning now for their 2027 election campaign work. And the "capable of repetition" exception applies here, as it does to many election-related cases, because the case could not be fully litigated before Election Day, and Plaintiffs will likely suffer the same injury in future elections.

**A. Social media and MAGA Inc. advertisements**

Every day that the challenged advertisements are available on the White House's official social media channels and on the airwaves, they harm Plaintiffs. SEIU 32BJ and Empire PAC

spend resources to support pro-worker progressive candidates and causes by making materials that promote them and finding ways to distribute those resources. Defendants have sidestepped those costs entirely, creating the challenged advertisements using taxpayer-funded EOP labor and distributing them to millions of followers who follow the White House's social media platforms. Then MAGA Inc. has taken the videos and distributed them to millions more on television. That is not an option that is available to SEIU 32BJ and Empire PAC, which have significantly smaller social media followings with pages that do not receive the same attention as the official White House channel, which millions of people look view. Third Tall Decl. ¶ 19.

SEIU 32BJ and Empire PAC's commitment to advocating for pro-worker progressive candidates and causes is longstanding and ongoing. These organizations' campaign advocacy work continues across election cycles: as soon as the 2026 election cycle ends, they both begin preparing for the upcoming 2027 election. Further, even the 2026 cycle may not "end" on November 3, as run-off elections will likely occur after Election Day. SEIU 32BJ has helped support run-off candidates in the past and may do so in this cycle too. Third Tall Decl. ¶ 15.

The posting of the challenged advertisements on the White House's various social media platforms and through MAGA Inc. will continue to harm SEIU 32BJ and Empire PAC both before and after Election Day 2026, impeding their efforts to fundraise and otherwise rally support for pro-worker candidates in the 2027 election cycle. SEIU 32BJ has already begun plans for the 2027 election cycle including starting the process for endorsements of pro-worker candidates in New York, Virginia, Florida, Connecticut, New Jersey, and Pennsylvania. Third Tall Decl. ¶¶ 13-14. These endorsements will likely include some of the same pro-worker candidates it has endorsed in the past, including Democrats and some who the President and candidates affiliated with him has attacked as "socialists" and "communists" *Id.* ¶¶ 17, 21. The White House's government-

funded political propaganda competitively disadvantages the candidates that SEIU 32BJ and Empire PAC support. *Id.* ¶¶ 17-24; Third Banks Decl. ¶ 11. In addition, the continued running of these ads into the 2027 election cycle will have a compounding effect on SEIU 32BJ and Empire PAC by making it harder for them to compete in support of pro-worker candidates and gain support for pro-worker policies. Third Tall Decl. ¶ 19.

The ads similarly injure Hunter, who plans to continue his political career past the 2026 election and will continue to be irreparably harmed by Defendants' illegal actions. Third Hunter Decl. ¶ 8. If Hunter does not prevail in the 2026 Alabama House election, he is considering running both for state House again or for office in the City of Gadsden. *Id.* He is also working to expand the North Alabama DSA. *Id.* ¶ 11. Defendants' unlawful actions give Hunter's future electoral opponents an advantage and impede his effort to develop his local DSA because the advertisements' attack the Democratic party and fearmonger about socialism. The ads injure Hunter's political reputation and positive name ID, particularly because they carry the imprimatur of the government based on their creation through government resources and placement on the White House YouTube and Instagram pages. *Id.* ¶ 13. Hunter cannot fundraise or organize to counteract the political disadvantage that is created by continued EOP-funded advertisements that argue that socialist candidates, like himself, as well as his party, are dangerous. *Id.* ¶ 15.

**B. LMD Contract**

Although Defendants claim that they have told LMD to stop running any advertisements, "a government defendant claiming mootness on the basis of voluntary cessation still 'bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 621 (S.D.N.Y. 2020) (quoting *Mhany Mgmt., Inc.*,819 F.3d at 603-04). Defendants have not made such an absolutely clear showing. Rather, "[t]he blanket purchase agreement with LMD is still in effect, [Dkt. 38,]

Mehringer Decl. ¶ 3, the 'period of performance' of the [purchase order] itself lasts until September 19, 2027, *id.* ¶ 7, and LMD has only spent $19 million of the $20 million under the terms of the PO, *id.* ¶ 8." Op. and Order 18-19. As a result, Defendants could begin to run the advertisements on national television at any point through the 2027 elections.

