UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMON CAUSE *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF HOMELAND SECURITY *et al.*,<br><br>Defendants. | 26 Civ. 8882 (JLR) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND A SECTION 705 STAY**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
Email: jeffrey.oestericher@usdoj.gov

JEFFREY S. OESTERICHER
Assistant United States Attorney
*—Of Counsel—*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

STATEMENT OF FACTS ....................2

I. CBP's Purchase Order for Services in Support of Media Buys....................2

II. This Lawsuit and Plaintiffs' Motion for a Preliminary Injunction ....................3

ARGUMENT....................6

THE COURT SHOULD DENY PLAINTIFFS' PRELIMINARY INJUNCTION MOTION ......6

I. Legal Standards ....................6

II. Plaintiffs' Case Is Moot Because the Midterm Elections Are Over ....................6

III. Plaintiffs Fail to Show Irreparable Harm....................11

IV. Plaintiffs Fail to Demonstrate Article III Standing....................12

A. Plaintiffs Have Suffered No Injury-in-Fact ....................13

B. The Alleged Injury Is Not Redressable by an Order from this Court ....................15

V. If Only Plaintiff Hunter Has Standing, SDNY Is an Improper Venue ....................15

VI. MAGA, Inc. Cannot Be Enjoined....................15

VII. Plaintiffs' Ultra Vires Claims Fail ....................17

VIII. Plaintiffs Fail to Show an Equal Protection Clause Violation....................24

IX. Plaintiffs' Requested Preliminary Injunction Is Overbroad ....................24

X. Plaintiffs' Should Be Required to Post a Bond ....................26

CONCLUSION....................27

# TABLE OF AUTHORITIES

Page(s)

Cases

*AB PAC v. Fed. Election Comm.*,
No. 22-2139 (TJK), 2023 WL 4560803 (D.D.C. July 17, 2023) .......... 14

*Borey v. Nat'l Union Fire Ins. Co.*,
934 F.2d 30 (2d Cir. 1991) .......... 11

*Caremark Therapeutic Services v. Leavitt*,
405 F. Supp. 2d 454 (S.D.N.Y. 2006) .......... 15

*Center for Reproductive Law and Policy v. Bush*,
304 F.3d 183 (2d Cir. 2002) .......... 14

*City of New York v. Mickalis Pawn Shop, LLC*,
645 F.3d 114 (2d Cir. 2011) .......... 24, 25

*Conn. Citizens Def. League, Inc. v. Lamont,*
6 F.4th 439 (2d Cir. 2021) .......... 7

*Cook v. Colgate Univ.*,
992 F.2d 17 (2d Cir. 1993) .......... 7

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024) .......... 6

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025) .......... 12

*E. Air Lines, Inc. v. Civil Aeronautics Bd.*,
261 F.2d 830 (2d Cir. 1958) .......... 6

*FEC v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) .......... 9

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 16

*Fulani v. League of Women Voters Educ. Fund*,
882 F.2d 621 (2d Cir. 1989) .......... 15

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) .......... 16, 26

*In re U.S. Catholic Conference*,
885 F.2d 1020 (2d Cir. 1989)........ 9, 13

*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002)........ 11

*Knighton v. City of Syracuse Fire Dep't*,
145 F. Supp. 2d 217 (N.D.N.Y. 2001)........ 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........ 12

*Make the Road New York v. Pompeo*,
475 F. Supp. 3d 232 (S.D.N.Y. 2020)........ 16

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)........ 5

*Munaf v. Geren*,
553 U.S. 674 (2008)........ 5

*Murphy v. Hunt,*
455 U.S. 478 (1982)........ 10

*Murthy v. Missouri*,
603 U.S. 43 (2024)........ 11

*Neguse v. ICE*,
822 F. Supp. 3d 86 (D.D.C. 2026)........ 18

*Neurological Surgery Prac. of Long Island, PLLC v. HHS*,
145 F.4th 212 (2d Cir. 2025)........ 6

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020)........ 6

*NRC v. Texas*,
605 U.S 665 (2025)........ 17

*Palmer v. Amazon.com, Inc.*,
51 F.4th 491 (2d Cir. 2022)........ 6, 7

*Patsy's Italian Restaurant, Inc. v. Banas*,
658 F.3d 254 (2d Cir. 2011)........ 24

*Peregrine Myanmar, Ltd. v. Segal*,
89 F.3d 41 (2d Cir. 1996)........ 25

*Preiser v. Newkirk*,
422 U.S. 395 (1975) ........ 6

*Reuters Ltd. v. United Press Int'l, Ltd.*, 903 F.2d 904 (2d Cir. 1990) ........ 11

*Rodriguez ex rel. Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999) ........ 11

*Schmidt v. Lessard*,
414 U.S. 473 (1974) ........ 25

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ........ 13

*Sumpter v. Skiff*,
260 Fed. Appx. 350 (2d Cir. 2008) ........ 15, 16

*Town of Newburgh v. Newburgh EOM LLC*,
151 F.4th 96 (2d Cir. 2025) ........ 9, 10

*United States v. Mercurris*,
192 F.3d 290 (2d Cir. 1999) ........ 8

*United States v. Regan*,
858 F.2d 115 (2d Cir. 1988) ........ 15

*United States Postal Service v. California*,
No. 26A305, 609 U.S. __, 2026 WL 2687160 (Sept. 14, 2026) ........ 17, 23

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) ........ 15

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000) ........ 24

*Wagschal v. Skoufis*,
442 F. Supp. 3d 612 (S.D.N.Y. 2020) ........ 10

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ........ 6, 11

*Yale New Haven Hospital v. Becerra*,
56 F.4th 9 (2d Cir. 2022) ........ 18, 20, 21, 24

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) ........ 15

Statutes and Regulations

5 U.S.C. § 705 .......... 1, 6

28 U.S.C. § 1391(e)(1) .......... 14, 15

28 U.S.C. § 1406 .......... 15

31 U.S.C. § 712(1) .......... 19

31 U.S.C. § 1301 .......... 17

31 U.S.C. § 1301(a) .......... 23

3 C.F.R. § 102.103 .......... 19

Fed. R. Civ. P. 65(c) .......... 26

Fed. R. Civ. P. 65(d) .......... 24

Fed. R. Civ. P. 65(d)(1)(C) .......... 25, 26

Fed. R. Civ. P. 65(d)(2)(C) .......... 16

Defendants (the "Government") respectfully submit this memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction ("PI") and a stay under Section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705.

