UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMON CAUSE, ROBERT HUNTER, SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ, and EMPIRE STATE 32BJ SEIU PAC,

Plaintiffs,

-against-

DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary of the Department of Homeland Security, in his official capacity; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, Director of the Office of Management and Budget, in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT; and SUSIE WILES, White House Chief of Staff, in her official capacity,

Defendants.

Case No. 1:26-cv-08882 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

This dispute concerns taxpayer-funded advertisements that were initially aired prior to the November 3, 2026 midterm elections, praising President Donald Trump and disparaging democratic candidates as well as progressive political ideologies such as democratic socialism. Plaintiffs Common Cause, Robert Hunter ("Hunter"), Service Employees International Union Local 32BJ ("SEIU 32BJ"), and Empire State 32BJ SEIU PAC ("Empire PAC") (collectively, "Plaintiffs") bring this action against Defendants Department of Homeland Security ("DHS"), Markwayne Mullin ("Mullin"), Office of Management and Budget ("OMB"), Russell Vought ("Vought"), the Executive Office of the President ("EOP"), and Susie Wiles ("Wiles") (collectively, "Defendants"). *See* Dkt. 1 ("Compl." or the "Complaint"); Dkt. 90 ("Am. Compl." or the "Amended Complaint").

In October 2026, leading into the November 3, 2026 federal midterm and state elections, Hunter, SEIU 32BJ, and Empire PAC (collectively, "Moving Plaintiffs") sought emergency relief claiming they were being immediately and irreparably harmed by the taxpayer-funded advertising campaign because (1) Hunter was then-running for office as a democratic socialist, and (2) SEIU 32BJ and Empire PAC were advocating on behalf of progressive candidates and those associated with democratic socialists. The Court granted temporary relief, and a limited expansion of that relief, on October 11, 2026, and October 30, 2026, respectively.

Now the November 3, 2026 elections have passed and Moving Plaintiffs seek a preliminary injunction and stay under Section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705, arguing that they will continue to be harmed if these advertisements resume, pointing to future potential elections with hypothetical candidates that they may support or run against, under circumstances that they speculate would mirror the political landscape of the earlier midterms. *See* Dkt. 108 ("Mot."). For the following reasons, the Court finds that the cited harm is too speculative and non-imminent to warrant the extraordinary remedy of preliminary injunctive relief.

## BACKGROUND

"When considering a motion for [injunctive relief], . . . the Court need not accept as true the well-pleaded allegations in Plaintiff[s'] complaint." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (quoting *Victorio v. Sammy's Fishbox Realty Co.*, No. 14-cv-08678 (CM), 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014)); *see also AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 386 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical."). Instead, the "court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. OptumRx, Inc.*, 152

F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, No. 01-cv-09587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003)).

The evidence before the Court consists of public reporting and declarations from Moving Plaintiffs concerning the advertisements and their asserted effect on candidates and political organizations, as well as declarations from Defendants concerning the allocation and use of federal taxpayer funds for the advertisements. *See* Dkt. 38 ("First Mehringer Decl."); Dkt. 109-4 ("Third Hunter Decl."); Dkt. 109-5 ("Third Tall Decl."); Dkt. 109-6 ("Third Banks Decl."); Dkt. 109-7 ("Third Ward-Packard Decl.").

## I. Factual Background

The Court has previously provided an overview of the relevant issues in this case. *See Common Cause v. Dep't of Homeland Sec.*, No. 1:26-cv-08882 (JLR), 2026 WL 3041134 (S.D.N.Y. Oct. 11, 2026) ("*Common Cause I*"); *Common Cause v. Dep't of Homeland Sec.*, No. 1:26-cv-08882 (JLR), 2026 WL 3043900 (S.D.N.Y. Oct. 12, 2026) ("*Common Cause II*"); *Common Cause v. Dep't of Homeland Sec.*, No. 1:26-cv-08882 (JLR), 2026 WL 3306257, (S.D.N.Y. Oct. 30, 2026) ("*Common Cause III*"). In short, Plaintiffs allege that federal officials and agencies, at the direction of the EOP, redirected taxpayer funds appropriated for border-security purposes to finance an advertising campaign — using advertisements created by EOP staff — in advance of the November 3, 2026 midterm and state elections. *See* Am. Compl. ¶¶ 1-7, 42-47.

### A. The Challenged Advertisements

In connection with the present preliminary injunction motion, Moving Plaintiffs seek to enjoin five particular taxpayer-funded political advertisements as well as "any political advertisement attacking or promoting a particular candidate, party, or political ideology" ("the

Challenged Advertisements”).[1] *See* Dkt. 110 (“Proposed Order”) at 1-2. Those five advertisements identified by Moving Plaintiffs can be sorted into two groups. “The Country He Loves” and “Final Battle,” (together, the “Initial Challenged Advertisements”), along with several other advertisements not challenged in the present motion, were the subject of this Court’s prior Opinion and Order granting a temporary restraining order and stay under Section 705. *See* Am. Compl. ¶¶ 50, 66; *Common Cause I*, 2026 WL 3041134, at *1; *Common Cause II*, 2026 WL 3043900, at *3-4. Descriptions of each are set forth in the Court’s earlier Opinion and Order. *See Common Cause II*, 2026 WL 3043900, at *3-5. The three remaining advertisements were the subject of this Court’s subsequent bench Opinion and Order expanding the temporary restraining order: “Every Democrat Voted Against No Tax on Tips,” “$5000 to Americans,” and “The Cost of Socialism” (together, the “Additional Challenged Advertisements”). *See* Am. Compl. ¶¶ 103-11, 115; Dkt. 114 (transcript of bench opinion); *Common Cause III*, 2026 WL 3306257, at *1. Those three advertisements are described below.