Moreover, although LMD "has currently purchased media buys . . . at an approximate cost of $19,000,000," Op. and Order 11, Defendants stated in response to Interrogatory Number 9 that they have paid only $8.6 million. Defs.' Am. Resp. & Objs. to Pls.' Interrogs. 6, Dkt. 75-5. Defendants are on the hook for $11 million. Therefore, there is a live controversy to ensure that $11 million in taxpayer money is not handed over to LMD for unlawfully running the challenged advertisements.

**C. The mootness exception for cases capable of repetition but evading review**

While the ongoing harms detailed above demonstrate that this case is not moot, it is also clear that the harms at issue here are capable of repetition but could evade review. *See Wisconsin Right To Life*, 551 U.S. at 462. That exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quotation marks omitted). This case began less than one month before Election Day, because Defendants began to run the challenged ads just before then; thus, the timeline was "too short" to allow full litigation. *Id.* And because Plaintiffs are certain to be involved in future elections, including in 2027, the mootness exception applies here. *See id.*

**III. Plaintiffs are likely to succeed on the merits of their APA claims.**

As this Court held last month, Plaintiffs are likely to succeed in showing that DHS and OMB have violated the APA. *See* Op. and Order 30-37. DHS's decision to obligate funds to pay for

political ads, and OMB's decision to apportion the funds for that purpose, exceed their authority, are contrary to law, and are arbitrary and capricious under the APA. 5 U.S.C. § 706(2).[17]

### A. Contrary to law and in excess of statutory authority

#### 1. Purpose Statute, 31 U.S.C. § 1301

First, the ads violate the Purpose Statute because political advertising is not among the purposes for which Congress appropriated funds to DHS. *See* 31 U.S.C. § 1301.

For Fiscal Year 2026, Congress appropriated funds to CBP "to hire, pay, train, and equip Border Patrol agents and Border Patrol support personnel" for border security and immigration enforcement operations, and for various specific border security, technology, and screening costs. Secure America Act, Pub. L. No. 119-98, §§ 101, 103, 201, 140 Stat. 837, 837-39 (2026).[18] The same is true as to FY2027 funds. *See* Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, div. A, § 101, 140 Stat. 987, 987-99 (2026) (providing continuing appropriations for FY2027 through December 11, 2026).

In a 2025 budget reconciliation act, Congress made multi-year appropriations to DHS, including CBP. Pub. L. No. 119-21, tit. IX, subtitle A, 139 Stat. 72, 357-61 (2025) (H.R. 1). As before, it required CBP to invest in border security technology and other infrastructure

[17] Both DHS obligation of the funds via the ad-buy contract with LMD and OMB's apportionment of the funds to DHS are final agency actions reviewable under the APA because each "mark[ed] the consummation of the agency's decisionmaking process" and "determined" "rights or obligations" or had "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (cleaned up). An OMB apportionment is "legally binding" because it "limits the obligations [the agency] may incur" with the funds. OMB, Circular A-11 § 120.1 (2025), https://perma.cc/Q6JV-4DTC; 31 U.S.C. § 1517(a)(1), (b). And an agency incurs an "obligation" when it enters a contract. U.S. Gov't Accountability Off., GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 70 (Sep. 2005), https://perma.cc/2HC2-YZWD.

[18] *See also* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 ("FY2026 Continuing Resolution"), Pub. L. No. 119-37, div. A, 139 Stat. 495, 495-508 (2025) (providing FY2026 appropriations from November 12, 2025 through January 30, 2026).

improvements. *See id.*, §§ 90001-04, 139 Stat. at 357-58. Within these expenses, H.R. 1 provided for outlays related to "[c]ommemorating efforts and events related to border security." *Id.*, § 90004. That appropriation was included to fund "line-of-Duty death memorials, Department or agency anniversaries," "commendation ceremonies," and "events recognizing victims of crime." H. R. Rep. No. 119-106, at 792 (2025). It was meant to be used for "venue and setup, program materials, commemoratives (e.g., plaques, flags, awards); and personnel and services (e.g., honor guard, officiants, security)," *id.*, not campaign ads.