## PRELIMINARY STATEMENT

Plaintiffs' motion for a PI lacks merit for several independent reasons and should be denied. Most fundamentally, the matter no longer presents a live case or controversy and should be dismissed as moot. Plaintiffs' entire Complaint, Amended Complaint, and motions for temporary restraining orders asserted that the airing of allegedly partisan political advertisements caused a single specific injury—putting Plaintiffs or their preferred candidates at a competitive disadvantage in the November 3rd midterm elections. However, those elections have now concluded. Accordingly, the Court cannot redress any such injury. Moreover, Plaintiffs' attempt to pivot and assert a potential future injury from the possible airing of similar ads that could affect unspecified future candidates in unspecified future elections fails because this speculative injury is not sufficiently concrete or particularized to satisfy the Article III case or controversy requirement.

Plaintiffs also cannot meet their burden of showing irreparable harm for similar reasons. The hypothetical future injury that Plaintiffs now are positing is not actual and imminent, but plainly remote and speculative.

Plaintiffs' motion should also be denied because they lack the requisite standing. Plaintiffs SEIU 32BJ and SEIU 32BJ PAC[1] are not themselves candidates for office but merely organizations that endorse and support progressive, pro-worker candidates. As such, they are not

[1] Defendants employ the same abbreviations herein as contained in their Memorandum of Law in Opposition to Plaintiffs' Motion to Expand the TRO (ECF No. 86).

direct competitors of any candidate or public official as required to establish standing. And Plaintiff Hunter, who ran for the position of Alabama House Representative, is also not in direct personal competition with President Trump.

Furthermore, Plaintiffs cannot meet the rigorous standard for proving an *ultra vires* cause of action. Contrary to Plaintiffs' claim, the use of EOP staff time to compile certain videos does not clearly violate an express prohibition of the Purpose Statute, 31 U.S.C. § 1301, or Section 718 of the 2026 Consolidated Appropriations Act. Moreover, as the Court previously found on the same record, Plaintiffs have not demonstrated a clear likelihood of success on their Equal Protection claim.

Finally, Plaintiffs' request to obtain injunctive relief against non-parties MAGA and LMD is mistaken as a matter of law. The Court does not have jurisdiction to enjoin the conduct of non-parties to this litigation.

For the foregoing reasons and as explained further below, Plaintiffs' motion for a preliminary injunction should be denied.

## STATEMENT OF FACTS

### I. CBP's Purchase Order for Services in Support of Media Buys

On September 19, 2026, U.S. Customs and Border Protection ("CBP"), a component of the Department of Homeland Security ("DHS"), submitted a request to the Office of Management and Budget ("OMB") to reapportion funds appropriated by section 90004 of the Working Families Tax Cut Act (Pub. L. 119-21) within CBP's "Operations and Support" account. *See* ECF No. 39 (Declaration of William C. Woolf, dated October 10, 2026 ("Woolf Decl.")), ¶ 3. CBP's reapportionment request sought to make an additional $20 million available for "OBBBA - Commemorative Events." *Id.* ¶ 4. That additional funding came from amounts apportioned for

obligation in fiscal year 2027. *Id*. OMB approved CBP's reapportionment request on September 19, 2026. *Id.* ¶ 5.

On or about September 20, 2026, CBP issued a $20,000,000 purchase order for services (the "Purchase Order") to Lepugh, Inc. (doing business as LMD Agency, Inc.) (the "Vendor" or "LMD") under a previously awarded blanket purchase agreement. ECF No. 38 (Declaration of Holly C. Mehringer, dated October 10, 2026 ("Mehringer Decl.")), ¶ 3. To fund the Purchase Order, DHS used funds appropriated to CBP in section 90004 of Public Law No. 119-21. *Id.* ¶ 4; Woolf Decl. ¶ 3. Those funds are available for, among other things, "[c]ommemorating efforts and events related to border security." Mehringer Decl. ¶ 4.

The Purchase Order was issued for media services in support of CBP for placing national media buys. *Id.* ¶ 5. The Purchase Order did not fund the creation or production of any videos or media; it only funded the airing of preexisting media. *Id.* ¶ 6. The Purchase Order's period of performance is September 20, 2026, through September 19, 2027, or until all deliverables and media placements have occurred. *Id.* ¶ 7. The Vendor purchased media buys under the terms of the Purchase Order through Sunday, October 11, 2026, at an approximate cost of $19,000,000. *Id.* ¶ 8. DHS directed the Vendor not to make any additional media buys past October 11. *Id.*; ECF No. 59-1 (Declaration of Holly C. Mehringer, dated October 15, 2026) ¶ 4 (Vendor notified all media outlets on October 7, 2026, not to run any ads past October 11, 2026, including "make goods"). Any residual funding left under the Purchase Order after October 11, 2026, after all invoices have been paid, will be de-obligated. *Id.* ¶ 9. DHS has no plans to make any additional media buys under the Purchase Order or to renew the Purchase Order or otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit. *Id.* ¶ 10.

## II. This Lawsuit and Plaintiffs' Motion for a Preliminary Injunction

On October 7, 2026, Plaintiffs Common Cause, SEIU 32BJ, SEIU 32BJ PAC, and Hunter filed this action challenging DHS's broadcast of certain media depicting the President of the United States as violative of the APA and the Equal Protection Clause of the Fifth Amendment, and as *ultra vires*. ECF No. 1 (Complaint). Plaintiffs allege in their Complaint that they have been injured by Defendants' decision to use taxpayer funds to air what they characterize as partisan political ads during an ongoing state and federal election period. *Id.* ¶¶ 1-6, 44-88, 97-128.