**“Every Democrat Voted Against No Tax on Tips.”** This 30-second advertisement first aired on October 16, 2026. Third Ward-Packard Decl. ¶ 7; *see also* Am. Compl. ¶ 106. It features images of various Democratic members of Congress, including Senator Jon Ossoff and Representative Alexandria Ocasio-Cortez, both of whom were up for re-election on November 3, 2026, and disparages their records and positions.[2] The advertisement criticizes them for voting

[1] While the Proposed Order lists the titles of six advertisements, *see* Dkt. 110 (“Proposed Order”) at 1-2, there are only five advertisements at issue because “The Country He Loves” is the same video as “America Will Never Be a Socialist/Communist Country,” *see* Dkt. 113 (“Opp.”) at 22 n.7; Dkt. 116 (“Reply”) at 5 n.1.

[2] Every Democrat Voted Against No Tax on Tips, https://nysd.uscourts.gov/sites/default/files/2026-10/Every%20Democrat%20Voted%20Against%20No%20Tax%20on%20Tips.mp4 (last visited Nov. 13, 2026).

against particular tax bills regarding tips, overtime, and social security. *See* Am. Compl. ¶ 105. It ends with a clip of democrat Hakeen Jeffries at a press conference before the vote on a bill stating, "every single House Democrat will vote 'hell no.'" *Id.*

**"$5000 to Americans."** This 30-second advertisement first appeared on the White House YouTube channel on October 12, 2026. *Id.* ¶ 108. The advertisement begins with President Trump sitting in the Oval Office, looking directly at the camera, and stating, "I'm going to give all adult citizens in the United States of America $5,000."[3] *Id.* ¶ 109. After cutting to an image of stacks of $100 bills, President Trump states: "If the Democrats win, you will have an economic depression. If the Republicans win, you will each have $5,000 in your pocket and economic success for our country like we have never ever seen before." *Id.* ¶¶ 109-10.

**"The Cost of Socialism."** This 35-second advertisement was first posted to the White House YouTube page the week of October 26, 2026. *Id.* ¶ 115. This advertisement includes a voiceover that states, "[i]magine prices more than doubling. That's the projected increase under the Democratic Socialists of America's proposed agenda."[4] The advertisement states that if voters elect those who are pursuing such an agenda there will be higher mortgage rates, fewer rental homes, less jobs, fewer police resources, and growing fears of public safety, among others. There is then a call to action, urging voters to steer clear of voting for the candidates aligned with this agenda by saying: "The decisions we make today will shape tomorrow and the cost of getting it wrong could be irreversible."

---

[3] $5000 to Americans, https://nysd.uscourts.gov/sites/default/files/2026-10/%245000%20to%20Americans.mp4 (last visited Nov. 13, 2026).

[4] The Cost of Socialism, https://nysd.uscourts.gov/sites/default/files/2026-10/The%20Cost%20of%20Socialism.mp4 (last visited Nov. 13, 2026).

### B. Producing and Disseminating the Challenged Advertisements Using Taxpayer Funds

Defendants acknowledge that EOP staff "compiled" these Challenged Advertisements, *see* Dkt. 75-5 at 5; Dkt. 96 ("Oct. 28, 2026 Hr'g Tr.") at 7:1-18, and they were paid by funds appropriated for EOP staff salaries, *see* Oct. 28, 2026 Hr'g Tr. at 9:5-8 (Defendants confirming that "staff time by EOP staff" "was used to compile the clips"); Consolidated Appropriations Act, 2026, 140 Stat. 173, 450-56 (providing Congressional appropriation for EOP staff salaries and expenses); *see also* Am. Compl. ¶¶ 40, 203.

Likewise, Defendants do not dispute that the Initial Challenged Advertisements were broadcast on local and national television using taxpayer funds allocated to DHS for "[c]ommemorating efforts and events related to border security." *See* Reconciliation Act, Pub. L. No. 119-21, § 90004, 139 Stat. 72, 359 (2025) (H.R. 1). The Court provided a thorough account of how those funds were allocated, which Defendants do not dispute. *See Common Cause II*, 2026 WL 3043900, at *2-3,

## II. Procedural History

Plaintiffs commenced this action on October 7, 2026. *See* Compl. The Complaint asserts nine counts arising from the funding and dissemination of allegedly partisan advertisements, including claims under the APA, a non-statutory ultra vires claim, and an equal protection claim. *See generally id.*

### A. Temporary Restraining Order

On the evening of October 8, 2026, the Moving Plaintiffs requested a temporary restraining order ("TRO") and stay under 5 U.S.C. § 705. *See* Dkts. 25-27. As with the instant motion for a preliminary injunction, the Moving Plaintiffs consisted of Hunter, a democratic socialist who was then-running for state office in Alabama, as well as SEIU 32BJ and Empire

PAC, which advocate on behalf of progressive candidates who are often criticized by their opponents as socialists. *See* Am. Compl. ¶¶ 123, 129, 139, 144.