Defendants admit that funds appropriated to CBP in Section 90004 were used to pay LMD to purchase the airtime for these advertisements. Mehringer Decl. ¶¶ 3-4, Dkt. 38. Nothing in Section 90004 could plausibly be read to appropriate funds for ads attacking the President's perceived political enemies, nor have Defendants ever argued to the contrary. So Congress has not affirmatively authorized that these funds or any others appropriated to DHS be spent on political propaganda. This spending violates Section 1301. *See United States v. MacCollom*, 426 U.S. 317, 321 (1976).

**2. Prohibition on "publicity or propaganda," § 718**

The ads also violate the prohibition on using appropriated funds "directly or indirectly, including by private contractor, for publicity or propaganda purposes." FY2026 Appropriations Act, Pub. L. No. 119-75, § 718, 140 Stat. at 495; FY2024 Appropriations Act, Pub. L. No. 118-47, § 718, 138 Stat. at 576, as incorporated by FY2025 Continuing Resolution, Pub. L. No. 119-4, §§ 1101(a)(6), 1102, 1105, 139 Stat. at 10-12.

This longstanding prohibition—included in appropriation acts since 1952—covers at least two types of publications: those that are "self-aggrandizing" or "purely partisan in nature." GAO Red Book, at 3-285, 3-293. Agencies may, of course, fund communications "reasonably necessary" to carry out their duties. *Id.* at 3-284. But they may not use taxpayer funds for the "individual

glorification" of executive officials, *Acting Comptroller General Fisher to the Chairman, NLRB*, 31 Comp. Gen. 311, 313 (1952), or "to emphasize the importance of the agency or activity in question," *id.* And appropriations may not be used "to aid a political party or candidate." GAO Red Book, at 3-293-94 (citation omitted). In short, "[i]t is axiomatic that funds appropriated to carry out a particular program would not be available for political purposes." *Id.* at 3-294.

The challenged ads are publicity and propaganda in violation of Section 718. The ads are both "self-aggrandizement" and "purely partisan" communications. GAO Red Book, at 3-236-37. The ads are part of an advertising campaign that emerged from an August 7 White House meeting in which President Trump, Susie Wiles, and other EOP staff met with Republican strategists to discuss efforts to support Republican candidates in the midterm elections—a fact that Defendants have not disputed.[19] The content of the ads confirms that they were designed to aid the Republican Party and its candidates. For example, one reproduced a campaign ad from President Trump's 2024 presidential campaign.[20] Another attacks socialists and has a voiceover of Ultimate Fighting Championship's CEO calling the President the "toughest, most resilient person I've ever met."[21] Yet another states that if Republicans win the midterms, every adult American citizen will get $5,000, but not if the Democrats win.[22] In all, the ads engage in the personal glorification of the

[19] Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, N.Y. Times (Oct. 2, 2026), https://perma.cc/8J9D-MLN2.

[20] AdImpact Politics (@AdImpact_Pol), X (Sep. 28, 2026, at 12:50 ET), https://x.com/AdImpact_Pol/status/2104614634325979457?s=20.

[21] *America Will Never Be A Socialist/Communist Country*, The White House (Sep. 11, 2026), https://www.whitehouse.gov/videos/america-will-never-be-a-socialist-communist-country/.

[22] The White House, *$5000 to Americans* (YouTube, Oct. 12, 2026), https://www.youtube.com/watch?v=OaTi_y8_GLk (removed from the White House YouTube in compliance with this Court's second TRO); *see also* Ex. A, at 34-35 (describing "$5,000 to Americans").