Specifically, the Complaint alleges that "[t]he taxpayer-funded ads harm Plaintiffs because they give a 'competitive advantage' to candidates, causes, and organizations aligned with the President in the 2026 midterm elections, putting Plaintiffs at a disadvantage." *Id.* ¶ 97. With respect to Hunter, a Democratic Socialist running for office in the Alabama House of Representatives, *id.* ¶ 98, Plaintiffs assert that the media depicting the President are placing him "at a competitive disadvantage." *Id.* ¶¶ 99, 102. As to SEIU 32BJ and SEIU 32BJ PAC, Plaintiffs likewise allege that the media depicting the President puts the union's (and the union's PAC's) favored candidates at a competitive disadvantage to the extent those candidates are not aligned with the policies of the federal government or the Trump Administration. *Id.* ¶¶ 111, 122. Finally, Plaintiffs assert that the decision to use government funds to air such media depicting the President "interferes with Common Cause's core business activities." *Id.* ¶ 126. The Complaint asserts nine claims for relief, including seven counts under the APA, one *ultra vires* count, and one count alleging a violation of the Equal Protection Clause of the Fifth Amendment. *Id.* ¶¶ 129-193.

On October 8, 2026, Plaintiffs filed a motion for a temporary restraining order ("TRO"). ECF No. 25. In their motion, Plaintiffs sought broad emergency relief. *See* ECF Nos. 26 (Plaintiffs' Brief in Support of Motion for a TRO and a Section 705 Stay, ("Pls. TRO Br.")), 27 (Proposed Order). On October 11, 2026, the Court granted Plaintiffs' motion for a TRO and, among other

things, stayed DHS's contract with the Vendor, stayed OMB's appropriation of $20 million to fund the Vendor contract, and enjoined Defendants from entering into a new vendor contract to, among other things, create, disseminate or air the challenged advertisements. ECF No. 41 (Order) at 2-3. The Court's TRO has been extended to November 20, 2026 (ECF No. 80).

On October 23, 2026, Plaintiffs filed a motion to expand the TRO. ECF No. 81. Specifically, Plaintiffs complained that allegedly partisan advertisements had recently been posted on the White House YouTube page and had aired on television, paid for by MAGA. ECF No. 82 (Plaintiffs' Brief in Support of Motion to Expand the TRO) at 1-2, 3-5.

On October 28, 2026, Plaintiffs filed their First Amended Complaint. ECF No. 90 ("Amended Complaint"). The Amended Complaint added allegations relating to the posting of allegedly partisan videos on the White House YouTube page and the airing of allegedly partisan advertisements on television by MAGA. *Id.* ¶¶ 4, 102-121.

On October 30, 2026, the Court issued an Order (ECF No. 101, the "Second TRO") which, among other things, granted in part Plaintiffs' motion to expand the TRO and enjoined Defendants from disseminating three specific advertisements, entitled "$5,000 to Americans," "Every Democrat Voted Against No Tips," and "Cost of Socialism," and ordered Defendants to cancel any arrangements for the airing or dissemination of the three advertisements with authorized third parties, including MAGA. ECF No. 101 at 2. The Second TRO remains in effect until November 13, 2026. *Id.* at 3.

On November 2, 2026, Plaintiffs filed this motion for a preliminary injunction. ECF No. 108.

## ARGUMENT

## THE COURT SHOULD DENY PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

### I. Legal Standards

A preliminary injunction is an "an extraordinary and drastic remedy," which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation marks omitted). An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the moving party seeks a mandatory injunction – *i.e.*, an injunction that "requires the non-movant to take some action," *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) – the movant must "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm," *id.* (internal quotation marks and citation omitted); *see also* ECF No. 109-1 (Transcript of Oral Argument and Court's Oral Opinion Regarding Plaintiff's Motion to Expand the TRO) at 24 (same).

The "standard for a stay under 5 U.S.C. § 705" "is the same as the standard for a preliminary injunction." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020); *see E. Air Lines, Inc. v. Civil Aeronautics Bd.*, 261 F.2d 830, 830 (2d Cir. 1958).

### II. Plaintiffs' Case Is Moot Because the Midterm Elections Are Over

Even if the Court believes Plaintiffs had sufficient interest at the outset of this case for Article III standing, now that the midterm elections are over this case presents no redressable injury and should be dismissed as moot. Article III of the Constitution requires that a live case or

controversy must exist at all stages of federal court proceedings to support a court's subject matter jurisdiction. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). The mootness doctrine "'ensures that [a] litigant's interest in the outcome continues to exist throughout the life of the lawsuit.'" *Neurological Surgery Prac. of Long Island, PLLC v. HHS*, 145 F.4th 212, 223 (2d Cir. 2025) (quoting *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022)). "If because of changed circumstances 'a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness.'" *Palmer*, 51 F.4th at 503 (quoting *Conn. Citizens Def. League, Inc. v. Lamont,* 6 F.4th 439, 444 (2d Cir. 2021)). "A case becomes moot when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* (internal quotation marks omitted). Thus, "a case that is live at the outset may become moot when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (internal quotation marks omitted).

In their original complaint, amended complaint, motions for a TRO, and the supporting declarations, Plaintiffs alleged that they suffered from a single specific type of injury—being put at a competitive disadvantage in certain races in the November 3rd midterm elections. *See* Am. Compl. ¶ 122 ("The taxpayer-funded ads harm Plaintiffs because they give a 'competitive advantage' to candidates, causes, and organizations aligned with the President *in the 2026 midterm elections*, putting Plaintiffs at a disadvantage." (emphasis added)); *see id.* ¶¶ 122-50; Compl. ¶¶ 1-6, 97-125; Pls. TRO Br. at 11-14; First Hunter Decl. ¶¶ 2, 5-10; First Tall Decl. ¶¶ 16-23; First Banks Decl. ¶¶ 7-8, 14-15, 21. In the PI motion, however, Plaintiffs argue for the first time that, even after the elections, the media spots will continue to harm them by placing them at a