At that time, the Moving Plaintiffs sought, among other things, to (1) suspend an alleged $20 million advertising contract Defendants had formed with Lepugh, Inc. d/b/a LMD Agency, Inc. ("LMD") to air the advertisements, (2) prevent further use of DHS funds for disseminating the Initial Challenged Advertisements, along with several other advertisements, and (3) require cancellation of scheduled placements and compliance reporting. *See* Dkt. 27 at 1-2. The parties appeared before the Court on the morning of October 9, 2026, for a conference on the motion and the Court set an expedited briefing schedule. Dkt. 33. In accordance with that schedule, Defendants submitted their opposition brief and supporting declarations on October 10, 2026, Dkts. 37-39, and Moving Plaintiffs replied on October 11, 2026, Dkt. 40. The Moving Plaintiffs stressed immediate relief that evening was necessary because the advertisements were currently running, attracting "millions of viewers," and were aired to "attack the opposing party during an ongoing election period . . . [in order to] sway voters in those elections." Dkt. 40 at 1, 3.

The Court granted Moving Plaintiffs' motion for a TRO on Sunday, October 11, 2026, *Common Cause I*, 2026 WL 3041134, and issued its corresponding opinion on Monday morning, October 12, 2026, *Common Cause II*, 2026 WL 3043900. Specifically, the Court ordered, *inter alia*, that the purchase order between CBP and LMD and the OMB's apportionment of $20 million both be stayed, that Defendants were enjoined from using any DHS funds to create or air the Initial Challenged Advertisements, along with several other advertisements, and that Defendants must cease airing the Initial Challenged Advertisements immediately. *Common Cause I*, 2026 WL 3041134, at *1-2. Later in the day on October 12, 2026, Plaintiffs notified the Court that, although they were not seeking sanctions, the advertisements continued to air the morning after the Court's October 11, 2026 Order. *See* Dkt. 43. Defendants filed their status

report, as required, on the evening of October 12, 2026, stating that there was some delay in complying with the Court's Order because the clients did not receive the Order until the morning of Monday, October 12, 2026. Dkt. 44.

The parties subsequently consented to an extension of the TRO until November 20, 2026. Dkts. 76, 78-80. The parties engaged in limited discovery and a preliminary injunction hearing was scheduled for November 13, 2026. Dkt. 80.[5]

### B. Expanded Temporary Restraining Order and Amended Complaint

In the meantime, on October 23, 2026, the Moving Plaintiffs filed a motion to expand the TRO to enjoin undefined "political advertisements," including thirteen advertisements that were created with EOP staff time and placed on social media sites, the White House YouTube page, and now aired by MAGA Inc. based on the theory that the Defendants acted in an *ultra vires* fashion and violated the equal protection clause when they improperly used funds appropriated for EOP salaries to compile or create the political advertisements in violation of the Purpose Statute, 31 U.S.C. § 1301, and Section 718 of the Appropriations Act. *See* Dkts. 81-83. Defendants opposed the Moving Plaintiffs' motion on October 27, 2026. Dkt. 86. Moving Plaintiffs filed their reply on October 29, 2026, where they again stressed the need for immediate relief "as the November 3 elections approach." Dkt. 95 at 2.

On October 30, 2026, the Court heard argument on Moving Plaintiffs' motion. *See* Dkt. 101. In a bench opinion at that conference, the Court granted Moving Plaintiffs' motion in part and denied it in part. Dkt. 114; Dkt. 101. Specifically, the Court enjoined Defendants from

---

[5] The Democratic National Committee brought a similar case in the District of Columbia and the court likewise entered a temporary injunction on October 28, 2026. *Democratic Nat'l Comm. v. Trump, et al.*, No. CV 26-3506 (LLA), 2026 WL 3228366 (D.D.C. Oct. 28, 2026). A preliminary injunction hearing was held on November 19, 2026. No decision has been issued to date.

disseminating the three Additional Challenged Advertisements. *See Common Cause III*, 2026 WL 3306257, at *1. The Court ordered that these advertisements be removed from official government websites and social media, and that Defendants direct authorized third parties — including MAGA Inc. — not to air the ads. *Id.*

On October 31, 2026, Moving Plaintiffs filed a letter informing the Court that some of the Additional Challenged Advertisements remained on the White House's YouTube page through the morning of October 31, 2026. Dkt. 103. Later that day, Defendants certified compliance with the TRO. Dkt. 104.

### C. Motion for Preliminary Injunction

On November 2, 2026, Moving Plaintiffs filed their current motion for a preliminary injunction*, see* Mot.; Dkt. 109 ("Br."), seeking to enjoin, among other things, (1) the disbursement of funds for a September 20, 2026 purchase order with LMD to air certain taxpayer-funded political advertisements, and (2) the dissemination of the Challenged Advertisements, which include the five specific advertisements as well as "any political advertisement attacking or promoting a particular candidate, party, or political ideology," *see* Dkt. 110 ("Proposed Order") at 1-2. Defendants opposed the motion on November 5, 2026. Dkt. 113 ("Opp."). Moving Plaintiffs filed their reply on November 9, 2026. Dkt. 116 ("Reply"). The motion is fully briefed. On November 13, 2026, the Court held a preliminary injunction hearing and the parties presented oral argument. *See* Nov. 13, 2026 Hr'g Tr.

## LEGAL STANDARD

### I. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666-67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "To obtain a preliminary injunction . . . the [movant] must

establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-74 (2d Cir. 2021); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Agnant*, 62 F.4th at 672 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). The Second Circuit has routinely, and summarily, upheld the denial of a preliminary injunction based on a movant's failure to demonstrate irreparable harm. *See Care One, LLC v. Nat'l Lab. Rels. Bd.*, 166 F.4th 335, 343 (2d Cir. 2026) (collecting cases).