President, tout his administration's claimed legislative achievements, and call viewers to "battle" against his opponents, including "socialis[ts]" and "communists," terms that he uses to attack Democrats.[23] They do not provide any "'information reasonably necessary to the proper administration of the laws' for which [DHS] is responsible." GAO Red Book, at 3-284 (quoting 31 Comp. Gen. at 314). Instead, they are "designed to aid a political party or candidate" in violation of Section 718. *Id.* at 3-293-94; *see D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988).

**B. Arbitrary and Capricious**

A decision is arbitrary and capricious where an agency "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. of the United States, Inc v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); 5 U.S.C. § 706(2)(A). OMB's decision to apportion and DHS's decision to obligate $20 million appropriated for border security for a taxpayer-funded political propaganda campaign is arbitrary and capricious for at least three reasons.

First, Defendants failed to consider the Hatch Act implications of creating and disseminating taxpayer-funded political propaganda. The Hatch Act prohibits a federal employee from engaging in "political activity" while "on duty"; "in any room or building occupied in the discharge of official duties." 5 U.S.C. § 7324(a). The Act covers any activity "directed toward[s] the success or failure of a political party, candidate for partisan political office, or partisan political group," 5 C.F.R. § 734.101, even if it is not express electoral advocacy. *See* U.S. Off. of Special Couns., *Hatch Act Assessment and Advisory: Partisan Agency Communications During the 2025 Lapse in*

[23] AdImpact Politics, *supra* note 24; The White House, *supra* note 25.

*Appropriations*, at 1 (Sep. 25, 2026); U.S. Off. of Special Couns., *Hatch Act Advisory Opinion Regarding the Use of Presidential Campaign Slogans*, at 1 (June 7, 2023). Defendants failed to consider the consequences of engaging in such unlawful activity.

Second, Defendants failed to consider or explain the consequences of diverting funds away from the purposes for which they were appropriated. Congress appropriated billions to DHS for "border security, technology, and screening" investments. H.R. 1, § 90004, 139 Stat. at 359. Defendants never explained why that appropriation should be diverted to create propaganda and why no harm would result from diverting funds from the purposes Congress deemed essential.

Third, Defendants' explanations as to the permissibility of using taxpayer dollars to fund these ads lack a basis in law and fact. DHS directed inquiries about the ads to the White House, and provided no other explanation of its own, implicitly adopting the President's explanation.[24] As for the President, he defended the ad spending on the grounds that he is "not promoting [himself]" in these ads "because [he is] not running for office" and that the ads do not advocate for or against any particular candidate by name.[25] But any viewer of the ads can see that they do, indeed, promote President Trump while deriding policy positions he opposes—and regularly attributes to his political adversaries. And while President Trump is not presently running for office, he has asked voters to "pretend I'm on the ballot" in the upcoming midterm elections.[26] Moreover, the most-recent EOP-created ads—which the President shifted to his own super PAC, MAGA Inc.—have

---

[24] Steven Portnoy et al., *Pro-Trump ad campaign was financed by DHS: Sources,* Eyewitness News ABC 7 (Sep. 30, 2026), https://perma.cc/M8UU-65L3.

[25] *President Trump Defends Taxpayer-Funded Ads, Says He's Promoting the Country*, (C-SPAN, Sep. 30, 2026), https://www.c-span.org/clip/white-house-event/president-trump-defends-taxpayer-funded-ads-says-hes-promoting-the-country/5207706.

[26] Anna Barrett, *Donald Trump tells Mobile rally to "pretend I'm on the ballot,"* Alabama Reflector (Oct. 2, 2026), https://perma.cc/L9D5-WT6U.

become more explicitly partisan. Promising $5,000 to each adult citizen if the Democrats lose, for example, cannot plausibly be seen as anything other than an attempt to sway an election.

### IV. Plaintiffs are likely to succeed on their *ultra vires* claims.

EOP's use of appropriated funds to produce and disseminate the challenged advertisements is *ultra vires* and should be enjoined. The Court may enjoin executive action that is "in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). Specifically, to prevail on an *ultra vires* claim, a plaintiff must show that (i) there is no "express" preclusion of all judicial review; "(ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). That standard is met here.