competitive disadvantage in possible future election cycles. *See* ECF No. 109 (Plaintiffs' Brief in Support of Motion for a Preliminary Injunction and a Section 705 Stay ("Pls. Br.")) at 12-15. Specifically, Hunter states that if he does not win his race for Alabama state representative on November 3, 2026, he is "considering running for . . . the same position next election cycle" or for Gadsden City Council or mayor of Gadsden, Alabama.[2] Third Hunter Decl. ¶ 8. He asserts that if the media spots continue to run, such "public[] attacks [on] socialism" will "damage[] [his] reputation within the community," and thus his future electoral success. *Id.* ¶ 13; *see* Pls. Br. at 14. SEIU Local 32BJ's political director similarly explains that the union is "already making plans about how it will get involved in 2027 races across the country" by "beginning our planning" for making candidate endorsements. Third Tall Decl. ¶ 14. The union further posits that certain of the November 3rd races may result in runoffs into December 2026. *Id.* ¶ 15. According to SEIU Local 32BJ, the continued airing of the media after November 3 will negatively impact its interests in promoting its candidates in any runoff elections that are held and will also put the union at a competitive disadvantage during the 2027 election cycle. *Id.* ¶¶ 23-24; *see* Pls. Br. at 13. Finally, Empire State 32BJ PAC is "already preparing for 2027 elections in New York, specifically the races for the Bronx and Queens District Attorneys," which will be held in June 2027 (primary) and November 2027 (general election). Third Banks Decl. ¶ 12. The PAC argues that the continued airing of the media will disadvantage it in its "preparation for those elections" which includes participation in "a battle of ideas." *Id.*; *see* Pls Br. at 13.

It cannot be disputed that Plaintiffs' alleged injuries related to the midterm elections can no longer be redressed now that those elections have concluded. Moreover, Plaintiffs' remaining

[2] Hunter did not win his race for Alabama state representative. *See* https://ballotpedia.org/Robert_Hunter_(Alabama) (last visited Nov. 5, 2026).

(*i.e.*, post-midterm) alleged harms are not concrete, particularized, and non-speculative injuries. Accordingly, this case is moot as it does not satisfy Article III's "case or controversy" requirement. *See United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999).

Most fundamentally, all three Plaintiffs' alleged post-midterm harms are speculative and inchoate. Hunter is "considering" running in another election and assumes—without any information about the political landscape at the time of this potential future electoral campaign—that the continued running of the media spots will harm his reputation given his known identity as a socialist. *See* Third Hunter Decl. ¶¶ 8, 13. SEIU Local 32BJ has not endorsed candidates for any future elections and is only "beginning [its] planning" for endorsements in races that, again, will take place in an entirely different and evolving political landscape. *See* Third Tall Decl. ¶ 14. The union speculates that elections involving candidates it has endorsed could result in runoffs into early December, something that very well may not happen. None of these injuries is sufficiently concrete or particularized to satisfy the Article III case or controversy requirement.

Plaintiffs' alleged post-midterm injuries also expand the "competitive advocate" theory of standing beyond its breaking point. As discussed *infra*, under this theory, Plaintiffs must "personally compete[] in the same arena with the party to whom the government has bestowed the assertedly illegal benefit" so as to be "personally disadvantaged." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). Plaintiffs do not do so. Rather, their mootness arguments require dispensing with the limits of "personal" competition and the "same arena" altogether as, under their theory of injury, the at-issue media spots work a competitive disadvantage on any person who might run for any elected office (at any level) as a Democrat or progressive or any person or organization supporting such a candidate.

Plaintiffs' claims are not saved by the "capable of repetition but evading review" exception to mootness. *See* Pls Br. at 15. That exception involves challenged conduct that "is too short in duration to be fully litigated before it ceases, and [where] it is probable that the pleading party will need to seek the same relief from the defendant's same conduct again in the future." *Town of Newburgh v. Newburgh EOM LLC*, 151 F.4th 96, 102 (2d Cir. 2025) (internal quotation and citation omitted). Plaintiffs argue that this exception applies because they "are certain to be involved in future elections, including in 2027." Pls Br. at 15. But the second prong of this exception requires more: "a 'reasonable expectation' or a 'demonstrated probability' that 'the same controversy will recur involving the same complaining party.'" *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482 (1982)). The same controversy is "sufficiently likely to recur when a party has a reasonable expectation that it will again be subjected to the alleged illegality." *Id.* (cleaned up). Plaintiffs have no such reasonable expectation. Indeed, Plaintiffs characterized the media spots as unique to this particular political moment, coming "on the heels of President Trump stumping for Republican midterm candidates and urging voters to vote in the midterms as if Trump was on the ballot." Am. Compl. ¶ 3. Taking this at face value, there is no reason to believe that the media spots, if motivated by these specific circumstances, would be run in future election cycles. While it is theoretically possible that the same spots could be aired during future election cycles despite the constantly shifting political landscape, "mere speculation" about Defendants' future actions and their possible effects on Plaintiffs "does not rise to the level of a reasonable expectation or demonstrated probability of recurrence." *Town of Newburgh*, 151 F.4th at 102. "As courts in this Circuit have held, it is inappropriate for Court's [sic] to revive a moot case by speculating about a defendant's future actions." *Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 622 (S.D.N.Y. 2020), *aff'd*, 857 F. App'x 18

(2d Cir. 2021). Given the unlikelihood that the same controversy will ever occur, Plaintiffs' claims do not fall into this limited exception and should be dismissed as moot.[3]

## III. Plaintiffs Fail to Show Irreparable Harm

Plaintiffs' motion should also be denied because they have not established any likelihood of irreparable harm. Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999) (citations omitted). Accordingly, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Ltd.*, 903 F.2d 904, 907 (2d Cir. 1990). A movant can establish irreparable harm upon a showing that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks and citations omitted). The irreparable harm alleged must be "actual and imminent, not remote or speculative." *Id*. By contrast, the "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction" or a preliminary injunction. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991); *see also Winter*, 555 U.S. at 22.

As demonstrated above, Plaintiffs cannot establish any "actual and imminent" harms related to the 2026 midterms because those elections have concluded, and their alleged post-midterm harms are plainly remote and speculative. *See supra* Section II.

[3] Plaintiffs' argument that the case is not moot because money remains available under DHS' contract with LMD (Pls. Br. at 14-15) also lacks merit. DHS has made clear that it has no plans to make additional media buys under the Purchase Order and that any residual funding under the Purchase Order will be de-obligated once all invoices have been paid. Mehringer Decl. ¶¶ 9-10.