A heightened showing applies where, as here, a movant seeks a mandatory injunction — an injunction that "requires the non-movant to take some action." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024); *see Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act."); Proposed Order at 1-3 (seeking injunction to cease payments and broadcasts, remove placements of advertisements, and impose reporting requirements). In such a case, the movant must "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Daileader*, 96 F.4th at 356 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

## II. Stay Under APA § 705

Section 705 of the APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The provision authorizes

interim protection pending judicial review, not a final decision on the validity of agency action. *See id.* Its terms require the Court to identify the agency action whose operation would be postponed and to tailor any process to what is necessary to preserve the relevant rights. *See id.*

Courts considering relief under Section 705 commonly apply the traditional preliminary injunction factors: likelihood of success, irreparable injury, the balance of equities, and the public interest. *See, e.g.*, *Rural & Migrant Ministry v. U.S. Env't Prot. Agency*, 565 F. Supp. 3d 578, 595 (S.D.N.Y. 2020) ("The standard for a stay under 5 U.S.C. § 705 is the same as or similar to the standard for a preliminary injunction."); *E. Air Lines, Inc v. C a B*, 261 F.2d 830, 830 (2d Cir. 1958) (per curiam) ("[S]tay of an order of an administrative agency may be granted when the following conditions are met: (a) [w]here the petitioner is likely to prevail on the merits of its appeal; (b) [w]here the petitioner has shown that without a stay it will suffer irreparable injury; (c) [w]here there is no substantial harm to other interested persons; and (d) [w]here the public interest will not be harmed."); *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (setting out the factors governing stays pending review). Although a stay and an injunction are distinct forms of relief, *see Nken*, 556 U.S. at 428-29, the parties' requests overlap here because each seeks to prevent further operation of the challenged advertising arrangements while the case proceeds.

**DISCUSSION**

The urgency of the earlier requests for temporary injunctive relief in this case centered around the November 3, 2026 midterm and state elections and it was asserted that the advertisements were harming Moving Plaintiffs and their candidates leading up to those elections. *See* Am. Compl. ¶ 7. Those elections have now passed. Nonetheless, Moving Plaintiffs argue that they are "repeat participants in elections at every level of government,"

Reply at 1, such that "harm will continue as long as Defendants are allowed to continue creating and disseminating these ads," Br. at 1.

Specifically, Hunter lost the election for Alabama House District 28 on November 3, 2026. *See* Third Hunter Decl. ¶ 2; Alabama Political Reporter, https://perma.cc/4KF4-KEXA (last visited Nov. 12, 2026). Hunter has provided a declaration regarding his future intent to run for office again, stating that there are three political offices he is "considering running for: the same position next election cycle, a position on the Gadsden City Counsel, or mayor of Gadsden." Third Hunter Decl. ¶ 8. In deciding on the particular political office, Hunter claims he "would consider how competitive the race is and how positive [his] name ID is with the electorate." *Id.* ¶ 9. Hunter further states that he will pursue projects that build his name recognition in the community, including work with the state and county democratic parties and will "help[] develop policy ideas for the state party in the next four years." *Id.* ¶ 10. Hunter also intends to continue to expand the work of the North Alabama Democratic Socialists of America ("DSA") and is "considering founding" another DSA chapter. *Id.* ¶ 11.

With respect to SEIU 32BJ, it has declared that its leadership will meet to determine priority races for the 2027 election cycle "[w]ithin a few days of Election Day 2026." Third Tall Decl. ¶ 14. As of November 2, 2026, SEIU 32BJ was already making plans for 2027 races across the country. *Id.*

Similarly, Empire PAC provides that its independent spending in support of pro-worker campaigns will not end on midterm election day. Third Banks Decl. ¶ 9. "Empire PAC is already preparing for 2027 elections in New York, specifically the races for the Bronx and Queens District Attorneys" where the primary elections will be held in June 2027 and the general election in November 2027. *Id.* ¶ 12.

The Moving Plaintiffs therefore argue that a preliminary injunction is warranted here because Hunter is looking to run for office in the future and "SEIU 32BJ and Empire PAC similarly have confirmed their intention to continue endorsing progressive, pro-worker candidates, organizing members to support these candidates, and making independent expenditures for such candidates in the 2027 elections." Reply at 3.

Defendants respond that the motion should be denied because the November 3, 2026 elections have now passed so (1) Moving Plaintiffs lack standing, (2) their claims are moot, and (3) they cannot establish irreparable harm. *See* Opp. at 6-15. While the Court concludes that Moving Plaintiffs have standing and their claims fall under the mootness exception for controversies capable of repetition but evading review, they have failed to demonstrate immediate irreparable harm necessary for a preliminary injunction.

## I. Moving Plaintiffs Have Standing

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'" *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

In arguing that Moving Plaintiffs do not have standing, Defendants reiterate the same arguments that the Court already addressed in its prior Opinion and Order. *See Common Cause II*, 2026 WL 3043900, at *10-14; *compare* Opp. at 12-15 *with* Dkt. 37 at 7-11. In its prior Opinion and Order, the Court relied on "competitive advocate standing" which applies "where the government's allocation of a particular benefit 'creates an uneven playing field' for organizations advocating their views in the public arena." *Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002) (quoting *In re United States Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989)); *see also Fulani v. League of Women Voters Educ. Fund*, 882 F.2d

621, 626 (2d Cir. 1989) (concluding that exclusion of candidate from televised debate "palpably impaired [her] ability to compete on an equal footing with other significant presidential candidates" such that she suffered a cognizable injury sufficient to confer standing). "In order to 'satisfy the rule that he was personally disadvantaged,' a plaintiff must 'show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit.'" *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197 (quoting *Catholic Conference*, 885 F.2d at 1029).