The first two requirements are satisfied because Congress has neither expressly precluded judicial review nor provided an adequate alternative for review here. Congress must employ "unambiguous and comprehensive" language for a court to conclude that Congress "intends to bar judicial review altogether." *Lindahl v. OPM*, 470 U.S. 768, 779-80 (1985). "Only express statutory preclusion bars *ultra vires* review; implied preclusion is insufficient." *Summerour v. IRS*, No. CV 23-2442 (LLA), 2024 WL 3443604, at *4 (D.D.C. July 16, 2024). Thus, "[a]bsent an express statutory command to the contrary—of which there is none here—courts retain authority to review whether executive officials have exceeded the limits Congress imposed." *Am. Council of Learned Societies v. Nat'l Endowment for the Humans*, No. 25-cv-3657, 2026 WL 1256545, at *30 (S.D.N.Y. May 7, 2026). The APA does not provide an alternative path for review because, "[a]s a general matter, the Executive Office of the President is not an 'agency' under the APA." *Nat'l*

*Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 821 F. Supp. 3d 62, 72 (D.D.C. 2026) (citation omitted). The resulting gap allows Plaintiffs' *ultra vires* claim to proceed to the merits.

As to the third requirement, Plaintiffs are likely to establish that Defendants are "plainly act[ing] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hosp.*, 56 F.4th at 27 (quoting *DCH Reg'l Med. Ctr.*, 925 F.3d at 509). That is because by using appropriated funds to create political propaganda, EOP plainly violates both the Purpose Statute and Section 718.

The Purpose Statute, which "reinforce[s] Congress's control over appropriated funds," prohibits EOP from using federal funds other than for the "'objects for which the appropriations were made except as otherwise provided by law.'" *Fed. Lab. Rels. Auth.*, 665 F.3d at 1347-48 (Kavanaugh, J.) (quoting 31 U.S.C. § 1301(a)). "[T]he use of any government resources—whether salaries, employees, paper, or buildings—. . . would entail government expenditures." *Neguse v. ICE*, 822 F. Supp. 3d 86, 104 (D.D.C. 2026) (quoting *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 871-72 (9th Cir. 1995)). Contrary to Defendants' suggestions, *see* Defs.' Opp'n to Expand TRO 8, "time spent" by government employees and the use of "information technology systems and contracts, office supplies, utilities, and building infrastructure" fall under congressional appropriations to which the Purpose Statute applies. *Id.* at 106; *see* Ex. A, at 30:19–22.

Congress did not appropriate any funding to EOP to produce political advertisements praising President Trump and attacking his ideological opponents. Nor did Congress appropriate funds for EOP to then disseminate those ads to a super PAC to influence an ongoing election. For Fiscal Years 2026 and 2027, EOP was appropriated funds for staff and consultant salaries, subsistence expenses, and various operating expenses related to the Executive Residence, including "security," "information resources," "motor vehicles," "heating and lighting," and the like. FY2026

Appropriations Act, Pub. L. No. 119-75, div. E, title II, 140 Stat. 173, 450–56; Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, div. A, § 101, 140 Stat. 987, 987-99 (providing continuing appropriations for FY2027 through Dec. 11, 2026). None of these appropriations authorize the creation of political advertisements.

When Congress intended to permit EOP to use appropriations for political purposes, it specifically delineated those permitted purposes and required that political expenses incurred by EOP be reimbursed by the sponsoring political entity and not be borne by the taxpayers. For example, Congress has required "each person sponsoring a reimbursable political event" at the White House "to pay in advance an amount equal to the estimated cost of the event" and "the national committee of the political party of the President to maintain on deposit $25,000, to be separately accounted for and available for expenses relating to reimbursable political events sponsored by such committee during such fiscal year." FY2026 Appropriations Act, div. E, title II, 140 Stat. at 450-51.