## IV. Plaintiffs Fail to Demonstrate Article III Standing

The Court should deny the request for a PI because Plaintiffs have not demonstrated the requisite standing to pursue their claims.[4] At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs must demonstrate standing at each stage of the litigation with an increasing burden of proof. *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (citing *Lujan*, 504 U.S. at 561). "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Id.* (internal quotation and citation omitted). "Consequently, to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation and citation omitted).

Here, Plaintiffs attempt to establish standing as "political competitors" under the "competitive advocate" theory of standing. *See* Pls. Br. at 8-12. Hunter was the Democratic Party's candidate for Alabama House District 28 in the since concluded midterm election, First Hunter Decl. ¶ 2; SEIU 32BJ and SEIU 32BJ PAC are a labor union and its affiliated PAC, both of whom support progressive causes and candidates and supported several Democratic candidates

---

[4] Standing is also relevant to the "likelihood of success on the merits" preliminary injunction factor, as that factor includes both the merits of the underlying claims and jurisdictional issues. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

for state and federal offices in the midterm election, Tall Decl. ¶¶ 7-8, 12, 16-17; Banks Decl. ¶¶ 5, 7, 10, 19; *see also* Compl. ¶¶ 8-10. These plaintiffs do not have Article III standing because they establish neither an injury-in-fact nor that their alleged injuries could be redressed by a favorable decision from this Court.

**A. Plaintiffs Have Suffered No Injury-in-Fact**

Under the "competitor advocate" theory, a plaintiff may establish an injury as a competitor if she can show that she "personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit" so as to be "personally disadvantaged." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). This path to standing is narrow, however, as merely advocating for a position in a public political debate does not make one a "competitor" for standing purposes. *Id.* at 1030; *see also id.* ("strongly held beliefs are not a substitute for injury in fact"); *cf. Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (injury cannot be based on an entity's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem").

Plaintiffs have failed to make this showing. The media depicting the President of which Plaintiffs complain does not "personally disadvantage" them because they are not "personally compet[ing] in the same arena" with the party the media buys purportedly benefit—President Trump. While this media attacks a generic list of "villains," it does not address any specific race or electoral candidate. *See* Compl. ¶ 63 (describing ad that lists as "villains," "the deep state," "warmongers," "globalists," "the communists, Marxists, and fascists," "the sick political class," and "the fake news media"). Plaintiffs attempt to expand the scope of the "arena," by pointing to advertisements that are critical of the policies that Plaintiffs prefer and "show[] the White House logo." Pls. Br. at 8. But Plaintiffs' theory goes too far; under it, essentially every non-Republican

candidate running in any election (state or federal), and any organization or PAC supporting any non-Republican candidate should be considered to be personally competing in the same arena with President Trump (who is himself not running for office). Such an approach is untenable as it lacks any limiting principle and would "effectively give standing to any spectator who supported a given side in public political debate." *In re U.S. Catholic Conference*, 885 F.2d at 1030.

The fact that Hunter is a self-described socialist, *see* Pls. Br. at 9; First Hunter Decl. ¶ 5, or that some of the candidates that SEIU 32BJ and Empire State 32BJ PAC supported "have been labeled socialists by their opposition," Banks Decl. ¶ 14, does not put Plaintiffs in direct personal competition with President Trump. And SEIU 32BJ and SEIU 32BJ PAC, which are not themselves candidates for office but merely organization that endorsed and supported progressive, pro-worker candidates, are not even direct competitors of any candidate or public official. *See AB PAC v. Fed. Election Comm.*, No. 22-2139 (TJK), 2023 WL 4560803, at *4 (D.D.C. July 17, 2023) ("No court has ever extended competitor standing to cover PACs . . . that seek to enforce political candidates' (or even other PACs') compliance with campaign-finance laws.").

Plaintiffs argue that this case is analogous to *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002), in which the Second Circuit held that pro-choice organizations had standing to challenge a government policy under which anti-abortion groups (but not pro-choice groups) could receive support from federally funded foreign organizations. Pls. Br. at 9. But in that case, it was clear that the plaintiffs were players in a defined arena: the government had "bestowed a benefit on plaintiffs' competitive adversaries" by permitting "anti-abortion groups engaged in advocacy around the very same issues" to receive grants that they were denied. *Ctr. For Reprod. L. & Pol'y*, 304 F.3d at 197. No such direct competition exists here.

### B. The Alleged Injury Is Not Redressable by an Order from this Court

Plaintiffs also cannot show that an order from this Court could redress the harm they allege they have suffered. The midterm elections have concluded. As such, for the same reason that this case is moot and Plaintiffs cannot show irreparable harm (discussed *supra*), the relief they seek will not redress their alleged harm.

## V. If Only Plaintiff Hunter Has Standing, SDNY Is an Improper Venue

Venue in this district is predicated solely on the fact that SEIU 32BJ and its PAC reside here. Compl. ¶ 20 (citing 28 U.S.C. § 1391(e)(1)); *see* First Hunter Decl. ¶ 1 (Hunter resides in Gadsden, Alabama). If the Court finds that they both lack standing, there is no basis for venue in SDNY. *See* 28 U.S.C. § 1391(e)(1); *Caremark Therapeutic Services v. Leavitt*, 405 F. Supp. 2d 454, 463-64 (S.D.N.Y. 2005). Therefore, should the Court find that only Hunter has standing, venue does not properly lie in SDNY, and this case should be dismissed or transferred to a district in which it could have been brought. *See* 28 U.S.C. § 1406.

## VI. MAGA, Inc. Cannot Be Enjoined

Plaintiffs' motion regarding the challenged advertisements paid for by MAGA should also be denied for the additional, independent reason that the Court does not have jurisdiction over MAGA. As this Court has observed, "'no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury.'" ECF No. 42 (Opinion and Order) at 30 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)). To satisfy the redressability requirement, there must be a "'substantial likelihood that the relief requested will have a substantial ameliorative effect on the specific injury alleged.'" *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 628 n.6 (2d Cir. 1989).