The Court determined that Moving Plaintiffs established standing because each was competitively disadvantaged in the then-upcoming November 3, 2026 elections because the advertisements limited their ability to compete with their ideological opponents on equal footing. *See Common Cause II*, 2026 WL 3043900, at *10-14. Because "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added), standing is not defeated by the passage of the election, *see Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025) ("[P]ost-filing changes in circumstance cannot deprive a plaintiff of standing."); *accord United States v. Greebel*, 184 F.4th 93, 99-100 (2d Cir. 2026) (holding that district court erred in finding that the defendant did not have standing because post-filing circumstances had changed given that "[s]tanding doctrine evaluates a litigant's personal stake as of the outset of litigation" (citation modified)).

## II. Moving Plaintiffs' Claims Are Capable of Repetition but Evading Review

Although Moving Plaintiffs had standing when their claims were filed, the Court must next determine if the passing of the November 3, 2026 midterm elections has since rendered their claims moot, and if so, whether an exception applies. *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020) ("While standing doctrine determines

whether a plaintiff has a personal stake in the litigation when the complaint is filed, '[m]ootness doctrine determines what to do if an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation after its initiation.'" (quoting *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018)); *Doe*, 128 F.4th at 385 (recognizing a court should analyze a jurisdictional challenge "through the lens of mootness" when the challenge is "focuse[d] exclusively on events that occurred after the filing of the complaint"); *Alexander v. Yale Univ.*, 631 F.2d 178, 183 (2d Cir. 1980) ("[T]ime element of standing comes under the rubric of mootness doctrine.") (quotation marks omitted)).

"A case becomes moot — and therefore no longer a 'Case' or 'Controversy' for purposes of Article III — when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified). "If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." *Janakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020). In other words, "[a] case becomes moot when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021) (quotation marks omitted); *see also Alexander*, 631 F.2d at 183 ("A party's case or controversy becomes moot either when the injury is healed and only prospective relief has been sought or when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury.").

Moving Plaintiffs insist their claims are not moot for two reasons. First, they contend the Challenged Advertisements "will injure [them] even if they are not tied to any particular election." Br. at 12. In other words, they "perpetually 'participate in a battle of ideas'" with

their competitors such that the passage of an election does not change their continued injury. Br. at 25 (quoting Third Banks Decl. ¶ 12). Second, they argue they "are already planning for 2027 campaign activity, and potentially 2026 runoff elections" as well as other election cycles so the Challenged Advertisements will continue to competitively disadvantage them. Br. at 12; *see* Third Banks Decl. ¶ 12; Third Tall Decl. ¶¶ 14-15; *see also* Third Hunter Decl. ¶ 8. Neither argument is sufficient to maintain a live controversy here.

First, the Court declines to recognize under these circumstances that a perpetual state of ideological competition exists between Moving Plaintiffs and unnamed, generalized political opponents with whom they purportedly compete in circumstances that may or may not be analogous to those shortly before the 2026 midterm elections — where the sitting President ran advertisements featuring his criticism of his opponents and told voters in speeches to "pretend [he was] on the ballot." *Common Cause II*, 2026 WL 3043900, at *12. Previously, this Court recognized competitive advocate standing for Hunter where some of the Initial Challenged Advertisements benefitted Hunter's opponent in the November 2026 midterm election by criticizing Hunter's political identity as a democratic socialist and extolling President Trump, with whom that candidate aligned himself. *Id.* Likewise, SEIU 32BJ and Empire PAC were disadvantaged because some of the Initial Challenged Advertisements "denounce[d]" ideological "labels that political opponents" had ascribed to progressive candidates who Moving Plaintiffs supported in the 2026 elections, thereby affecting the ability of SEIU 32BJ and Empire PAC to advocate on behalf of their favored candidates. *Id.* at *13.

Now that the 2026 election is effectively over, the nature of the political competition — and with it, Moving Plaintiffs' injuries — has changed. As stated above, a plaintiff must show he "personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." *Cath. Conf.*, 885 F.2d at 1029. In

*Center for Reproductive Law and Policy*, the Second Circuit recognized a redressable injury where an "advocacy organization that communicates its viewpoint regarding issues of abortion and reproductive rights" was disadvantaged by government grants provided to "anti-abortion groups engaged in advocacy around the very same issues." 304 F.3d at 197. Although the Second Circuit did not necessarily require those claims be brought in proximity to an election or other impending deadline, the scope of that ideological competition was clear: A reproductive rights group was harmed because those holding diametrically opposed views received funding they were denied. *See id.* Here, on the other hand, the "arena" Moving Plaintiffs invoke is not clearly defined. The Court cannot conclude how the Challenged Advertisements benefit Moving Plaintiffs' alleged adversaries when those adversaries remain unidentified and the nature of those opponents' advocacy has not been clearly presented to the Court. For example, the Court acknowledges that SEIU 32BJ and Empire PAC are established advocacy groups working to promote "economic justice, affordable housing, healthcare access, and public services," Third Tall Decl. ¶ 7, but the competitive "arena" has yet to be defined in terms of adversaries, the advocacy and positions of those adversaries, and the overall election landscape.