The challenged advertisements also violate Section 718's prohibition on using appropriated funds for publicity or propaganda. As already explained (at 17-19), the challenged advertisements are plainly designed to aggrandize President Trump, aid the Republican Party and its candidates, and attack opposition candidates, parties, and ideologies. Using appropriated funds to create these ads—which EOP did here in expending staff time and resources to compile them—thus violates Section 718. *See District of Columbia Common Cause*, 858 F.2d at 11 ("[p]rinting pamphlets, flyers, and posters" with appropriated funds constituted prohibited "publicity or propaganda"); *Neguse*, 822 F. Supp. 3d at 105-06 ("fact that officials and employees spent time" performing certain activities "constitutes a use of funds, one which is prohibited" by appropriations rider); *accord Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 871-72 (9th Cir. 1995) ("The use of any government

resources—whether salaries, employees, paper, or buildings—to accomplish [an agency action] would entail government expenditure.").

**V. Plaintiffs are likely to succeed on their Equal Protection claim.**

Defendants have also violated the Equal Protection guarantee of the Fifth Amendment. The Supreme Court has repeatedly cautioned that neither states nor the federal government may intentionally treat one class of people differently from others without a rational reason for doing so. *See*, *e.g.*, *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, Defendants have used taxpayer money to attack certain political opponents of President Trump. And because they have unsurprisingly failed to even claim that the challenged advertisements are related to a legitimate government purpose, those attacks violate Plaintiffs' right to equal protection. *See City of Saint Paul v. Wright*, 816 F. Supp. 3d 65, 72-74 (D.D.C. 2026) (federal government violated equal protection by terminating environmental project grants in states that voted against President Trump in 2024).

First, there is no question that Defendants have treated Plaintiffs and their political allies differently from those who President Trump supports, such as Republicans. They have spent millions of dollars and used EOP staff time to attack Democrats, socialists, and communists, while they have used those same resources to praise President Trump. *See supra* Factual Background Part II-IV; Argument Part III.A.2. Thus, "[t]he different treatment of plaintiff from others similarly situated is plain on the record." *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 167 (D.D.C. 2025), *appeal filed*, No. 25-5241 (D.C. Cir. Jul. 2, 2025). This treatment is especially noxious because Defendants are making a distinction based on political ideology and expressive activity. *City of St. Paul*, 816 F. Supp. 3d at 72 (noting that federal government did not dispute that it "drew a classification between grantees located in Blue States and grantees located in Red States").

Because Defendants have unmistakably drawn a classification between groups of political actors, the only remaining question is whether they had a "rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564. But there can never be a rational governmental interest in favoring one political group or party over another; such political favoritism is illegitimate. *See U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 534 (1973) ("For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

Indeed, this is not the first time in recent history that the federal government has attempted to condition spending on political affiliation. In *City of St. Paul*, the government eliminated grant funding within some states because the citizens of those states had voted for President Trump's opponent in the 2024 election. 816 F. Supp. 3d at 72. The court easily concluded that there was no rational basis for the government to terminate grants based on a state's "political identity." *Id*. The same answer applies here, where Defendants' animus against the disfavored group is explicitly stated in the ads themselves.

**VI. Plaintiffs will continue to suffer irreparable harm absent a stay or injunction.**

Plaintiffs also show an imminent threat of irreparable harm—harm that "cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291 (2d Cir. 2026) (cleaned up), *petition for cert. filed, Patel v. Gov't Emps. Ins. Co.*, No. 26-85 (U.S. July 20, 2026).

As explained in detail above, *see supra* Argument Parts I.A, II, continued dissemination of the challenged ads will harm Plaintiffs, and no future remedy will be able to repair that harm. Even aside from work directly related to elections, Plaintiffs perpetually "participate in a battle of ideas," and they are disadvantaged when the challenged ads attack the ideas and people they support.

Third Banks Decl. ¶ 12. And of course, Plaintiffs are also likely to face election-related harm: SEIU 32BJ has begun planning its 2027 campaign activities, including starting the process for endorsements in New York, Virginia, Florida, Connecticut, New Jersey, and Pennsylvania. Third Tall Decl. ¶¶ 13-14. The endorsements will almost certainly include some of the same candidates 32BJ has endorsed before, including Democrats and candidates who the President and allies have attacked as "socialists and communists." *Id.* ¶¶ 17, 21. The taxpayer-funded propaganda competitively disadvantages the candidates that SEIU 32BJ and Empire PAC support. Third Tall Decl. ¶ 17; Third Banks Decl. ¶ 11. And Hunter plans to run for office again as a Democrat and a socialist, but government-funded advertisements attacking both groups damage his reputation in the community and his future electoral prospects. Third Hunter Decl. ¶¶ 8, 13, 14. These harms cannot be remedied by money damages, and given the compounding harms every time these advertisements are seen, they cannot be rectified at the time of a final decision on the merits. Despite the conclusion of the 2026 election cycle, time remains of the essence.