Here, Plaintiffs seek to enjoin the airing of challenged advertisements paid for by MAGA, but they have not named MAGA as a defendant. Accordingly, the Court has no ability to enjoin

the airing of those advertisements. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 110-12 (1969) ("It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process."); *U.S. v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988) ("a court generally may not issue an order against a nonparty"). The Proposed Order that Plaintiffs submitted (ECF No. 110) thus is overbroad and improper because it purports to enjoin MAGA "from continuing to run the challenged advertisements." ECF No. 110 at 3; *see Sumpter v. Skiff*, 260 Fed. Appx. 350, 351 (2d Cir. 2008) ("The district court did not exceed its allowable discretion in denying Sumpter's application for injunctive relief. The New York State Division of Parole (the 'Division'), to which Sumpter's motion was directed, was not named as a defendant in the underlying action and does not fall within any of the exceptions listed in Rule 65(d). Thus, the district court did not have the authority to order injunctive relief against the Division.").

Nor can Plaintiffs obtain jurisdiction over MAGA through their assertion in their proposed order that MAGA is "an entity in active concert and participation with Defendants." ECF No. 110 at 3. There is no evidence in the record that the named Defendants are "in active concert and participation with" MAGA. Indeed, the Amended Complaint is devoid of any such allegation, as are the declarations that Plaintiffs submitted in support of this motion. The only evidence in the record is that "MAGA, Inc. is an independent organization." ECF No. 109-3 (Nov. 1, 2026 Letter from Charles Gantt); *see also* Amended Complaint ¶ 4 ("But even if MAGA, Inc. were independent – as the law requires . . .").

The fact that the Amended Complaint asserts in passing that MAGA is "a super PAC that President Trump has continually described as under his control," Amended Complaint ¶ 4, does not change the analysis. President Trump is not a named Defendant; therefore, this allegation

cannot remedy the jurisdictional defect.[5] Instead, as with any non-party, the Court's injunction binds MAGA only from "acting for the benefit of, or to assist, a named party in violating the injunction." *Havens v. James*, 76 F.4th 103, 111-116 (2d Cir. 2023); *see also* Fed. R. Civ. P. 65(d)(2)(C).[6]

## VII. Plaintiffs' Ultra Vires Claims Fail

Plaintiffs' PI motion should be denied for the additional reason that they are not likely to succeed on the merits of their *ultra vires* claims. Plaintiffs claim that EOP acted *ultra vires* in compiling the videos that are posted on the White House YouTube page and airing on television paid for by MAGA. Pls. Br. at 21-24. Specifically, Plaintiffs allege that EOP's actions violate the Purpose Statute, 31 U.S.C. § 1301, and Section 718 of the 2026 Consolidated Appropriations Act. *Id*. However, neither claim is correct.

Because *ultra vires* claims rely on a judicially implied cause of action and may be used to "end run" statutes created by Congress that restrict judicial review, "'cases have strictly limited nonstatutory *ultra vires* review' to a narrow set of circumstances." *United States Postal Service v. California*, No. 26A305, 609 U.S. __, 2026 WL 2687160, at *3 (Sept. 14, 2026) (Justices Alito and Thomas dissenting from the denial of application for stay) (quoting *NRC v. Texas*, 605 U.S 665, 681 (2025)). Accordingly, an action is not *ultra vires* "simply because an agency has arguably reached a conclusion which does not comport with the law." *NRC*, 605 U.S. at 681 (internal quotation marks and citation omitted); *see also* ECF 109-1 at 27. Rather, the agency action must be "entirely in excess of [the agency's] delegated powers and contrary to a specific prohibition in

[5] The law is clear that courts "have no 'jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 252 (S.D.N.Y. 2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992)).

[6] MAGA nonetheless has "instructed the organization's media buyer to cancel any placement of the specified advertisements" in the Court's second TRO. ECF No. 109-3.

a statute." *NRC*, 605 U.S. at 681 (internal quotation marks and emphasis omitted); *see also* ECF No. 109-1 at 28. For this reason, claims under this doctrine have been characterized as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 605 U.S. at 681-82; *see* ECF No. 109-1 at 27.

The rigorous test for an *ultra vires* claim has been set forth by the Second Circuit. An *ultra vires* claim is only available in the "extremely limited" circumstance "when three requirements are met: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hospital v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (internal quotation marks and citation omitted); *see also* ECF No. 109-1 at 27. Plaintiffs cannot meet that standard here.

As an initial matter, Plaintiffs' assertion that the use of staff time to compile the videos constitutes the "use" of appropriations within the meaning of the Purpose Act and Section 718 is unavailing. Importantly, this is not a situation where funds were appropriated to an agency for a specific purpose and then redirected by the agency for another project. Rather, as Plaintiffs acknowledge (Pls. Br. at 22), EOP was appropriated funds in Fiscal Years 2026 and 2027 for, among other things, "staff and consultant salaries" and there is no dispute that the funds at issue were used to pay the salaries of EOP staff. Likewise, Plaintiffs do not allege that any additional salary or other monies were paid out in connection with the compilation of certain ads by EOP staff.

Thus, there was no diversion of appropriated funds or expenditure of additional funds as a result of the use of staff time. And, in this context, the term "use of funds" more naturally means the incurring of new legal obligations that require the payment of money. Indeed, when Congress

wishes to prevent the allocation of appropriated salary for a specific prohibited purpose, it speaks with much more clarity. For example, since 1998, annual appropriations acts have contained a government-wide prohibition on the use of appropriated funds to pay the salary of any federal official who prohibits or prevents another federal employee from communicating with Congress. *See* Pub. L. No. 105-61, § 640, 111 Stat. 1272, 1318 (Oct. 10, 1997).

Given the ambiguity regarding whether devotion of staff time constitutes the use of appropriated funds and the fact that Congress has not forbidden the allocation of staff time for this purpose, Plaintiffs cannot establish an *ultra vires* claim based on the fact that EOP staff spent time compiling certain of the challenged advertisements. *But see Neguse v. ICE*, 822 F. Supp. 3d 86, 105-06 (D.D.C. 2026) (holding that the use of any government resources, including time spent by government employees, would entail government expenditures).