Second, Moving Plaintiffs cannot rescue their claims by reframing them as claims centered around general preparation for future elections, a claim that nowhere appears in their Amended Complaint. In affidavits provided to the Court, Hunter has claimed he "plan[s] to continue [his] political career" by running for specific elected positions in the future. Third Hunter Decl. ¶ 8. Likewise, Empire PAC attested to "preparing for 2027 elections in New York," Third Banks Decl. ¶ 12, and SEIU 32BJ has described "making plans about how it will get involved in 2027 races across the country" as well as possible 2026 run-off elections, Third Tall Decl. ¶¶ 14-15; *see also* Br. at 12-14. But Hunter has not declared his candidacy and SEIU 32BJ and Empire PAC have not identified specific candidates they are supporting in particular

elections nor the impact of the Challenged Advertisements on those elections. Moreover, SEIU 32BJ and Empire PAC acknowledged at the preliminary injunction hearing that they are not involved in any 2026 run-off elections. Nov. 13, 2026 Hr'g Tr. at 29:1-5. Thus, Moving Plaintiffs' claims are moot because the focus of their pleaded claims — the advertisements' impact on the November 2026 elections — has passed and it is not clear how the Challenged Advertisements will benefit as yet unspecified political competitors in unidentified hypothetical future elections. *See Janakievski*, 955 F.3d at 319 ("A case is moot when the prospect of judicial redress is so remote and speculative that any decision on the merits could not affect the matter in issue in the case." (citation modified)).

Having found that Moving Plaintiffs' claims are moot, the Court must determine if an exception applies. "A moot case may still be justiciable, however, if the underlying dispute is 'capable of repetition, yet evading review.'" *Van Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001) (citation omitted); *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982) ("We have recognized an exception to the general rule [to dismissing moot cases] in cases that are 'capable of repetition, yet evading review.'" (citation omitted)). This exception "applies only in exceptional situations, where two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 85 (2d Cir. 2005) (citation modified); *accord Van Wie*, 267 F.3d at 114. The party asserting reliance on this doctrine bears the burden of showing both conditions. *Video Tutorial Servs., Inc. v. MCI Telecommunications Corp.*, 79 F.3d 3, 6 (2d Cir. 1996); *accord Delaware Riverkeeper Network v. New York State Dep't of Env't Conservation*, 788 F. App'x 65, 66 (2d Cir. 2019) (summary order). Moving Plaintiffs have satisfied both conditions here.

First, because this election-related dispute is only cognizable once the nature of competition in an election is sufficiently clear, "its duration too short to be fully litigated prior to cessation or expiration." In *Federal Election Commission v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007), the Supreme Court recognized that a challenge to a federal law prohibiting certain forms of electioneering within a certain number of days before an election met this first condition because the plaintiff advocacy group there "had no way of knowing well in advance" the nature of the electioneering with which it might want to attempt to engage in during the prohibited period. *Id.* at 462. Although the present case does not involve such an explicitly defined period in which the Moving Plaintiffs could bring a claim, the Court recognizes that the fast-moving pace of events leading up to an election suggests that this controversy is sufficiently short in duration; this is especially so given the inability to reach the final merits of this action before the 2026 midterm election passed. *Id.* (recognizing that period before election was too short in duration for party to "obtain[] complete judicial review of its claims" (citation omitted)); *cf. Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 485 (1985) (recognizing "relatively short duration of . . . upcoming general election campaigns for President allowed little time in which to prosecute an enforcement action before it would become moot in whole or in part"); *see also Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) ("Election cases often fall within [the capable of repetition but evading review] exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits."). Indeed, the reallocation of funding for the previously restrained advertisements and the airing and disseminating of those advertisements occurred in a very short time frame close to the upcoming election. *See Common Cause II*, 2026 WL 3043900, at *2 (recounting how funds were reallocated within hours and advertisements began playing within several days).

Second, there is a "reasonable expectation that the same complaining party would be subjected to the same action again" because Moving Plaintiffs intend to participate in future elections and there is a reasonable expectation that Defendants will continue airing the ads during elections. "Although a plaintiff need not show a 'demonstrated probability' of recurrence, there must be at least a 'reasonable expectation' of repetition." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 120 (2d Cir. 2001) (citations omitted). "[M]ere speculation that the parties will be involved in a dispute over the same issue does not rise to the level of a 'reasonable expectation' or 'demonstrated probability' of recurrence." *Dennin v. Connecticut Interscholastic Athletic Conf., Inc.*, 94 F.3d 96, 101 (2d Cir. 1996) (citation modified).

Moving Plaintiffs have submitted several affidavits attesting that they intend to compete in future elections. *See* Third Tall Decl. ¶¶ 6, 14, 22-24; Third Banks Decl. ¶¶ 6, 9, 12; Third Hunter Decl. ¶ 8. This is sufficient to support a reasonable expectation of repetition. *See Davis*, 554 U.S. at 736 (recognizing candidate's "public statement expressing his intent" to run for office was sufficient in challenge to election law); *Wisconsin Right To Life*, 551 U.S. at 463 (concluding "reasonable expectation" of reoccurrence where advocacy group "credibly claimed that it planned on running 'materially similar' future targeted broadcast ads"); *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 775 (1978) (recognizing "reasonable expectation" that plaintiffs will be subject to future government enforcement action where they "insist that they will continue to oppose the [challenged provision], and there is no reason to believe that the [government] will refrain from prosecuting violations of [it]").