## VII. The balance of equities and public interest favor Plaintiffs.

Finally, the balance of equities and public interest favor preliminarily enjoining Defendants. The public interest and balance of equities merge here, where the government is a party to the suit, *New York v. U.S. Dep't of Homeland Sec.,* 969 F.3d 42, 86 (2d Cir. 2020), and both factors favor stopping the government's misappropriation of taxpayer dollars to fund partisan propaganda. In general, "the perpetuation of unlawful agency action is not in the public interest." *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019). To the contrary, the public interest favors "having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. Trump*, 490 F. Supp. 3d 736, 747 (S.D.N.Y. 2020) (three-judge panel) (quoting *League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016)).

Here, plaintiffs have shown a "clear and substantial likelihood of success on the merits" so the public interests favor enjoining the unlawful government action. *Common Cause v. Dep't of Homeland Sec.*, No. 1:26-cv-08882 (JLR), 2026 WL 3043900, at *18 (S.D.N.Y. Oct. 12, 2026). Where Congress has not funded an expenditure, it "presumably decided" the expenditure "was not in the public interest," and it is "not for [courts] to reach a different conclusion." *Sierra Club v. Trump*, 929 F.3d 670, 707 (9th Cir. 2019), *stay granted*, 140 S. Ct. 1 (2019) (mem.). This is true, as explained above for expenditures that include funding for staff salaries. *See supra* Argument Part IV.

"A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions." *Mountain States Legal Found. v. Denver Sch. Dist. No. 1*, 459 F. Supp. 357, 360 (D. Colo. 1978) (quoting *Stanson v. Mott*, 17 Cal. 3d 206, 217 (1976)). When the government violates that precept, "fairness and justice" require "that the use by public bodies of public funds for advocacy be restrained." *Citizens to Protect Pub. Funds v. Bd. of Educ.*, 13 N.J. 172, 182 (1953) (Brennan, J.). Defendants have not demonstrated that they will cease their unlawful behavior, which will continue through the next election cycle—which has already begun in some places.

Courts accordingly have enjoined other "use of the power of publicly owned resources to propagandize," finding relief "necessary for the protection of the public interest." *Mountain States Legal Found.*, 459 F. Supp. at 360-61 (granting preliminary injunction); *see, e.g.*, *D.C. Common Cause*, 858 F.2d at 11 (affirming final injunction). The equities and public interests favor the same relief here.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court enter a preliminary injunction and a stay under 5 U.S.C. § 705 as described in the accompanying proposed order.

November 2, 2026

Respectfully submitted,

*/s/ Bradley Girard*

Bradley Girard
Sean Ouellette
Michael J. Gaffney
Anashua Dutta
Paul R.Q. Wolfson
Robin F. Thurston
Democracy Forward
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bgirard@democracyforward.org

Bruce V. Spiva
Tara Malloy
Brent Ferguson
Sejal Jhaveri
Renata O'Donnell
Katherine Hamilton
Campaign Legal Center Action
1333 New Hampshire Ave. NW
Washington, DC 20036
(202) 736-2200

Brendan Ballou
Samuel T. Ward-Packard
Public Integrity Project Action, Inc.
1763 Columbia Rd. NW, Suite 175
Washington, DC 20009
(917) 684-3900

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

Under Local Rule 7.1(c), I hereby certify that this memorandum of law was prepared using Microsoft Word, and that using the Word Count feature, it is 8,731 words, including footnotes and not including those portions of the memorandum excluded from the word count by Local Rule 7.1(c).

/s/ *Bradley Girard*
Bradley Girard