Even assuming the Court finds that the devotion of staff time constitutes a clear use of appropriated funds (*see* ECF No. 109-1 at 31-32), Plaintiffs' *ultra vires* claim still fails because they cannot establish that the use of EOP staff to compile the videos violated the Purpose Statute or Section 718. That is because Plaintiffs' argument ignores EOP's function within the Executive Branch. EOP contains a number of entities, including the White House Office (the staff working closest to the President, including West Wing staff) and the Office of the Vice President. *See* 3 C.F.R. § 102.103. These offices support the work of the President. ECF No. 109-1 at 32. And it is well established that the President has a legitimate interest in communicating with the public to advocate for his positions and communicate about his functions, policies, and activities, even on controversial issues. *Id.*

As this Court has recognized (Opinion and Order at 35), the limitations in appropriations laws are interpreted and administered by the Government Accountability Office ("GAO"). *See* 31

U.S.C. § 712(1), (3)-(4) (2012); ECF No. 109-1 at 30. Because federal agencies, including the Executive Branch, must communicate information to the public regularly and may have statutory missions or other objectives requiring them to educate the public, GAO interprets the limitations on agencies' use of funding narrowly. GAO Redbook at 3-294. Indeed, with respect to the President specifically, GAO has observed that:

> [t]o restrict all materials that have some political content or express support of an Administration's policies would significantly curtail the recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies. It is important for the public to understand the philosophical underpinnings of the policies advanced by elected officials and their staff in order for the public to evaluate and form opinions on those policies.

*See* GAO Redbook at 3-296.

As applied here, it cannot be said that the devotion of EOP staff time to compile videos was plainly in "excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Becerra*, 56 F.4th at 26-27. Plaintiffs insist that Section 718 imposes a clear bar on the Executive from using appropriations directly or indirectly for publicity and propaganda purposes and that the challenged videos plainly are "publicity or propaganda," Pls. Br. at 23; however, that is not correct.

As an initial matter, the Appropriations Act does not define "publicity or propaganda." *See* GAO Redbook at 3-281 ("[T]here is no definition of either term."); *see also id.* at 3-282 ("[T]he prohibitions themselves provide little definitional guidance as to what specific activities are publicity or propaganda."). And the GAO has recognized that "the lines separating the nonpolitical from the political cannot be precisely drawn." GAO Redbook at 3-296 (quoting B-144323 (Nov. 4, 1960)). Furthermore, GAO has explained that "[i]n construing and applying a publicity or propaganda provision," *id.* at 3-281, it is necessary to "achieve a delicate balance between

competing interests." *Id.* On the one hand, the Executive "has a legitimate right to explain and defend its policies and respond to attacks on th[ose] polic[ies]." *Id.* at 3-294. So "[t]o restrict all materials that have some political content or express support of an Administration's policies would significantly curtail th[at] recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies." *Id.* at 3-296 (citation omitted). On the other hand, the statute must mean something, so if the activity in question is "completely devoid of any connection with official functions," then the use of appropriated funds will be improper. *Id.* at 3-294 (citation omitted).

GAO's application of this standard is instructive. For example, GAO did not find a violation of the publicity or propaganda prohibition in an analogous matter which also involved use of White House staff time. That decision involved a challenge to the Republican National Committee having financed in 1973 a mass mailing of copies of editorials from British newspapers in praise of the President. The editorials were transmitted with a letter prepared by a member of the White House staff on State Department letterhead stationery and signed by the Ambassador to Great Britain. *See* GAO Redbook at 3-285 (citing B-178528 (July 27, 1973)). GAO again noted the extreme difficulty in distinguishing between disseminating information to explain or defend administration policies, which is permissible, and similar activities designed for purely political or partisan purposes. *See id.* (citing B-194776 (June 4, 1979)). Thus, GAO was unable to conclude that there was any violation of the publicity or propaganda law. *Id.*

Applying the same standard here, Plaintiffs have not met their burden of proof on their *ultra vires* claim. Specifically, based on the current record, Plaintiffs have not established that they are clearly and substantially likely to succeed in showing that EOP plainly acted contrary to a clear prohibition in Section 718 with regard to the challenged advertisements.

As a threshold matter, Plaintiffs' claim fails with respect to the six specific advertisements at issue (*see* ECF No. 110 at 1-2)[7] because they fail to offer an ad-by-ad argument demonstrating that each advertisement is "completely devoid of any connection" with official functions. Plaintiffs' cursory reference to statements in three of the videos (Pls. Br. at 18) is not sufficient to meet their burden that the ads as a whole are purely partisan. GAO Redbook at 3-285, 3-296. Furthermore, Plaintiffs' complaint that the videos "derid[e] policy positions [the President] opposes," Pls. Br, at 20, proves Defendants' point. It is a "legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies." GAO Redbook at 3-296.

In serving the President, White House staff play an important role in helping educate the public regarding the President's positions, policies, and accomplishments. ECF 109-1 at 32. Accordingly, as applied to EOP, it is particularly difficult to draw clear lines between what is strictly partisan and what is information explaining and defending the Administration's policies. *See, e.g.* GAO Redbook at 3-294 (The question "whether in any particular case a speech or a release by a cabinet officer can be said to be so completely devoid of any connection with official functions or so political in nature that it is not in furtherance of the purpose for which Government funds were appropriated . . . is extremely difficult to determine in most cases as the lines separating the nonpolitical from the political cannot be precisely drawn."). Accordingly, the devotion of EOP staff to compile videos that informed the public of the Administration's policies and countered attacks on those policies was part of the agency's function and cannot be said to be "completely devoid of any connection with official functions." *Id.*

---

[7] Although Plaintiffs list the titles of six videos in their Proposed Order, it is Defendants' understanding that the video "The Country He Loves" is the same video titled "America Will Never Be A Socialist/Communist Country."