Likewise, there is a reasonable expectation that the Challenged Advertisements will continue to be aired. Defendants object that "there is no reason to believe that the [Challenged Advertisements] . . . would be run in future election cycles" and "it is inappropriate for [courts]

to revive a moot case by speculating about a defendant's future actions." Opp. at 10-11 (second quotation quoting *Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 622 (S.D.N.Y. 2020), *aff'd*, 857 F. App'x 18 (2d Cir. 2021). While a court may not speculate on a defendant's future actions, the likelihood that Defendants' conduct continues is beyond "mere speculation." *Dennin*, 94 F.3d at 101. Indeed, Defendants have (1) continued to dispute the illegality of their conduct, *see* Opp. at 2; (2) continued posting similar advertisements that the Court declined to initially enjoin, Am. Compl. ¶¶ 4, 103, 115, 118-21; (3) continued to run the enjoined advertisements in some instances after the Court had enjoined them, *see* Dkts. 43-44, 103-04; (4) maintained a current contract with LMD on which purchase orders can be drawn for further advertising spots, *see* First Mehringer Decl. ¶¶ 8-9; and (5) averred no intent to stop running the advertisements. Thus, "there is no reason to believe that the [government] will refrain from [its conduct]." *Wisconsin Right To Life*, 551 U.S. at 463; *cf. Liu v. Hochul*, No. 25-1031-cv, 2026 WL 2620270, at *1 (2d Cir. Sept. 4, 2026) (summary order) (determining reasonable expectation of reoccurrence given plaintiff's status as registered Republican and "New York's recent history of casting its electoral college votes for the Democratic presidential candidate"). To the extent Defendants argue there is not a reasonable expectation of reoccurrence because these particular advertisements would not be used in future elections, *see* Opp. at 10, this claim fails because the repeated controversy need not be identical to fall under this exception, *see Wisconsin Right To Life*, 551 U.S. at 463 (holding plaintiff's "materially similar" future conduct was sufficient to support reasonable expectation of reoccurrence).

For all of these reasons, the Court finds that Moving Plaintiffs' claims fall under the mootness exception of being capable of repetition but evading review.[6]

[6] No party has raised any arguments regarding Common Cause's claims, which have not yet been addressed.

### III. The Moving Plaintiffs Have Not Demonstrated Irreparable Harm

Finally, the Court addresses whether Moving Plaintiffs have satisfied the requirements for their requested preliminary injunction. To obtain a preliminary injunction, the Moving Plaintiffs must establish that they are likely to suffer irreparable harm absent an injunction, *Kosinski*, 987 F.3d at 273, which requires "more than merely alleg[ing] harm sufficient to establish standing," *Fiallos v. Aviles-Ramos*, No. 25-cv-07281 (JMF), 2025 WL 2961624, at *4 (S.D.N.Y. Oct. 20, 2025). "[I]rreparable harm is a critical prerequisite for the issuance of a preliminary injunction." *State of New Jersey v. U.S. Dep't of Transp.*, No. 26-282, 2026 WL 696286, at *1 (2d Cir. Mar. 11, 2026). To demonstrate irreparable harm, "the movant must show an 'injury that is neither remote nor speculative, but *actual* and *imminent* and cannot be remedied by an award of monetary damages.'" *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291 (2d Cir. 2026) (emphases added) (quoting *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025)).

The Moving Plaintiffs allege that they will continue to experience actual and immediate irreparable harm absent a preliminary injunction. In the context of the earlier TRO, the parties focused on the irreparable harm from being disadvantaged in the upcoming November 2026 midterm elections by the Challenged Advertisements. *See Common Cause II*, 2026 WL 3043900, at *17. The Moving Plaintiffs previously argued that they demonstrated irreparable harm because "*[a]s the midterm elections approach*, every day the government-sponsored political ads continue to run . . . is another day the federal government illegally influences the elections in which the plaintiffs participate." Dkt. 26 ("TRO Br.") at 25 (emphasis added). The Moving Plaintiffs emphasized how the advertisements were running while voters were casting their ballots and exclusively invoked the November 2026 midterm election as the basis for their harm. *See id.* at 25-26. With respect to Hunter, the Moving Plaintiffs argued he was

"irreparably harmed every day that the advertisements continue[d] to air" because "[v]oting [wa]s already underway in Alabama, with absentee voting having begun on September 9." *Id.* at 25. Similarly, the Moving Plaintiffs previously argued that "SEIU 32BJ and Empire PAC also suffer every day that these ads continue to air" and that Empire PAC "intend[ed] to spend more [campaign funds] through the November 3rd election." TRO Br. at 26. And the midterm elections were the basis for the Court finding that Moving Plaintiffs demonstrated a strong showing of imminent irreparable harm in the Court's prior Opinion and Order and expanded TRO. *See Common Cause II*, 2026 WL 3043900, *17 (finding irreparable harm because all voters will have cast their ballots "in less than a month" and after "the November election pass[es], there can be no do over and no redress" (first quoting TRO Br. at 25, and then quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quotation marks and citation omitted)); Dkt. 114 ("Oct. 30, 2026 Hr'g Tr.") at 37:5-7, 37:19-24 (finding irreparable harm in granting expansion of TRO for "largely for the reasons set forth in the Court's earlier opinion," namely "the approaching midterm and state elections").