To take one example, Plaintiffs argue that a video posted on the White House YouTube page in which the President promises $5,000 to all adult citizens depending on the outcome of the midterm elections is purely partisan and constitutes propaganda. *See* Pls. Br. at 18; ECF No. 109-1 at 36 (finding this video was "designed to aid a political party or candidate"). But the ad also informs the general public of a new monetary proposal as well as the Administration's views on tax policy. Accordingly, Plaintiffs cannot satisfy the rigorous *ultra vires* standard.[8] *See California*, 609 U.S. __, 2026 WL 2687160, at *3 ("If the question of the Postal Service's power were before us in something other than the context of an ultra vires claim, the Government's argument would present a difficult question. But here the question is different.").[9]

Plaintiffs' *ultra vires* claim based on a purported violation of the Purpose Act also fails. Indeed, the Court previously denied Plaintiffs' request for a TRO based on a violation of the Purpose Act on essentially the same record. ECF No. 109-1 at 29.

The Purpose Act provides that appropriations should be used for their intended purpose. *See* 31 U.S.C. § 1301(a) ("[A]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). Here, EOP was appropriated funds for salaries and there is no dispute that the funds were used to pay salaries. ECF No. 109-1 at 29. Moreover, just like the prohibition on using funds for "publicity or propaganda," the Purpose Act's directive to use funds for which they are intended is likewise not sufficiently clear or specific

---

[8] The same holds true for the other challenged advertisements.

[9] It is important to recognize that under Plaintiffs' theory, the Court could be called on to review speeches prepared for the President by White House staff to determine if they were purely partisan and therefore (according to Plaintiffs' arguments) violative of the Appropriations Act. This type of review would raise serious separation of powers concerns and is one of the reasons why the publicity and propaganda review standard is so deferential. *See* GAO Redbook at 3-294 (discussing the difficulties of applying the standard to speeches or releases by cabinet officers).

to support a finding that EOP "plainly" acted contrary to "a specific statutory prohibition that is clear and mandatory." *Becerra*, 56 F.4th at 26-27.

## VIII. Plaintiffs Fail to Show an Equal Protection Clause Violation

Plaintiffs' Equal Protection claim fares no better. Pls. Br. at 24-25. This Court denied Plaintiffs' motion to expand the TRO based on their Equal Protection claim on the exact same record. ECF No. 109-1 at 29. The Court should not deviate from that ruling.

As the Court recognized, "this is not the typical context in which an Equal Protection claim is asserted." *Id.* at 28. The Equal Protection Clause is violated when someone is (1) "intentionally treated differently from others similarly situated" and (2) that "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Knighton v. City of Syracuse Fire Dep't*, 145 F. Supp. 2d 217, 222-23 (N.D.N.Y. 2001). Here, Plaintiffs have not met their heavy burden of showing a clear and substantial likelihood of prevailing on their claim that in creating the challenged advertisements, Defendants intended to discriminate against individuals based on their political identity and there was no rational basis for the difference in treatment. *See* ECF No. 109-1 at 29.

## IX. Plaintiffs' Requested Preliminary Injunction Is Overbroad

If the Court nonetheless is inclined to grant Plaintiffs' motion for a preliminary injunction (which it should not), any order should be appropriately tailored to the perceived exigency. *See* Fed. R. Civ. P. 65(d); *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) ("[i]njunctive relief should be narrowly tailored to fit specific legal violations") (internal quotation marks and citation omitted). In particular, the injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011) (internal quotation marks and citation omitted);

*see* Fed. R. Civ. P. 65(d)(1)(C) (injunction must "describe in reasonable detail . . . the act or acts restrained"). As the Supreme Court has instructed:

> [T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Here, the proposed order submitted by Plaintiffs (ECF No. 110) is far broader than necessary and lacks the requisite specificity in stating its terms.

For example, Plaintiffs request that the Court enjoin Defendants from using appropriated funds, including staff time, to create or disseminate "any political advertisement attacking or promoting a particular candidate, party, or political ideology." ECF No. 110 at 2. That proposed injunction is both far too broad, as only advertisements that constitute "publicity or propaganda" are barred by Section 718, and much too vague because, as the Court has recognized (ECF No. 109-1 at 32-33), it is often difficult to draw definitive lines between an advertisement that sets out a policy position or rebuts attacks on that policy position and one that is "attacking or promoting a particular candidate, party, or political ideology." Just as the Court previously rejected Plaintiffs' request to "enjoin all undefined 'political advertisements' compiled by the EOP, ECF No. 109-1 at 33, the Court should reject this provision as well. *See, e.g.*, *Mickalis Pawn Shop*, 645 F.3d at 143 (injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed"); *Peregrine Myanmar, Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("an injunction must be more specific than a simple command that the defendant obey the law").

For the same reason, each provision of Plaintiffs' proposed order that references the "challenged advertisements" should be rejected because that term is defined to include the six specified advertisements together with "any political advertisement attacking or promoting a particular candidate, party, or political ideology." ECF No. 110 at 2. That language runs afoul of Rule 65.

Plaintiffs' request that the Court enjoin Defendants from posting the challenged advertisements "on official government websites or social media channels . . . *or other similar sites*" is also improper. ECF No. 110 at 2 (emphasis added). The phrase "other similar sites" is vague, not defined, and not narrowly tailored, and therefore cannot be included in a proper injunction. *See* Fed. R. Civ. P. 65(d)(1)(C).

Finally, as discussed *supra*, the Court cannot enjoin MAGA because that entity is not a party to this action and Plaintiffs have not established that any exception in Rule 65(d)(1)(C) applies. *See Havens*, 76 F.4th at 111. Likewise, Plaintiffs' request that the Court enjoin non-party LMD from continuing to run the challenged advertisements "as a contractor that is in active concert and participation with Defendants," ECF No. 101 at 2, is also improper and should be rejected.

## X. Plaintiffs Should Be Required to Post a Bond

If the Court grants a preliminary injunction (which the Court should not do), it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post bond pursuant to Rule 65(c).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: November 5, 2026
New York, New York

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: *_/s/ Jeffrey Oestericher_*
JEFFREY S. OESTERICHER
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695
Email: jeffrey.oestericher@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, that this brief complies the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 8,576 words in this brief.

Dated: New York, New York
November 5, 2026

*/s/ Jeffrey Oestericher*
JEFFREY S. OESTERICHER
Assistant United States Attorney