But circumstances are different now. Hunter lost the election for Alabama House District 28 on November 3, 2026. *See* Alabama Political Reporter, https://perma.cc/4KF4-KEXA (last visited Nov. 12, 2026). The November 3, 2026 elections to which SEIU 32BJ and Empire PAC previously pointed have also now concluded.

In pressing for an injunction, Hunter now pivots to future political offices he is "considering running for: the same position next election cycle, a position on the Gadsden City Counsel, or mayor of Gadsden." Third Hunter Decl. ¶ 8. In addition to the possibility of running in another election, Hunter provides that he will continue other political activities, including, building name recognition, developing "policy ideas for the state party in the next four

years," continuing to expand the work of the North Alabama DSA, and is "considering founding" another DSA chapter. *Id.* ¶¶ 10-11.

SEIU 32BJ also shifts to now assert that it is making plans for 2027 races across the country, including that its leadership will meet to determine priority races for the 2027 election cycle "[w]ithin a few days of Election Day 2026." Third Tall Decl. ¶ 14. SEIU 32BJ also notes that it has previously supported candidates who have faced runoffs, and "some may face runoffs again in the 2026 cycle." *Id.* ¶ 15. Empire PAC provides that its independent spending in support of pro-worker campaigns "will not end" after election day in 2026. Third Banks Decl. ¶ 9. Specifically, "Empire PAC is already preparing for 2027 elections in New York, specifically the races for the Bronx and Queens District Attorneys" where the primary elections will be held in June 2027 and the general election in November 2027. *Id.* ¶ 12.

These harms, ungrounded in the present Amended Complaint, are not sufficiently imminent to justify the "extraordinary remedy" of a preliminary injunction. *Agnant*, 62 F.4th at 666; *see also Am. Future Fund, Inc. v. New York State Bd. of Elections*, No. 25-2781, 2026 WL 3368276, at *5 (2d Cir. Nov. 6, 2026). As of the date of this opinion, Hunter concedes that he is not currently running for election. *See* Third Hunter Decl. ¶ 8. He says only that he will "*consider*[] running for" office, including "the same position [in the] next election cycle." *Id.* (emphasis added). And his decision whether to run at all, and for which office, is yet to be made because it requires Hunter to "consider how competitive the race is and how positive [his] name ID is with the electorate," *id.* ¶ 9, which, by definition, cannot occur until some undefined point in the future. Irreparable harm must be "imminent, not remote or speculative." *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). Given the "speculative nature of [Hunter's] claim of future injury," in some presently unknown, potential election, Hunter has not

shown the "real or immediate threat" required for irreparable injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

SEIU 32BJ's and Empire PAC's alleged harms fare no better. The Moving Plaintiffs conceded at the preliminary injunction hearing that they will not be involved in any 2026 run-offs. *See* Nov. 13, 2026 Hr'g Tr. at 29:1-5. That SEIU 32BJ and Empire PAC are "already making plans," *id.* ¶ 14, and "already preparing for," Third Banks Decl. ¶ 12, the 2027 election cycle does not make any possible harm in those future elections presently imminent. "Real and imminent, not remote, irreparable harm is what must be demonstrated[.]" *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980); *accord Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992).

The Moving Plaintiffs have not demonstrated what harm they would *now* experience from the Challenged Advertisements in the absence of an immediate preliminary injunction. The Court issued the prior temporary restraining order, in part, because the advertisements were directly, and sometimes explicitly, connected to the imminent November 3, 2026 midterm elections. Indeed, in the "$5000 to Americans" advertisement, President Trump promised to pay $5,000 to all adult citizens if the Republicans win in the upcoming elections. Similarly, the "Every Democrat Voted Against No Tax on Tips" advertisement features images of various Democratic members of Congress (*e.g.*, Senator Ossoff, Representative Ocasio-Cortez, etc.) who were up for election on November 3, 2026, but will not be up for election for several years. In addition, the "Cost of Socialism" advertisement warns voters against making the wrong choice in the upcoming midterm elections. The circumstances of future elections may also be different depending on whether President Trump will expressly tie himself to the election with a proclamation that voters should vote as if he is on the ballot.

"[A] preliminary injunction is an extraordinary remedy designed to address emergency situations that cannot wait until the full adjudication of the dispute. It is a scalpel to be used

surgically, not a Swiss Army knife that can be switched up and altered to suit the shifting legal strategies of litigants." *Am. Future Fund*, 2026 WL 3368276, at *5 (citation omitted). Supporting candidates in future elections and the speculative possibility of campaigning in hypothetical elections with unknown surrounding circumstances are not "emergency situations" presently before the Court.

Because the Moving Plaintiffs have not established imminent, irreparable harm, the Court denies their request for a preliminary injunction. *See Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) ("In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied."); *Lyons*, 461 U.S. at 111 ("[A preliminary injunction] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]"). Thus, the Court need not consider the other requirements for injunctive relief, including the likelihood of success on the merits. *See Care One*, 166 F.4th at 343, 349 (collecting cases and affirming the denial of a preliminary injunction based on movant's failure to demonstrate irreparable harm without considering other requirements for injunction).

## CONCLUSION

In sum, the Court finds that the Moving Plaintiffs have standing and their claims are not moot because they are capable of repetition but evading review. However, Moving Plaintiffs have not demonstrated the strong showing of imminent and irreparable harm required for the extraordinary remedy of a preliminary injunction. Therefore, the Court DENIES their motion for a preliminary injunction and stay.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 108.

Dated: November 20, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge